## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| In re: | (Chapter 11) |
| PREMIER KINGS, INC., *et al.*,[1] | Case No. 23-02871-TOM |
| Debtors. | Joint Administration Requested |

## DECLARATION OF DAVID M. BAKER
## IN SUPPORT OF FIRST-DAY MOTIONS

I, David M. Baker, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that the contents of this Declaration in Support of First-Day Motions are true and correct.

## BACKGROUND

1.     I, David M. Baker, am over 21 years of age and am competent to testify to the matters set forth herein.  I am the Managing Partner of Aurora Management Partners Inc., a Georgia Corporation ("Aurora").  Aurora is a financial consulting and advisory firm that specializes in providing crisis and turnaround management consulting to distressed companies. On or about June 2, 2022, Aurora was engaged by Premier Kings, Inc.; Premier Kings of Georgia, Inc., Inc.; and Premier Kings of North Alabama, LLC (collectively, "PK," or, the "Debtors") to provide certain financial and business advisory services.   Since Aurora's engagement, I have been actively involved in evaluating the Debtors' liquidity, cash management system, financial forecasting, and contingency planning.  On July 22, 2022, I was appointed as the Chief Restructuring Officer for each of the Debtors ("CRO").  In my capacity as

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification numbers, are:  Premier Kings, Inc. (3932); Premier Kings of Georgia, Inc. (9797); and Premier Kings of North Alabama, LLC (9282).  The Debtors' address is 7078 Peachtree Industrial Blvd., Suite #800, Peachtree Corners, GA 30071.  The Debtors have filed a motion for joint administration with the Court.

CRO, I am intimately familiar with the day-to-day operations of the Debtors, their businesses and financial affairs, and books and records.

2.      I am a graduate of the University of North Carolina at Chapel Hill with a degree in accounting.  I have over forty (40) years of diversified business experience in restructuring, financial management, and accounting.  I have extensive experience in the development of reorganization plans, creditor negotiations, business plan preparation and long-term forecasting, developing and implementing cost reduction programs, and financial management of public and privately held companies.  I have advised companies, boards, investors, and lender groups and served in interim management roles and led assignment in numerous districts.

3.      I submit this Declaration in support of the Debtors' chapter 11 petition, first-day applications, and motions described below (collectively, the "First-Day Motions").  To enable the Debtors to operate effectively and minimize potential adverse effects in this chapter 11 case, the Debtors have requested certain relief in the First-Day Motions.  The First Day Motions, summarized below, seek, among other things, to (a) obtain the Court's authorization to use the Debtors' secured lenders' cash collateral to continue operations and administer these chapter 11 cases; (b) ensure the continuation of the Debtors' cash management system and other business operations without interruption, (c) maintain employee morale and confidence, and (d) implement certain administrative procedures that will promote a seamless transition into chapter 11.

4.      Gaining and maintaining the support of the Debtors' employees, vendors, customers, and other key constituents, as well as maintaining the day-to-day operations of the Debtors' businesses with minimal disruption, will be critical to the Debtors' efforts in chapter 11 and their ability to maximize the recovery prospects for all interested parties.  The relief

65533/0001-45698767v1

requested in the First-Day Motions is in the best interests of the Debtors, their estates, and their creditors, and is necessary to avoid immediate and irreparable harm.

5.     Except as otherwise indicated, all facts set forth in this Declaration are offered to the best of my knowledge, information, and belief, and are based upon my personal knowledge, my review of relevant documents, information provided to me by the Debtors' management or professionals working with me or under my supervision, or my informed opinion based upon my experience and knowledge of the Debtors' industry, operations, and financial condition.  If I were called upon to testify, I could and would testify competently to the facts set forth herein.  I am authorized to submit this Declaration on behalf of the Debtors.

6.     This Declaration is intended to provide a summary overview of the Debtors' businesses and the need for their restructuring pursuant to chapter 11 of the Bankruptcy Code. Section I provides a brief overview of the Debtors' businesses.  Section II describes the Debtors' pre-petition capital structure.   Section III describes the circumstances that precipitated the commencement of the chapter 11 cases and the Debtors' objectives in the chapter 11 cases. Section IV provides a summary of the First-Day Motions and the factual bases for the relief requested therein.

## I.     **The Debtors' Businesses.**

### A.     **Corporate Structure and Governance.**

7.     The Debtors are four (4) entities named Premier Kings, Inc., which is a corporation formed under the laws of Alabama ("PK Inc."); Premier Kings of Georgia, Inc., which is a corporation formed under the laws of Georgia ("PKGA Inc."); and Premier Kings of North Alabama, LLC, which is a single-member Limited Liability Company formed under the laws of Alabama ("PKNA LLC").  The Debtors have a number of affiliates that own real estate leased to Burger King or Popeyes restaurants, or operate other restaurant brands.  As of the

65533/0001-45698767v1

Petition Date, the sole owner/member of each of the Debtors is Joginder Sidhu, Personal Representative for the Estate of Manraj Sidhu (deceased).  The Debtors' fiscal year runs from January 1 to December 31.

**B.    Overview of the Debtors' Business Operations.**

8.    PK was founded in 2009 by Manraj "Patrick" Sidhu ("Mr. Sidhu") for the purpose of owning and operating Burger King restaurants (each, a "Restaurant" or "Store," and, collectively, the "Restaurants" or the "Stores") as franchisee pursuant to franchise agreements with Burger King Corporate, Inc. ("BKCI").  Beginning with six (6) Restaurants in or around Birmingham, Alabama in early 2010, the Debtors later added 34 locations to the portfolio throughout Alabama, Georgia, and Tennessee over the course of 2014. The Debtors opened an eighth (8) store in September of 2015 and expanded to 32 stores in Huntsville, Alabama and 22 in Birmingham, Alabama. PK continued to grow between 2015 and 2021, opening 115 additional locations in Tennessee, Florida, and South Carolina.  As of the Petition Date, PK Inc. owns 53 Restaurants, PKGA Inc. owns 82 Restaurants, and PKNA LLC owns 39 Restaurants.  Operating these Restaurants, the Debtors achieved sales of $233.3 and $255 million in calendar years 2021 and 2020, respectively, while employing nearly 3,600 employees.

9.    Unfortunately, Mr. Sidhu passed away unexpectedly on May 24, 2022, which triggered great operational instability for PK's existing Restaurants, as Mr. Sidhu was not only the sole stockholder or member, but also sole manager.  Upon Mr. Sidhu's tragic death, Joginder Sidhu became the Personal Representative of Mr. Sidhu's estate (the "Estate Representative") and, as such, gained legal and operational control over the Debtors.  The Estate Representative hired Aurora on June 2, 2022 to provide financial advisory services, and later engaged me as CRO of each of the Debtors.

65533/0001-45698767v1

10.     As of the Petition Date, the Debtors continue to operate 172 Restaurants pursuant to limited license agreements with BK (the "Franchise Agreement") that were negotiated prior to the Petition Date.

C.     **The Debtors' Employees.**

11.     As of the Petition Date, the Debtors have 3,605 employees (the "Employees"), 236 of whom are on salary (the "Salaried Employees") and 3,369 of whom are paid hourly (the "Hourly Employees"). The Debtors' employee workforce is comprised of 3,540 restaurant-level employees, who perform functions necessary to prepare and serve food, receive and stock inventory, and handle daily upkeep. An additional 65 employees are Area Directors, Directors of Operations, Regional Vice Presidents, Corporate Administrators, or who perform maintenance functions. Five Hundred Eighty-Five (585) of the Employees work full time. Full-time Employees are those who are regularly scheduled to work at least 30 hours per week (the "Full-Time Employees"). Three thousand Forty-Seven (3,047) of the Employees work part time. Part-time Employees are those who are regularly scheduled to work less than 30 hours per week (the "Part-Time Employees").

D.     **The Debtors' Recent Financials.**

12.     For the fiscal year ending December 31, 2022, the Debtors had sales of $223.0 million and suffered a net operating loss of $27.0 million.

13.     As of September 30, 2023, the Debtors' balance sheets reflect assets of approximately $134.5 million and liabilities of approximately $123.1 million.

II.     **The Debtors' Prepetition Capital Structure.**

14.     On February 25, 2021, PK Inc., PKGA Inc., and PKNA LLC, each in its capacity as Borrower (the "Debtor Loan Parties"), entered into that certain Second Amended and Restated

65533/0001-45698767v1

Credit Agreement (as amended by that certain First Amendment to Credit Agreement, dated as of May 18, 2023, and as further amended, supplemented, or modified from time to time prior to the date hereof, the "Prepetition Credit Agreement") with, among others, Wells Fargo National Bank, in its capacity as Prepetition agent (the "Prepetition Agent") and the lenders thereunder (the "Prepetition Lenders" or the "Lender Group").[2]

15.     Also on February 25, 2021, PK Inc., PKGA Inc., and PKNA LLC entered into that certain Pledge and Security Agreement (the "Prepetition Security Agreement") with the Prepetition Agent. Pursuant to the Prepetition Security Agreement, each of the Debtor Loan Parties granted to the Prepetition Agent, for the benefit of the Prepetition Term Loan Lenders (as defined below), security interests in and liens on substantially all of their assets (the "Prepetition Collateral").

**III.    The Need for Chapter 11 Relief and the Events Leading to the Commencement of the Chapter 11 Cases.**

    **A.    Events Leading to Chapter 11 Filing.**

16.     Like many other businesses, and particularly restaurants, the Debtors have faced significant challenges over the past few years. Most importantly, however, was the sudden and unexpected passing of its sole member, Mr. Sidhu, on May 24, 2022. This tragic loss, coupled with various macroeconomic factors, has caused tremendous uncertainty and disruption within the business. Those factors include, among others, the national impact of the COVID-19 pandemic on restaurant operations, high inflation, increased borrowing rates, and an increasingly limited qualified labor force.

---

[2] Capitalized terms used in this section but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Prepetition Credit Agreement.

65533/0001-45698767v1

17.     Following the death of Mr. Sidhu, and based on the performance of the Restaurants and the managerial and capital needs to operate, the Estate Representative determined in consultation with the CRO and various professionals that a sale of PK's assets was necessary to preserve the go-forward value of PK's businesses and to maximize the return to creditors. PK retained Raymond James & Associates, Inc. ("Raymond James") as the investment banker to commence a marketing process and to solicit interest for the purchase of the Debtors' assets (the "Sale Process"). Raymond James has engaged, and continues to engage, in a robust and sophisticated marketing campaign designed to maximize the value of the Debtors' estates and the return to creditors.

18.     However, due to low performance and increasing losses, the Debtors, with the advice of their professionals, made the difficult decision to close several Restaurants in an attempt to avoid further losses and to stabilize the business in anticipation of a sale. Unfortunately, these cost-cutting measures have not been sufficient to correct or prevent the Debtors' insolvency. Facing increased pressure from landlords, vendors, and secured lenders, and with a fragile liquidity position, the Debtors have no choice but to seek relief in this Court in order to reorganize its business in chapter 11.

   **B.     Proposed Course of the Chapter 11 Cases.**

19.     As reflected in the Debtors' cash flow forecast, the Debtors' business can remain operational as a going concern as long as the Debtors are permitted to use the Lender Group's cash collateral. The Debtors believe that those funds, along with cash-on-hand and revenue generated from their ongoing business, will provide the stability and liquidity needed to achieve a successful result in these chapter 11 cases through a sale process. Without use of these funds, however, the Debtors would ultimately be unable to pay their payroll or purchase supplies and would be prevented from operating their business long enough to market and sell the assets, thus

7

impairing the Debtors' ability to preserve the value of their business and the estates for the benefit of all stakeholders.

20.     The Debtors intend to operate their business during these chapter 11 cases while seeking to conduct a prompt sale process pursuant to the Bidding Procedures Motion and Sale Motion, both filed contemporaneously herewith.

## IV.     The Debtors' First-Day Motions.[3]

21.     Concurrently with the filing of these chapter 11 cases, the Debtors filed a number of First-Day Motions.  The Debtors anticipate that the Court will conduct a hearing soon after the commencement of these cases (the "First-Day Hearing") to consider the First-Day Motions.

22.     An important and critical element to the success of these chapter 11 cases will be the entry of orders granting the relief requested in each of the First-Day Motions.  Generally, the First-Day Motions are designed to facilitate: (a) the continuation of business operations without interruption, and to approve the Debtors' use of the Lender Group's cash collateral; (b) preservation of customer and vendor relationships; and (c) maintenance of employee morale and confidence.  The factual background in support of each First-Day Motion is provided below:

> **a)     Motion of the Debtors and Debtors-In-Possession for Entry of Interim and Final Orders (I) Authorizing Postpetition Use of Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, and (III) Scheduling a Final Hearing, and (IV) Granting Related Relief (the "Cash Collateral Motion").**

23.     By the Cash Collateral Motion, the Debtors are seeking interim and final orders authorizing the use of Cash Collateral (as defined in the Cash Collateral Motion) in order to fund the Debtors' ongoing business operations, as well as the fees and expenses of administering these

---

[3] Capitalized terms not defined herein shall have the meaning ascribed to them in the respective First-Day Motions.

65533/0001-45698767v1

Chapter 11 Cases, to the extent approved by the Court, and to provide for adequate protection to the Lender Group in connection with the use of Cash Collateral.

24.     Entry of the Cash Collateral Orders will significantly contribute to the success of this case by providing the Debtors with the liquidity necessary to preserve their businesses as a going concern and allow for a sale process to maximize the value of their assets for the benefit of the Debtors, their estates, and their creditors. The Debtors require access to the Prepetition Collateral, including Cash Collateral, to satisfy payroll, pay suppliers, meet overhead, pay utility expenses, make adequate protection payments, and pay professionals, as well as to make any other payments permitted or required under the Interim Order. The ability to satisfy these expenses as and when due is essential to the continued management, operation, and preservation of the Debtors' businesses and properties during the pendency of these proceedings and to avoid immediate and irreparable harm to their estates. In the normal course of business, the Debtors use cash on hand and cash flow from operations and other sources to fund working capital, capital expenditures, and for maintenance of their businesses and properties. Absent access to Cash Collateral, the Debtors will not have adequate unencumbered cash on hand to pay these necessary expenses, and therefore, the uninterrupted use of Cash Collateral is critical.

25.     Specifically, the Debtors seek authority to use $11,118,311.00 of the Cash Collateral upon entry of the Interim Order, for use during the interim period prior to entry of the Final Order.

26.     The Debtors and their advisors continue their good faith arm's-length negotiations with the Lender Group and expect to obtain the Required Prepetition Lenders consent to the use of Cash Collateral by the Debtors subject to various material terms and conditions set forth in the Cash Collateral Motion and the proposed interim and final orders, including, among other terms,

9

the Debtors' compliance with an Approved Budget, the Debtors' grant of various claims, rights and benefits (the "Adequate Protection Obligations") to the Lender Group, and the Debtors' agreement to certain releases and covenants.

27. The terms and conditions of the Debtors' use of Cash Collateral as set forth in the Cash Collateral Motion, the proposed Interim Order, and the Approved Budget (a) are, in my belief, taken as a whole, fair and reasonable under the circumstances; (b) reflect the Debtors' reasonable exercise of business judgment consistent with their fiduciary duties; and (c) are supported by reasonably equivalent value and fair consideration.

28. For the reasons set forth above and in the Cash Collateral Motion and proposed Interim and Final Orders, it is my belief that that the requested use of Cash Collateral and the proposed protections afforded to the Lender Group are reasonable and appropriate, and in the best interests of the Debtors, their estates, and creditors, and therefore should be authorized and approved by this Court.

29. Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Collateral Motion should be approved.

       **b)** **Motion of the Debtors and Debtors-In-Possession for Entry of Interim and Final Orders Authorizing Payment of Prepetition Payroll Obligations, Employee Benefits and Related Items, and the Continuation of Certain Employment Programs and Policies in the Ordinary Course (the "Employee Wages Motion").**

30. By the Employee Wages Motion, the Debtors seek entry of an interim and a final Order (i) authorizing, but not requiring, the Debtors to pay outstanding Prepetition Payroll Obligations and Employee Benefits, and (ii) authorizing the Debtors to continue to honor in the ordinary course of their businesses and perform their obligations under the Health Care Plans, HSAs, Insurance and Disability Plans, PTO Program, 401(k) Plan, and the Additional Employee

65533/0001-45698767v1

Benefits. The Debtors also seek (a) authorization for its Bank to process and honor all checks issued for payments approved by the Employee Wages Motion and, (b) authorization to reissue checks for payments approved by the Employee Wages Motion where the applicable check is dishonored post-petition

31.     As of the Petition Date, the Debtors have 3,605 employees (the "Employees"), 236 of whom are on salary (the "Salaried Employees") and 3,369 of whom are paid hourly (the "Hourly Employees"). The Debtors' employee workforce is comprised of 3,540 restaurant-level employees, who perform functions necessary to prepare and serve food, receive and stock inventory, and handle daily upkeep. An additional 65 employees are Area Directors, Directors of Operations, Regional Vice Presidents, Corporate Administrators, or who perform maintenance functions. Five Hundred Eighty-Five (558) of the Employees work full-time. Full-time Employees are those who are regularly scheduled to work at least 30 hours per week (the "Full-Time Employees"). Three thousand Forty-Seven (3,047) of the Employees work part time. Part-time Employees are those who are regularly scheduled to work less than 30 hours per week (the "Part-Time Employees").

32.     The Debtors pay Employees bi-weekly on the second Tuesday following each pay period, which begins on a Monday and ends on a Sunday. Payments to employees are handled on a centralized basis and with the assistance of a third-party payroll processor, Greenlink Human Capital Management ("Greenlink"). Prior to payday, the Debtors' payroll account is funded with enough money to cover payroll for the pay period. Greenlink calculates the payroll obligations, handles direct deposits, checks, and pays payroll taxes and other applicable deductions required by law. Greenlink charges a fee of approximately $1.85 per Employee on a

65533/0001-45698767v1

bi-weekly basis for this service, but the Debtors believe that there is no outstanding balance as of the Petition Date on account of this ordinary course service.

33.     Because the Employees are paid in arrears, as of the Petition Date, the Employees have not been paid all of their prepetition wages.  Specifically, the Employees are not scheduled to be paid until November 7, 2023 for prepetition wages covering a two-week period containing 8 pre-petition days.

34.     As of the Petition Date, the aggregate amount of accrued wages that remain unpaid to the Debtors' Employees is $1,530,908.00, with an additional $62,288.00 owing on account of related insurance, for a total of approximately $1,593,196.00 (collectively, the "Prepetition Payroll Obligations").[4]  None of the Employees the Debtors seek to pay will receive more than the cap under 11 U.S.C. § 507(a)(4)(A).  A schedule of the Prepetition Payroll Obligations is attached to the Employee Wages Motion as Exhibit C.

35.     I have been advised that the Unpaid Wages and Employee Benefits that the Debtors seek to pay with respect to the Unpaid Wages and Reimbursable Expenses are entitled to priority status under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code, to the extent they do not exceed $15,150.00 per Employee.  The Debtors would therefore be required to pay these claims in full in order to confirm a chapter 11 plan.

36.     The Debtors also maintain various employment benefit plans and policies, administered through Global Financial Services, including, without limitation, medical and prescription plans, a dental plan, a vision plan, voluntary employee-paid life insurance, short-

---

[4] For certain administrative and management level Employees, the Debtors previously implemented a retention program in or around September 2022, which was supplemented in September 2023 to include Area Directors, as well as an incentive program for management level Employees and above during October 2023.  No payments under the pre-petition retention or incentive programs are included in the Prepetition Payroll Obligations and this Motion does not seek the Court's approval of any such payments. As of the Petition Date, no amounts under either the retention or incentive program have accrued.

65533/0001-45698767v1

term disability insurance, group accident insurance and group critical care insurance, and the Debtors administer other benefit programs themselves, including paid time off and other employee benefit programs (the "Employee Benefits").

37.     As explained above, the Debtors operate their businesses with over 3,500 Employees.  The Employees' skills, knowledge, and understanding of the Debtors' businesses are the Debtors' most valuable assets.  Any disruption in the Debtors' operations from Employee resignations or poor morale could have significant negative effects on the Debtors' reorganization efforts.  Most of the Debtors' Employees (and their families) are dependent upon the wages, salaries, reimbursements and other benefits they receive from the Debtors.

38.     If amounts owed are not paid, insurance reimbursements not made, or other benefits delayed, Employees may suffer extensive personal hardship and, in some cases, will be unable to meet the "basic living" needs.  This could cause significant harm to Employees and their families and potentially make it difficult or impossible for them to continue working for the Debtors.

39.     I believe that, to avoid the risk of such Employee resignations and to maintain Employee morale, it is critical that the Debtors be authorized to pay the Employees certain compensation amounts (subject to the statutory cap) that have been earned under the Debtors' prepetition contractual obligations or practices.  It is also essential that the Debtors continue the employee programs and policies discussed in the Debtors' Motion in the ordinary course of business and on an uninterrupted basis.  Payment of these obligations and the continuation of the related programs and policies are essential to maintain employee morale and ensure that the Debtors retain its employees during this critical period.

65533/0001-45698767v1

40.     In addition, the Debtors request that all applicable banks and other financial institutions be authorized to (i) receive, process, honor, and pay any and all checks and transfer requests evidencing amounts approved under this Order whether presented prior to or after the Petition Date; (ii) reissue checks evidencing amounts approved under this Order where checks may be dishonored post-petition; and (iii) to the extent that a bank may have honored any prepetition payroll checks prior to the Petition Date, such honoring is ratified.  Any such checks are drawn on identifiable bank accounts.  Accordingly, checks other than those for the Prepetition Payroll Obligations and Employee Benefits will not be honored inadvertently. Moreover, the Debtors will have sufficient cash reserves to promptly pay all of the Prepetition Payroll Obligations and Employee Benefits, to the extent described herein, on an ongoing basis and in the ordinary course of business.

41.     In sum, the Employees' skills, knowledge, long-time relationships with customers and vendors, and understanding of the Debtors' operations and customer relations are essential to the continued operations and reorganization of the Debtors' businesses.  Without the continued services of the Employees, I believe an effective reorganization of the Debtors would not be possible.

42.     Accordingly, on behalf of the Debtors, I respectfully submit that the Employee Wages Motion should be approved.

       **c)**    **Motion of the Debtors and Debtors-In-Possession for Entry of Interim and Final Orders Approving Cash Management System and Authorizing the Debtors to Continue Using Existing Bank Accounts and Business Forms (the "<u>Cash Management Motion</u>")**

43.     By the Cash Management Motion, the Debtors respectfully request the entry of interim and final orders authorizing the Debtors to continue using the Bank Accounts, Debit Cards, and existing Cash Management System (as those terms are defined below), and to

14

continue using the Business Forms substantially in the form existing immediately before the Petition Date, without reference to their status as debtors-in-possession. The Debtors also seek authority to require the Banks to permit the Debtors' Chief Restructuring Officer, David Baker, and any Deputy Restructuring Officers appointed by Mr. Baker (the "DROs"), to sign on behalf of the Debtors with regard to all rights and obligations of the Debtors concerning the Bank Accounts and Debit Cards, including, but not limited to, for purposes of deposits, withdrawals, and charges, and to provide to Mr. Baker and the DROs the same level of access to the Bank Accounts and Debit Cards to which the Debtors are entitled by law or contract.

<u>The Debtors' Cash Management System and Bank Accounts</u>

44. In the ordinary course of business, the Debtors utilize an integrated, centralized cash management system typical of fast-food franchises, and comparable to the centralized cash management systems used by other similarly-sized companies to collect, concentrate, and disburse funds generated by its operations (as explained below, the "Cash Management System"). The Cash Management System is tailored to meet the Debtors' operating needs. The Cash Management System enables the Debtors to efficiently collect and disburse cash generated by their businesses, pay their financial obligations, centrally control and monitor corporate funds and available cash, reduce administrative expenses, and efficiently obtain accurate account balances and other financial data. I believe that it is critical that the Cash Management System remain intact to ensure seamless continuation of operations and uninterrupted collection of revenues.

45. The Cash Management System currently consists of 212 bank accounts located at Truist Financial Corporation ("Truist") and other selected banks whose branches are located near the Debtors' various store locations (collectively, with Truist, the "Banks"). A list of the

65533/0001-45698767v1

Debtors' bank accounts (collectively, the "Bank Accounts") is set forth on Exhibit C to the Cash Management Motion. A schematic diagram of the Cash Management System is attached as Exhibit D to the Cash Management Motion.

46. Each of the Debtors' restaurants (collectively, the "Restaurants," and, each, a "Restaurant") deposit cash proceeds of sales into various depository accounts (the "Depository Accounts"), and from there the funds are swept into the respective Debtors' operating accounts (the "Operating Accounts") on a daily basis from each of the Truist accounts, and once per week from each of the other select banks identified on Exhibit C to the Cash Management Motion.

47. Funds needed to pay employees, to pay vendors, and to meet other operational obligations are funded through the Operating Account. The Operating Account is maintained at Truist. All of the Debtors' Bank Accounts are insured by the Federal Deposit Insurance Corporation (the "FDIC").

48. The Debtors incur customary monthly banking fees in the approximate amount of $1,000 per month in connection with the Bank Accounts and, as of the Petition Date, the Debtors do not believe that there are any unpaid prepetition service fees.

49. The Debtors maintain over 200 Depository Accounts, each of which was selected because it has a branch located near one of the Restaurant locations. The Depository Accounts are also identified on Exhibit C to the Cash Management Motion. These Depository Accounts are an important part of the Debtors' cash management system, and if these accounts were closed, the Debtors' collection of funds would be unnecessarily delayed and the administrative burdens on the Debtors would be increased with no offsetting benefit to the Debtors, their estates, or their creditors. No checks are written from the Depository Accounts. However, I can

65533/0001-45698767v1

confirm that each of the depository accounts is FDIC insured. Thus, the funds maintained in the depository accounts are not at risk.

50.     Each of the Debtors maintains a Positive Pay, Operating Account at Truist (three Operating Accounts total). The Operating Accounts are funded from the Depository Accounts, as explained above. The Operating Accounts are a critical part of the Debtors' cash management system. If they were closed, the administrative burdens on the Debtors would similarly be increased with no benefit to the Debtors, their estates, or their creditors. Historically, the Debtors have made ACH, check, and wire transfer payments directly from the Operating Accounts to third parties in the ordinary course of their businesses. The Debtors have instructed Truist to remove all pre-authorizations for ACH transfers. As such, as of the Petition Date, there are no pre-authorized automatic wire transfers, except to fund payroll.

51.     The Operating Accounts are "Positive Pay" accounts. This system is designed to reduce potential fraud and administrative costs associated with cash management by permitting the Debtors to control the payment of checks presented to their Banks (the "Positive Pay System"). The Positive Pay System works through a sophisticated system of magnetic coding that is imprinted on each disbursement check issued against one of the Operating Accounts. Before Truist can honor any check presented against an account using the Positive Pay system, it must compare critical information magnetically encoded on that check (e.g., check number and amount) to a list of authorized checks that the Debtors electronically transmit to Truist whenever checks are written. Truist will only honor the check if all critical information is successfully verified. Furthermore, the Debtors can receive an electronic transmission from Truist at any time indicating what checks have been presented against the Operating Accounts.

65533/0001-45698767v1

52.     These key features of a Positive Pay System, while designed as a protection against fraud, can also be used in connection with the Chapter 11 Cases to ensure that the Debtors' outstanding, prepetition checks will not be honored subsequent to the Petition Date. Concurrently with the commencement of the Debtors' cases, the controller was directed to remove from the Debtors' list of authorized checks all checks then outstanding, and to promptly transmit this updated list, which will reflect no outstanding, authorized checks, to Truist. After this is done, if a check that was outstanding on the Petition Date is presented to Truist for payment, the critical information magnetically encoded on that check will not match any check on the Debtors' list of outstanding, authorized checks, and Truist will be unable to honor that check. Thus, there is virtually no risk that, if the Operating Account remains open, prepetition checks could inadvertently be honored.

53.     The Positive Pay System took significant time to implement, and any disruption thereto would cause substantial harm. It would take several weeks, at minimum, to reestablish the Positive Pay System if the Operating Accounts were to be closed and reopened. During that time, the Debtors would be required to disburse funds by either issuing wire transfer instructions—which are too costly to be used for most transactions—or to operate without the control features of the Positive Pay System, thereby exposing the Debtors to potential fraud. The resulting disruption to the Debtors' operations could have a devastating effect on their relationships with their vendors. The Debtors' reorganization efforts therefore require that the Positive Pay System continue essentially intact, and the Debtors are requesting authority to continue using the Operating Accounts and the Positive Pay System. In accordance with the pending Cash Collateral Motion, the Debtors intend to fund the Utility Account from the Operating Accounts.

65533/0001-45698767v1

54.     Each of the Debtors also maintains a controlled disbursement account at Truist, for payment of utilities that are set for auto withdrawal (the "Utility Accounts"). The Utility Account is funded by transfers from the Operating Accounts. Any funds remaining in the Utility Accounts are swept daily back into the Operating Accounts in amounts necessary to cover the Debtors' business expenditures.

55.     The Debtors have implemented a system (the "Debit Card System") whereby a pre-loaded corporate debit card (each, a "Debit Card" and, together, the "Debit Cards") are provided to the Debtors' Regional Vice Presidents, District Operators, Area Directors, Repair and Maintenance employees, IT Specialists, and certain Corporate Administrators (the "Debit Card Users"). The Debit Cards are loaded at pre-determined levels on a bi-monthly basis from three (3) funding accounts maintained at Meta Bank solely for the purpose of administering the Debit Card System (the "Debit Card Funding Accounts"). The Debit Card Funding Accounts are funded from the Debtors operating accounts once per week or on an as-needed basis and contain an aggregate of no more $50,000 at any given time. The Debit Cards are used only for the Debit Card Users' gas and restaurant level expenses.

The Debtors' Business Forms

56.     The Debtors utilize certain correspondence and business forms, such as checks and other business correspondence (the "Business Forms"), in the ordinary course of their business. Notably, the Business Forms include some preprinted checks. The Debtors also maintain books and records to document, among other things, their profits and expenses. The Debtors would incur additional expenses and delay if required to generate new forms, and therefore requests authorization to continue using their Business Forms.

The Service Charges

65533/0001-45698767v1

57.	The Debtors incur periodic service charges and other fees owed to the Banks for maintenance of the Debtors' Cash Management System, as well as other service charges and fees from their payment processors (the "Service Charges") in connection with the maintenance of the Cash Management System.  It is my belief that payment of any pre-petition Service Charges is in the best interests of the Debtors and all parties-in-interest in these Chapter 11 cases, as it will prevent unnecessary disruptions to the Cash Management System and ensure that the Debtors' receipt of funds is not delayed. Further, because the Banks and payment processors likely have setoff rights for the Service Charges, payment of pre-petition Service Charges should not alter the rights of unsecured creditors in these Chapter 11 Cases.

Continued Use of a Cash Management System and Continued
Use of Existing Bank Accounts and Business Forms Is Warranted

58.	The Cash Management System constitutes an ordinary course and essential business practice of the Debtors.  The Cash Management System provides significant benefits to the Debtors including, among other things, the ability to (i) control corporate funds, (ii) ensure the maximum availability of funds when and where necessary, and (iii) reduce costs and administrative expenses by facilitating the movement of funds and the development of more timely and accurate account information.

59.	I do not anticipate a need for the Debtors to open additional accounts, other than those that may be required as a result of this Court's orders.  The Debtors will ensure that any such new accounts shall be with a bank (a) insured by the FDIC and (b) organized under the laws of the United States or any State therein, or in the case of accounts that may carry a balance exceeding the insurance limitations set thereby, a financial institution that is sufficiently secure to justify a waiver of the requirements of Bankruptcy Code section 345(b).

20

60.     The operation of the Debtors' business requires that the Cash Management System continue during the pendency of the Chapter 11 cases.  As a practical matter, it would be time-consuming, difficult, and expensive to establish and maintain a new cash management system.  Requiring the Debtors to adopt new cash management systems at this early and critical stage of this case would be extraordinarily disruptive and harmful to their operations.  Any such disruption would have a severe and adverse impact upon the Debtors' Chapter 11 estates.  In sum, it is my belief that maintaining the existing Cash Management System is in the best interest of all parties-in-interest.

61.     It is my belief that, absent authorization to continue to use the Debtors' existing Bank Accounts, Business Forms, and Cash Management System in the ordinary course of business, significant and unnecessary disruption to the Debtor's business will occur.

62.     Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Management Motion should be approved.

> **d)     Motion of the Debtors and Debtors-In-Possession for Entry of Interim and Final Orders (I) Approving the Adequate Assurance of Payment for Future Utility Services Proposed by Debtors, (II) Prohibiting Utility Companies From Altering, Refusing, or Discontinuing Services, (III) Approving Procedures by Debtors for Resolving Additional Assurance Requests, and (IV) Setting a Final Hearing Related Thereto (the "Utilities Motion").**

63.     By the Utilities Motion, the Debtors respectfully request entry of an Interim Order and a Final Order (a) approving the Debtors' proposed form of adequate assurance of postpetition payment to their "utilities" (the "Utility Companies"), as that term is used in section 366 of the Bankruptcy Code; (b) approving Adequate-Assurance Procedures (as defined below) for resolving any objections by the Utility Companies relating to the Proposed Adequate Assurance (as defined below); and (c) prohibiting the Utility Companies from altering, refusing,

65533/0001-45698767v1

or discontinuing service to, or otherwise discriminating against, the Debtors on the basis of the commencement of these Chapter 11 Cases or a debt owed by the Debtors for services rendered prior to the Petition Date, or on account of any perceived inadequacy of the Debtors' Proposed Adequate Assurance.

64.     In the ordinary course of business, the Debtors purchase electricity, telecommunications, natural gas, water, waste management (including sewer and trash) internet, and other similar services (collectively, the "Utility Services" giving rise to "Utility Obligations") from various Utility Companies. A list of the Debtors' Utility Services and the respective Utility Companies providing such services (the "Utility Company List") is attached as Schedule I to the proposed Interim and Final Orders attached to the Utilities Motion. The Utility Company List further identifies the Projected Monthly Average of the Utility Obligations. The relief requested in the Utilities Motion pertains to all Utility Companies providing Utility Services to the Debtors and is not limited to those listed on the Utility Company List.

65.     To the best of my knowledge, there are no unpaid invoices outstanding for Utility Services. While charges for Utility Services have accrued since the last invoice issued by each of the Debtors' Utility Companies, the Debtors have not yet received invoices for those charges. Therefore, unless any unintended payment interruptions have been caused by the filing of these Chapter 11 Cases, each of the Debtors' accounts for Utility Services are "current."

66.     The Debtors intend to timely pay all undisputed prepetition and postpetition obligations owed to the Utility Companies in the ordinary course of business (the "Ordinary Course Payments"). Upon entry of an order authorizing the Debtors to use cash collateral, cash held by the Debtors as of the Petition Date will provide sufficient liquidity to pay the Utility Obligations, in the ordinary course of business, in accordance with their prepetition practice.

65533/0001-45698767v1

Further, Utility Companies holding prepetition deposits will be authorized to maintain those deposits in compliance with the General Rules of the Alabama Public Service Commission.

67.     It is my belief that the Ordinary Course Payments, along with the maintenance of any prepetition deposits, (together, the "Proposed Adequate Assurance") constitutes sufficient adequate assurance of the Utility Companies in full satisfaction of section 366 of the Bankruptcy Code. The Proposed Adequate Assurance will result in no prejudice to the Utility Companies and places them in the same position, from a loss, risk, and payment standpoint, as if these Chapter 11 Cases were not filed.

68.     Moreover, in the event that any Utility Company requests additional adequate assurance of payment pursuant to Bankruptcy Code section 366(c)(2), the Debtors propose that such requests be addressed pursuant to the "Adequate Assurance Procedures" set forth in the Utilities Motion.

69.     Uninterrupted Utility Services are essential to the Debtors' ongoing business operations and thus, the overall success of these Chapter 11 Cases. Should any Utility Company refuse or discontinue service, even for a brief period, the Debtors' business operations would be severely disrupted, and such disruption would jeopardize the Debtors' ability to manage their reorganization efforts. Further, feasible alternative utility providers do not exist for most of the stores, or the Debtors would incur substantial costs in finding alternative providers. Accordingly, I believe that it is essential that the Utility Services continue uninterrupted during the Chapter 11 Cases

70.     Moreover, the proposed Adequate Assurance Procedures will allow the Debtors to avoid a chaotic set of circumstances where a Utility Company could make a last-minute demand

23

65533/0001-45698767v1

for adequate assurance that would force the Debtors to pay under the threat of losing critical Utility Services

71.     Accordingly, on behalf of the Debtors, I respectfully submit that the Utilities Motion should be approved.

> **e)**     **Motion of the Debtors and Debtors-In-Possession for an Order (I) Authorizing the Debtors to Pay Prepetition Claims of Certain Critical Vendors and (II) Granting Related Relief (the "<u>Critical Vendor Motion</u>").**

72.     By the Critical Vendor Motion, the Debtors seek entry of an order (a) authorizing, but not directing, the Debtors to pay, in the ordinary course of business, undisputed, liquidated, prepetition amounts owing on account of claims held by Critical Vendors (as defined in the Critical Vendor Motion) in an amount not to exceed $1,500,000.00 and (b) granting related relief.

73.     In the ordinary course of business, the Debtors purchase goods or services from certain Critical Vendors that, as a practical matter, are the only suppliers that the Debtors can use. The Debtors' franchise agreement with Burger King provides that the Debtors must adhere to the Burger King System, including the MOD Manual, which includes Burger King's Approved Brands and Distributors List, identifying the vendors from which the Debtors can purchase food and equipment.  The franchise agreement further states that "only food, supplies, paper products and packaging from sources approved by BKC shall be used in the Franchised Restaurants."

74.     Thus, the goods and services provided by the Critical Vendors are essential for the Debtors to continue their ongoing operations within the parameters of the franchise agreement and to preserve the value of their estates.

75.     The Debtors have reviewed their accounts payable to identify those vendors that are essential to avoid irreparable harm to the Debtors' ongoing operations and their estates.  The

following critical vendors have been identified based on a number of factors, including: (i) the nature of the goods or services being supplied and their importance to the Debtors' operations; (ii) whether the supplier is a "sole source" provider; (iii) whether the Debtors can find an acceptable alternative supplier within a reasonable timeframe; (iv) whether the Debtors have sufficient goods stored or may procure sufficient services in order to continue operations while a replacement supplier is found; and (v) whether failure to pay all or part of a particular vendor's claim could cause the supplier to refuse to ship inventory or to provide essential services on a postpetition basis.

76.　　The Debtors have identified the Critical Vendors with these factors in mind.  The Debtors have further taken steps to ensure that any vendors receiving payment of prepetition claims will continue to operate on a postpetition basis in accordance with the terms of the Debtors' prepetition dealings with each Critical Vendor (the "Existing Trade Terms").

77.　　Here, the Critical Vendors are essential to the Debtors' ongoing operations and to maintain the value of the Debtors' estates as going concern for their creditors.  The Debtors serve customers daily and need to maintain their relationships with these Critical Vendors in order to do so.  If the Debtors miss even a single delivery from the Critical Vendors, it will jeopardize the Debtors' relationship with their retail customers and ultimately their reputation among consumers.

78.　　As explained above, the Debtors have been engaged in the operation of their franchise locations for many years and are acutely aware of the availability of the supplies necessary to operate their locations.  As a practical matter, the Debtors must utilize vendors in compliance with requirements under their franchise agreements.  Moreover, even if hypothetical other vendors were available, the Debtors' fresh food requirements dictate that they cannot afford

65533/0001-45698767v1

the downtime required to locate, engage, and obtain approval of replacement vendors. For example, the Debtors do not purchase frozen beef or poultry. They receive fresh beef and poultry with use by dates that are typically 5–7 days from the date of delivery. The velocity of this inventory turnover does not allow for even a day of missed deliveries.

79. I have also been advised that the Critical Vendors here may be entitled to administrative priority pursuant to section 503(b)(9) of the Bankruptcy Code. To the extent that Critical Vendors are entitled to administrative priority, I have been advised that the payment of such claims will not deplete the pool of assets generally available to other unsecured creditors.

80. For these reasons, it is imperative that the Debtors be permitted to pay their prepetition obligations to the Critical Vendors in order to maintain their ongoing operations and preserve the value of their estates.

81. Accordingly, on behalf of the Debtors, I respectfully submit that the Critical Vendor Motion should be approved.

    **f)**  **Motion of the Debtors and Debtors-in-Possession for Entry of an Order Authorizing the Debtors to Pay Prepetition Sales Taxes (the "Taxes Motion").**

82. By the Taxes Motion, the Debtors seek entry of an order authorizing them to pay certain prepetition sales taxes (the "Sales Taxes") to certain sales taxing authorities identified on Exhibit B to the Taxes Motion (the "Taxing Authorities").

83. The Debtors are required to collect Sales Taxes from purchasers at their restaurants on a per sale basis. The Debtors periodically remit the Sales Taxes to the Taxing Authorities. Prior to the Petition Date, the Debtors incurred tax obligations to approximately 93 Taxing Authorities.

65533/0001-45698767v1

84. The Sales Taxes generally accrue as food is sold and are calculated as a percentage of the sales price as dictated by statute. The statutory percentage of Sales Taxes that the Debtors are required to collect varies by state and county. In addition, the manner in which the Sales Taxes are remitted to the Taxing Authority differs depending on the nature of the tax and the identity of the Taxing Authority.

85. The Taxing Authorities require a monthly transfer of Sales Taxes collected on the 20th day of the month that follows the end of the tax period. The Debtors typically remit Sales Taxes through ACH transfer. As of October 25, 2023, the Debtors owed a total of $1,235,420.00 in prepetition sales taxes, payable on November 20, 2023.

86. I have been advised that the accrued prepetition Sales Taxes are given priority status pursuant to section 507(a)(8) of the Bankruptcy Code and thus must be paid in full in order to confirm a Chapter 11 plan. I have been further advised that failure to remit the Sale Taxes could result in an audit by the Taxing Authorities or the imposition of a statutory tax lien, burdening the Debtors estates and distracting from the Debtors' operations.

87. It is thus imperative that the Debtors be permitted to pay the Sales Taxes in the maximum amount of $1,235,420.00 in order to avoid irreparable harm to the Debtors' estates and therefore to creditors. Accordingly, on behalf of the Debtors, I respectfully submit that the Taxes Motion should be approved.

      **g)** **Motion of the Debtors and Debtors-In-Possession for Entry of an Order Extending the Time to File Schedules of Assets and Liabilities and Statement of Financial Affairs (the "<u>Schedules and SOFA Motion</u>").**

88. By the Schedules and SOFA Motion, the Debtors seek entry of an order granting a thirty (30) day extension of the fourteen-day deadline provided by Bankruptcy Rule 1007(c),

65533/0001-45698767v1

which will provide the Debtors with a total of forty-four (44) days after the Petition Date to file the Schedules and Statements of Financial Affairs ("SOFA").

89.     The Debtors have in excess of 200 creditors and operate 172 Burger King franchise locations throughout Alabama, Georgia, South Carolina, Tennessee, and Florida.  As set forth above, the Debtors' employee workforce is comprised of over 3,500 restaurant-level employees, who perform functions necessary to prepare and serve food, receive and stock inventory, and handle daily upkeep.  Several dozen additional Employees are Area Directors, Directors of Operation, Regional Vice Presidents, Corporate Administrators, or Employees who perform maintenance functions..  The daily operation of the Debtors' businesses requires the Debtors to maintain extensive books and records.

90.     As explained above, the Debtors retained Aurora to provide certain financial and business advisory services and later engaged me as the Debtors' Chief Restructuring Officer.  Aurora and I, along with the Debtors' other professionals, have worked diligently to stabilize the Debtors' businesses by communicating and working with their vendors and other creditors to ensure a smooth transition in the initial stages of the Chapter 11 Cases.  Aurora and I have also had to reconcile the Debtors' financial records and work with the Debtors' landlords, secured lenders, and BKCI to maintain operations.  Due to this substantial workload, the Debtors and their professionals have yet to complete the Schedules and SOFAs, and anticipate that such documents cannot reasonably be completed by the deadline established by Bankruptcy Rule 1007(c).

91.     I have been advised that Bankruptcy Rule 1007(c) provides that the Court may extend the Debtor's deadline to file its Schedules and SOFA "for cause shown."  Here, despite the efforts of the Debtors and their professionals, an extension is necessary for the proper

65533/0001-45698767v1

completion of these documents for the reasons set forth below and in the Debtors' Schedules and SOFA Motion.

92.     I submit that the increased burden placed on the Debtors' organizations and their professionals, the substantial amount of information that the Debtors must assemble and compile, and the number of employee and professional hours required to complete the Schedules and SOFAs while managing the operations of the Debtors' ongoing businesses, all constitute good and sufficient cause for granting the requested extension of time.

93.     Accordingly, on behalf of the Debtors, I respectfully submit that the Schedules and SOFA Motion should be approved.

> **h)     Motion of Debtors and Debtors-In-Possession For Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief (the "Joint Administration Motion").**

94.     By the Joint Administration Motion, the Debtors seek entry of an Order: (a) directing procedural consolidation and joint administration of these chapter 11 cases; and (b) granting related relief.  The Debtors request that one file and one docket be maintained for all of the jointly administered cases under the case of Premier Kings, Inc, and that the cases be administered under a consolidated caption.

95.     Given the integrated nature of the Debtors' operations, joint administration of the Chapter 11 Cases will provide significant administrative convenience without harming the substantive rights of any party in interest. Many of the motions, hearings, and orders in the Chapter 11 Cases will affect each debtor entity. The entry of an order directing joint administration of these Chapter 11 Cases will reduce fees and costs by avoiding duplicative filings and objections. Joint administration also will allow all parties in interest to monitor the Chapter 11 Cases with greater ease and efficiency.

65533/0001-45698767v1

96.     Moreover, joint administration will not adversely affect the Debtors' respective constituencies because this Motion seeks only administrative, not substantive, consolidation of the Debtors' estates. Parties in interest will not be harmed by the relief requested. Instead, parties in interest will benefit from the cost reductions associated with the joint administration of the Chapter 11 Cases. Consequently, it is my belief that the joint administration of these Chapter 11 Cases is in the best interests of the Debtors, their estates, their creditors, and all other parties in interest.

97.     Accordingly, on behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be approved.

      **i)**     **Motion of Debtors and Debtors-In-Possession For Entry of an Order (I) Autorizing the Debtors to File a Consolidated List of Unsecured Creditors for Giving Notice in Lieu of Submitting a Separate List for Each Debtor, (II) Authorizing the Debtors to Implement Certain Notice and Case Management Procedures, and (III) Granting Related Relief (the "Consolidated Creditor List and Notice and Case Management Procedures Motion").**

98.     By the Consolidated Creditor List and Notice and Case Management Procedures Motion, the Debtors seek entry of an Order substantially in the form attached as <u>Exhibit A</u> to the Motion: (i) authorizing the Debtors to file a consolidated list of unsecured creditors for giving notice in lieu of submitting separate lists for each Debtor, (ii) authorizing the Debtors to implement certain notice and case management procedures (the "<u>Procedures</u>"), and (iii) granting related relief.

99.     Because many creditors may be shared amongst the Debtors, the Debtors request authority to file a single, consolidated list of their 40 largest general unsecured creditors (the "<u>Top 40 List</u>"). The Top 40 List will help alleviate administrative burdens, costs, and the possibility of duplicative service.

65533/0001-45698767v1

100.     Moreover, the Debtors have numerous creditors and diverse parties in interest. Broad notice and service requirements would be expensive, administratively inefficient, and unduly burdensome on the Debtors' estates. The Debtors propose to reduce expense and administrative burden by limiting notice and service requirements pursuant to Sections 102(1)(A) and 105(a) of the Bankruptcy Code and Bankruptcy Rules 2002(m) and 9007.

101.     As explained further in the Motion, the Debtors seek authority to implement certain Procedures in connection with the administration of the Chapter 11 Cases, which establish requirements for the filing and serving of notices, motions, pleadings, applications, other requests for relief, and all documents filed in support thereof in the Chapter 11 Cases and the filing of any objections or replies thereto. As set forth more fully in the Motion, the Procedures (a) set forth the standards for notice; (b) authorize the Debtors to schedule, in cooperation with the Court, periodic omnibus hearing dates; and (c) articulate mandatory guidelines for the scheduling of hearings and objection deadlines. Furthermore, the Debtors seek to reduce expenses and administrative burdens by limiting notice and service requirements.

102.     It is my belief that approval of the Procedures is in the best interests of the Debtors, their estates, and their creditors. In addition to the discharge of their ordinary duties, the Debtors' personnel now carry the additional burdens imposed by the commencement of the Chapter 11 Cases. The Procedures, by authorizing the Debtors to schedule omnibus hearing dates and by establishing clear timelines for the filing of requests for relief, will assist the Debtors' CRO in organizing the Debtors' time and directing the attention of their personnel to issues raised in these Chapter 11 Cases. It will also reduce the cost of administration of this case.

103.     Accordingly, on behalf of the Debtors, I respectfully submit that the Consolidated Creditor List and Notice and Case Management Procedures Motion should be approved.

65533/0001-45698767v1

## CONCLUSION

104.    Approval of the Debtors' First-Day Motions is crucial to the Debtors' ability to continue its businesses.  Without the relief requested, the Debtors would be forced to cease operations and would be unable to pursue their reorganization efforts.  The requested relief will also assist the Debtors in maintaining employee morale, retaining employees, and establishing certain other administrative procedures to promote a smooth transition into, and eventually out of, chapter 11.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 25, 2023

*/s/ David M. Baker*
David M. Baker, Chief Restructuring Officer

65533/0001-45698767v1