## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| In re: | (Chapter 11) |
| PREMIER KINGS, INC., *et al.*,[1] | Case No. 23-02871-TOM |
| Debtors. | Joint Administration Requested |

### NOTICE OF FILING OF STALKING HORSE AGREEMENTS

Premier Kings, Inc., and its debtor affiliates, as debtors and debtors-in-possession in the above-captioned chapter 11 cases, hereby submit this Notice of Filing of Stalking Horse Agreements in connection with the *Motion of the Debtors and Debtors in Possession for Entry of an Order (I) Approving Bidding Procedures for the Sale of All or Substantially All the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests; (II) Approving Bid Protections for Stalking Horse Bidders; (III) Approving Procedures for Assumption and Assignment of Executory Contracts and Unexpired Leases; (IV) Scheduling an Auction for, and Hearing to Approve, the Sale of All or Substantially all of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests; (V) Approving the Form and Manner of Sale Notice; and (VI) Granting Related Relief* [Dkt. No. 42] and files the following:

- **Exhibit "A"** – Asset Purchase Agreement by and between Premier Kings, Inc. and Certain of its Affiliates, as Sellers, and Newell-Berg Alliance AL, LLC and Newell-Berg Alliance TN II, LLC, as Buyers, dated October 25, 2023.

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification numbers, are: Premier Kings, Inc. (3932); Premier Kings of Georgia, Inc. (9797); and Premier Kings of North Alabama, LLC (9282). The Debtors' address is 7078 Peachtree Industrial Blvd., Suite #800, Peachtree Corners, GA 30071. The Debtors have filed a motion for joint administration with the Court.

- **Exhibit "B"** – Asset Purchase Agreement by and between Premier Kings of Georgia, Inc., as Seller, and RRG of Jacksonville, LLC, or its Nominees, as Buyer, dated October 25, 2023.

- **Exhibit "C"** – Asset Purchase Agreement by and between Premier Kings, Inc. and Certain of its Affiliates, as Sellers, and Bulldog Restaurants, LLC, as Buyer, dated October 26, 2023.

Dated: October 27, 2023
Birmingham, Alabama

/s/ Jesse S. Vogtle, Jr.

Jesse S. Vogtle, Jr.
Eric T. Ray
HOLLAND & KNIGHT LLP
1901 Sixth Avenue North, Suite 1400
Birmingham, Alabama 35203
Telephone: (205) 226-5700
Facsimile: (205) 214-8787
jesse.vogtle@hklaw.com
etray@hklaw.com

*-and-*

COLE  SCHOTZ P.C.

Gary H. Leibowitz*
Irving E. Walker*
H.C. Jones III*
J. Michael Pardoe*
COLE SCHOTZ PC
1201 Wills Street, Suite 320
Baltimore, MD 21231
(410) 230-0660
(410) 230-0667
gleibowitz@coleschotz.com
iwalker@coleschotz.com
hjones@coleschotz.com
mpardoe@coleschotz.com

*Proposed Attorneys for the Debtors and Debtors-in-Possession*

*\* Admitted Pro Hac Vice*

**EXHIBIT "A"**

DocuSign Envelope ID: 7CBC5D31-567D-4058-A593-6147276238A9

**ASSET PURCHASE AGREEMENT**

**by and between**

**PREMIER KINGS, INC. AND CERTAIN OF ITS AFFILIATES, as Sellers**

**and**

**NEWELL-BERG ALLIANCE AL, LLC and NEWELL-BERG ALLIANCE TN II, LLC
and/or its assigns, as Buyers**

**October 25, 2023**

65533/0001-46243691v3

DocuSign Envelope ID: 7CBC5D31-567D-4058-A593-6147276238A9

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "**Agreement**") dated as of October 25, 2023 (the "**Effective Date**") is by and between Premier Kings, Inc., an Alabama corporation ("**PK**"), and its affiliate Premier Kings of North Alabama, LLC, an Alabama limited liability company ("**PKNA**", and collectively with PK, "**Sellers**"), and Newell-Berg Alliance AL, LLC, an Alabama limited liability company ("**NBAL**") and its affiliate Newell-Berg Alliance TN II, a Tennessee limited liability company ("**NBTN**") and/or its assigns (collectively with NBAL and/or its assigns "**Buyers**").  Buyers and Sellers are each referred to herein individually as a "**Party**" and collectively as the "**Parties**".  Capitalized terms used herein but not otherwise defined have the meanings ascribed to them in Article 14.

## RECITALS

**WHEREAS**, Sellers currently operate a number of retail fast food restaurants at various locations.  Sellers' stores include those listed in Exhibit A (each individual restaurant being a "**Store**" and collectively, the "**Stores**"), under the name "Burger King" pursuant to the Franchise Agreements (defined below) held by each of the Sellers, and the businesses operated at the Stores pursuant to the Franchise Agreement are collectively referred to herein as the "**Business**;"

**WHEREAS**, Sellers lease certain real property and improvements listed on Exhibit B attached hereto (the "**Leased Properties**") pursuant to lease agreements governing the Leased Properties listed on Exhibit C (the "**Existing Leases**") for the operation of the Stores;

**WHEREAS**, pursuant to this Agreement, Sellers desire to (i) assign to Buyers and Buyers desires to assume from Sellers, the Existing Leases and the Assumed Contracts (defined below), in each case subject to the terms and conditions thereof unless otherwise provided herein or as agreed to by Buyers and the third-parties to the Existing Leases and Assumed Contracts, and (ii) sell and transfer to Buyers, and Buyers desires to purchase and assume from Sellers, all of Sellers' right, title, and interest in the Assets (as defined below); and

**WHEREAS**, Sellers have advised the Buyers that Sellers intend to file a voluntary petition (the "**Petition**") for relief under Title 11 of the United States Code, 11 U.S.C. §101 et seq. (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Northern District of Alabama (the "**Bankruptcy Court**") in order to preserve and maximize the value of their Business through a Bankruptcy Court sale process as set forth below;

## AGREEMENT

**NOW, THEREFORE**, for and in consideration of the recitals and of the promises and mutual covenants, agreements, representations and warranties contained in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Buyers and Sellers agree as follows:

1

DocuSign Envelope ID: 7CBC5D31-567D-4058-A593-6147276238A9

# ARTICLE 1
# PURCHASE AND SALE OF ASSETS; EXCLUDED ASSETS

Section 1.1    Assets to be Sold. At the Effective Time (as defined in Section 5.5 below), on the terms and subject to the conditions set forth in this Agreements, Sellers will sell, assign, transfer, convey and deliver to Buyers, and Buyers agrees to purchase, accept, acquire, assume, and take assignment and delivery from Sellers, the following assets (collectively, the "**Assets**"):

(a)    Leased Property. All of Sellers' right, title and interest in, or the assumption and assignment to Buyers where applicable, the Leased Properties pursuant to the Existing Leases, along with all of Sellers' right, title and interest, if any, in and to all buildings, improvements, easements, appurtenances, rights and privileges belonging or appertaining to the Leased Properties;

(b)    Equipment.  All of Sellers' rights, title, and interest in and to, or to the extent leased by Sellers, the assignment and assumption of the Equipment located at the Stores on the Closing Date.  For purposes of this Agreement, "**Equipment**" means all furniture, furnishings, fixtures, signage, security systems, point-of-sale systems, computer equipment, alarm systems, cameras, kitchen equipment, equipment, and machinery within the four walls of each Store, including such Equipment leased by Seller.

(c)    Inventory.  All inventory (including without limitation, food, supplies, paper, cleaning and marketing supplies) of Sellers held for use or sale by Sellers in connection with the operation of the Business at the Effective Time (the "**Inventory**"). Following the close of business on the day which is five (5) days prior to the Closing Date, Buyers and Sellers together shall audit the Inventory at the Stores as set forth in Section 3.4(c) below;

(d)    Leases and Contracts.  To the extent assignable without the consent of any third party and to the extent relating solely to the Leased Properties or the Business, all of Sellers' right, title, and interest in those certain contracts, service agreements, disposal agreements, leases (specifically including the Leases and Equipment leases), license agreements, commitments, purchase orders, business arrangements, governmental contracts, and all amendments, modifications and assignments thereof, which directly and exclusively relate to the operation of the Leased Properties or the Business and which (and only to the extent that) Buyers expressly agrees to assume in writing (the "**Assumed Contracts**"), except to the extent third parties require (or Buyers and Sellers agree to) termination of existing contracts and execution of new or replacement agreements by Buyers in connection with the transactions contemplated herein;

(e)    Permits.   To the extent assignable, all of the permits, approvals, authorizations, registrations, licenses, certificates of occupancy, variances, orders, rulings, and decrees or permissions from any Governmental Entity or any entity or Person which directly and exclusively relate to the operation of the Leased Properties or the Business or the ownership of the Assets (the "**Permits**"); and

65533/0001-46243691v3

(f)     Other Assets.   To the extent assignable without the consent of any third party, all telephone and fax numbers for the Stores, warranties and guarantees, and any other assets of Seller located within the four walls of each Store immediately prior to the Effective Time or necessary for the ongoing operation of the Business, to the extent owned by Sellers, other than Excluded Assets as described in Section 1.2.

Section 1.2     Excluded Assets.   Notwithstanding anything in this Agreement to the contrary, Buyers will not acquire from Sellers any of Sellers' assets listed on Schedule 1.2 (the "**Excluded Assets**").   The Parties, upon mutual agreement, may amend the Schedules and Exhibits included herewith at any time on or before the Closing Date in order to include or exclude any additional Assets or Excluded Assets.

## ARTICLE 2
## ASSUMPTION OF LIABILITIES

Section 2.1     Liabilities Assumed.   Except as expressly provided herein, Buyers shall not assume any liabilities of Sellers, including any liabilities stemming from a bank, bank holding company, debt fund, private creditor, or any other lending institution.   Buyers shall not assume any liabilities of Sellers under any contract which first accrued and was to be performed prior to the Closing Date or which otherwise relate to any period prior to the Closing Date or any liability of Sellers arising out of or resulting from its compliance or noncompliance with any law, rules, or regulations of any Governmental Entity, except as Buyers may agree as a condition for assignment of any such contract to Buyers.   Upon the terms and subject to the conditions set forth in this Agreement, at the Effective Time, Buyers shall assume and thereafter shall perform and discharge, (i) Sellers' obligations arising on and after the Effective Time under the Assumed Contracts and the Existing Leases (each if assigned as contemplated by this Agreement; and (ii) those obligations and liabilities arising out Buyers' ownership or operation of the Assets and Business from and after the Effective Time (the "**Assumed Liabilities**").

## ARTICLE 3
## PURCHASE PRICE AND ADJUSTMENT

Section 3.1     Purchase Price.   The consideration to be paid by Buyers to Sellers on the Closing Date for the Assets shall be via wire transfer of good and collected funds in the amount of Eighteen Million Five Hundred Thousand Dollars ($18,500,000.00) (the "**Initial Purchase Price**"), plus the adjustments as set forth in Section 3.4 (all such amounts collectively, the "**Purchase Price**"), *minus* the amount of the Good Faith Deposit (as defined below), to Sellers in immediately available funds by wire transfer to an account designated by Sellers

Section 3.2     Good Faith Deposit.   Upon the execution and delivery of this Agreement, Buyers shall deposit a cash payment equal to One Million Eight Hundred Fifty Thousand Dollars ($1,850,000) (the "**Good Faith Deposit**") which shall be placed in a non-interest-bearing account with an escrow agent to be identified by the Sellers, subject to Buyers' approval which shall not be unreasonably withheld (the "**Escrow Agent**").   If Buyers fails to make the Good Faith Deposit in a timely manner, then Sellers shall have the right to terminate this Agreement and Buyers shall have no further rights hereunder.   The Good Faith Deposit and Escrow Agent's duties hereunder shall be further subject to the provisions set forth on Schedule 3.2 attached hereto, or if applicable, a

separate escrow agreement to which the Parties may mutually agree to replace the provisions of Schedule 3.2. Upon Closing of the sale of the Assets under this Agreement, the Good Faith Deposit shall be released to Sellers and applied to the Purchase Price at Closing.

Section 3.3    Tax Allocations. Sellers and Buyers agree that (i) the Purchase Price will be allocated for state and federal income tax purposes as agreed in good faith by Buyers and Sellers and shall be based on appraisals or agreed values of the Assets, and (ii) after the Closing, neither party will take any position or action in connection with complying with the Internal Revenue Code (the "**Code**") and the regulations promulgated thereunder, inconsistent with such allocations. If required by the Code, both Buyers and Sellers agree to execute the appropriate tax forms to acknowledge such allocations. Allocation Schedule is attached as Schedule 3.3.

Section 3.4    Adjustment of the Purchase Price. The Purchase Price will be adjusted at the Closing as follows:

(a)    Tax Prorations between Buyers and Sellers. All ad valorem property and personal taxes payable upon the Assets will be prorated between Sellers and Buyers for the tax year in which the Closing is held on the basis of the tax statements for such year; provided, however, that if tax statements for the current year are not available as of the Closing Date, the tax proration between Sellers and Buyers will be made on the basis of the taxes for the immediately prior tax year. Notwithstanding anything to the contrary, the tax proration made at Closing will be a final proration between Buyers and Sellers.

(b)    Store Bank Accounts and Deposits in Transit. In addition to the Purchase Price and payment for Inventory provided below, Buyers shall pay at Closing a good faith estimate of cash amounts held as "store banks" as daily operating cash for amounts generated prior to the Effective Time but held in the cash registers or other repositories at the Stores or on behalf of the Stores at the Effective Time with a true up post-Closing at an amount determined in accordance with this Section 3.4(b), and Sellers shall be entitled to retain all cash generated prior to the Effective Time but held in transit for deposit, whether at the Stores or otherwise. Following the close of business the day prior to the Closing Date, Buyers and Sellers together shall audit the cash registers and other repositories at the Stores or on behalf of the Stores to determine the amount of cash held as "store banks" at the Effective Time. Buyers shall pay to Sellers, or Sellers shall pay to Buyers, as appropriate, without offset for any reason, the difference between the actual cash amount in the store banks and the estimate paid at Closing within thirty (30) days following the Closing.

(c)    Inventory Audit and Payment. In addition to the Purchase Price and the payment for "store banks" as provided above, at Closing, the Purchase Price shall be adjusted for Inventory in accordance with this Section 3.4(c). No earlier than three (3) days prior to the Closing Date, Buyers and Sellers together shall audit the Inventory and from said audit determine the amount and value (based on Sellers' actual cost without mark-up) of all Inventory on hand (the "**Inventory Audit Value**"). At the Closing, the Purchase Price shall be increased by an amount equal to the difference between (i) the Inventory Audit Value *plus* any additional deliveries of Inventory to the Stores between the time of the Inventory audit and the Effective Time and (ii) the estimated value of Inventory to be

consumed at the Stores between the time of the Inventory audit and the Effective Time (as determined using Sellers' historical operational data for the Stores).

(d)  Expenses.  Operational expenses directly related to the Assets and the Business, including, without limitation, Assumed Contract expenses, utilities and rent (including sales tax on rent), will be prorated with Sellers being responsible for those expenses accruing prior to the Effective Time and Buyers being responsible for those expenses accruing at or after the Effective Time.  Utilities shall be paid by Sellers to the Closing Date and the accounts closed or assigned to Buyers effective as of Closing.  If the closing or assigning of Sellers' operating accounts with utility and other providers, and opening of Buyers' operating accounts with same, is impractical or would cause an interruption in service (the Parties shall work in good faith to ensure a smooth transition and avoid any interruption in service), utilities, deposits and similar expenses shall be adjusted as of Closing and settled within thirty (30) days after Closing.

(e)  Security Deposits.  At the option of Sellers, Sellers shall ether (i) retain all rights to any security deposits paid by Sellers and held by landlords, Franchisor, or utilities under any Existing Leases, the Franchise Agreements, or other agreements, or (ii) at Closing Sellers shall assign such security deposits to Buyers and the Buyers shall pay to Sellers an amount equal to the amount of such security deposits.

# ARTICLE 4
# BANKRUPTCY COURT MATTERS

Section 4.1    Competing Bids and Break-Up Fee

(a)  This Agreement is subject to approval by the Bankruptcy Court and the consideration by Sellers of higher or better competing bids (each a "**Competing Bid**"). Buyers shall have the right to bid against any Competing Bids.

(b)  In the event that Buyers is not the winning bidder at any Auction held in the bankruptcy case, as set forth below, and the Sellers complete closing of a sale of the Assets with another bidder, Sellers shall pay Buyers, as consideration for Buyers' entry into this Agreement and reimbursement of expenses incurred in connection herewith, a "break-up fee" equal to Four Hundred Sixty Two Thousand Five Hundred Dollars ($462,500.00) (the "**Break-Up Fee**") plus an expense reimbursement of actual and documented expenses incurred by Buyer not to exceed One Hundred Fifty Thousand Dollars ($150,000.00) (the "**Expense Reimbursement**, and together with the Break-Up Fee, the "**Stalking Horse Bid Protections**").  The Stalking Horse Bid Protections shall be paid by Sellers to Buyers from the proceeds of and at the closing on the sale of the Assets approved by the Bankruptcy Court.  This provision shall survive termination of this Agreement.

(c)  The Sale Motion and Procedures

(i)    <u>Sale Motion and Bid Procedures Order</u>.  Within the earlier of (i) fourteen (14) Business Days following the complete execution of this Agreement or (ii) two (2) Business Days after the date of the Petition, Seller shall file with the Bankruptcy Court the Petition and one or more motions ("**Sale Motion**"), subject to higher and better bids, as well as entry of an Order of the Bankruptcy Court approving the procedures for submission and consideration of Competing Bids ("**Bid Procedures Order**").  The Sale Motion shall include procedures for the assumption of and assignment to Buyers of the Assumed Contracts.  The Bid Procedures Order will include provisions for approval of the Stalking Horse Bid Protections as well as provisions governing the submission of Competing Bids. The form of the Sale Motion and Bid Procedures Order are subject to review and comment (but not approval) by the Buyers.  Sellers shall serve all counterparties to leases and contracts that are being assumed by the Sellers and assigned to Buyers under this Agreement a notice of proposed assumption and assignment of unexpired leases and executory contract and cure which shall include a deadline for counterparty objections and a procedure for resolution of objections. Cure amounts, whether agreed to by counterparties or set by the Court shall be paid from the Purchase Price.  Bankruptcy Court approval of the Sellers' assumption and assignment of executory contracts and unexpired leases to Buyers shall be incorporated in the Sale Order.  The form of the notice to lease and contract counterparties shall be subject to review and comment (but not approval) by Buyers.

(ii)    <u>Auction</u>.  In the event that Sellers receive one or more Competing Bids Sellers determine, in their sole discretion, that is a qualified bid higher or better than the Purchase Price provided under this Agreement, then Sellers shall schedule and conduct an auction to be conducted in the manner set forth in the Bid Procedures Order, during which Buyers and any qualified bidder will be permitted to submit higher and better bids (the "**Auction**").  At minimum, to become a qualified bidder a competing bidder must make a good faith deposit equal to or greater than the Good Faith Deposit of the Buyers, provide evidence that, in the Sellers' judgment and sole discretion, the competing bidder should be qualified as a franchisee by the Franchisor, and offer an overbid price with an Asset Purchase Agreement in a form similar to this Agreement with a mark-up showing the changes made to this Agreement. At the conclusion of the Auction, Sellers shall select the winning bid based on the Sellers' determination, in their sole discretion, of which bid is the highest or best bid.  The Sellers also may select, in the Sellers' sole discretion, the second best bid, which shall be designated as the "**Back-up Bidder**", with the understanding that if for any reason the winning bidder fails to close as required by the applicable purchase agreement approved by the Bankruptcy Court, the Back-up Bidder shall be authorized and obligated to close on its bid for the purchase of the Assets approved by the Bankruptcy Court.

(d)    <u>Sale Order</u>.  Subject to Buyers being designated as the Successful Bidder, Sellers shall use commercially reasonable efforts to obtain entry of an Order approving the sale to Buyers under this Agreement (the "**Sale Order**"), shall not be subject to the stay in Bankr. R. Civ. P. 6004(h) and 6006(d) and is enforceable and effective immediately and

shall include a finding that the Buyers is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code. The Sale Order shall also include findings and conclusions that (i) notice of the Sale Motion and Sale Procedures Order have been provided to all entities who claim and interest or lien in the Assets, all governmental entities who may have claims against the Sellers, all utilities serving the Seller and the Assets, all persons entitled to notice under Bankr. R. Civ. P. 9010 and 2002 and all entities that expressed an interest in purchasing the Assets, (ii) the Buyers is not assuming any debts, liabilities or obligations of the Seller accrued as of the Closing Date except as otherwise set forth in this Agreement, (iii) the Buyers is not a mere continuation of the Sellers or the Sellers' bankruptcy estate and there is no continuity of enterprise between the Seller and Buyers and Buyers is not a successor of the Sellers, (iv) the transactions effecting the sale of the Assets by the Seller to the Buyers is not constitute a consolidation, merger or de facto merger of the Buyers and the Sellers or the Sellers' bankruptcy estate, (v) the Sale Order shall be binding upon the Sellers and their respective successors and assigns, including any successor Chapter 7 or 11 Trustee and (vi) the Assets are being sold and transferred to the Buyers free and clear of all liens, claims, encumbrances, lis pendens, rights of possession, contracts, covenants, options or other rights to acquire and interest in the Assets . The form of the Sale Order is subject to Buyers' review and approval, which shall include a finding that the Buyers is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.

(e)     Back-up Bidder.  In the event Buyers is not determined to be the Successful Bidder under the Bid Procedures Order process and the Successful Bidder fails to close, Buyers agrees, after receiving notice of such failure, to consummate the transactions in accordance with the terms of this Agreement, as modified pursuant to any increase in the Purchase Price made by Buyers during the bidding process, as the Back-Up Bidder.

## ARTICLE 5
## CLOSING

Section 5.1     Closing; Risk of Loss.

(a)     Consummation of the transactions contemplated by this Agreement (the "**Closing**" will be held at a location, time, manner, and date (the "**Closing Date**") to be agreed upon by the Parties within ten (10) Business Days following entry of the Sale Order.

(b)     The risk of loss for the Assets will be borne by Sellers until the Closing and by Buyers after the Closing.

Section 5.2     Buyers' Closing Expenses.     Except as otherwise provided in this Agreement, Buyers will pay the following Closing expenses:

(a)     Fees for any type of inspection or audit that may be required by Buyers to determine whether the Assets are suitable for the purposes for which Buyers, or its assigns may intend;

(b)     Fees of Buyers' attorneys, accountants, consultants and other advisors;

(c)     All commissions which arise from the inaccuracy of Buyers' representations in <u>Section 7.5</u> below;

(d)     All costs, fees and expenses attributable to Buyers' financing;

(e)     All transfer fees, extension fees, and other fees, charges or requirements of Franchisor, including but not limited to all scopes of work (or similar property improvements required by the Franchisor) and all franchise related fees and charges arising out of the transaction contemplated in this Agreement, <u>excluding</u> any such fees outstanding or otherwise in arrears and any associated penalties, late fees, or reinstatement fees of the Franchisor as provided under the Franchise Agreements as of the Closing Date;

(f)     Any and all sales, use, transfer, mortgage, documentary and like taxes and/or stamps required to be paid in connection with the transactions contemplated hereby; and

(g)     Costs for all other items for which Buyers is responsible under this Agreement.

(h)     For the avoidance of doubt, Buyers shall not be responsible for any investment banking or broker fees, commissions, or payments of any kind claimed by any professional previously engaged by Sellers.

Section 5.3     <u>Sellers' Closing Expenses</u>.  Except as otherwise provided in this Agreement, Sellers will pay the following Closing expenses:

(a)     Fees of Sellers' attorneys, investment bankers, accountants, consultants and other professionals and advisors; and

(b)     Costs for all other items for which Sellers are expressly responsible under this Agreement.

Section 5.4     <u>Waiver of all other Warranties</u>.  Except as expressly provided in <u>Article 6</u> and any express warranties of title contained in the closing documents contemplated in Section 5.6, the Assets will be conveyed "as is, where is", with all faults, and without any warranties, express or implied, including but not limited to warranties of title, condition, fitness for a particular purpose or habitability.  Buyers acknowledges that other than as specifically provided in this Agreement, Sellers have made no representation, warranty or guaranty, express or implied, oral or written, past, present or future, of, as to, or including:  (a) the condition or state of repair of the Assets, including, without limitation, any condition arising in substances (which includes all substances listed as such by applicable law, all pollutants or asbestos and naturally-occurring but harmful substances such as methane or radon) on, in, under, above, upon or in the vicinity of the Assets; (b) the quality, nature, adequacy, and physical condition of the Assets, including but not limited to, the structural elements, environmental issues, appurtenances, and access; (c) the quality, nature, adequacy and physical condition of soils and geology and the existence of ground water; (d) the existence, quality, nature, adequacy and physical conditions of utilities serving the Property or Assets; (e) the development potential of the Property, its habitability, merchantability, or the fitness, suitability or adequacy of the Assets for any particular purpose; (f) the zoning or other

legal status of the Property; (g) the Property or its operations' (including the Business) compliance with any applicable codes, laws, regulations, statutes, ordinances, covenants, conditions, and restrictions of any governmental or quasi-governmental entity or of any other person or entity. Sellers and Buyers agree that this provision shall survive the execution of this Agreement and the Closing of the sale of the Assets.  Other than the express representations and warranties specifically provided in <u>Article 6</u> of this Agreement, Buyers hereby acknowledges and declares reliance solely on its own examination, inspection and evaluation of the Assets, and not on any warranties or representation, whether express or implied or written or oral, from Sellers. Except for any claims arising out of a breach of the express representations and warranties set forth in <u>Article 6</u> (subject to the limitations set forth in <u>Article 10</u>), Buyers shall have absolutely no right or cause of action against Sellers, whether in tort, contract, quasi contract or otherwise, to assert in any controversy or litigation any claim or demand arising from the sale or purchase of, or in an way related to or in connection with, the assets. Buyers hereby expressly waives and renounces its ability to rescind the sale of the assets or seek a reduction in the purchase price for any reason whatsoever under any applicable law.  All implied warranties with respect to the Assets, including those related to title and fitness for a particular purpose, will be, and are hereby disclaimed by Sellers in any controversy, claim, demand, or litigation arising from or in connection with the Assets, except with respect to a default under this Agreement, or breach of any warranty or representation made by Sellers herein.  Sellers hereby reserves the right to include, in Sellers' sole discretion, language to the effect of the foregoing waiver of warranties in any documents conveying the Assets to Buyers as contemplated in this Agreement.

Section 5.5 <u>Effective Time</u>.  Notwithstanding the actual time of the Closing, the transfer of the Assets will be effective as of 12:01 a.m. Eastern Time on the Closing Date (the "**Effective Time**").  Prorations and similar adjustments, however, shall be made as of 11:59 p.m. on the date preceding the Closing Date.

Section 5.6 <u>Execution and Delivery of Documents</u>.  At or prior to the Closing and subject to the conditions to Closing set forth in <u>Article 10</u>, Sellers and Buyers will execute and deliver to the other all documents, instruments, certificates and schedules required under this Agreement, including, but not limited to, the following:

(a) Sellers will deliver to Buyers in a form reasonably acceptable to Buyers:

(i) Assignment and Assumption of Existing Leases from Seller to Buyers, for each applicable Existing Lease, acknowledged and approved by the respective landlords if required under the applicable Existing Lease, conveying all of Sellers' rights, title and interest in each such Existing Lease in the form attached as <u>Exhibit D</u>.

(ii) A Bill of Sale in the form attached hereto as <u>Exhibit E;</u>

(iii) A certificate of active status or good standing of Sellers issued by the Secretary of State of the State of Alabama and the State of Georgia, as applicable; and

(iv)     A certificate dated as of the Effective Date of Sellers' non-foreign status as set forth in Treasury Regulation Section 1.1445-2(b).

(b)     Buyers will deliver to Sellers:

(i)     Signed counterparts, as applicable, of the documents required in Section 5.6(a)(i) and (ii);

(ii)     The Purchase Price, as adjusted pursuant to Article 3 or other provisions of this Agreement, by cash or wire transfer, with the portion of the Purchase Price sufficient to pay in full the amount owed to Seller's lenders as of Closing to be delivered by wire transfer to the Administrative Agent;

(iii)     A certified copy of resolutions of Buyers' directors, members, managers and/or shareholders authorizing this Agreement and the transactions contemplated by this Agreement; and

(iv)     A certificate of active status or good standing of Buyers issued by the Secretary of State of Alabama and the Secretary of State of Tennessee.

(c)     Buyers and Sellers will execute and deliver to one another:

(i)     An Assignment and Assumption Agreement in the form attached hereto as Exhibit F;

(ii)     A closing statement setting forth the calculation of the adjustments to the Purchase Price described in Article 3;

(iii)     Internal Revenue Service Form 8594, Asset Acquisition Statement, or similar required form attesting to the Asset allocations; and

(iv)     Any documents reasonably requested by Sellers or Buyers to effectuate the transactions and waivers contemplated by this Agreement.

Section 5.7     Simultaneous Delivery.  All payments, documents and instruments to be delivered on the Closing Date will be regarded as having been delivered simultaneously, and no document or instrument will be regarded as having been delivered until all documents and instruments being delivered on the Closing Date have been delivered.

Section 5.8     Further Acts.  Sellers and Buyers agree to (a) furnish such further information, (b) execute and deliver to the other such other documents and instruments, and (c) do such other acts and things, all as the other party reasonably requests, for the purpose of carrying out the intent of this Agreement and transfer and assignment of the Assets.

## ARTICLE 6
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Sellers hereby represent and warrant to Buyers as of the Effective Date of this Agreement and as of immediately prior to the Closing as follows:

Section 6.1    Organization and Qualification.  Each Seller (a) is an Alabama corporation and limited liability company respectively, duly formed, validly existing and in good standing under the laws of the State of Alabama; (b) has all corporate powers to own its properties and to carry on the Business as owned and operated as of the date of this Agreement; and (c) is duly qualified and is in good standing in all jurisdictions in which the nature of the Business make such qualification necessary, in each case, except where the failure to have such power or authority would not have a Material Adverse Effect on the Assets, Property, results or operations or conditions (financial or otherwise) of the Business, taken as a whole.

Section 6.2    Due Authorization; Enforceability.

(a)    The execution, delivery and performance of this Agreement by Sellers and the consummation of the transactions contemplated by this Agreement have been duly and effectively authorized by the governing authority of Sellers, as well as by all other requisite corporate action.

(b)    This Agreement and the agreements contemplated by this Agreement have been, and when executed will be, duly executed, delivered and performed by Sellers; and, assuming the due authorization, execution and delivery of this Agreement and the agreements contemplated by this Agreement by Buyers, this Agreement constitutes, and when executed will constitute, a valid and binding obligation of Sellers, enforceable against Sellers in accordance with its terms.

Section 6.3    No Violation.    The execution of this Agreement and the agreements contemplated by this Agreement by Sellers will not: (a) cause Sellers to violate any (i) law, (ii) rule or regulation of any Governmental Entity or (iii) order, writ, judgment, injunction, decree, determination or award; (b) violate or be in conflict with, or result in a breach of or constitute (with or without notice or lapse of time or both) a default under, Sellers' organizational documents; or (c) result in the creation or imposition of any Lien upon any of the Assets, in each case, except for violations, breaches, accelerations or defaults which would not, individually or in the aggregate, have a Material Adverse Effect.

Section 6.4    Compliance with Laws.  Except as disclosed on Schedule 6.4, to Sellers' Knowledge, Sellers are not in violation or default, and in carrying out the transactions described in this Agreement will not come into material violation or default, under any present laws, ordinances, regulations, orders or decrees applicable to the Business, Sellers or the Assets that could reasonably be expected to have a Material Adverse Effect.

Section 6.5    Foreign Person. Sellers are not a foreign person under Sections 1445 and 7703 of the Internal Revenue Code of 1986, as amended and regulations promulgated thereunder.

Section 6.6    Existing Leases.  Sellers have made available to Buyers, to the extent they are in Sellers' possession, true and correct copies of all Existing Leases.  Except as disclosed on Schedule 6.6 attached hereto, Seller has not received written notice of any default or breach on the part of Seller of any of the Existing Leases which has not been cured.

Section 6.7    <u>Contracts</u>.  Sellers have made available to Buyers copies of the Assumed Contracts.  Except as disclosed on <u>Schedule 6.7</u> attached hereto, Sellers have not written received notice of any default or breach on the part of Sellers under any Assumed Contract which has not been cured.

Section 6.8    <u>Permits</u>.  Sellers have made available to Buyers copies of Permits in their possession.  To the Knowledge of Sellers, the Permits are in full force and effect except where Sellers are in the process of renewing or reinstating periodic or lapsed Permits, and there is no outstanding material violation of any Permit that could reasonably be expected to have a Material Adverse Effect.

Section 6.9    <u>Legal Proceedings</u>.  Except as listed in <u>Schedule 6.9</u>, there is not pending or, to the Knowledge of Sellers, threatened, any legal, administrative, arbitration or other proceeding or investigation related to the Business or the Assets, and Sellers have no Knowledge of any circumstances that could be expected to give rise to any action, suit or proceeding against Sellers or Buyers that could reasonably be expected to have a Material Adverse Effect.

Section 6.10    <u>Equipment</u>.  As of the Effective Time, the Equipment included in the Assets will be present at each Store and no Equipment shall have been removed from a Store since the Effective Date.

Section 6.11    <u>Exclusivity of Representations and Warranties; As-Is Sale</u>.  EXCEPT AS EXPRESSLY SET FORTH IN <u>ARTICLE 6</u> OF THIS AGREEMENT OR ANY EXPRESS WARRANTIES OF TITLE IN THE CLOSING DOCUMENTS CONTEMPLATED BY <u>SECTION 5.6</u>, THE REPRESENTATIONS AND WARRANTIES MADE BY SELLERS IN THIS AGREEMENT ARE IN LIEU OF AND ARE EXCLUSIVE OF ALL OTHER REPRESENTATIONS AND WARRANTIES, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.  EXCEPT AS EXPRESSLY SET FORTH IN <u>ARTICLE 6</u> OF THIS AGREEMENT OR ANY WARRANTIES OF TITLE IN THE CLOSING DOCUMENTS CONTEMPLATED BY <u>SECTION 5.6</u>, SELLERS HEREBY DISCLAIM ANY SUCH OTHER OR IMPLIED REPRESENTATIONS OR WARRANTIES, NOTWITHSTANDING THE DELIVERY OR DISCLOSURE TO BUYERS OR ITS OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIVES OF ANY DOCUMENTATION OR OTHER INFORMATION (INCLUDING ANY FINANCIAL PROJECTIONS OR OTHER SUPPLEMENTAL DATA).  BUYERS ACKNOWLEDGES AND AGREES THAT, EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, SELLERS HAVE NOT MADE, AND HEREBY SPECIFICALLY NEGATES AND DISCLAIMS, ANY REPRESENTATIONS, WARRANTIES, COVENANTS OR AGREEMENTS OF ANY KIND OR CHARACTER REGARDING ANY ASPECT OF THE ASSETS.  BUYERS FURTHER ACKNOWLEDGES AND AGREES THAT, EXCEPT AS OTHERWISE SET FORTH IN THIS AGREEMENT, TO THE MAXIMUM EXTENT PERMITTED BY LAW THE SALE PROVIDED FOR HEREIN IS MADE ON AN "AS-IS, WHERE-IS" BASIS AS TO CONDITION WITH ALL FAULTS.

**ARTICLE 7**
**REPRESENTATIONS AND WARRANTIES OF BUYERS**

Buyers represents and warrants to Sellers that as of the Effective Date of this Agreement and as of immediately prior to the Closing as follows:

Section 7.1    Organization and Qualification.  Buyers (a) are limited liability companies duly formed, validly existing and in good standing under the laws of the State of Alabama and State of Tennessee; (b) has all necessary limited liability company powers to own its properties and to carry on its business as owned and operated as of the date of this Agreement; and (c) is duly qualified and is in good standing in all jurisdictions in which the nature of its business makes such qualification necessary, in each case, except where the failure to have such power or authority would not have a Material Adverse Effect.

Section 7.2    Due Authorization.

(a)    The execution, delivery and performance of this Agreement by Buyers and the consummation of the transactions contemplated by this Agreement have been duly and effectively authorized by the managers and members of Buyers, as well as by all other requisite company action.

(b)    This Agreement and the agreements contemplated by this Agreement have been, and when executed will be, duly executed and delivered by Buyers; and, assuming the due authorization, execution and delivery of this Agreement and the agreements contemplated by this Agreement by Sellers, this Agreement constitutes, and when executed will constitute, a valid and binding obligation of Buyers, enforceable against Buyers in accordance with its terms, except (a) to the extent enforceability may be limited by applicable bankruptcy, insolvency, reorganization or other laws affecting the enforceability of creditor's rights generally and (b) that the availability of equitable remedies, including specific performance, is subject to the discretion of the court before which any proceeding thereof may be brought.

Section 7.3    No Violation.  Buyers' execution, delivery and performance of this Agreement and the agreements contemplated by this Agreement will not: (a) cause Buyers to violate any (i) law, (ii) rule or regulation of any Governmental Entity, or (iii) order, writ, judgment, injunction, decree, determination or award; or (b) violate or be in conflict with, or result in a breach of or constitute (with or without notice or lapse of time or both) a default under, Buyers' organizational documents, in each case, except for violations, breaches, accelerations or defaults which would not individually or in the aggregate, have a Material Adverse Effect.

Section 7.4    Consents and Approvals of Governmental Bodies and Other Persons.  No consent, approval or authorization of, or declaration, filing or registration with, any Governmental Entity or any other Person applicable to Buyers is required in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated by this Agreement.

Section 7.5    Commissions.  Buyers has not incurred or become liable for any broker's commission or finder's fees related to the transactions contemplated by this Agreement.

Section 7.6    No Knowledge of Misrepresentations or Omissions.  Buyers has no knowledge that any of the representations and warranties of Sellers in this Agreement and any

disclosures made herein or in the schedules hereto are untrue or incorrect, and Buyers has no knowledge of any material errors in, or material omissions from, the schedules hereto.

Section 7.7    Buyers' Inspection.  Prior to the Closing, Buyers and/or Buyers' agent has had the opportunity to inspect the Assets and the Stores and is familiar with the Equipment located in each such Store.

## ARTICLE 8
## COVENANTS AND ACTIONS PENDING CLOSING

Section 8.1    Conduct of Business.  Between the date of this Agreement and the Closing Date, Sellers will:

(a)    maintain the operation of the Business and conduct the Business in the ordinary course and in accordance with past business practices;

(b)    maintain and repair all the tangible Assets in accordance with past business practices;

(c)    comply with all applicable laws, rules and regulations in all material respects applicable to the Business or the Assets;

(d)    maintain insurance in the ordinary course of business with respect to the Assets until the Effective Time on the Closing Date;

(e)    advertise and market the Stores and Business consistent with historical business practices;

(f)    not sell or dispose of any of the Assets other than in the ordinary course of the operation of the Business; and

(g)    not incur, assume, guarantee, create or otherwise become liable with respect to any indebtedness, borrowed money, or similar obligation, except in the ordinary course of business consistent with past practices, with respect to the Property, Equipment (regardless of who owns such equipment and how that equipment is owned), Stores, Business, or the Assets, subject to the further exceptions set forth on Schedule 7.1 hereto.

Section 8.2    Consents; Additional Agreements.  Buyers and Sellers agree to cooperate and promptly take, or cause to be taken, all action, and to cooperate and promptly do, or cause to be done, all things reasonably necessary, proper or advisable to consummate and make effective as promptly as practicable the transactions contemplated by this Agreement, including: (i) the removal of any legal impediment to the consummation or effectiveness of such transactions; and (ii) the obtaining of all necessary waivers, releases, consents, assignments, and approvals of all third parties and Governmental Bodies, and the making of all necessary filings.

Section 8.3    Confidentiality.  Buyers will hold, and will cause its respective officers, agents and employees to hold, in confidence, and not disclose to others, the terms of this Agreement, the transactions contemplated by this Agreement, and all plans, documents, contracts,

records, data analysis, compilations, forecasts, and studies and other informational material received or prepared by either of them with respect to the Assets and the Business (collectively the "**Information**") except: (a) to the extent that such Information (i) is otherwise available from third persons without restrictions on its further use or disclosure or (ii) is required by order of any Governmental Entity, any law, regulation or any reporting obligation of Buyers or Sellers; (b) to the extent such information is or becomes publicly known other than through a violation of this paragraph by the party in question; or (c) to the extent such information is provided to persons who are assisting in the consummation of the transactions contemplated hereby, or is required to be given to such third party in order to obtain any consents, approval, authorizations or disclosures contemplated by this Agreement (including, without limitation, the disclosure to representatives or employees of the Franchisor, landlord, Sellers' lenders and professionals, or any Governmental Entity).

Section 8.4      Right of First Refusal.  Sellers, with Buyers' cooperation, will provide all required information and notice to Franchisor in order that Franchisor may timely elect or waive its right of first refusal.

Section 8.5      Contact with Employees, Customers and Suppliers.  Prior to the Closing, except as otherwise mutually agreed, Buyers and its representatives shall not contact or communicate with any of the employees, customers, landlords, developers and suppliers of Sellers in connection with the transaction contemplated by this Agreement, except with the prior consent of Sellers, provided, however, (i) Buyers may contact or communicate with the Franchisor in connection with this transaction, and (ii) Sellers shall allow Buyers reasonable access to the key employees of Sellers (as mutually agreed upon by the Parties), provided that Sellers shall be allowed to have its representative(s) present at any such meeting.  Nothing herein shall be deemed to prevent Buyers' representatives currently involved in the business operations of Sellers from continuing their business activities consistent with past practices.

Section 8.6      Evidence of Buyers' Ability to Perform.  Prior to the execution of this Agreement, Buyers shall have provided Seller with written evidence, in form and substance reasonably acceptable to Sellers, of Buyers' financial ability to: (i) close the contemplated transaction under this Agreement; (ii) perform Buyers' obligations under the Assumed Contracts; and (iii) maintain the Assets and fund the operation of the Business after the Closing.

Section 8.7      Access to Seller Information. Prior to Closing, Sellers shall provide Buyers and its representatives access to the Property and Business, subject to reasonable prior notice during normal business hours, and any and all reasonably requested books and records and any other such information reasonably requested by Buyers that is in Sellers possession.

## ARTICLE 9
## PROVISIONS RESPECTING EMPLOYEES

Section 9.1      Sellers' Employees.  Immediately after the Closing, Sellers will notify all of its employees who are engaged in connection with the operation of the Business (the "**Employees**") that the Assets have been sold to Buyers.  Buyers and Sellers agree that Buyers may, but is not obligated to, offer to the Employees employment with Buyers, subject to the requirements of Section 9.2 below.  This Section 9.1 does not establish, as to any Employee, a

15

contract of employment for a definite term or any term or any contractual right that his or her employment can only be terminated for just cause, and no Employee has any rights under this Agreement as a third-party beneficiary or otherwise.

Section 9.2    WARN Act; Employee Compensation.    Buyers will retain a sufficient number of employees of Sellers such that Buyers' actions and the transactions contemplated herein will not trigger application of the requirements of the Workers Adjustment Retaining and Notification Act ("**WARN**") with respect to pre-Closing notifications to employees of Sellers and to avoid any liability on the part of Sellers to employees who may be terminated in connection with Buyers' acquisition of the Assets. Buyers shall indemnify, defend and hold harmless Sellers and its equity holders for any claims, liabilities, or other damages arising out of or related to application of the WARN act or the violation or breach of the above obligations of Buyers. Sellers shall be responsible for all employees' wages, accrued bonuses, pension benefits, vacation time, F.I.C.A. unemployment and other taxes and benefits due as the employer of the employees at the Stores which have accrued and have been earned prior to the Closing Date, and Buyers shall be responsible for such compensation and benefits for those employees (in accordance with Buyers' policies and plans) Buyers rehires or retains to the extent accrued or earned from and after the Closing Date. This provision is not intended to require Buyers to retain or hire any employees of Sellers, but only to warrant that Buyers' actions and the transactions contemplated herein will not trigger application of WARN and to provide for Buyers' indemnity of Sellers and their equity holders for any violation or breach of this Section 9.2.

## ARTICLE 10
## CONDITIONS TO CLOSING

Section 10.1    Conditions to Closing.

(a)    Conditions Applicable to Buyers and Sellers.    The respective obligations of each Party to consummate the transactions contemplated by this Agreement are subject to the satisfaction or waiver on or prior to the Closing Date of the following conditions:

(i)    The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall not be subject to any stay.

(ii)    Franchisor shall have timely waived its right of first refusal and consented to the contemplated transaction.

(b)    Conditions to Sellers' Obligations.    Each and every obligation of Sellers under this Agreement to be performed at or before the Closing will be subject to the satisfaction, at or prior to the Closing, of the following conditions, unless waived in writing by Sellers:

(i)    The representations and warranties of Buyers contained in this Agreement that are qualified as to Material Adverse Effect shall be true and correct as of the date of this Agreement and as of immediately prior to the Closing (other than representations and warranties which address matters only as of a particular date, in which case such representations and warranties shall be true and correct, on and as of such particular date), with the same force and effect as if then made; and

(ii) the representations and warranties of Buyers contained in this Agreement that are not qualified as to Material Adverse Effect shall be true and correct as of the date of this Agreement and as of immediately prior to the Closing (other than representations and warranties which address matters only as of a particular date, in which case such representations and warranties shall be true and correct, on and as of such particular date), with the same force and effect as if then made, except where the failure of such representations and warranties to be true and correct would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Buyers and Sellers shall have received a certificate to that effect from Buyers.

(ii) Buyers shall have performed or complied in all material respects with all material agreements and covenants required by this Agreement to be performed or complied with by it on or prior to the Closing Date.

(iii) All third parties on all Assumed Contracts related exclusively to the Assets or Business shall have consented in writing to an assignment of such contracts to Buyers with Buyers' assumption thereof, if any such consent is required by the Assumed Contract or under applicable law.

(c) <u>Conditions to Buyers' Obligations</u>. Each and every obligation of Buyers under this Agreement to be performed at or before the Closing will be subject to the satisfaction, at or before the Closing, of the following conditions, unless waived in writing by Buyers:

(i) the representations and warranties of Sellers contained in this Agreement that are qualified as to Material Adverse Effect shall be true and correct as of the date of this Agreement and as of immediately prior to the Closing (other than representations and warranties which address matters only as of a particular date, in which case such representations and warranties shall be true and correct, on and as of such particular date), with the same force and effect as if then made; and (ii) the representations and warranties of Sellers contained in this Agreement that are not qualified as to Material Adverse Effect shall be true and correct as of the date of this Agreement and as of immediately prior to the Closing (other than representations and warranties which address matters only as of a particular date, in which case such representations and warranties shall be true and correct, on and as of such particular date), with the same force and effect as if then made, except where the failure of such representations and warranties to be true and correct would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, and Buyers shall have received a certificate to such effect from Sellers.

(ii) Sellers shall have performed or complied in all material respects with all material agreements and covenants required by this Agreement to be performed or complied with by it on or prior to the Closing Date.

(iii)     The Sale Order shall become a Final Order on or before January 8, 2024 (the "**Outside Date**").

**ARTICLE 11**
**TERMINATION**

Section 11.1    <u>Termination</u>.  This Agreement may be terminated at any time as follows:

(a)     By mutual written consent of Sellers and Buyers;

(b)     By Buyers if (i) Sellers have breached any of its respective representations, warranties, covenants or agreements and has not cured such breach prior to the earlier of (A) 10 days following written notice of the breach and (B) the Closing Date; (ii) any order, decree, ruling or other order has been issued by a court or other competent Governmental Entity permanently restraining, enjoining, or otherwise prohibiting the transactions contemplated by this Agreement and each such decree, ruling or other order has become final and non-appealable; (iii) or so long as Buyers is not in default of its obligations hereunder, if any of the conditions to closing set forth in <u>Article 10</u> benefiting Buyers are not satisfied on or prior to the Closing Date, in which case Buyers shall receive a return of the Good Faith Deposit;  or

(c)     by Sellers if (i) Buyers has breached any of its representations, warranties, covenants or agreements and has not cured such breach prior to the earlier of (A) 10 days following written notice of the breach and (B) the Closing Date; or (ii) any order, decree, ruling or other order has been issued by a court or other competent Governmental Entity permanently restraining, enjoining, or otherwise prohibiting the transactions contemplated by this Agreement and each such decree, ruling or other order has become final and non-appealable; (iii)  if any of the conditions to closing set forth in <u>Article 10</u> benefiting Sellers are not satisfied on or prior to the Closing Date; or (iv) if the Closing has not occurred, for any reason whatsoever, on or before the date set forth in <u>Section 5.1(a)</u>.

(d)     In the event of the termination of this Agreement pursuant to the provisions of this <u>Article 11</u>, no Party will have any liability of any nature whatsoever to the other under this Agreement, including liability for damages, unless such Party is in default of its obligations under this Agreement, in which event the Party in default will be liable to the other Party for such default as set forth below.  Notwithstanding the foregoing, each party shall be obligated to indemnify the other for those items for which it has agreed to indemnify the other under this Agreement, subject to the limitations of such indemnity.  In addition, if termination occurs pursuant to <u>Section 11.1(a)</u> or <u>(b)</u>, Sellers shall return to Buyers the Good Faith Deposit within ten (10) Business Days following such termination.

Section 11.2    <u>Default</u>.  In the event the sale contracted for herein is not consummated due to breach or default on the part of Buyers of its obligations under this Agreement, and without fault on the part of Sellers, then Sellers' remedies hereunder include the right to terminate this Agreement pursuant to <u>Section 11.1(c)</u> upon written notice to the Buyers and retain the Good Faith Deposit, as well as all other rights and remedies available under applicable law, including the right to seek recovery of damages and, if applicable, specific performance.

18

## ARTICLE 12
## SURVIVAL OF AGREEMENTS; POST-CLOSING OBLIGATIONS

Section 12.1 <u>Survival of Representations, Warranties and Covenants</u>. The representations and warranties contained in this Agreement, and any indemnity obligation of Sellers related thereto, shall not survive the Closing.

Section 12.2 <u>Indemnification by Buyers</u>. Subject to the provisions of this <u>Article 12</u>, Buyers hereby agrees to indemnify and hold harmless Sellers and each officer, director, partner (whether limited or general), employee, agent or Affiliate of Seller (each, a "**Seller Indemnified Party**") from and against, and agrees promptly to defend each Seller Indemnified Party for any and all Damages arising directly from (a) the material inaccuracy or breach by Buyers of any of Buyers' representations or warranties set forth in this Agreement or in any document or agreement delivered hereunder; (b) any failure by Buyers to carry out, perform, satisfy or discharge any covenants, agreements, undertakings, liabilities or obligations to be performed by Buyers pursuant to the terms of this Agreement or any of the documents or agreements delivered by Buyers pursuant to this Agreement; or (c) any liabilities arising or accruing in the conduct of the Business after the Closing Date, each only upon Seller having suffered or incurred actual damages  Sellers shall take and cause its Affiliates to take all commercially reasonable steps to mitigate any Damages upon becoming aware of any event which would reasonably be expected to, or does, give rise thereto, including incurring costs only to the minimum extent necessary to remedy the breach which gives rise to the Damages.

Section 12.3 <u>Certain Rebates, Excluded Assets</u>. For rebates included in the Excluded Assets on <u>Schedule 1.2</u>, which are not expected to be received until after the Closing, Buyers shall remit to Seller, at Closing, the sum equal to the total such rebates received by Seller for 2022 (the "**Total 2022 Rebates**"), pro-rated based on the percentage of the 2023 calendar year occurring prior to Closing multiplied by the Total 2022 Rebates for rebates paid for periods prior to Closing. Any rebate pre-payments or mutually agreed rebates received by Seller prior to or after the Closing for any period following the Closing Date shall be remitted to Buyers or the Purchase Price shall be adjusted accordingly.

## ARTICLE 13
## MISCELLANEOUS PROVISIONS

Section 13.1 <u>Further Assurance and Assistance</u>. Each Party agrees that after the Closing Date it will, from time to time, upon the reasonable request of the other, execute, acknowledge and deliver in proper form any instrument of conveyance or further assurance reasonably necessary or desirable to transfer to Buyers the interest in the Assets being transferred to Buyers in accordance with the terms of this Agreement, or otherwise carry out the terms of this Agreement.

Section 13.2 <u>Amendment and Modification</u>. This Agreement may be amended, modified or supplemented only by mutual written consent of the Parties to this Agreement.

Section 13.3 <u>Waiver of Compliance</u>. The failure by any Party at any time to require performance of any provision of this Agreement will not affect its right later to require such

performance.  No waiver in any one or more instances will (except as stated therein) be deemed to be a further or continuing waiver of any such condition or breach in other instances or a waiver of any condition or breach of any other term, covenant, representation or warranty.

Section 13.4    Expenses.    All costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby will be paid by the Party incurring such expenses, except as provided elsewhere in this Agreement.

Section 13.5    Notices.  All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed given if delivered personally, facsimile (with confirmation), mailed by certified mail (postage prepaid, return receipt requested), or delivered by national courier service to the Parties at the following addresses (or at such other address for a party as shall be specified by like notice) and shall be effective upon receipt (or upon the next succeeding Business Day if received after 5:00 p.m. local time on a Business Day or if received on a Saturday, Sunday or United States holiday). All notices and other communications required may be made by email, where there is reasonable certainty that such email may be relied upon as valid and as follows:

| | |
|---|---|
| If to Buyers: | Newell-Berg Alliance AL, LLC |
| | Newell-Berg Alliance TN II, LLC |
| | 115 N. Eighth Street |
| | Mayfield Kentucky 42066 |
| | Tele: (270)705-2384 |
| | E-Mail: kevin.newell@supremefoods.com |
| | Attn: Kevin Newel1 |
| | |
| With a copies to: | Price, Hill, Kolarich & Moore |
| | 214 Second Avenue, North |
| | Suite 205 |
| | Nashville, Tennessee 37201 |
| | Tele: (615) 242-5772 |
| | E-Mail: benmoore@pricehillkolarich.com |
| | Attn: M. Ben Moore, II, Esq. |
| | |
| If to Sellers: | Premier Kings, Inc., et al. |
| | c/o Aurora Management Partners |
| | 112 South Tryon Street, Suite 1770 |
| | Charlotte, NC 28284 |
| | Attention: David M. Baker |
| | Email: dbaker@auroramp.com |
| | |
| With a copy to: | Cole Schotz P.C. |
| | 1201 Wills Street, Suite 320 |
| | Baltimore, MD 21231 |
| | Attention: Gary Leibowitz, Esquire |

Irving E. Walker, Esquire
Email: gleibowitz@coleschotz.com
iwalker@coleschotz.com

or to such other addresses as may be specified pursuant to notice given by either Party in accordance with the provisions of this Section 13.5.

Section 13.6    Time.  Time is of the essence of this Agreement, provided that if any date upon which some action, notice or response is required of any party hereunder occurs on a weekend or national holiday, such action, notice or response shall not be required until the next succeeding Business Day.

Section 13.7    Assignability of Agreement.  This Agreement and the rights and obligations of the parties hereunder may not be transferred, assigned, pledged or hypothecated by any party without the prior written consent of the other party hereto.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. It being understood and agreed by the Parties that Buyers intends to establish affiliated controlled entities for structuring, tax, and liability purposes, each of which may enter into the various agreements as contemplated in this Agreement, provided that Buyers shall remain liable to Seller under this Agreement in any event.

Section 13.8    Governing Law; Consent to Jurisdiction; Waiver of Jury Trial.

(a)    This Agreement shall be governed by, and construed in accordance with, the laws of the State of Alabama, regardless of the laws that might otherwise govern under applicable principles of conflicts of law.  The Parties each hereby irrevocably submit to the exclusive jurisdiction of the federal and/or state courts of Alabama for any claims or matters arising under or relating to this Agreement.  Each Party also agrees not to bring any action or proceeding arising out of or relating to this Agreement in any court other a federal or state court of Alabama.  Any Party may make service on any other Party by sending or delivering a copy of the process to the Party to be served at the address and in the manner provided for the giving of notices in Section 13.5 above.  Nothing in this Section, however, shall affect the right of any Party to serve legal process in any other manner permitted by law or at equity.

(b)    TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, BUYERS AND SELLER HEREBY IRREVOCABLY AND EXPRESSLY WAIVE ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER DOCUMENTS AND AGREEMENTS DELIVERED IN CONNECTION HEREWITH, THE TRANSACTION OR THE ACTIONS OF BUYERS OR SELLER IN THE NEGOTIATION, ADMINISTRATION, OR ENFORCEMENT HEREOF OR THEREOF.

Section 13.9    Attorneys' Fees.  In the event of any dispute, litigation or other proceeding between the Parties to enforce any of the provisions of this Agreement or any right of either Party hereunder, the unsuccessful party to such dispute, litigation or other proceeding shall pay to the

DocuSign Envelope ID: 7CBC5D31-567D-4058-A593-6147276238A9

successful party all costs and expenses, including reasonable attorneys' fees, incurred at trial, on appeal, and in any arbitration, administrative or other proceedings, all of which may be included in and as a part of the judgment rendered in such litigation. Any indemnity provisions herein shall include indemnification for such costs and fees. This section shall survive the Closing or a prior termination hereof.

Section 13.10 <u>Counterparts, Electronic Signatures</u>. This Agreement may be executed simultaneously in two or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument. This Agreement and any other documents to be delivered in connection herewith may be electronically signed, and any electronic signatures or such other documents are the same as handwritten signatures for the purposes of validity, enforceability, and admissibility. All Schedules and Exhibits attached hereto and referred to herein are hereby incorporated herein by reference and made a part of this Agreement for all purposes as if fully set forth herein.

Section 13.11 <u>Headings</u>. The headings of the Sections and Articles of this Agreement are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Agreement.

Section 13.12 <u>No Reliance</u>. No third party is entitled to rely on any of the representations, warranties and agreements contained in this Agreement. Buyers and Sellers assume no liability to any third party because of any reliance on the representations, warranties and agreements of Buyers or Seller contained in this Agreement.

Section 13.13 <u>Severability</u>. If any term or other provision of this Agreement is held by a court of competent jurisdiction to be invalid, illegal or incapable of being enforced by any rule of law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect. Upon such a determination, the parties hereto shall negotiate in good faith to modify this Agreement so as to affect the original intent of the parties as closely as possible in a reasonably acceptable manner in order that the transactions contemplated hereby may be consummated as originally contemplated to the fullest extent possible.

Section 13.14 <u>Interpretation</u>. Unless the context requires otherwise, all words used in this Agreement in the singular number shall extend to and include the plural, all words in the plural number shall extend to and include the singular, and all words in either gender shall extend to and include both genders.

Section 13.15 <u>Force Majeure</u>. In no event shall Buyers be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation, strikes, work stoppages, failure of suppliers of materials, accidents, war, invasion, epidemic, pandemic, acts or war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software or hardware) services. Reasonable diligence shall be used to remove the condition that prevents performance and shall not be entitled to suspend performance of its obligations in any greater scope or for any longer duration than is required by the event.

65533/0001-46243691v3

# ARTICLE 14
## DEFINITIONS

Section 14.1  <u>Definitions</u>.  For purposes of this Agreement, the following terms have the meanings specified below:

"**Administrative Agent**" means Wells Fargo Bank, National Association, as Administrative Agent for itself as a lender and for each of the lenders nor or hereafter party to the Credit Agreement with Sellers.

"**Affiliate**" of a Person (as defined herein) means any Person that directly or indirectly controls, is controlled by or is under common control with such Person and each of such Person's executive officers, directors and partners.  For the purpose of this definition, "control" of a Person means the power to direct, or to cause the direction of, the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise, and the terms and phrases "controlling," "controlled by" and "under common control with" have correlative meanings.

"**Business Day**" means any day on which national banks located in Montgomery, Alabama, are generally open to the conduct of banking business and excluding Saturdays and Sundays.

"**Damages**" means any and all actions, suits, proceedings (including any investigation or inquiries), losses, damages, costs, expenses, liabilities, obligations, and claims of any kind or nature whatsoever, including, without limitation, reasonable attorneys' fees and other legal costs and expenses.

"**Franchise Agreements**" mean the certain Franchise Agreements by and between Franchisor and Sellers for each of the locations listed in <u>Exhibit A</u>.

"**Franchisor**" means Restaurant Brands International, Inc. and/or Burger King Corporation and/or Burger King Company LLC, as applicable.

"**Governmental Entity**" means any federal, state or local government or any court, administrative or regulatory agency or commission or other governmental authority or agency having jurisdiction.

"**Knowledge of Sellers**" or "**Sellers' Knowledge**" means the current actual knowledge of Joginder Sidhu, on the date hereof and on the Closing Date, and does not include constructive knowledge or inquiry knowledge.

"**Liens**" means liens, pledges, charges, security interests, deeds of trust, mortgages, conditional sales agreements, interests, encumbrances, or other similar rights of third parties.

"**Material Adverse Effect**" means a material and adverse effect on the Assets, or financial condition, properties, business or results of operations of Sellers, taken as a whole, or on the ability of Sellers to perform its obligations under this Agreement or to consummate the transactions contemplated herein; provided, however, that effects relating to (a) any adverse change, effect, event, occurrence, state of facts or development attributable to conditions affecting the industry in

which Sellers participate, the U.S. economy as a whole or the capital markets in general or the markets in which Sellers and its parent company operate which does not materially and disproportionately affect Sellers and their parent company, taken as a whole; (b) any adverse change, effect, event, occurrence, state of facts or development attributable to the reaction of employees, customers or suppliers of Sellers to the public announcement of the transactions contemplated by this Agreement; (c) any adverse change, effect, event, occurrence, state of facts or development arising from or relating to any change required by generally accepted accounting principles, in accounting requirements or principles or any change in applicable laws, rules or regulations or the interpretation thereof which does not materially and disproportionately affect Sellers and its parent company, taken as a whole; or (d) the failure of Sellers and its parent company to meet any projected financial or other results, in each case, shall not be deemed to constitute a "Material Adverse Effect" and shall not be considered in determining whether a "Material Adverse Effect" has occurred.

"**Person**" means an individual, a partnership, a limited liability company, a joint venture, a corporation, a trust, an unincorporated organization, a division or operating group of any of the foregoing, a government or any department or agency thereof, or any other entity.

Section 14.2    Entire Agreement.  This Agreement, including the agreements referred to in this Agreement, the Schedules and Exhibits attached to this Agreement and other documents referred to in this Agreement which form a part of this Agreement, contains the entire understanding of the parties to this Agreement in respect of the subject matter contained in this Agreement.   There are no restrictions, promises, representations, warranties, covenants or undertakings, other than those expressly set forth or referred to in this Agreement.   This Agreement supersedes all prior agreements and understandings between the parties with respect to such subject matter.

[Signatures on Following Pages]

24

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed in multiple original counterparts as of the date first above written.

SELLERS:

**PREMIER KINGS, INC.**
an Alabama corporation

By: _David Baker_
Name: David M. Baker
Title: Chief Restructuring Officer

**PREMIER KINGS OF NORTH ALABAMA, LLC**

By: _David Baker_
Name: David M. Baker
Title: Chief Restructuring Officer

**BUYERS**:

**NEWELL-BERG ALLIANCE AL, LLC**
an Alabama limited liability company

By: _____
Name: Kevin Newell
Title: Authorized Member

**NEWELL-BERG ALLIANCE TN II, LLC**
A Tennessee limited liability company

By: _____
Name: Kevin Newell
Title: Authorized Member

25

**List of Exhibits and Schedules**

| | |
|---|---|
| Exhibit A | List of Store Locations |
| Exhibit B | Leased Property |
| Exhibit C | Assumed Leases |
| Exhibit D | Form of Assignment and Assumption of Leases |
| Exhibit E | Form of Bill of Sale |
| Exhibit F | Form of Assignment and Assumption Agreement |
| Schedule 1.2 | Excluded Assets |
| Schedule 3.2 | Form of Escrow Agreement |
| Schedule 3.3 | Tax Allocation |
| Schedule 6.4 | Compliance with Laws |
| Schedule 6.6 | Existing Leases |
| Schedule 6.7 | Contracts |
| Schedule 6.9 | Legal Proceedings |
| Schedule 8.1 | Pre-Closing Conduct of Business Covenant Exceptions |

65533/0001-46243691v3

# Exhibit A

## List of Store Locations

| Store# | Operating Entity | Address | City | State | Zip Code |
|---|---|---|---|---|---|
| 435 | Premier Kings of North Alabama, LLC | 1244 Florence Blvd | Florence | AL | 35630 |
| 1225 | Premier Kings of North Alabama, LLC | 308 Jordan Lane | Huntsville | AL | 35805 |
| 1486 | Premier Kings of North Alabama, LLC | 1605 Town Square | Cullman | AL | 35055 |
| 2261 | Premier Kings of North Alabama, LLC | 3204 South Broad Street | Scottsboro | AL | 35769 |
| 2297 | Premier Kings of North Alabama, LLC | 2116 Whitesburg Drive | Huntsville | AL | 35801 |
| 3242 | Premier Kings of North Alabama, LLC | 7300 Highway 431 N | Albertville | AL | 35950 |
| 3942 | Premier Kings of North Alabama, LLC | 8895 Madison Blvd | Madison | AL | 35758 |
| 4272 | Premier Kings of North Alabama, LLC | 1111 SE Jefferson Street | Athens | AL | 35611 |
| 4705 | Premier Kings of North Alabama, LLC | 1929 Gunter Avenue | Guntersville | AL | 35976 |
| 4885 | Premier Kings of North Alabama, LLC | 2057 Beltline Road | Decatur | AL | 35603 |
| 6150 | Premier Kings of North Alabama, LLC | 1506 Glenn Blvd. SW | Fort Payne | AL | 35967 |
| 6468 | Premier Kings of North Alabama, LLC | 3541 North Memorial Parkway | Huntsville | AL | 35810 |
| 8173 | Premier Kings of North Alabama, LLC | 2331 Jordan Lane | Huntsville | AL | 35816 |
| 9306 | Premier Kings of North Alabama, LLC | 376 Hughes Road | Madison | AL | 35758 |
| 9694 | Premier Kings of North Alabama, LLC | 3105 Woodward Avenue | Muscle Shoals | AL | 35661 |
| 9783 | Premier Kings of North Alabama, LLC | 601 Highway 31 North | Hartselle | AL | 35640 |
| 10714 | Premier Kings of North Alabama, LLC | 807 Cox Creek Parkway | Florence | AL | 35630 |
| 11000 | Premier Kings of North Alabama, LLC | 11157 Alabama Highway 157 | Moulton | AL | 35650 |
| 11664 | Premier Kings of North Alabama, LLC | 554 Brindlee Mt. Parkway | Arab | AL | 35016 |
| 11914 | Premier Kings of North Alabama, LLC | 5940 Alabama Highway 157 | Cullman | AL | 35055 |
| 12710 | Premier Kings of North Alabama, LLC | 6363 University Drive | Huntsville | AL | 35806 |
| 13084 | Premier Kings of North Alabama, LLC | 11925 South Memorial Parkway | Huntsville | AL | 35803 |
| 13212 | Premier Kings of North Alabama, LLC | 323 Main St. W. | Rainsville | AL | 35986 |
| 13277 | Premier Kings of North Alabama, LLC | 1600 Highway 72 East | Athens | AL | 35611 |
| 13512 | Premier Kings of North Alabama, LLC | 105 Highway 72 West | Tuscumbia | AL | 35674 |
| 14433 | Premier Kings of North Alabama, LLC | 2313 6th Avenue | Decatur | AL | 35601 |
| 21340 | Premier Kings of North Alabama, LLC | 14637 Hwy 231 | Hazel Green | AL | 35750 |
| 22937 | Premier Kings of North Alabama, LLC | 8670 Hwy 72 | Madison | AL | 35758 |
| 23952 | Premier Kings of North Alabama, LLC | 5615 Alabama Hwy 68 | Collinsville | AL | 35961 |
| 25817 | Premier Kings of North Alabama, LLC | 1214 Locust Ave | Lawrenceburg | TN | 38464 |
| 29043 | Premier Kings of North Alabama, LLC | 4240 Florence Blvd | Florence | AL | 35634 |

# Exhibit B

# Leased Properties

| Store# | Operating Entity | Address | City | State | Zip Code |
|---|---|---|---|---|---|
| 435 | Premier Kings of North Alabama, LLC | 1244 Florence Blvd | Florence | AL | 35630 |
| 1225 | Premier Kings of North Alabama, LLC | 308 Jordan Lane | Huntsville | AL | 35805 |
| 1486 | Premier Kings of North Alabama, LLC | 1605 Town Square | Cullman | AL | 35055 |
| 2261 | Premier Kings of North Alabama, LLC | 3204 South Broad Street | Scottsboro | AL | 35769 |
| 2297 | Premier Kings of North Alabama, LLC | 2116 Whitesburg Drive | Huntsville | AL | 35801 |
| 3242 | Premier Kings of North Alabama, LLC | 7300 Highway 431 N | Albertville | AL | 35950 |
| 3942 | Premier Kings of North Alabama, LLC | 8895 Madison Blvd | Madison | AL | 35758 |
| 4272 | Premier Kings of North Alabama, LLC | 1111 SE Jefferson Street | Athens | AL | 35611 |
| 4705 | Premier Kings of North Alabama, LLC | 1929 Gunter Avenue | Guntersville | AL | 35976 |
| 4885 | Premier Kings of North Alabama, LLC | 2057 Beltline Road | Decatur | AL | 35603 |
| 6150 | Premier Kings of North Alabama, LLC | 1506 Glenn Blvd. SW | Fort Payne | AL | 35967 |
| 6468 | Premier Kings of North Alabama, LLC | 3541 North Memorial Parkway | Huntsville | AL | 35810 |
| 8173 | Premier Kings of North Alabama, LLC | 2331 Jordan Lane | Huntsville | AL | 35816 |
| 9306 | Premier Kings of North Alabama, LLC | 376 Hughes Road | Madison | AL | 35758 |
| 9694 | Premier Kings of North Alabama, LLC | 3105 Woodward Avenue | Muscle Shoals | AL | 35661 |
| 9783 | Premier Kings of North Alabama, LLC | 601 Highway 31 North | Hartselle | AL | 35640 |
| 10714 | Premier Kings of North Alabama, LLC | 807 Cox Creek Parkway | Florence | AL | 35630 |
| 11000 | Premier Kings of North Alabama, LLC | 11157 Alabama Highway 157 | Moulton | AL | 35650 |
| 11664 | Premier Kings of North Alabama, LLC | 554 Brindlee Mt. Parkway | Arab | AL | 35016 |
| 11914 | Premier Kings of North Alabama, LLC | 5940 Alabama Highway 157 | Cullman | AL | 35055 |
| 12710 | Premier Kings of North Alabama, LLC | 6363 University Drive | Huntsville | AL | 35806 |
| 13084 | Premier Kings of North Alabama, LLC | 11925 South Memorial Parkway | Huntsville | AL | 35803 |
| 13212 | Premier Kings of North Alabama, LLC | 323 Main St. W. | Rainsville | AL | 35986 |
| 13277 | Premier Kings of North Alabama, LLC | 1600 Highway 72 East | Athens | AL | 35611 |
| 13512 | Premier Kings of North Alabama, LLC | 105 Highway 72 West | Tuscumbia | AL | 35674 |
| 14433 | Premier Kings of North Alabama, LLC | 2313 6th Avenue | Decatur | AL | 35601 |
| 21340 | Premier Kings of North Alabama, LLC | 14637 Hwy 231 | Hazel Green | AL | 35750 |
| 22937 | Premier Kings of North Alabama, LLC | 8670 Hwy 72 | Madison | AL | 35758 |
| 23952 | Premier Kings of North Alabama, LLC | 5615 Alabama Hwy 68 | Collinsville | AL | 35961 |
| 25817 | Premier Kings of North Alabama, LLC | 1214 Locust Ave | Lawrenceburg | TN | 38464 |
| 29043 | Premier Kings of North Alabama, LLC | 4240 Florence Blvd | Florence | AL | 35634 |

# Exhibit C

# Assumed Leases

| Store Number | Store Address | City | State | Zip Code | Lessor | Lessor Address | Lessee/ Op Entity | Date of Lease or Sublease | As Amended or Assigned | Expiry of Primary Term or Current Option Period |
|---|---|---|---|---|---|---|---|---|---|---|
| 435 | 1244 Florence Blvd | Florence | AL | 35630 | Burger King Corporation | 5505 Blue Lagoon Drive Miami, FL 33126 ATTN: Robin Shafer | PKNA | 3/17/15 | | 6/29/35 |
| 1225 | 308 Jordan Lane | Huntsville | AL | 35805 | Preston Properties, LLC | 4012A Dunsmore Street, Huntsville, AL 35802 ATTN: James Wessell | PKNA | 4/29/14 | | 4/29/34 |
| 1486 | 1605 Town Square | Cullman | AL | 35055 | Traymore Properties, LLC | 4012A Dunsmore Street, Huntsville, AL 35802 ATTN: James Wessell | PKNA | 9/18/74 | 5/2/94 3/12/13 4/29/14 | 12/31/34 |
| 2261 | 3204 South Broad Street | Scottsboro | AL | 35769 | Traymore Properties, LLC | 4012A Dunsmore Street, Huntsville, AL 35802 ATTN: James Wessell | PKNA | 4/29/14 | 8/18/14 8/12/15 | 4/29/34 |
| 2297 | 2116 Whitesburg Drive | Huntsville | AL | 35801 | Traymore Properties, LLC | 4012A Dunsmore Street, Huntsville, AL 35802 ATTN: James Wessell | PKNA | 4/11/08 | 4/29/14 | 4/30/23 |
| 3242 | 7300 Highway 431 N | Albertville | AL | 35950 | Traymore Properties, LLC | 4012A Dunsmore Street, Huntsville, AL 35802 ATTN: James Wessell | PKNA | 4/29/14 | 8/18/14 | 4/29/34 |
| 3942 | 8895 Madison Blvd | Madison | AL | 35758 | Preston Properties, LLC | 4012A Dunsmore Street, Huntsville, AL 35802 ATTN: James Wessell | PKNA | 4/29/14 | | 4/29/34 |
| 4272 | 1111 SE Jefferson Street | Athens | AL | 35611 | Traymore Properties, LLC | 4012A Dunsmore Street, Huntsville, AL 35802 ATTN: James Wessell | PKNA | 2/19/04 | 12/2/04 4/29/14 | 12/1/24 |
| 4705 | 1929 Gunter Avenue | Guntersville | AL | 35976 | Wesfam Restaurants, Inc. | 4012A Dunsmore Street, Huntsville, AL 35802 ATTN: James Wessell | PKNA | 8/18/14 | 8/12/15 | 4/29/34 |
| 4885 | 2057 Beltline Road | Decatur | AL | 35603 | Traymore Properties, LLC | 4012A Dunsmore Street, Huntsville, AL 35802 ATTN: James Wessell | PKNA | 4/29/14 | | 4/29/34 |
| 6150 | 1506 Glenn Blvd. SW Loc 110 | Fort Payne | AL | 35967 | Glenda Reed, ground lease /I | 1606 Glenn Blvd SW Fort Payne, AL 35968 ATTN: Robby Reed | PKNA | 8/31/16 | | 7/31/23 |
| 6468 | 3541 North Memorial Parkway | Huntsville | AL | 35810 | M.D. Homes Alabama, LLC | P.O. Box 6415 East Brunswick, NJ 08816 ATTN: Mendel Bohm | PKNA | 4/29/14 | 8/18/14 | 4/29/34 |

| Store Number | Store Address | City | State | Zip Code | Lessor | Lessor Address | Lessee/ Op Entity | Date of Lease or Sublease | As Amended or Assigned | Expiry of Primary Term or Current Option Period |
|---|---|---|---|---|---|---|---|---|---|---|
| 8173 | 2331 Jordan Lane #8173 | Huntsville | AL | 35816 | Traymore Properties, LLC | 4012A Dunsmore Street, Huntsville, AL 35802 ATTN: James Wessell | PKNA | 4/29/14 | 8/18/14 8/12/15 | 4/29/34 |
| 9306 | 376 Hughes Road | Madison | AL | 35758 | Traymore Properties, LLC | 4012A Dunsmore Street, Huntsville, AL 35802 ATTN: James Wessell | PKNA | 4/29/14 | 8/18/14 | 4/29/34 |
| 9694 | 3105 Woodward Avenue #9694 | Muscle Shoals | AL | 35661 | Traymore Properties, LLC | 4012A Dunsmore Street, Huntsville, AL 35802 ATTN: James Wessell | PKNA | 4/29/14 | | 5/31/25 |
| 9783 | 601 Highway 31 North | Hartselle | AL | 35640 | Traymore Properties, LLC | 4012A Dunsmore Street, Huntsville, AL 35802 ATTN: James Wessell | PKNA | 4/29/23 | 8/18/14 | 4/29/34 |
| 10714 | 807 Cox Creek Parkway | Florence | AL | 35630 | Traymore Properties, LLC | 4012A Dunsmore Street, Huntsville, AL 35802 ATTN: James Wessell | PKNA | | | 7/30/27 |
| 11000 | 11157 Alabama Highway 157 | Moulton | AL | 35650 | Traymore Properties, LLC | 4012A Dunsmore Street, Huntsville, AL 35802 ATTN: James Wessell | PKNA | 4/29/14 | | 4/29/34 |
| 11664 | 554 Brindlee Mt. Parkway | Arab | AL | 35016 | Traymore Properties, LLC | 4012A Dunsmore Street, Huntsville, AL 35802 ATTN: James Wessell | PKNA | 4/29/14 | 8/18/14 8/12/15 | 4/29/34 |
| 11914 | 5940 Alabama Highway 157 | Cullman | AL | 35055 | Traymore Properties, LLC | 4012A Dunsmore Street, Huntsville, AL 35802 ATTN: James Wessell | PKNA | 4/29/14 | 8/18/14 8/12/15 | 4/29/34 |
| 12710 | 6363 University Drive #12710 | Huntsville | AL | 35806 | Traymore Properties, LLC | 4012A Dunsmore Street, Huntsville, AL 35802 ATTN: James Wessell | PKNA | 4/29/14 | 8/18/14 8/12/15 | 4/29/34 |
| 13084 | 11952 South Memorial Parkway | Huntsville | AL | 35803 | Traymore Properties, LLC | 4012A Dunsmore Street, Huntsville, AL 35802 ATTN: James Wessell | PKNA | 4/29/14 | 8/18/14 8/12/15 | 4/29/34 |
| 13212 | 323 Main St. W. | Rainsville | AL | 35986 | Premier Kings Holdings of Alabama, LLC | Estate of Manraj S Sidhu c/o Robert Ritchey P.O. Drawer 4540 Montgomery, AL 36103-4540 | PKNA | 10/30/18 | | 10/31/38 |
| 13277 | 1600 Highway 72 East | Athens | AL | 35611 | Traymore Properties, LLC | 4012A Dunsmore Street, Huntsville, AL 35802 ATTN: James Wessell | PKNA | 4/29/14 | 8/18/14 8/12/15 | 4/29/34 |

Exhibit B to Novex Agreement - Subleases/Assigned Leases

| Store Number | Store Address | City | State | Zip Code | Lessor | Lessor Address | Lessee/ Op Entity | Date of Lease or Sublease | As Amended or Assigned | Expiry of Primary Term or Current Option Period |
|---|---|---|---|---|---|---|---|---|---|---|
| 13512 | 105 Highway 72 West | Tuscumbia | AL | 35674 | Traymore Properties, LLC | 4012A Dunsmore Street, Huntsville, AL 35802 ATTN: James Wessell | PKNA | 4/29/14 | | 11/9/38 |
| 14433 | 2313 6th Avenue | Decatur | AL | 35601 | Traymore Properties, LLC | 4012A Dunsmore Street, Huntsville, AL 35802 ATTN: James Wessell | PKNA | 4/29/14 | | 8/14/27 |
| 21340 | 14637 Hwy 231/431 | Hazel Green | AL | 35750 | Premier Kings Holdings, LLC | Estate of Manraj S Sidhu c/o Robert Ritchey P.O. Drawer 4540 Montgomery, AL 36103-4540 | PKNA | 10/30/18 | | 10/31/38 |
| 22937 | 8670 Hwy 72 aka 8680 Hwy 72 | Madison | AL | 35758 | Premier Kings Holdings of Alabama, LLC | Estate of Manraj S Sidhu c/o Robert Ritchey P.O. Drawer 4540 Montgomery, AL 36103-4540 | PKNA | 8/10/16 | 10/30/18 | 10/31/38 |
| 23952 | 5615 Alabama Hwy 68 | Collinsville | AL | 35961 | BK Collinsville LLC | 4615 University Drive, Coral Cables, FL 33146 ATTN: Maria Ambros | PKNA | 4/22/22 | | 4/22/42 |
| 25817 | 1214 Locust Ave | Lawrenceburg | TN | 38464 | Owned by PKNA | N/A | PKNA | TBD | | N/A |
| 29043 | 4240 Florence Blvd | Florence/Killen | AL | 35634 | Premier Holdings, LLC | Estate of Manraj S Sidhu c/o Robert Ritchey P.O. Drawer 4540 Montgomery, AL 36103-4540 | PKNA | 11/17/21 | | 11/16/41 |

"PKNA" = Premier Kings of North Alabama, LLC

**Exhibit D**

**Assignment and Assumption of the Assumed Leases**

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Assignment") is made and entered into as of _____, 2023, by and among Premier Kings of North Alabama, LLC, an Alabama limited liability company ("**Assignor**") and _____, a _____ ("**Assignee**"). Assignor and Assignee are referred to collectively as "**Parties**" herein, and each individually, a "**Party**".

## RECITALS

WHEREAS, Assignor and Assignee are parties to that certain Asset Purchase Agreement dated as of [_____], 2023 (the "**Purchase Agreement**"), pursuant to which to which Assignor agreed to assign, and Assignee agreed to assume, all of Assignor's right, title and interest in and to the Assumed Leases;

WHEREAS, in connection with the consummation of the transactions contemplated by the Purchase Agreement, Assignor agreed to assign, and Assignee agreed to assume, pay, perform, discharge or otherwise satisfy the Assumed Liabilities; and

WHEREAS, all capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Purchase Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, and incorporating the recitals above, the Parties agree as follows:

## AGREEMENT

1. Assignment of Assumed Leases.  Subject to the terms and conditions set forth in the Purchase Agreement, for valuable consideration received from Assignee, Assignor hereby assigns, transfers and conveys to Assignee all of Assignor's right, title and interest in, to and under the Assumed Leases and Assignee accepts such assignment.

2. Assumption of Assumed Liabilities.  Subject to the terms and conditions set forth in the Purchase Agreement, Assignor hereby assigns to Assignee the Assumed Liabilities and Assignee hereby accepts such assignment and agrees to pay, perform, discharge or otherwise satisfy the Assumed Liabilities.  Other than as specifically set forth herein, Assignee assumes no debt, liability, or obligation of Assignor all of which shall remain the responsibility of Assignor and shall be Excluded Liabilities.

3. Further Assurances.  In case at any time after the date hereof any further actions are necessary or desirable to carry out the purposes of this Assignment, the Parties shall execute and deliver such additional documents, instruments, conveyances

and assurances and take such further actions as may be reasonably required to carry out the provisions hereof.

4. <u>Instrument of Conveyance Only</u>. This Assignment is being made by the Parties pursuant to the requirements of the Purchase Agreement, the terms and conditions of which are incorporated herein by this reference, and this Assignment shall be subject to such terms and conditions. Except for the actual conveyance of the Assumed Leases as set forth in <u>Section 1</u> of this Assignment and the assumption of the Assumed Liabilities as set forth in <u>Section 2</u> of this Assignment, nothing set forth in this Assignment is intended to or shall expand, enlarge, modify, restrict, limit, or abridge any of the terms, representations, warranties, covenants, conditions, agreements, provisions, rights, benefits, obligations or liabilities of Assignors or Assignee beyond that set forth in the Purchase Agreement. In the event of any conflict, ambiguity or discrepancy between the terms or conditions of the Purchase Agreement and this Assignment, the terms and conditions of the Purchase Agreement shall be controlling in all respects.

5. <u>No Third Party Beneficiaries</u>. This Assignment is for the sole and exclusive benefit of the Parties and their respective successor and permitted assigns, and nothing herein is intended or shall be construed to confer upon any person other than the Parties and their respective successors and permitted assigns any rights, remedies or claims under, or by any reason of, this Assignment of any term, covenant or condition hereof.

6. <u>Governing Law; Disputes</u>. The Parties agree that this Assignment shall be governed by and construed in accordance with the laws of the State of Alabama without regard to such state's conflicts of laws rules. Any dispute arising from this Assignment shall be subject to the terms and conditions of the Purchase Agreement.

7. <u>Counterparts</u>. This Assignment may be executed in multiple counterparts, each of which will constitute an original and all of which, when taken together, will constitute one and the same agreement. The Parties may deliver executed signature pages to this Assignment by facsimile or email transmission. No Party may raise as a defense to the formation or enforceability of this Assignment, and each Party forever waives any such defense, either (a) the use of a facsimile or email transmission to deliver a signature or (b) the fact that any signature was signed and subsequently transmitted by facsimile or email transmission.

[Signature Page Follows]

IN WITNESS WHEREOF, Assignor and Assignee have executed this Assignment effective as of the date first set forth above.

**ASSIGNOR:**

PREMIER KINGS OF NORTH ALABAMA, INC.

By:_____
Name:_____
Title:_____

**ASSIGNEE:**

By:_____
Name:_____
Title:_____

**Exhibit E**
**BILL OF SALE**

THIS BILL OF SALE (this "**Bill of Sale**") is made and entered into as of _____[●], 2023, by Premier Kings of North Alabama, Inc., an Alabama corporation ("**Seller**") in favor of _____, a limited liability company, ("**Buyer**"). Seller and Buyer are referred to collectively as "**Parties**" herein, and each individually, a "**Party**".

**RECITALS**

WHEREAS, Buyer and Seller are parties to that certain Asset Purchase Agreement dated as of [●], 2023 (the "**Purchase Agreement**"), pursuant to which Seller agreed to sell, convey, assign, transfer and deliver to Buyer, all of its respective right, title and interest in and to the Assets (as defined therein), and Buyer agreed to acquire the same; and

WHEREAS, all capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Purchase Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, and incorporating the recitals above, the Parties agree as follows:

**AGREEMENT**

1.  Assignment. Subject to the terms and conditions set forth in the Purchase Agreement, for valuable consideration received from Buyer, Seller do hereby irrevocably and unconditionally sell, assign, transfer, convey and deliver to Buyer, its successors and assigns forever, all of Seller's rights, title and interest in and to the Assets, including good and marketable title thereto, free and clear of any and all Liens, to have and to hold the same and each and all thereof unto Buyer, its successors and assigns forever, to its and their own use and benefit forever.

2.  Further Assurances. In case at any time after the date hereof any further actions are necessary or desirable to carry out the purposes of this Bill of Sale, Seller shall execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required or requested by Buyer to carry out the provisions hereof.

3.  Instrument of Conveyance Only. This Bill of Sale is being made by Seller pursuant to the requirements of the Purchase Agreement, the terms and conditions of which are incorporated herein by this reference, and this Bill of Sale shall be subject to such terms and conditions. Except for the actual conveyance of the Assets as set forth in Section 1 of this Bill of Sale, nothing set forth in this Bill of Sale is intended to or shall expand, enlarge, modify, restrict, limit, or abridge any of the terms, representations, warranties, covenants, conditions, agreements, provisions, rights, benefits, obligations or liabilities of the Parties beyond that set

forth in the Purchase Agreement. In the event of any conflict, ambiguity or discrepancy between the terms or conditions of the Purchase Agreement and this Bill of Sale, the terms and conditions of the Purchase Agreement shall be controlling in all respects.

4. <u>No Third Party Beneficiaries</u>. This Bill of Sale is for the sole and exclusive benefit of the Parties and their respective successors and permitted assigns, and nothing herein is intended or shall be construed to confer upon any person other than the Parties and their respective successors and permitted assigns any rights, remedies or claims under, or by any reason of, this Bill of Sale or any term, covenant or condition hereof.

5. <u>Governing Law; Disputes</u>. The Parties agree that this Bill of Sale shall be governed by and construed in accordance with the laws of the State of Alabama without regard to such state's conflicts of laws rules. Any dispute arising from this Bill of Sale shall be subject to the terms and conditions of Section 13.8 of the Purchase Agreement.

6. <u>Counterparts</u>. This Bill of Sale may be executed in multiple counterparts, each of which will constitute an original and all of which, when taken together, will constitute one and the same agreement. Seller may deliver executed signature pages to this Bill of Sale by facsimile or email transmission. No Party may raise as a defense to the formation or enforceability of this Bill of Sale, and each Party forever waives any such defense, either (a) the use of a facsimile or email transmission to deliver a signature or (b) the fact that any signature was signed and subsequently transmitted by facsimile or email transmission.

*[Remainder of Page Left Blank]*

IN WITNESS WHEREOF, the undersigned have executed this Bill of Sale effective as of the date first set forth above.

SELLER

PREMIER KINGS, INC.

By:_____

Name:_____

Title:_____

PREMIER KINGS OF GEORGIA, INC.

By:_____

Name:_____

Title:_____

PREMIER KINGS OF NORTH ALABAMA, INC.

By:_____

Name:_____

Title:_____

**Exhibit F**

**Assignment and Assumption of the Assumed Contracts**

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Assignment") is made and entered into as of _____, 2023, by and among Premier Kings, Inc., an Alabama limited liability company, Premier Kings of Georgia, Inc., a Georgia corporation, and Premier Kings of North Alabama, LLC, an Alabama limited liability company (jointly, "**Assignor**"), and _____, a _____ ("**Assignee**"). Assignor and Assignee are referred to collectively as "**Parties**" herein, and each individually, a "**Party**".

**RECITALS**

WHEREAS, Assignor and Assignee are parties to that certain Asset Purchase Agreement dated as of [_____], 2023 (the "**Purchase Agreement**"), pursuant to which to which Assignor agreed to assign, and Assignee agreed to assume, all of Assignor's right, title and interest in and to the Assumed Contracts;

WHEREAS, in connection with the consummation of the transactions contemplated by the Purchase Agreement, Assignor agreed to assign, and Assignee agreed to assume, pay, perform, discharge or otherwise satisfy the Assumed Liabilities; and

WHEREAS, all capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Purchase Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, and incorporating the recitals above, the Parties agree as follows:

**AGREEMENT**

7. **Assignment of Assumed Contracts**. Subject to the terms and conditions set forth in the Purchase Agreement, for valuable consideration received from Assignee, Assignor hereby assigns, transfers and conveys to Assignee all of Assignor's right, title and interest in, to and under the Assumed Contracts and Assignee accepts such assignment.

1. **Assumption of Assumed Liabilities**. Subject to the terms and conditions set forth in the Purchase Agreement, Assignor hereby assigns to Assignee the Assumed Liabilities and Assignee hereby accepts such assignment and agrees to pay, perform, discharge or otherwise satisfy the Assumed Liabilities. Other than as specifically set forth herein, Assignee assumes no debt, liability, or obligation of Assignor all of which shall remain the responsibility of Seller and shall be Excluded Liabilities.

2. **Further Assurances**. In case at any time after the date hereof any further actions are necessary or desirable to carry out the purposes of this Assignment, the Parties shall execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof.

3.     <u>Instrument of Conveyance Only</u>. This Assignment is being made by the Parties pursuant to the requirements of the Purchase Agreement, the terms and conditions of which are incorporated herein by this reference, and this Assignment shall be subject to such terms and conditions. Except for the actual conveyance of the Assumed Contracts as set forth in <u>Section 1</u> of this Assignment and the assumption of the Assumed Liabilities as set forth in <u>Section 2</u> of this Assignment, nothing set forth in this Assignment is intended to or shall expand, enlarge, modify, restrict, limit, or abridge any of the terms, representations, warranties, covenants, conditions, agreements, provisions, rights, benefits, obligations or liabilities of Assignors or Assignee beyond that set forth in the Purchase Agreement. In the event of any conflict, ambiguity or discrepancy between the terms or conditions of the Purchase Agreement and this Assignment, the terms and conditions of the Purchase Agreement shall be controlling in all respects.

4.     <u>No Third Party Beneficiaries</u>. This Assignment is for the sole and exclusive benefit of the Parties and their respective successor and permitted assigns, and nothing herein is intended or shall be construed to confer upon any person other than the Parties and their respective successors and permitted assigns any rights, remedies or claims under, or by any reason of, this Assignment of any term, covenant or condition hereof.

5.     <u>Governing Law; Disputes</u>. The Parties agree that this Assignment shall be governed by and construed in accordance with the laws of the State of Alabama without regard to such state's conflicts of laws rules. Any dispute arising from this Assignment shall be subject to the terms and conditions of the Purchase Agreement.

6.     <u>Counterparts</u>. This Assignment may be executed in multiple counterparts, each of which will constitute an original and all of which, when taken together, will constitute one and the same agreement. The Parties may deliver executed signature pages to this Assignment by facsimile or email transmission. No Party may raise as a defense to the formation or enforceability of this Assignment, and each Party forever waives any such defense, either (a) the use of a facsimile or email transmission to deliver a signature or (b) the fact that any signature was signed and subsequently transmitted by facsimile or email transmission.

[Signature Page Follows]

IN WITNESS WHEREOF, Assignor and Assignee have executed this Assignment effective as of the date first set forth above.

**ASSIGNOR:**

PREMIER KINGS, INC.

By:_____
Name:_____
Title:_____

PREMIER KINGS OF GEORGIA, INC.

By:_____
Name:_____
Title:_____

PREMIER KINGS OF NORTH ALABAMA, INC.

By:_____
Name:_____
Title:_____

**ASSIGNEE:**

By:_____
Name:_____
Title:_____

**Schedule 1.2**
**Excluded Assets**

1. Coca-Cola Rebate for the portion of the rebate earned by Premier King through closing date.

2. Dr. Pepper Rebate for the portion of the rebate earned by Premier King through closing date.

3. RSI Rebate for the portion of the rebate earned by Premier King through closing.

4. Any and all claims and causes of action of Seller arising under bankruptcy and applicable non-bankruptcy law, including, but not limited to, all claims to collect accounts receivable and other debts, and all other causes of action for events and occurrences arising both before and after the Petition Date.

5. Any and all cash, cash equivalents, bank accounts, deposit accounts, credits, prepaid expenses, deposits, deferred charges, insurance claims, litigation proceeds, advance payments, security deposits, prepaid items, funds, securities, investment accounts, accounts receivable, notes, notes receivable, mortgages, security interests, income, revenues derived from Seller before the Closing Date.

6. Any and all avoidance actions Seller may have under Sections 544-551 of the Bankruptcy Code.

7. Any real or tangible personal property not located in the Stores to be sold to Buyer.

8. All of Seller's rights, claims and interests under insurance policies.

9. To the extent Buyer does not assume liability for and agree to take assignment of Seller's contracts with current vendors that have equipment within the Stores, all such equipment owned by such vendors, who also have the right to retrieve their equipment within the purchased restaurants.

**Schedule 3.2**

**Escrow Agreement**

65533/0001-46330134v4

# ESCROW DEPOSIT AGREEMENT

This ESCROW DEPOSIT AGREEMENT  dated as of this  25th day of October 2023 (the "Agreement") by and among **PREMIER KINGS OF NORTH ALABAMA, LLC**, an Alabama limited liability company ("Party A"), each having an address at c/o Aurora Management Partners, 112 South Tryon Street, Suite 1770, Charlotte, North Carolina 28284, **NEWELL-BERG ALLIANCE AL, LLC,** an Alabama limited liability company ("Party B"), **NEWELL-BERG ALLIANCE TN II, LLC**, a Tennessee limited liability company ("Party C"), having an address at 115 N. Eighth Street, Mayfield, Kentucky 42066, and **FLAGSTAR BANK, N.A.** (the "Escrow Agent"), having an address at 1400 Broadway, 26th Floor, New York, NY 10018.

## W I T N E S S E T H:

WHEREAS, Party A, Party B and Party C have agreed that a certain sum of money shall be held in escrow upon certain terms and conditions; and

WHEREAS, Party A, Party B and Party C appoint the Escrow Agent as escrow agent of such escrow subject to the terms and conditions set forth in this Agreement; and

WHEREAS, the Escrow Agent accepts such appointment as escrow agent subject to the terms and conditions set forth in this Agreement.

NOW, THEREFORE, IT IS AGREED as follows:

1.      Delivery of Escrow Funds.

(a)      The Party A, Party B and Party C will deliver, or shall cause to be delivered, to the Escrow Agent checks or wire transfer made payable to "Flagstar Bank, N.A. as Escrow Agent for Premier Kings of North Alabama, LLC" to be held in an account at Flagstar Bank, N.A. entitled "Premier Kings of North Alabama, LLC, Flagstar Bank, N.A., as Escrow Agent" having ABA No. 026013576, Account No. 1505274373 (the "Escrow Account").

(b)      The collected funds deposited into the Escrow Account are referred to as the "Escrow Funds".

(c)      The Escrow Agent shall have no duty or responsibility to enforce the collection or demand payment of these checks or any other funds delivered to Escrow Agent for deposit into the Escrow Account.  If, for any reason, these checks or any other funds deposited into the Escrow Account shall be returned unpaid to the Escrow Agent, the sole duty of the Escrow Agent shall be to advise Party A, Party B and Party C promptly thereof and return check in the manner directed in writing by Party A, Party B and Party C.

2.      Release of Escrow Funds.  The Escrow Funds shall be paid by the Escrow Agent in accordance with the instructions, in form and substance satisfactory to the Escrow Agent, received from Party A, Party B, Party C or in absence of such instructions in accordance with the order of a court of competent jurisdiction. The Escrow Agent shall not be required to pay any uncollected

funds or any funds that are not available for withdrawal. The Escrow Agent may act in reliance upon any instructions, court orders, notices, certifications, demands, consents, authorizations, receipts, powers of attorney or other writings delivered to it without being required to determine the authenticity or validity thereof or the correctness of any fact stated therein, the propriety or validity of the service thereof, or the jurisdiction of the court issuing any judgment or order.

3.     <u>Acceptance by Escrow Agent</u>.  The Escrow Agent hereby accepts and agrees to perform its obligations hereunder, provided that:

(a)     Upon execution of this Agreement, Party A shall execute and deliver to Escrow Agent, Exhibit A hereto, Party B shall execute and deliver to Escrow Agent Exhibit A-1 and Party C shall execute and deliver to Escrow Agent Exhibit A-2 (together with Exhibit A and Exhibit A-1, each a "<u>Certificate</u>") hereto, for the purpose of (i) establishing the identity of each respective authorized representative(s) of Party A, Party B and Party C entitled to singly initiate and/or confirm disbursement instructions to Escrow Agent on behalf of each such party and (ii) providing standing wire instructions for each of Party A, Party B and Party C to be used for disbursements to said party.  The Escrow Agent may act in reliance upon any signature on each Certificate believed by it to be genuine, and may assume that any person who has been designated by Party A, Party B or Party C to give any written instructions, notice or receipt, or make any statements in connection with the provisions hereof has been duly authorized to do so.  The Escrow Agent shall have no duty to make inquiry as to the genuineness, accuracy or validity of any statements or instructions or any signatures on statements or instructions, including but not limited to, those contained on each Certificate. Party A,  Party B and Party C may update their respective Certificate by executing and delivering to the Escrow Agent an updated Certificate in the form attached hereto as Exhibit A, Exhibit A-1 and/or Exhibit A-2.  Until such time as Escrow Agent shall receive an updated Certificate, Escrow Agent shall be fully protected in relying without inquiry on the current Certificate on file with Escrow Agent.

(b)     The Escrow Agent may seek confirmation of disbursement instructions by telephone call back to one of the authorized representatives set forth on <u>each Certificate,</u> and the Escrow Agent may rely upon the confirmations of anyone purporting to be the person(s) so designated.  To ensure the accuracy of the instruction it receives, the Escrow Agent may record such call back. If the Escrow Agent is unable to verify the instruction, or is not satisfied in its sole discretion with the verification it receives, it will not execute the instruction until all issues have been resolved to its satisfaction. Party A, Party B and Party C agree that the foregoing procedures constitute commercially reasonable security procedures. Escrow Agent further agrees not to comply with any direction or instruction (other than those contained herein or delivered in accordance with this Agreement) from any party inconsistent with the foregoing.

(c)     The Escrow Agent may act relative hereto in reliance upon advice of counsel in reference to any matter connected herewith.  The Escrow Agent shall not be liable for any mistake of fact or error of judgment or law, or for any acts or omissions of any kind, unless caused by its willful misconduct or gross negligence.

(d)     Party A, Party B and Party C, jointly and severally, agree to indemnify, release, and hold the Escrow Agent harmless from and against any and all claims, losses, costs, liabilities,

damages, suits, demands, judgments or expenses, including, but not limited to, attorney's fees, costs and disbursements, (collectively "Claims") claimed against or incurred by Escrow Agent arising out of or related, directly or indirectly, to this Agreement and the Escrow Agent's performance hereunder or in connection herewith, except to the extent such Claims arise from Escrow Agent's willful misconduct or gross negligence as adjudicated by a court of competent jurisdiction.

(e)     In the event of any disagreement between or among Party A, Party B and Party C, or between any of them and any other person, resulting in adverse claims or demands being made to Escrow Agent in connection with the Escrow Account, or in the event that the Escrow Agent, in good faith, be in doubt as to what action it should take hereunder, the Escrow Agent may, at its option, refuse to comply with any claims or demands on it, or refuse to take any other action hereunder, so long as such disagreement continues or such doubt exists, and in any such event, the Escrow Agent shall not become liable in any way or to any person for its failure or refusal to act, and the Escrow Agent shall be entitled to continue so to refrain from acting until (i) the rights of all parties shall have been fully and finally adjudicated by a court of competent jurisdiction, or (ii) all differences shall have been adjusted and all doubt resolved by agreement among all of the interested persons, and the Escrow Agent shall have been notified thereof in writing signed by all such persons. The Escrow Agent shall have the option, after thirty (30) days' notice to Party A, Party B and Party C of its intention to do so, to file an action in interpleader requiring the parties to answer and litigate any claims and rights among themselves. The rights of the Escrow Agent under this section are cumulative of all other rights which it may have by law or otherwise.

(f)     In the event that the Escrow Agent shall be uncertain as to its duties or rights hereunder, the Escrow Agent shall be entitled to (i) refrain from taking any action other than to keep safely the Escrow Funds until it shall be directed otherwise by a court of competent jurisdiction, or (ii) deliver the Escrow Funds to a court of competent jurisdiction.

(g)     The Escrow Agent shall have no duty, responsibility or obligation to interpret or enforce the terms of any agreement other than Escrow Agent's obligations hereunder, and the Escrow Agent shall not be required to make a request that any monies be delivered to the Escrow Account, it being agreed that the sole duties and responsibilities of the Escrow Agent shall be to the extent not prohibited by applicable law (i) to accept checks or other instruments for the payment of money delivered to the Escrow Agent for the Escrow Account and deposit said checks or instruments into the Escrow Account, and (ii) disburse or refrain from disbursing the Escrow Funds as stated herein, provided that the checks or instruments received by the Escrow Agent have been collected and are available for withdrawal.

4.     Escrow Account Statements and Information. The Escrow Agent agrees to send to Party A, Party B and/or Party C a copy of the Escrow Account periodic statement, upon request in accordance with the Escrow Agent's regular practices for providing account statements to its non-escrow clients and to also provide Party A, Party B and/or Party C, or their designee, upon request other deposit account information, including Account balances, by telephone or by computer communication, to the extent practicable. Party A, Party B and Party C agree to complete and sign all forms or agreements required by the Escrow Agent for that purpose.  Party A, Party B and Party C each consents to the Escrow Agent's release of such Account information to any of the

individuals designated by Party A, Party B or Party C, which designation has been signed in accordance with Section 3(a) by any of the persons in each Certificate. Further, Party A, Party B and Party C have an option to receive e-mail notification of incoming and outgoing wire transfers. If this e-mail notification service is requested and subsequently approved by the Escrow Agent, Party A, Party B and Party C agrees to provide a valid e-mail address and other information necessary to set-up this service and sign all forms and agreements required for such service. Party A, Party B and Party C each consents to the Escrow Agent's release of wire transfer information to the designated e-mail address(es). The Escrow Agent's liability for failure to comply with this section shall not exceed the cost of providing such information.

5.     Resignation and Termination of the Escrow Agent.  The Escrow Agent may resign at any time by giving thirty (30) days' prior written notice of such resignation to Party A, Party B and Party C. Upon providing such notice, the Escrow Agent shall have no further obligation hereunder except to hold the Escrow Funds that it has received as of the date on which it provided the notice of resignation as depository. In such event, the Escrow Agent shall not take any action until Party A, Party B and Party C jointly designates a banking corporation, trust company, attorney or other person as successor escrow agent. Upon receipt of such written instructions signed by Party A, Party B and Party C, the Escrow Agent shall promptly deliver the Escrow Funds, net of any outstanding charges, to such successor escrow agent and shall thereafter have no further obligations hereunder. If such instructions are not received within thirty (30) days following the effective date of such resignation, then the Escrow Agent may deposit the Escrow Funds and any other amounts held by it pursuant to this Agreement with a clerk of a court of competent jurisdiction pending the appointment of a successor escrow agent. In either case provided for in this section, the Escrow Agent shall be relieved of all further obligations and released from all liability thereafter arising with respect to the Escrow Funds.

6.     Termination. Party A, Party B and Party C may terminate the appointment of the Escrow Agent hereunder upon a joint written notice to Escrow Agent specifying the date upon which such termination shall take effect. In the event of such termination, Party A, Party B and Party C shall, within thirty (30) days of such notice, jointly appoint a successor escrow agent and the Escrow Agent shall, upon receipt of written instructions signed by both Party A, Party B and Party C, turn over to such successor escrow agent all of the Escrow Funds; provided, however, that if Party A, Party B and Party C fail to appoint a successor escrow agent within such thirty (30)-day period, such termination notice shall be null and void and the Escrow Agent shall continue to be bound by all of the provisions hereof. Upon receipt of the Escrow Funds, the successor escrow agent shall become the Escrow Agent hereunder and shall be bound by all of the provisions hereof and the Escrow Agent shall be relieved of all further obligations and released from all liability thereafter arising with respect to the Escrow Funds.

7.     Investment.  All Escrow Funds received by the Escrow Agent shall be held only in non-interest bearing bank accounts at Escrow Agent.

8.     Compensation.  The Escrow Agent shall be entitled, for the duties to be performed by it hereunder, to a fee of $6,000.00, which fee shall be paid by Party A, Party B and Party C upon the signing of this Agreement. Further, if the term of this Agreement exceeds one (1) year from the execution date hereof, a fee of $1,500.00 will be paid by Party A, Party B and Party C on each

such anniversary of the execution of this Agreement. In addition, Party A, Party B and Party C shall be obligated to reimburse Escrow Agent for all fees, costs and expenses incurred or that becomes due in connection with this Agreement or the Escrow Account, including reasonable attorney's fees. Neither the modification, cancellation, termination or rescission of this Agreement nor the resignation or termination of the Escrow Agent shall affect the right of the Escrow Agent to retain the amount of any fee which has been paid, or to be reimbursed or paid any amount which has been incurred or becomes due, prior to the effective date of any such modification, cancellation, termination, resignation or rescission. To the extent the Escrow Agent has incurred any such expenses, or any such fee becomes due, prior to any closing, the Escrow Agent shall advise Party A, Party B and Party C and the Party A, Party B and Party C shall direct all such amounts to be paid directly at any such closing.

9.    <u>Notices</u>.  All notices, requests, demands and other communications required or permitted to be given hereunder shall be in writing and shall be deemed to have been duly given if sent by hand-delivery, by facsimile followed by first-class mail, by nationally recognized overnight courier service or by prepaid registered or certified mail, return receipt requested, to the addresses set forth below.

If to Party A:

Premier Kings, Inc., et al.
c/o Aurora Management Partners
112 South Tryon Street, Suite 1770
Charlotte, NC 28284
Attention: David M. Baker
Email: dbaker@auroramp.com

With a copy (which shall not constitute notice to Party A) to:

Cole Schotz P.C.
1201 Wills Street, Suite 320
Baltimore, MD 21231
Attention: Gary Leibowitz, Esquire
            and Irving E. Walker, Esquire
Email: gleibowitz@coleschotz.com
        iwalker@coleschotz.com


If to Party B and Party C:

Newell-Berg Alliance AL, LLC
Newell-Berg Alliance TN II, LLC
115 N. Eighth Street
Mayfield Kentucky 42066
E-Mail: kevin.newell@supremefoods.com
Attn: Kevin Newel1

With a copy (which shall not constitute notice to Party B) to:

Price, Hill, Kolarich & Moore
214 Second Avenue, North
Suite 205
Nashville, Tennessee 37201
E-Mail: benmoore@pricehillkolarich.com
Attn: M. Ben Moore, II, Esq.

If to Escrow Agent:

1400 Broadway, 26th Floor
New York, NY 10018
Attention: Robert Bloch, Managing Group Director - EVP
Facsimile No.: _____
Email: rbloch@signatureny.com

10.    Regulatory Compliance.

(a)    Party A, Party B and Party C agree to observe and comply, to the extent applicable, with all anti-money laundering laws, rules and regulations including, without limitation, regulations issued by the Office of Foreign Assets Control of the United States Department of Treasury and the Financial Crimes Enforcement Network of the U.S. Department of Treasury.

(b)    Party A, Party B and Party C shall provide to the Escrow Agent such information as the Escrow Agent may require to enable the Escrow Agent to comply with its obligations under the Bank Secrecy Act of 1970, as amended ("BSA"), or any regulations enacted pursuant to the BSA or any regulations, guidance, supervisory directive or order of the New York State Department of Financial Services or Federal Deposit Insurance Corporation.  The Escrow Agent shall not make any payment of all or any portion of the Escrow Funds to any person unless and until such person has provided to the Escrow Agent such documents as the Escrow Agent may require to enable the Escrow Agent to comply with its obligations under the BSA.

(c)    To help the United States government fight funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account.  When an account is opened, and from time to time as may be required by the Escrow Agent's internal policies and procedures, the Escrow Agent shall be entitled to ask for information that will allow the Escrow Agent to identify relevant parties.  For a non-individual person such as a business entity, a charity, a trust, or other legal entity, the Escrow Agent may ask for documentation to verify its formation and existence as a legal entity.  The Escrow Agent may also ask to see financial statements, licenses, identification, and authorization documents from individuals claiming authority to represent the entity or other relevant documentation.  The Parties acknowledge that a portion of the identifying information set forth herein is being requested by the Escrow Agent in connection with Title III of the USA Patriot Act, Pub.L. 107-56 (the "Act"), and Party A, Party B and Party C each agrees to provide any additional information requested by the Escrow Agent in its sole discretion in connection with the Act or any other legislation, regulation, regulatory order or published guidance to which the Escrow Agent is subject, in a timely manner.

11.     General.

(a)     Each of the parties hereto hereby irrevocably agrees that any action, suit or proceedings against any of them by any of the other aforementioned parties with respect to this Agreement shall be brought in the Bankruptcy Court, which shall have exclusive jurisdiction over such action, suit or proceedings. This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of New York applicable to agreements made and to be entirely performed within such State.   EACH OF THE PARTIES HERETO HEREBY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.

(b)     This Agreement sets forth the entire agreement and understanding of the parties in respect to the matters contained herein and supersedes all prior agreements, arrangements and understandings relating thereto.

(c)     All of the terms and conditions of this Agreement shall be binding upon, and inure to the benefit of and be enforceable by, the parties hereto, as well as their respective successors and assigns.

(d)     This Agreement may be amended, modified, superseded or canceled, and any of the terms or conditions hereof may be waived, only by a written instrument executed by each party hereto or, in the case of a waiver, by the party waiving compliance.  The failure of any party at any time or times to require performance of any provision hereof shall in no manner affect its right at a later time to enforce the same.  No waiver of any party of any condition, or of the breach of any term contained in this Agreement, whether by conduct or otherwise, in any one or more instances shall be deemed to be or construed as a further or continuing waiver of any such condition or breach or a waiver of any other condition or of the breach of any other term of this Agreement. No party may assign any rights, duties or obligations hereunder unless all other parties have given their prior written consent.

(e)     If any provision included in this Agreement proves to be invalid or unenforceable, it shall not affect the validity of the remaining provisions.

(f)     This Agreement and any modification or amendment of this Agreement may be executed in several counterparts or by separate instruments and all of such counterparts and instruments shall constitute one agreement, binding on all of the parties hereto.

12.     Form of Signature. The parties hereto agree to accept a facsimile transmission copy of their respective actual signatures as evidence of their actual signatures to this Agreement and any modification or amendment of this Agreement; *provided*, *however*, that each party who produces a facsimile signature agrees, by the express terms hereof, to place, promptly after transmission of his or her signature by fax, a true and correct original copy of his or her signature in overnight mail to the address of the other party.

13.     No Third-Party Beneficiaries.  This Agreement is solely for the benefit of the parties and

their respective successors and permitted assigns, and no other person has any right, benefit, priority or interest under or because of the existence of this Agreement.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

*[Signature page to follow]*

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the date first set forth above.

**PARTY A:**

**PREMIER KINGS OF NORTH ALABAMA, LLC**


By:_____
Name: Laura Kendall
Title:   Deputy Restructuring Officer


**PARTY B:**

**NEWELL-BERG ALLIANCE AL, LLC**


By:_____
Name:   Kevin Newell
Title:    Authorized Member

**PARTY C:**

**NEWELL-BERG ALLIANCE TN II, LLC**


By:_____
Name:   Kevin Newell
Title:    Authorized Member


**ESCROW AGENT:**

**FLAGSTAR BANK, N.A.**


By: _____
        Name:_____
        Title: _____

# EXHIBIT A

CERTIFICATE OF AUTHORIZED REPRESENTATIVES – *PREMIER KINGS OF NORTH ALABAMA, LLC*

| Name | Signature | Initiate (Y/N) | Callback (Y/N) | Phone No. | Alt. Phone No. |
|------|-----------|----------------|----------------|-----------|----------------|
| Greg Baker | _____ | Y | Y | 770-670-8598 | _____ |
| Nick Wright | _____ | Y | Y | 678-910-1738 | _____ |
| Laura Kendall | _____ | Y | Y | 704-957-3322 | _____ |
| David Baker | _____ | Y | Y | 828-638-5744 | _____ |
| Greg Baker | _____ | Y | Y | 770-670-8598 | _____ |

_____

## STANDING WIRE INSTRUCTIONS FOR PARTY A

In accordance with Section 3(a) of the Agreement disbursements to Party A by wire transfer must be sent in accordance with the following wire instructions:

| | |
|---|---|
| Bank Name: | Truist Bank |
| Bank Address: | 214 North Tryon Street Charlotte, NC |
| ABA Number: | 062203984 |
| Account Number: | 126913265 |
| Account Name: | HUNTSVILLE MAIN 3265 |

## EXHIBIT A-1

CERTIFICATE OF AUTHORIZED REPRESENTATIVES – *NEWELL-BERG ALLIANCE AL, LLC*

| Name | Signature | Initiate (Y/N) | Callback (Y/N) | Phone No. | Alt. Phone No. |
|------|-----------|----------------|----------------|-----------|----------------|
| Angie Boaz | _____ | Y | Y | (270) 748-5763 | _____ |
| Kevin Newell | _____ | Y | Y | (270) 705-2384 | _____ |
| _____ | _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ | _____ |

## STANDING WIRE INSTRUCTIONS FOR PARTY B

In accordance with Section 3(a) of the Agreement disbursements to Party B by wire transfer must be sent in accordance with the following wire instructions:

| | |
|---|---|
| Bank Name: | Regions Bank |
| Bank Address: | 2090 Parkway Office Circle, Hoover, Alabama |
| ABA Number: | 062005690 |
| Account Number: | 0098806408 |
| Account Name: | Newell-Berg Alliance, LLC |

# EXHIBIT A-2

CERTIFICATE OF AUTHORIZED REPRESENTATIVES – *NEWELL-BERG ALLIANCE TN II, LLC*

| Name | Signature | Initiate (Y/N) | Callback (Y/N) | Phone No. | Alt. Phone No. |
|------|-----------|----------------|----------------|-----------|----------------|
| Angie Boaz | _____ | Y | Y | (270) 748-5763 | _____ |
| Kevin Newell | _____ | Y | Y | (270) 705-2384 | _____ |
| _____ | _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ | _____ |

# STANDING WIRE INSTRUCTIONS FOR PARTY C

In accordance with Section 3(a) of the Agreement disbursements to Party C by wire transfer must be sent in accordance with the following wire instructions:

| | |
|--|--|
| Bank Name: | Regions Bank |
| Bank Address: | 2090 Parkway Office Circle, Hoover, Alabama |
| ABA Number: | 062005690 |
| Account Number: | 0098806408 |
| Account Name: | Newell-Berg Alliance, LLC |

## Schedule 3.3

## Tax Allocation

[Buyer to provide]

**Schedule 6.4**

**Compliance with Laws**

None.

## Schedule 6.6

## Existing Leases

| Store Number | Store Address | City | State | Zip Code | Lessor | Lessor Address | Nature of Default | Lessee/ Op Entity | Date of Lease or Sublease | Expiry of Primary Term or Current Option Period |
|---|---|---|---|---|---|---|---|---|---|---|
| 435 | 1244 Florence Blvd | Florence | AL | 35630 | Burger King Corporation | 5707 Blue Lagoon Drive Miami, FL  33126 ATTN: Robin Shafer | Failure to Pay Rent | PKNA | 3/17/15 | 6/29/35 |

"PKNA" = Premier Kings of North Alabama, LLC

14

DocuSign Envelope ID: 7CBC5D31-567D-4058-A593-6147276238A9

**Schedule 6.7**

**Contracts**

None.

**Schedule 6.9**

**Legal Proceedings**

None.

**Schedule 8.1**
**Pre-Closing Conduct of Business Covenant Exceptions**

None.

# EXHIBIT "B"

ASSET PURCHASE AGREEMENT

by and among

PREMIER KINGS OF GEORGIA, INC., as Seller

and

RRG OF JACKSONVILLE, LLC, OR ITS NOMINEE(S), as Buyer

October 25, 2023

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "**Agreement**") dated as of October 25, 2023 (the "**Effective Date**") is by and between Premier Kings of Georgia, Inc., a Georgia corporation ("**Seller**"), and RRG of Jacksonville, LLC, a Florida limited liability company, or its nominee(s) ("**Buyer**"). Buyer and Seller are each referred to herein individually as a "**Party**" and collectively as the "**Parties**". Capitalized terms used herein but not otherwise defined have the meanings ascribed to them in Article 14.

## RECITALS

**WHEREAS**, Seller currently operates a number of retail fast food restaurants at various locations. The Seller's restaurants include those listed in Exhibit A (each individual restaurant being a "**Store**" and collectively, the "**Stores**"), under the name "Burger King" pursuant to the Franchise Agreements held by Seller, and the businesses operated pursuant to the Franchise Agreement are collectively referred to herein as the "**Business**;"

**WHEREAS**, Seller leases certain real property and improvements for the operations of the Stores (each individual property being a "**Leased Property**" and collectively, the "**Leased Properties**") pursuant to lease agreements governing the Leased Properties listed on Exhibit B (each individual lease being an "**Existing Lease**" and collectively, the "**Existing Leases**");

**WHEREAS**, pursuant to this Agreement, Seller desires to (i) assign to Buyer and Buyer desires to assume from Seller, the Designated Leases (defined herein) and the Assumed Contracts (defined herein), in each case subject to the terms and conditions thereof unless otherwise provided herein or as agreed to by Buyer and the third-parties to the Designated Leases and Assumed Contracts, and (ii) sell and transfer to Buyer, and Buyer desires to purchase and assume from Seller, all of Seller's right, title, and interest in the Assets (defined herein); and

**WHEREAS**, Seller has advised the Buyer that Seller intends to file a voluntary petition (the "**Petition**") for relief under Title 11 of the United States Code, 11 U.S.C. §101 et seq. (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Northern District of Alabama (the "**Bankruptcy Court**") in order to preserve and maximize the value of their Business through a Bankruptcy Court sale process as set forth below.

## AGREEMENT

**NOW, THEREFORE**, for and in consideration of the recitals and of the promises and mutual covenants, agreements, representations and warranties contained in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Buyer and Seller agree as follows:

## ARTICLE 1
## PURCHASE AND SALE OF ASSETS; EXCLUDED ASSETS

1

DocuSign Envelope ID: D0E1D790-6803-4214-AD02-8F7AF4AB84B0

Section 1.1 <u>Assets to be Sold</u>. At the Effective Time (as defined in <u>Section 5.5</u> below), on the terms and subject to the conditions set forth in this Agreement, Seller will sell, assign, transfer, convey and deliver to Buyer, and Buyer agrees to purchase, accept, acquire, assume, and take assignment and delivery from Seller, the following assets (collectively, the "**Assets**"):

(a) <u>Leased Property</u>. All of Seller's right, title and interest in, or the assumption and assignment to Buyer where applicable, the Leased Properties pursuant to the schedule of assumed leases set forth on <u>Schedule 1.3(a)-2</u> (the "**Designated Leases**" and the "**Designated Leased Properties**"), along with all of Seller's right, title and interest, if any, in and to all buildings, improvements, easements, appurtenances, rights and privileges belonging or appertaining to the Designated Leased Properties;

(b) <u>Equipment</u>. All of Seller's rights, title, and interest in and to, or to the extent leased by Seller, the assignment and assumption of the Equipment located at the Stores on the Effective Date and on the Closing Date. For purposes of this Agreement, "**Equipment**" means all furniture, furnishings, fixtures, signage, security systems, point-of-sale systems, kitchen equipment, computer equipment, small wares, counters, shelving, racks, slat walls, display cases, décor, tables, seating, signs, promotional materials, new and unused uniforms, timers, printers, menu boards, kitchen controllers, cameras, DVRs, other equipment and machinery and replacement or spare parts, in each case, within the four walls of each Store, including such Equipment that is either owned or leased by Seller.

(c) <u>Inventory</u>. All unexpired inventory (including without limitation, food, food products, beverages, packaging, cups, lids, straws, napkins, paper products and other supplies, including cleaning and marketing supplies) of Seller held for use or sale by Seller in connection with the operation of the Business at the Effective Time (the "**Inventory**"). Following the close of business on the day which is immediately prior to the Closing Date, Buyer and Seller together shall audit the Inventory at the Stores as set forth in <u>Section 3.4(d)</u>;

(d) <u>Leases and Contracts</u>. All of Seller's right, title, and interest in those certain contracts, service agreements, disposal agreements, leases (specifically including the Leases and Equipment leases), license agreements, commitments, purchase orders, business arrangements, and other contracts, and all amendments, modifications and assignments thereof, which directly and exclusively relate to the operation of the Designated Leased Properties or the Business and which (and only to the extent that) Buyer expressly agrees to assume as provided and defined in <u>Section 1.2</u> (the "**Designated Contracts**");

(e) <u>Permits</u>. To the extent assignable, all of the permits, approvals, authorizations, registrations, licenses, certificates of occupancy, variances, orders, rulings, and decrees or permissions from any Governmental Entity or any entity or Person which directly and exclusively relate to the operation of the Designated Leased Properties or the Business or the ownership of the Assets (the "**Permits**"); and

2

65533/0001-46290727v8

DocuSign Envelope ID: D0E1D790-6803-4214-AD02-8F7AF4AB84B0

(f)     _Other Assets._  All telephone and fax numbers for the Stores, warranties and guarantees, and any other assets of Seller located within the four walls of each Store immediately prior to the Effective Time or necessary for the ongoing operation of the Business, to the extent owned or lease by Seller, other than the Excluded Assets as described in Section 1.2.

Section 1.2     **Assignable Contracts; Designated Contracts.**

(a)     Schedule 1.2(a)-1 lists all Contracts, other than Leases (collectively, the "**Assignable Contracts**"), that Buyer may elect to assume and have Seller assign to Buyer. Buyer shall have until that date which is five (5) Business Days prior to the date scheduled for hearing on the entry of the Sale Order (such date being referred to herein as the "**Contract Designation Date**") to designate which of such Assignable Contracts it wishes to assume and have Seller assign to Buyer at the Closing (collectively, the "**Designated Contracts**"). Schedule 1.2(a)-2 shall contain a list of all of the Designated Contracts, which shall be prepared by Buyer and delivered to Seller promptly following the Contract Designation Date.  Any amendment to Schedule 1.2(a)-2 pursuant to the foregoing provisions of this Section 1.2(a), shall be served by Seller on the parties who have been added to or deleted from Schedule 1.2-2.

(b)     With respect to each Designated Contract, on the Closing Date, Seller shall (i) assume such Designated Contract, and (ii) subject to Buyer paying any amounts necessary to cure any default under such Designated Contract or necessary to effect any consent to assignment thereof (collectively, the "**Cure Costs**") and providing adequate assurance of performance to the counterparty thereto to the extent required by the Bankruptcy Court, assign such Designated Contract to Buyer pursuant to an Order of the Bankruptcy Court (which may be the Sale Order). Seller shall provide Buyer with a credit against the Purchase Price equal to the aggregate amount of all Cure Costs. Effective on the Closing Date, Buyer shall assume each such Designated Contract.

(c)     The Sale Order shall provide that, as of the Closing, Seller shall assign to Buyer the Designated Contracts and the Designated Contracts shall be identified by (i) the name and date of the Designated Contracts (if available), (ii) the other party to the Designated Contract, and (iii) the address of such party for notice purposes, all included on an exhibit attached to either the motion filed in connection with the Sale Order or a motion for authority to assume and assign such Designated Contracts or a notice filed pursuant to the Bidding Procedures Order.

(d)     In the case of Permits, Designated Contracts and other commitments included in the Assets that cannot be transferred or assigned effectively without the consent of any third party, which consent has not been obtained prior to the Closing (after giving effect to the Sale Order and the Bankruptcy Code), Seller shall, subject to any approval of the Bankruptcy Court, use commercially reasonable efforts to cooperate with Buyer in endeavoring to obtain each such consent.

Section 1.3     **Assignable Leases; Designated Leases**

65533/0001-46290727v8

(a)     Schedule 1.3(a)-1 lists all Leases (collectively, the "**Assignable Leases**") that Buyer may elect to assume and have Seller assign to Buyer. Buyer shall have until that date which is five (5) Business Days prior to the date scheduled for hearing on the entry of the Sale Order (such date being referred to herein as the "**Lease Designation Date**") to designate which of such Assignable Leases it wishes to assume and have Seller assign to Buyer at the Closing (collectively, the "**Designated Leases**"). Schedule 1.3(a)-2 shall contain a list of all of the Designated Leases, which shall be prepared by Buyer and delivered to Seller promptly following the Lease Designation Date. Any amendment to Schedule 1.3(a)-2 pursuant to the foregoing provisions of this Section 1.3(a), shall be served by Seller on the parties who have been added to or deleted from Schedule 1.3-2.

(b)     With respect to each Designated Lease, on the Closing Date, Seller shall (i) assume such Designated Lease, and (ii) subject to Buyer paying any amounts necessary to cure any default under such Designated Lease or necessary to effect any consent to assignment thereof (collectively, the "**Cure Costs**") and providing adequate assurance of performance to the counterparty thereto to the extent required by the Bankruptcy Court, assign such Designated Lease to Buyer pursuant to an Order of the Bankruptcy Court (which may be the Sale Order). Seller shall provide Buyer with a credit against the Purchase Price equal to the aggregate amount of all Cure Costs. Effective on the Closing Date, Buyer shall assume each such Designated Lease.

(c)     The Sale Order shall provide that, as of the Closing, Seller shall assign to Buyer the Designated Leases and the Designated Leases shall be identified by (i) the address of the real property for each Designated Lease, (ii) the other party to the Designated Lease, and (iii) the address of such party for notice purposes, all included on an exhibit attached to either the motion filed in connection with the Sale Order or a motion for authority to assume and assign such Designated Leases or a notice filed pursuant to the Bidding Procedures Order.

(d)     In the case of Designated Leases that cannot be transferred or assigned effectively without the consent of any third party, which consent has not been obtained prior to the Closing (after giving effect to the Sale Order and the Bankruptcy Code), Seller shall, subject to any approval of the Bankruptcy Court, use commercially reasonable efforts to cooperate with Buyer in endeavoring to obtain such consent.

Section 1.4     **Franchise Agreements**. Seller and the Business operate at the Stores pursuant to Franchise Agreements with Franchisor. Buyer and Seller shall use commercially reasonable efforts to cause Franchisor and Buyer to enter into new franchise agreements with Buyer with respect to the Stores ("**New Franchise Agreements**") on terms reasonably satisfactory to Buyer. If Buyer does not obtain the New Franchise Agreements prior to the hearing to consider entry of the Sale Order, Buyer may, by written notice to Seller, terminate this Agreement.

Section 1.5     **Excluded Assets**. Notwithstanding anything in this Agreement to the contrary, Buyer will not acquire from Seller any of Seller's assets listed on Schedule 1.5 (the "**Excluded Assets**"). The Parties, upon mutual agreement, may amend the Schedules and

4

DocuSign Envelope ID: D0E1D790-6803-4214-AD02-8F7AF4AB84B0

Exhibits included herewith at any time on or before the Closing Date in order to include or exclude any additional Assets or Excluded Assets.

## ARTICLE 2
## ASSUMPTION OF LIABILITIES

Section 2.1 **Assumed Liabilities**.

(a) In consideration for the transfer of the Assets by Seller, Buyer shall assume only those executory liabilities, obligations or commitments of Seller for payment and performance pursuant to the Designated Leases and Designated Contracts, in each case solely to the extent arising or to be performed after the Effective Time (collectively, the "***Assumed Liabilities***").

(b) ANYTHING CONTAINED HEREIN TO THE CONTRARY NOTWITHSTANDING, EXCEPT FOR THE ASSUMED LIABILITIES SPECIFICALLY DESCRIBED IN <u>SECTION 2.1(a)</u>, BUYER SHALL NOT AND BUYER DOES NOT ASSUME ANY LIABILITIES, TAXES, OR OBLIGATIONS (FIXED OR CONTINGENT, KNOWN OR UNKNOWN, MATURED OR UNMATURED, OR OTHERWISE) OF SELLER, WHETHER OR NOT ARISING OUT OF OR RELATING TO ANY OF THE ASSETS, THE BUSINESS, OR ANY OTHER BUSINESS OF SELLER, ALL OF WHICH LIABILITIES, TAXES, AND OBLIGATIONS SHALL, AT AND AFTER THE CLOSING, REMAIN THE EXCLUSIVE RESPONSIBILITY OF SELLER.

Section 2.2 **Excluded Liabilities.** All of the Excluded Liabilities will remain the sole responsibility of Seller. The term "**Excluded Liabilities**" collectively means each and every Liability of Seller other than the Assumed Liabilities, including, without limitation, all accounts payable, employment taxes, employee benefits, compensation, severance, insurance, personal injuries, property damage, taxes, obligations and liabilities under any Contract which Buyer does not expressly assume in writing, or any other liabilities of Seller, the Business and/or the Stores, whether absolute or contingent, known or unknown, accrued or unaccrued, asserted or unasserted, or otherwise, arising out of applicable law, transactions, actions, or omissions occurring prior to the Closing.

## ARTICLE 3
## PURCHASE PRICE AND ADJUSTMENT

Section 3.1 **Purchase Price**. The consideration to be paid by Buyer to Seller on the Closing Date for the Assets shall be via wire transfer of good and collected funds in the amount of $15,525,000.00 (the "**Initial Purchase Price**"), as adjusted in accordance with the provisions of <u>Section 3.4</u> (all such amounts collectively, the "**Purchase Price**"), *minus* the amount of the Good Faith Deposit (defined herein), to Seller in immediately available funds by wire transfer to an account designated by Seller. Seller shall use a portion of the Purchase Price equal to the aggregate amount of all Cure Costs to pay such Cure Costs at Closing.

65533/0001-46290727v8

DocuSign Envelope ID: D0E1D790-6803-4214-AD02-8F7AF4AB84B0

Section 3.2 **Good Faith Deposit**. Upon the execution and delivery of this Agreement, Buyer shall deposit a cash payment equal to ten percent (10%) of the Initial Purchase Price (the "**Good Faith Deposit**") which shall be placed in a non-interest-bearing account with Flagstar Bank N.A. (the "**Escrow Agent**"). If Buyer fails to make the Good Faith Deposit within two (2) Business Days after the Effective Date, then Seller shall have the right to terminate this Agreement and Buyer shall have no further rights hereunder. The Good Faith Deposit and Escrow Agent's duties hereunder shall be further subject to a separate escrow agreement the form of which is attached hereto as Exhibit E. Upon Closing of the sale of the Assets under this Agreement, the Good Faith Deposit shall be released to Seller and applied to the Purchase Price at Closing.

Section 3.3 **Tax Allocations**. Seller and Buyer agree that (i) the Purchase Price will be allocated for state and federal income tax purposes as agreed in good faith by Buyer and Seller and shall be based on appraisals or agreed values of the Assets, and (ii) after the Closing, neither party will take any position or action in connection with complying with the Internal Revenue Code (the "**Code**") and the regulations promulgated thereunder, inconsistent with such allocations. Both Parties shall utilize such allocations for all Tax reporting purposes and shall defend any examination or audit relating thereto in a manner consistent with such allocation. Such allocation shall be reflected, as well, on Form 8594 (Asset Acquisition Statement under Section 1060), which Seller and Buyer shall each file separately with the Internal Revenue Service pursuant to the requirements of Section 1060 of the Code. Any adjustment to the Purchase Price shall be allocated as provided by Treasury Regulation Section 1.1060-1(c). If the Parties are unable to timely and reasonably agree upon such allocations, each Party may report allocation of the Purchase Price in their respective reasonable discretion.

Section 3.4 **Adjustment of the Purchase Price**. The Purchase Price will be adjusted at the Closing as follows:

(a) Tax Prorations between Buyer and Seller. All ad valorem property and personal taxes payable upon the Assets will be prorated between Seller and Buyer for the tax year in which the Closing is held on the basis of the tax statements for such year; provided, however, that if tax statements for the current year are not available as of the Closing Date, the tax proration between Seller and Buyer will be made on the basis of 106% of the taxes for the immediately prior tax year. Notwithstanding anything to the contrary, the tax proration made at Closing will be a final proration between Buyer and Seller.

(b) Store Bank Accounts and Deposits in Transit. In addition to the Purchase Price and payment for Inventory provided below, Buyer shall pay at Closing a good faith estimate of cash amounts held as "store banks" as daily operating cash for amounts generated prior to the Effective Time but held in the cash registers or other repositories at the Stores or on behalf of the Stores at the Effective Time with a true up post-Closing at an amount determined in accordance with this Section 3.4(c), and Seller shall be entitled to retain all cash generated prior to the Effective Time but held in transit for deposit, whether at the Stores or otherwise. Following the close of business the day prior to the Closing Date, Buyer and Seller together shall audit the cash registers and other

65533/0001-46290727v8

repositories at the Stores or on behalf of the Stores to determine the amount of cash held as "store banks" at the Effective Time. Buyer shall pay to Seller, or Seller shall pay to Buyer, as appropriate, without offset for any reason, the difference between the actual cash amount in the store banks and the estimate paid at Closing within thirty (30) days following the Closing.

(c)     Inventory Audit and Payment.  In addition to the Purchase Price and the payment for "store banks" as provided above, at Closing, the Purchase Price shall be adjusted for Inventory in accordance with this Section 3.4(c). After the close of business on the date that is immediately prior to the Closing Date, Buyer and Seller together shall audit the Inventory and from said audit determine the amount and value (based on Seller's actual cost without mark-up) of all Inventory on hand (the "**Inventory Audit Value**"). At the Closing, the Purchase Price shall be increased by an amount equal to the difference between (i) the Inventory Audit Value *plus* any additional deliveries of Inventory to the Stores between the time of the Inventory audit and the Effective Time and (ii) the estimated value of Inventory to be consumed at the Stores between the time of the Inventory audit and the Effective Time (as determined using Seller's historical operational data for the Stores).

(d)     Expenses.  Operational expenses directly related to the Assets and the Business, including, without limitation, Assumed Contract expenses, Designated Lease expenses, beverage rebates, utilities and rent (including sales tax on rent), will be prorated with Seller being responsible for those expenses accruing prior to the Effective Time and Buyer being responsible for those expenses accruing at or after the Effective Time. Utilities shall be paid by Seller to the Closing Date and the accounts closed or assigned to Buyer effective as of Closing. If the closing or assigning of Seller's operating accounts with utility and other providers, and opening of Buyer's operating accounts with same, is impractical or would cause an interruption in service (the Parties shall work in good faith to ensure a smooth transition and avoid any interruption in service), utilities, deposits and similar expenses shall be adjusted as of Closing and settled within thirty (30) days after Closing.

(e)     Security Deposits.  At the option of Seller, Seller shall ether (i) retain all rights to any security deposits paid by Seller and held by landlords, Franchisor, or utilities under any Existing Leases, the Franchise Agreements, or other agreements, or (ii) at Closing Seller shall assign such security deposits to Buyer and the Buyer shall pay to Seller an amount equal to the amount of such security deposits.

## ARTICLE 4
## BANKRUPTCY COURT MATTERS

Section 4.1     **Competing Bids and Break-Up Fee**.

(a)     Competing Bids. This Agreement is subject to approval by the Bankruptcy Court and the consideration by Seller of higher or better competing bids (each a

"**Competing Bid**"). Buyer shall have the right to bid against any Competing Bids consistent with the bid procedures (collectively, the "**Bid Procedures**") set forth in the Bid Procedures Order (defined herein).

(b) <u>Break-Up Fee/Expense Reimbursement</u>.

(i) In consideration for Buyer serving as the stalking-horse bidder, and this Agreement being subject to termination in the event Seller receives and accept a higher or better bid for the Assets consistent with the Bid Procedures (an "**Alternative Transaction**"), then, so long as this Agreement is not terminated prior to the Closing by Buyer or due to Buyer's uncured material breach and regardless of whether Buyer makes any matching or competing bids, but subject to subsection (d) below, Seller shall pay to Buyer a stalking-horse bidder fee, in an amount equal to $388,125.00 (the "**Break-Up Fee**"), plus the documented, out-of-pocket reasonable costs and expenses of Buyer, including reasonable attorneys' fees, not to exceed $150,000.00 (collectively, the "**Expense Reimbursement**"). The Break-Up Fee was determined by multiplying the Purchase Price by 2.5% and the Expense Reimbursement was determined as a fixed amount, irrespective of Purchase Price. If Seller agrees to a break-up fee or an expense reimbursement amount with any other buyer in connection with the sale of other stores or assets of Seller that exceeds the Break-Up Fee (2.5% of the Purchase Price) or the Expense Reimbursement ($150,000.00) hereunder, the Break-Up Fee and/or the Expense Reimbursement hereunder, as applicable shall be increased pro rata in accordance with such other break-up fee or expense reimbursement. Notwithstanding anything contained herein to the contrary, the Break-Up Fee and the Expense Reimbursement shall only be paid at the closing of an Alternative Transaction.

(ii) The Parties intend that the Break-Up Fee and Expense Reimbursement shall be treated as a super-priority administrative expense in the Bankruptcy Case, senior to all unsecured claims and other administrative expenses; <u>provided</u>, <u>however</u>, in no event will the Break-Up Fee and Expense Reimbursement be paid in the absence of the entry of a sale order approving an Alternative Transaction. Seller hereby acknowledges and agrees that: (A) the approval of the Break-Up Fee and Expense Reimbursement is an integral part of the Transaction contemplated by the Transaction Documents; (B) in the absence of Seller's obligation to pay the Break-Up Fee and Expense Reimbursement, Buyer would not have entered into this Agreement or any of the other Transaction Documents; (C) the entry of Buyer into this Agreement and the other Transaction Documents are necessary for preservation of the estate of Seller, and is beneficial to Seller because, in Seller's business judgment, it will enhance Seller's ability to maximize the value of its assets for the benefit of its creditors; and (D) the Break-Up Fee and Expense Reimbursement is reasonable in relation to Buyer's costs and efforts and to the magnitude of the Transaction, and to Buyer's lost opportunities resulting from the time spent pursuing the Transaction.

DocuSign Envelope ID: D0E1D790-6803-4214-AD02-8F7AF4AB84B0

(iii)     Notwithstanding anything to the contrary contained in this Agreement, Seller's obligations under this <u>Section 4.1</u> shall survive the expiration or termination of this Agreement.

(c)     <u>The Sale Motion and Bid Procedures</u>. Within the earlier of (i) fourteen (14) Business Days following the complete execution of this Agreement or (ii) two (2) Business Days after the date of the Petition, Seller shall file with the Bankruptcy Court the Petition and one or more motions (the "**Sale Motion**") seeking the Bankruptcy Court's issuance of:

(i)     a bidding procedures order which is subject to review and comment (but not approval) by the Buyer (the "**Bid Procedures Order**")

(ii)     a sale order in form and substance reasonably satisfactory to the Buyer (the "**Sale Order**").

The Sale Motion shall include procedures for the assumption of and assignment to Buyer of the Assumed Contracts and Designated Leases.  The Bid Procedures Order will include provisions for approval of the Break-Up Fee and Expense Reimbursement as well as provisions governing the submission of Competing Bids. The form of the Bid Procedures Order and Sale Motion are subject to review and comment (but not approval) by the Buyer.  Seller shall serve all counterparties to leases and contracts that are being assumed by the Seller and assigned to Buyer under this Agreement a notice of proposed assumption and assignment of unexpired leases and executory contract and cure which shall include a deadline for counterparty objections and a procedure for resolution of objections. Cure amounts, whether agreed to by counterparties or set by the Court shall be paid from the Purchase Price.  Bankruptcy Court approval of the Seller's assumption and assignment of executory contracts and unexpired leases to Buyer shall be incorporated in the Sale Order.   The form of the notice to lease and contract counterparties shall be subject to review and comment (but not approval) by Buyer.

(d)     <u>Auction</u>.  In the event that Seller receives one or more Competing Bids that Seller determines, in accordance with the Bid Procedures Order in Seller's sole discretion, is a qualified bid higher or better than the Purchase Price provided under this Agreement, then Seller shall schedule and conduct an auction to be conducted in the manner set forth in the Bid Procedures Order, during which Buyer and any qualified bidder will be permitted to submit higher and better bids (the "**Auction**").  At minimum, to become a qualified bidder a competing bidder must make a good faith deposit equal to or greater than the Good Faith Deposit, provide evidence that, in Seller's sole discretion, the competing bidder should be qualified as a franchisee by the Franchisor, and offer an overbid price with an asset purchase agreement in a form similar to this Agreement with a mark-up showing the changes made to this Agreement. At the conclusion of the Auction, Seller shall select the winning bid based on Seller's determination, in their sole discretion, of which bid is the highest or best bid.  Seller also may select, in the Seller's sole discretion, the second best bid, which shall be designated as the "**Back-up Bidder**", with the understanding that if for any reason the winning bidder fails to close as required

65533/0001-46290727v8

by the applicable purchase agreement approved by the Bankruptcy Court, the Back-up Bidder shall be authorized and obligated to close on its bid for the purchase of the Assets approved by the Bankruptcy Court.

(e)     <u>Sale Order</u>.  Subject to Buyer being designated as the successful bidder (the "**Successful Bidder**"), Seller shall use commercially reasonable efforts to obtain entry of the Sale Order.  The Sale Order shall not be subject to the stay in Bankr. R. Civ. P. 6004(h) and 6006(d) and shall be enforceable and effective immediately and shall include a finding that Buyer is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code. The Sale Order shall also include findings and conclusions that (i) notice of the Sale Motion and Sale Procedures Order have been provided to all entities who claim and interest or lien in the Assets, all Governmental Entities who may have claims against Seller, all utilities serving Seller and the Assets, all persons entitled to notice under Bankr. R. Civ. P. 9010 and 2002 and all entities that expressed an interest in purchasing the Assets, (ii) Buyer is not assuming any debts, liabilities or obligations of Seller accrued as of the Closing Date except as otherwise set forth in this Agreement, (iii) Buyer is not a mere continuation of Seller or Seller's bankruptcy estate and there is no continuity of enterprise between Seller and Buyer and Buyer is not a successor of Seller, (iv) the transactions effecting the sale of the Assets  by Seller to Buyer does not constitute a consolidation, merger or de facto merger of Buyer and Seller or Seller's bankruptcy estate, (v) the Sale Order shall be binding upon Seller and its successors and assigns, including any successor Chapter 7 or 11 Trustee and (vi)  the Assets are being sold and transferred to Buyer free and clear of all liens, claims, encumbrances, lis pendens, rights of possession, contracts, covenants, options or other rights to acquire and interest in the Assets.

(f)     <u>Back-up Bidder</u>.  In the event Buyer is not determined to be the Successful Bidder under the Bid Procedures Order process and the Successful Bidder fails to close, Buyer agrees, after receiving notice of such failure, to consummate the Transaction in accordance with the terms of this Agreement, as modified pursuant to any increase in the Purchase Price made by Buyer during the bidding process, as the Back-Up Bidder.

## ARTICLE 5
## CLOSING

Section 5.1     <u>**Closing; Risk of Loss**</u>.

(a)     Consummation of the Transaction contemplated by this Agreement (the "**Closing**") will be held at a location, time, manner, and date (the "**Closing Date**") to be agreed upon by the Parties, provided that in all events Closing shall be completed by no later than 30 days after entry of the Sale Order, unless otherwise determined by the Bankruptcy Court.

(b)     The risk of loss for the Assets will be borne by Seller until the Closing and by Buyer after the Closing.

Section 5.2    **Buyer's Closing Expenses**.    Except as otherwise provided in this Agreement, Buyer will pay the following Closing expenses:

(a)    Fees for any type of inspection or audit that may be required by Buyer to determine whether the Assets are suitable for the purposes for which Buyer, or its assigns may intend;

(b)    Fees of Buyer's attorneys, accountants, consultants and other advisors, except to the extent any portion of these amounts shall be payable to Buyer as part of the Break Up Fee;

(c)    All costs, fees and expenses attributable to Buyer's financing;

(d)    All transfer fees, extension fees, and other fees, charges or requirements of Franchisor, including but not limited to all scopes of work (or similar property improvements required by the Franchisor) and all franchise related fees and charges arising out of the Transaction contemplated in this Agreement, excluding any such fees outstanding or otherwise in arrears and any associated penalties, late fees, or reinstatement fees of the Franchisor as provided under the Franchise Agreements as of the Closing Date;

(e)    Any and all sales, use, transfer, mortgage, documentary and like taxes and/or stamps required to be paid in connection with the Transaction contemplated hereby;

(f)    all recording costs and fees necessary to transfer title of the Assets to Buyer and any fees and costs incurred by Seller in connection with Seller satisfying, curing and/or removing any Liens on the Assets; and

(g)    Costs for all other items for which Buyer is responsible under this Agreement.

For the avoidance of doubt, Buyer shall not be responsible for any investment banking or broker fees, commissions, or payments of any kind claimed by any professional previously engaged by Seller.

Section 5.3    **Seller's Closing Expenses**.    Except as otherwise provided in this Agreement, Seller will pay the following Closing expenses:

(a)    Fees of Seller's attorneys, investment bankers, accountants, consultants and other professionals and advisors;

(b)    Fees of the Escrow Agent to administer the Good Faith Deposit; and

(c)    Costs for all other items for which Seller are expressly responsible under this Agreement.

11

Section 5.4 **Waiver of all other Warranties**. Except as expressly provided in <u>Article 6</u> and any express warranties of title contained in the closing documents contemplated in <u>Section 5.6</u>, the Assets will be conveyed "as is, where is", with all faults, and without any warranties, express or implied, including but not limited to warranties of title, condition, fitness for a particular purpose or habitability. Buyer acknowledges that other than as specifically provided in this Agreement, Seller has made no representation, warranty or guaranty, express or implied, oral or written, past, present or future, of, as to, or including: (a) the condition or state of repair of the Assets, including, without limitation, any condition arising in substances (which includes all substances listed as such by applicable law, all pollutants or asbestos and naturally-occurring but harmful substances such as methane or radon) on, in, under, above, upon or in the vicinity of the Assets; (b) the quality, nature, adequacy, and physical condition of the Assets, including but not limited to, the structural elements, environmental issues, appurtenances, and access; (c) the quality, nature, adequacy and physical condition of soils and geology and the existence of ground water; (d) the existence, quality, nature, adequacy and physical conditions of utilities serving the Leased Property or Assets; (e) the development potential of the Leased Property, its habitability, merchantability, or the fitness, suitability or adequacy of the Assets for any particular purpose; (f) the zoning or other legal status of the Leased Property; (g) the Leased Property or its operations' (including the Business) compliance with any applicable codes, laws, regulations, statutes, ordinances, covenants, conditions, and restrictions of any Governmental Entity. Seller and Buyer agree that this provision shall survive the execution of this Agreement and the Closing of the sale of the Assets. Other than the express representations and warranties specifically provided in <u>Article 5</u>, Buyer hereby acknowledges and declares reliance solely on its own examination, inspection and evaluation of the Assets, and not on any warranties or representation, whether express or implied or written or oral, from Seller. Except for any claims arising out of a breach of the express representations and warranties set forth in <u>Article 5</u> (subject to the limitations set forth in <u>Article 10</u>), Buyer shall have absolutely no right or cause of action against Seller, whether in tort, contract, quasi contract or otherwise, to assert in any controversy or litigation any claim or demand arising from the sale or purchase of, or in an way related to or in connection with, the assets. Buyer hereby expressly waives and renounces its ability to rescind the sale of the assets or seek a reduction in the purchase price for any reason whatsoever under any applicable law. All implied warranties with respect to the Assets, including those related to title and fitness for a particular purpose, will be, and are hereby disclaimed by Seller in any controversy, claim, demand, or litigation arising from or in connection with the Assets, except with respect to a default under this Agreement, or breach of any warranty or representation made by Seller herein. Seller hereby reserves the right to include, in Seller's sole discretion, language to the effect of the foregoing waiver of warranties in any documents conveying the Assets to Buyer as contemplated in this Agreement.

Section 5.5 **Effective Time**. Notwithstanding the actual time of the Closing, the transfer of the Assets will be effective as of 12:01 a.m. Eastern Time on the Closing Date (the "**Effective Time**"). Prorations and similar adjustments, however, shall be made as of 11:59 p.m. on the date preceding the Closing Date.

Section 5.6 **Execution and Delivery of Documents**. At or prior to the Closing and subject to the conditions to Closing set forth in <u>Article 10</u>, Seller and Buyer will execute and

deliver to the other all documents, instruments, certificates and schedules required under this Agreement, including, but not limited to, the following:

(a)     Seller will execute and deliver to Buyer in a form reasonably acceptable to Buyer:

(i)     the Bill of Sale in the form attached hereto as <u>Exhibit C</u>, transferring the Assets to Buyer;

(ii)     the Assignment and Assumption Agreement in the form attached hereto as <u>Exhibit D</u>, effecting the assignment to and assumption by Buyer of the Designated Contracts and the Designated Leases;

(iii)     all written consents required to be obtained or given by any Person in order to consummate the Transaction;

(iv)     a completed certification of non-foreign status pursuant to Section 1.1445-2(b)(2) of the Treasury Regulations, and, if applicable, any certificate, affidavit or other documentation required to establish that no Tax withholding is required under applicable Law; and

(v)     such other documents or instruments, in form and substance reasonably acceptable to Buyer, as Buyer may deem reasonably necessary, or as may be required to consummate the Transaction.

(b)     Buyer will deliver to Seller:

(i)     Signed counterparts, as applicable, of the documents required in <u>Section 5.5(a)(i) and (ii)</u>;

(ii)     The Purchase Price, as adjusted pursuant to <u>Article 3</u> or other provisions of this Agreement, by cash or wire transfer, in accordance with a closing statement agreed between Seller and Buyer;

(iii)     A certified copy of resolutions of Buyer's members and managers authorizing this Agreement, the Transaction Documents and the Transaction; and

(iv)     A certificate of active status or good standing of Buyer issued by the Secretary of State of Florida.

(c)     Buyer and Seller will execute and deliver to one another:

(i)     A closing statement setting forth the calculation of the adjustments to the Purchase Price described in <u>Article 3</u>;

(ii)     Internal Revenue Service Form 8594, Asset Acquisition Statement, or similar required form attesting to the Asset allocations; and

(iii)     Any documents reasonably requested by Seller or Buyer to effectuate the Transactions contemplated by this Agreement.

Section 5.7     **Simultaneous Delivery**.  All payments, documents and instruments to be delivered on the Closing Date will be regarded as having been delivered simultaneously, and no document or instrument will be regarded as having been delivered until all documents and instruments being delivered on the Closing Date have been delivered.

Section 5.8     **Further Acts**.  Seller and Buyer agree to (a) furnish such further information, (b) execute and deliver to the other such other documents and instruments, and (c) do such other acts and things, all as the other party reasonably requests, for the purpose of carrying out the intent of this Agreement and transfer and assignment of the Assets.

## ARTICLE 6
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Buyer as of the Effective Date of this Agreement and as of immediately prior to the Closing as follows:

Section 6.1     **Organization and Qualification**.  PK and PKNA each (a) is an Alabama corporation and limited liability company respectively, duly formed, validly existing and in good standing under the laws of the State of Alabama; (b) has all corporate powers to own its properties and to carry on the Business as owned and operated as of the date of this Agreement; and (c) is duly qualified and is in good standing in all jurisdictions in which the nature of the Business make such qualification necessary, in each case, except where the failure to have such power or authority would not have a Material Adverse Effect on the Assets, Property, results or operations or conditions (financial or otherwise) of the Business, taken as a whole.  PKG (a) is a Georgia corporation, duly formed, validly existing and in good standing under the laws of the State of Georgia; (b) has all corporate powers to own its properties and to carry on the Business as owned and operated as of the date of this Agreement; and (c) is duly qualified and is in good standing in all jurisdictions in which the nature of the Business make such qualification necessary, in each case, except where the failure to have such power or authority would not have a Material Adverse Effect on the Assets, Property, results or operations or conditions (financial or otherwise) of the Business, taken as a whole.

Section 6.2     **Due Authorization; Enforceability**.

(a)     The execution, delivery and performance of this Agreement by Seller and the consummation of the Transaction contemplated by this Agreement have been duly and effectively authorized by the governing authority of Seller, as well as by all other requisite corporate action.

(b)     This Agreement and the agreements contemplated by this Agreement have been, and when executed will be, duly executed, delivered and performed by Seller; and, assuming the due authorization, execution and delivery of this Agreement and the agreements contemplated by this Agreement by Buyer, this Agreement constitutes, and

14

DocuSign Envelope ID: D0E1D790-6803-4214-AD02-8F7AF4AB84B0

when executed will constitute, a valid and binding obligation of Seller, enforceable against Seller in accordance with its terms.

Section 6.3 **No Violation**. The execution of this Agreement and the agreements contemplated by this Agreement by Seller will not: (a) cause Seller to violate any (i) law, (ii) rule or regulation of any Governmental Entity or (iii) order, writ, judgment, injunction, decree, determination or award; (b) violate or be in conflict with, or result in a breach of or constitute (with or without notice or lapse of time or both) a default under, Seller's organizational documents; or (c) result in the creation or imposition of any Lien upon any of the Assets.

Section 6.4 **Compliance with Laws**. Except as disclosed on Schedule 6.4, to Seller's Knowledge, Seller is not in violation or default, and in carrying out the Transactions described in this Agreement will not come into material violation or default, under any present laws, ordinances, regulations, orders or decrees applicable to the Business, Seller or the Assets that could reasonably be expected to have a Material Adverse Effect.

Section 6.5 **Foreign Person**. Seller is not a foreign person under Sections 1445 and 7703 of the Internal Revenue Code of 1986, as amended and regulations promulgated thereunder.

Section 6.6 **Existing Leases**. Seller has made available to Buyer true and correct copies of all Existing Leases. Except as disclosed on Schedule 6.6, Seller has not received written notice of any default or breach on the part of Seller of any of the Existing Leases which has not been cured.

Section 6.7 **Contracts**. Seller has made available to Buyer copies of the Assumed Contracts. Except as disclosed on Schedule 6.7, Seller is not in default or breach of any Assumed Contract and Seller have not received written notice of any default or breach on the part of Seller under any Assumed Contract which has not been cured.

Section 6.8 **Permits**. Seller has made available to Buyer copies of all Permits. To the Knowledge of Seller, the Permits are in full force and effect except where Seller is in the process of renewing or reinstating periodic or lapsed Permits, and there is no outstanding violation of any Permit that could reasonably be expected to have a Material Adverse Effect.

Section 6.9 **Legal Proceedings**. Except as listed in Schedule 6.9, there is not pending or, to the Knowledge of Seller, threatened, any legal, administrative, arbitration or other proceeding or investigation ("**Proceeding**") related to the Business or the Assets, and Seller has no Knowledge of any circumstances that could be expected to give rise to any Proceeding against Seller or Buyer that could reasonably be expected to have a Material Adverse Effect.

Section 6.10 **Equipment**. As of the Effective Time, the Equipment included in the Assets will be present at each Store and no Equipment shall have been removed from a Store since the Effective Date.

65533/0001-46290727v8

Section 6.11 **Employees**.

(a) Within five (5) days following Buyer's delivery of the Good Faith Deposit into escrow, Seller shall provide Buyer with a true and complete list of all persons presently employed by Seller at the Stores, or who dedicate all or substantially all of their time to the operation of the Stores such as the director of area operations, district managers, and maintenance technicians (including any such person who is absent from employment due to illness, vacation, injury, military service, or other authorized absence) (such persons, together with any additional employees hired by Seller in connection with the Business prior to the Closing, the "**Employees**") indicating their: (i) employer; (ii) job title or position; (iii) principal place of employment; (iv) date of commencement of service and seniority or service date if different than the date of commencement of service; (v) status as full-time or part-time; (vi) status as exempt or non-exempt; (vii) base wages or salary; (viii) other remuneration, including any bonus received or earned by any of them during the present and immediately preceding calendar year and a description of all perquisites, bonuses, and benefits (including vacation, severance, and fringe benefits) they receive or are eligible to receive; (ix) benefit elections in effect; and (x) leave status if absent from active employment.

(b) With respect to the Employees, except as set forth on <u>Schedule 6.11</u>: (i) all Employees are retained "at will"; (ii) to the Knowledge of Seller, no Employee intends to terminate his or her employment with Seller prior to the Closing or not accept employment with Buyer at the Closing; (iii) to the Knowledge of Seller, there is not in existence any pending or threatened strike, slowdown, work stoppage, picketing, interruption of work, lockout or any other similar dispute or controversy, labor-related organizational effort, election activities or request or demand for negotiations, recognition or representation, or grievance, arbitration, administrative hearing, formal claim or charge of unfair labor practice, other union- or labor-related action or other claim, workers' compensation claim, claim or investigation of wrongful discharge, claim or investigation of employment discrimination or retaliation, claim or investigation of sexual harassment, or other employment dispute of similar nature, against Seller; (iv) Seller is not a party to or bound by any collective bargaining agreement, other labor agreement, arrangement, or understanding, work rules, practice, or arbitration award with any labor union or any other similar organization, and (v) none of the Employees is subject to or covered by any collective bargaining agreement, arrangement, or understanding, work rules or practice, or arbitration award, or is represented by any labor organization.

(c) With respect to each Employee, Seller has copies of such Employee's Form I-9 (Employment Eligibility Verification Form) and all other records, documents, or other papers which are required to be retained with the Form I-9 by the employer pursuant to such immigration Laws.

(d) To the Knowledge of Seller, all Employees are properly treated as "exempt" or "non-exempt" from overtime requirements under applicable law.

(e)     Seller has never implemented any plant closing or mass layoff of employees that could implicate the Worker Adjustment and Retraining Notification Act of 1988, as amended, or any other law.

Section 6.12  **Insurance**.  Seller maintains various property, liability, and other insurance policies under which the Assets are insured.  All such policies are in full force and effect (and all premiums due and payable thereon have been or will be paid in full on a timely basis), and no written notice of cancellation, termination, or revocation or other notice that any such policy is no longer in full force or effect or that the issuer of any such policy is not willing or able to perform its obligations thereunder has been received by Seller.  There are no claims by Seller pending under any such policies as to which coverage has been denied by the insurer.

Section 6.13  **Commissions**.  Except as set forth on Schedule 6.13, Seller has not incurred or become liable for any broker's commission or finder's fees related to the Transaction contemplated by this Agreement.

Section 6.14  **Exclusivity of Representations and Warranties; As-Is Sale**.  EXCEPT AS EXPRESSLY SET FORTH IN ARTICLE 6 OR ANY EXPRESS WARRANTIES OF TITLE IN THE CLOSING DOCUMENTS CONTEMPLATED BY SECTION 5.6, THE REPRESENTATIONS AND WARRANTIES MADE BY SELLER IN THIS AGREEMENT ARE IN LIEU OF AND ARE EXCLUSIVE OF ALL OTHER REPRESENTATIONS AND WARRANTIES, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.  EXCEPT AS EXPRESSLY SET FORTH IN ARTICLE 5 OR ANY WARRANTIES OF TITLE IN THE CLOSING DOCUMENTS CONTEMPLATED BY SECTION 4.6, SELLER HEREBY DISCLAIM ANY SUCH OTHER OR IMPLIED REPRESENTATIONS OR WARRANTIES, NOTWITHSTANDING THE DELIVERY OR DISCLOSURE TO BUYER OR ITS MEMBERS, MANAGERS, EMPLOYEES, AGENTS OR REPRESENTATIVES OF ANY DOCUMENTATION OR OTHER INFORMATION (INCLUDING ANY FINANCIAL PROJECTIONS OR OTHER SUPPLEMENTAL DATA).  BUYER ACKNOWLEDGES AND AGREES THAT, EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, SELLER HAS NOT MADE, AND HEREBY SPECIFICALLY NEGATES AND DISCLAIMS, ANY REPRESENTATIONS, WARRANTIES, COVENANTS OR AGREEMENTS OF ANY KIND OR CHARACTER REGARDING ANY ASPECT OF THE ASSETS.  BUYER FURTHER ACKNOWLEDGES AND AGREES THAT, EXCEPT AS OTHERWISE SET FORTH IN THIS AGREEMENT, TO THE MAXIMUM EXTENT PERMITTED BY LAW THE SALE PROVIDED FOR HEREIN IS MADE ON AN "AS-IS, WHERE-IS" BASIS AS TO CONDITION WITH ALL FAULTS.

# ARTICLE 7
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller that as of the Effective Date of this Agreement and as of immediately prior to the Closing as follows:

Section 7.1  **Organization and Qualification**.  Buyer (a) is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Florida; (b) has

17

DocuSign Envelope ID: D0E1D790-6803-4214-AD02-8F7AF4AB84B0

all necessary limited liability company powers to own its properties and to carry on its business as owned and operated as of the date of this Agreement; and (c) is duly qualified and is in good standing in all jurisdictions in which the nature of its business makes such qualification necessary.

Section 7.2    **Due Authorization**.

(a)    The execution, delivery and performance of this Agreement by Buyer and the consummation of the Transaction contemplated by this Agreement have been duly and effectively authorized by the managers of Buyer, as well as by all other requisite company action.

(b)    This Agreement and the agreements contemplated by this Agreement have been, and when executed will be, duly executed and delivered by Buyer; and, assuming the due authorization, execution and delivery of this Agreement and the agreements contemplated by this Agreement by Seller, this Agreement constitutes, and when executed will constitute, a valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, except (a) to the extent enforceability may be limited by applicable bankruptcy, insolvency, reorganization or other laws affecting the enforceability of creditor's rights generally and (b) that the availability of equitable remedies, including specific performance, is subject to the discretion of the court before which any proceeding thereof may be brought.

Section 7.3    **No Violation**.    Buyer's execution, delivery and performance of this Agreement and the agreements contemplated by this Agreement will not: (a) cause Buyer to violate any (i) law, (ii) rule or regulation of any Governmental Entity, or (iii) order, writ, judgment, injunction, decree, determination or award; or (b) violate or be in conflict with, or result in a breach of or constitute (with or without notice or lapse of time or both) a default under, Buyer's organizational documents.

Section 7.4    **Consents and Approvals of Governmental Entities and Other Persons**. No consent, approval or authorization of, or declaration, filing or registration with, any Governmental Entity or any other Person applicable to Buyer is required in connection with the execution and delivery of this Agreement and the consummation of the Transaction contemplated by this Agreement.

Section 7.5    **Commissions**.    Buyer has not incurred or become liable for any broker's commission or finder's fees related to the Transaction contemplated by this Agreement.

Section 7.6    **Buyer's Inspection**.    Prior to the Closing, Buyer and/or Buyer's agent has had a reasonable opportunity to inspect the Assets and the Stores and is familiar with the Equipment located in each such Store on the Effective Date.

**ARTICLE 8**
**COVENANTS AND ACTIONS PENDING CLOSING**

18

Section 8.1 **Conduct of Business**. Between the date of this Agreement and the Closing Date, Seller will:

(a) except with respect to Store #1691 which is temporarily closed, maintain the operation of the Business and conduct the Business in the ordinary course and in accordance with past business practices, including without limitation using commercially reasonable efforts to maintain all employee staffing and adequate levels of good and saleable inventory, and in compliance with Franchisor's requirements;

(b) maintain and repair all the tangible Assets in accordance with commercially reasonable practices;

(c) comply with all applicable laws, rules and regulations in all material respects applicable to the Business or the Assets;

(d) maintain insurance in the ordinary course of business with respect to the Assets until the Effective Time;

(e) except with respect to Store #1691 which is temporarily closed, advertise and market the Stores and Business consistent with historical business practices;

(f) not sell or dispose of any of the Assets other than in the ordinary course of the operation of the Business;

(g) comply with all Designated Leases and Designated Contracts; and

(h) not incur, assume, guarantee, create or otherwise become liable with respect to any indebtedness, borrowed money, or similar obligation, except in the ordinary course of business consistent with past practices, with respect to the Property, Equipment (regardless of who owns such equipment and how that equipment is owned), Stores, Business, or the Assets, subject to the further exceptions set forth on Schedule 8.1.

Section 8.2 **Consents; Additional Agreements**. Buyer and Seller agree to cooperate and promptly take, or cause to be taken, all action, and to cooperate and promptly do, or cause to be done, all things reasonably necessary, proper or advisable to consummate and make effective as promptly as practicable the Transaction contemplated by this Agreement, including: (i) the removal of any legal impediment to the consummation or effectiveness of such Transaction; and (ii) the obtaining of all necessary waivers, releases, consents, assignments, and approvals of all third parties and Governmental Entities, and the making of all necessary filings.

Section 8.3 **Confidentiality**. Until the Petition is filed with the Bankruptcy Court, Buyer and Seller each will hold, and will cause its respective officers, agents and employees to hold, in confidence, and not disclose to others, the terms of this Agreement, the Transaction contemplated by this Agreement, and all plans, documents, contracts, records, data analysis, compilations, forecasts, and studies and other informational material received or prepared by either of them with respect to the Assets and the Business (collectively the "**Information**")

except: (a) to the extent that such Information (i) is otherwise available from third persons without restrictions on its further use or disclosure or (ii) is required by order of any Governmental Entity, any law, regulation or any reporting obligation of Buyer or Seller; (b) to the extent such information is or becomes publicly known other than through a violation of this paragraph by the party in question; (c) to the extent such information is provided to persons who are assisting in the consummation of the Transaction contemplated hereby, or is required to be given to such third party in order to obtain any consents, approval, authorizations or disclosures contemplated by this Agreement (including, without limitation, the disclosure to representatives or employees of the Franchisor, landlord, Seller's lenders and professionals, or any Governmental Entity); or (d) to the extent otherwise required or approved by the Bankruptcy Court.

Section 8.4 **Right of First Refusal**. No later than five (5) Business Days after the date of the Sale Motion, Seller, with Buyer's cooperation, will provide all required information and notice to Franchisor in order that Franchisor may timely elect or waive its right of first refusal.

Section 8.5 **Contact with Employees, Customers and Suppliers**. Prior to the Closing, except as otherwise mutually agreed, Buyer and its representatives shall not contact or communicate with any of the employees, customers, landlords, developers and suppliers of Seller in connection with the Transaction contemplated by this Agreement, except with the prior consent of Seller, not to be unreasonably withheld; provided, however: (i) Buyer may contact or communicate with the Franchisor in connection with this Transaction, and (ii) Seller shall allow Buyer reasonable access to the key employees of Seller (as mutually agreed upon by the Parties), provided that Seller shall be allowed to have its representative(s) present at any such meeting. Nothing herein shall be deemed to prevent Buyer's representatives currently involved in the business operations of Seller from continuing their business activities consistent with past practices.

Section 8.6 **Evidence of Buyer's Ability to Perform**. Prior to the execution of this Agreement, Buyer shall have provided Seller with written evidence, in form and substance reasonably acceptable to Seller, of Buyer's financial ability to: (i) close the contemplated transaction under this Agreement; and (ii) perform Buyer's obligations under the Assumed Contracts.

Section 8.7 **Access to Seller's Information**. Prior to Closing, Seller shall provide Buyer and its representatives access to the Stores, the Leased Property and the Business, subject to reasonable prior notice during normal business hours, and any and all reasonably requested financial, legal, operational and other books and records, and any other such information reasonably requested by Buyer that is in Seller possession.

## ARTICLE 9
## PROVISIONS RESPECTING EMPLOYEES

Section 9.1     **Seller's Employees**.  Immediately upon Closing, Seller will notify all Employees that the Assets have been sold to Buyer and that their employment with Seller is terminated.  Buyer and Seller agree that Buyer may, but is not obligated to, offer to the Employees employment with Buyer, on such terms as Buyer may determine.  This <u>Section 9.1</u> does not establish, as to any Employee, a contract of employment for a definite term or any term or any contractual right that his or her employment can only be terminated for just cause, and no Employee has any rights under this Agreement as a third-party beneficiary or otherwise. Any such offers of employment from Buyer shall be subject to Buyer's standard employment practices and policies, including Form I-9 compliance. Seller shall pay promptly after the Effective Time and in compliance with applicable laws, but in no event later than fourteen (14) days after the Closing Date, all wages, salaries, and benefits (including all severance amounts and other amounts due).  Seller will retain responsibility for all wages, salary, severance benefits, insurance, accrued vacations, unpaid sick and holiday pay, and other obligations of any kind whatsoever, of the Employees, including, without limitation, obligations and liabilities under Seller's employment benefit plans, which accrue prior to and through the Effective Time (but not those which accrue subsequent to the Effective Time). Seller shall be responsible for compliance with all applicable laws affecting the Employees through the Effective Time (including any Laws affecting the termination of such Employees) and for all employment related Liabilities arising from or relating to the employment prior to the Effective Time or termination of such Employees by Seller. Seller shall retain, bear, and discharge, as appropriate, all Liabilities, and Buyer shall not have any Liability whatsoever, with respect to the employee benefit plans of Seller.  Notwithstanding Seller's termination of the Employees as of the Effective Time, Seller agree to maintain any employee benefit plan relating to medical, vision, dental, or other health-related plans that by its terms continue in effect through the last day of the calendar month in which the Closing occurs.

Section 9.2     **Employment Matters**.  Seller shall be responsible for all employees' wages, accrued bonuses, pension benefits, vacation time, F.I.C.A. unemployment and other taxes and benefits due as the employer of the employees at the Stores which have accrued and have been earned prior to the Closing Date, and Buyer shall be responsible for such compensation and benefits for those employees (in accordance with Buyer's policies and plans) Buyer hires to the extent accrued or earned from and after the Closing Date. Subject to Buyer's review and reasonable satisfaction of the employee information provided to Buyer pursuant to Section 6.11, and subject to Buyer's standard employment practices and policies, Buyer presently intends to hire substantially all of Seller's employees set forth in the information provided to Buyer pursuant to Section 6.11; however, the foregoing does not establish, as to any person, an offer of employment.

# ARTICLE 10
# CONDITIONS TO CLOSING

Section 10.1    **Conditions Applicable to Buyer and Seller**.  The respective obligations of each Party to consummate the Transaction contemplated by this Agreement are subject to the satisfaction or waiver on or prior to the Closing Date of the following conditions:

(a)    Sale Order. The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall not be subject to any stay.

(b)    Franchisor. Franchisor shall have timely waived its right of first refusal and agreed to enter into New Franchise Agreements with Buyer.

(c)    Conditions to Seller's Obligations.  Each and every obligation of Seller under this Agreement to be performed at or before the Closing will be subject to the satisfaction, at or prior to the Closing, of the following conditions, unless waived in writing by Seller:

(i)    The representations and warranties of Buyer contained in this Agreement shall be true and correct as of the date of this Agreement and shall be true and correct in all material respects as of immediately prior to the Closing (other than representations and warranties which address matters only as of a particular date, in which case such representations and warranties shall be true and correct, on and as of such particular date), with the same force and effect as if then made, and Seller shall have received a certificate to that effect from Buyer.

(ii)    Buyer shall have performed or complied in all material respects with all agreements and covenants required by this Agreement to be performed or complied with by it on or prior to the Closing Date.

(iii)    All third parties on all Assumed Contracts and Designated Leases shall have consented in writing to an assignment of such contracts to Buyer with Buyer's assumption thereof, if any such consent is required under applicable law.

(d)    Conditions to Buyer's Obligations.  Each and every obligation of Buyer under this Agreement to be performed at or before the Closing will be subject to the satisfaction, at or before the Closing, of the following conditions, unless waived in writing by Buyer:

(i)    The representations and warranties of Seller contained in this Agreement shall be true and correct as of the date of this Agreement and shall be true and correct in all material respects as of immediately prior to the Closing (other than representations and warranties which address matters only as of a particular date, in which case such representations and warranties shall be true and correct, on and as of such particular date), with the same force and effect as if then made, and Buyer shall have received a certificate to such effect from Seller.

(ii)    Seller shall have performed or complied in all material respects with all agreements and covenants required by this Agreement to be performed or complied with by it on or prior to the Closing Date.

(iii)    the Sale Order shall become a Final Order on or before January 8, 2024 (the "**Outside Date**");

(iv)    Seller shall have tendered delivery of all items required to be delivered by Seller under this Agreement;

(v)    The Assumed Contracts and Designated Leases shall have been assigned to Buyer in a form and manner consistent with this Agreement; and

(vi)    No Proceeding that is not stayed by the Bankruptcy Court shall be pending before any Governmental Entity seeking or threatening to restrain or prohibit the consummation of the Transaction, or seeking to obtain substantial Damages in respect thereof, or involving a claim that consummation thereof would result in the violation of any applicable law.

## ARTICLE 11
## TERMINATION

Section 11.1    **Termination**.  This Agreement may be terminated at any time as follows:

(a)    <u>Mutual Agreement</u>. By mutual written consent of Seller and Buyer;

(b)    <u>Termination by Either Buyer or Seller</u>.   This Agreement may be terminated at any time prior to the Closing Date by either Buyer or Seller if any Governmental Entity shall have issued an Order permanently restraining, enjoining, or otherwise prohibiting the consummation of the Transaction and either (i) thirty (30) days shall have elapsed from the issuance of such Order and such Order has not been removed or vacated, or (ii) such Order shall have become final and non-appealable.

(c)    <u>Termination by Seller</u>.  This Agreement may be terminated with no further liability hereunder at any time prior to the Closing Date by Seller as follows:

a.  if there has been a material breach by Buyer, which breach Buyer has failed to cure within five (5) Business Days following its receipt of written notice thereof from Seller;

b.  so long as Seller is not in default of its obligations hereunder, if any condition precedent of Seller specified in <u>Section 10.1(c)</u> shall not have been satisfied or waived or, in the reasonable judgment of Seller, shall have become reasonably unlikely to be satisfied by the Closing Date, unless the failure of such condition to have been satisfied was caused primarily by a material breach by Seller;

c.  if the Closing shall not have occurred on or before 5:00 p.m. Eastern Time on the Outside Date, but only to the extent the Closing has not occurred as of the Outside Date for reasons other than Seller's failure to meet its obligations hereunder.

DocuSign Envelope ID: D0E1D790-6803-4214-AD02-8F7AF4AB84B0

(d)    Termination by Buyer.  This Agreement may be terminated at any time prior to the Closing Date by Buyer as follows:

    a. if the Sale Order does not become a Final Order duly entered by the Outside Date;

    b. if there has been a material breach by any Seller, which breach such Seller has failed to cure within five (5) Business Days following its receipt of written notice thereof from Buyer;

    c. so long as Buyer is not in default of its obligations hereunder, if any condition precedent of Buyer specified in Section 10.1(d) shall not have been satisfied or waived or, in the reasonable judgment of Buyer, shall have become reasonably unlikely to be satisfied, unless the failure of such condition to have been satisfied was caused primarily by a material breach by Buyer;

    d. if the Bankruptcy Court enters any Order approving any Alternative Transaction or confirming any chapter 11 plan involving any Alternative Transaction and the Buyer is not the Back-Up Bidder;

    e. if Buyer and Franchisor have not entered into the New Franchise Agreement by the Outside Date;

    f. if the Bankruptcy Case shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code, or a Chapter 11 trustee has been appointed, and, with respect to any of the foregoing, the trustee or Seller (as applicable) does not timely indicate its willingness to fulfill the obligations in this Agreement; or

    g. if the Closing shall not have occurred on or before 5:00 p.m. Eastern Time on the Outside Date, but only to the extent the Closing has not occurred as of the Outside Date for reasons other than Buyer's failure to meet its obligations hereunder.

(e)    In the event of the termination of this Agreement pursuant to the provisions of this Article 11, no Party will have any liability of any nature whatsoever to the other under this Agreement, including liability for Damages, unless such Party is in default of its obligations under this Agreement, in which event the Party in default will be liable to the other Party for such default as set forth below.  In addition, (i) if termination occurs pursuant to Section 11.1(a), (b) or (d), Buyer shall be entitled to a return of the Good Faith Deposit within ten (10) Business Days following such termination; and (ii) if termination occurs pursuant to Section 11.1(c), Seller shall be entitled to payment of the Good Faith Deposit within ten (10) Business Days following such termination. Buyer and Seller agree to execute and deliver to the Escrow Agent joint instructions with respect to disbursement of the Good Faith Deposit no later than five (5) Business Days after termination of this Agreement.

65533/0001-46290727v8

Section 11.2 **Default**. In the event the sale contracted for herein is not consummated due to breach or default on the part of Buyer of its obligations under this Agreement, and without fault on the part of Seller, then Seller's remedies hereunder shall be limited to the right to terminate this Agreement pursuant to <u>Section 10.1(c)</u> upon written notice to the Buyer and retain the Good Faith Deposit, and Seller may not otherwise seek recovery of damages or specific performance.

## ARTICLE 12
## SURVIVAL OF AGREEMENTS; POST-CLOSING OBLIGATIONS

Section 12.1 **Survival of Representations, Warranties and Covenants**. The representations and warranties contained in this Agreement shall not survive the Closing.

Section 12.2 **Certain Rebates, Excluded Assets**. For rebates included in the Excluded Assets which are actually received by Buyer after the Closing, Buyer shall remit to Seller, Seller's pro-rated portion thereof based on the percentage of the 2023 calendar year occurring prior to Closing. Any rebate pre-payments or mutually agreed rebates received by Seller prior to or after the Closing for any period following the Closing Date shall be remitted to Buyer, including pursuant to <u>Section 3.4(e)</u>. All such payments, remissions and reconciliation shall occur within thirty (30) days after the date on which any such rebate is received by a Party.

## ARTICLE 13
## MISCELLANEOUS PROVISIONS

Section 13.1 **Further Assurance and Assistance**. Each Party agrees that after the Closing Date it will, from time to time, upon the reasonable request of the other, execute, acknowledge and deliver in proper form any instrument of conveyance or further assurance reasonably necessary or desirable to transfer to Buyer the Assets and to otherwise carry out the terms of this Agreement.

Section 13.2 **Amendment and Modification**. This Agreement may be amended, modified or supplemented only by mutual written consent of all of the Parties.

Section 13.3 **Waiver of Compliance**. The failure by any Party at any time to require performance of any provision of this Agreement will not affect its right later to require such performance. No waiver in any one or more instances will (except as stated therein) be deemed to be a further or continuing waiver of any such condition or breach in other instances or a waiver of any condition or breach of any other term, covenant, representation or warranty.

Section 13.4 **Expenses**. All costs and expenses incurred in connection with this Agreement and the Transaction contemplated hereby will be paid by the Party incurring such expenses, except as provided elsewhere in this Agreement.

Section 13.5 **Notices**. All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed given if delivered personally, delivered via email (with confirmation and where there is reasonable certainty that such email may be relied upon as valid), mailed by certified mail (postage prepaid, return receipt requested), or

DocuSign Envelope ID: D0E1D790-6803-4214-AD02-8F7AF4AB84B0

delivered by national courier service to the Parties at the following addresses (or at such other address for a party as shall be specified by like notice) and shall be effective upon receipt (or upon the next succeeding Business Day if received after 5:00 p.m. local time on a Business Day or if received on a Saturday, Sunday or United States holiday). All notices and other communications shall be made as follows:

> If to Buyer: RRG of Jacksonville, LLC
> 525 South Flagler Drive, Suite 201
> West Palm Beach, FL 33401
> Attention: Michael L. Schmickle
> and Randy Pianin
> E-Mail: mschmickle@pbcap.com
> rpianin@royalrg.com

> With a copy (which shall not constitute notice to Buyer) to:
> Nelson Mullins Riley & Scarborough LLP
> 1905 Corporate Blvd. NW, Suite 310
> Boca Raton, Florida 33431
> Attention: Matthew M. Thompson
> E-Mail: matthew.thompson@nelsonmullins.com

> If to Seller: Premier Kings, Inc., et al.
> c/o Aurora Management Partners
> 112 South Tryon Street, Suite 1770
> Charlotte, NC 28284
> Attention: David M. Baker
> Email: dbaker@auroramp.com

> With a copy (which shall not constitute notice to Seller) to:
> Cole Schotz P.C.
> 1201 Wills Street, Suite 320
> Baltimore, MD 21231
> Attention: Gary Leibowitz, Esquire
> And Irving E. Walker, Esquire
> Email: gleibowitz@coleschotz.com
> iwalker@coleschotz.com

or to such other addresses as may be specified pursuant to notice given by either Party in accordance with the provisions of this Section 13.5.

Section 13.6    **Time**.  Time is of the essence of this Agreement, provided that if any date upon which some action, notice or response is required of any party hereunder occurs on a day that is not a Business Day, such action, notice or response shall not be required until the next succeeding Business Day.

65533/0001-46290727v8

Section 13.7 **Assignability of Agreement**. This Agreement and the rights and obligations of the parties hereunder may not be transferred, assigned, pledged or hypothecated by any party without the prior written consent of the other party hereto. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. Notwithstanding the foregoing, it is understood and agreed by the Parties that Buyer intends to establish affiliated entities for structuring, tax, and liability purposes, each of which may enter into the various agreements as contemplated in this Agreement, provided that Buyer shall remain liable to Seller under this Agreement in any event.

Section 13.8 **Governing Law; Consent to Jurisdiction; Waiver of Jury Trial**.

(a) This Agreement shall be governed by, and construed in accordance with, the laws of the State of Alabama, regardless of the laws that might otherwise govern under applicable principles of conflicts of law. The Parties each hereby irrevocably submit to the exclusive jurisdiction of the federal courts of Alabama for any claims or matters arising under or relating to this Agreement. Each Party also agrees not to bring any action or proceeding arising out of or relating to this Agreement in any court other a federal court of Alabama.

(b) TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, BUYER AND SELLER HEREBY IRREVOCABLY AND EXPRESSLY WAIVE ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER DOCUMENTS AND AGREEMENTS DELIVERED IN CONNECTION HEREWITH, THE TRANSACTION OR THE ACTIONS OF BUYER OR SELLER IN THE NEGOTIATION, ADMINISTRATION, OR ENFORCEMENT HEREOF OR THEREOF.

Section 13.9 **Attorneys' Fees**. In the event of any dispute, litigation or other proceeding between the Parties to enforce any of the provisions of this Agreement or any right of either Party hereunder, the unsuccessful party to such dispute, litigation or other proceeding shall pay to the successful party all costs and expenses, including reasonable attorneys' fees, incurred at trial, on appeal, and in any arbitration, administrative or other proceedings, all of which may be included in and as a part of the judgment rendered in such litigation. This Section 13.9 shall survive the Closing or a prior termination hereof.

Section 13.10 **Counterparts, Electronic Signatures**. This Agreement may be executed simultaneously in two or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument. This Agreement and any other documents to be delivered in connection herewith may be electronically signed, and any electronic signatures or such other documents are the same as handwritten signatures for the purposes of validity, enforceability, and admissibility. All Schedules and Exhibits attached hereto and referred to herein are hereby incorporated herein by reference and made a part of this Agreement for all purposes as if fully set forth herein.

Section 13.11 **Headings**. The headings of the Sections and Articles of this Agreement are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Agreement.

Section 13.12 **No Reliance**. No third party is entitled to rely on any of the representations, warranties and agreements contained in this Agreement. Buyer and Seller assume no liability to any third party because of any reliance on the representations, warranties and agreements of Buyer or Seller contained in this Agreement.

Section 13.13 **Severability**. If any term or other provision of this Agreement is held by a court of competent jurisdiction to be invalid, illegal or incapable of being enforced by any rule of law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect. Upon such a determination, the parties hereto shall negotiate in good faith to modify this Agreement so as to affect the original intent of the parties as closely as possible in a reasonably acceptable manner in order that the Transaction contemplated hereby may be consummated as originally contemplated to the fullest extent possible.

Section 13.14 **Interpretation**. Unless the context requires otherwise, all words used in this Agreement in the singular number shall extend to and include the plural, all words in the plural number shall extend to and include the singular, and all words in either gender shall extend to and include both genders.

Section 13.15 **Force Majeure**. In no event shall Buyer be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation, strikes, work stoppages, failure of suppliers of materials, accidents, war, invasion, epidemic, pandemic, acts or war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software or hardware) services. Reasonable diligence shall be used to remove the condition that prevents performance and shall not be entitled to suspend performance of its obligations in any greater scope or for any longer duration than is required by the event.

# ARTICLE 14
# DEFINITIONS

Section 14.1 **Definitions**. For purposes of this Agreement, the following terms have the meanings specified below:

"**Affiliate**" of a Person (as defined herein) means any Person that directly or indirectly controls, is controlled by or is under common control with such Person and each of such Person's executive officers, directors and partners. For the purpose of this definition, "control" of a Person means the power to direct, or to cause the direction of, the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise, and the terms and phrases "controlling," "controlled by" and "under common control with" have correlative meanings.

28

"**Business Day**" means any day on which national banks located in the State of Alabama, are generally open to the conduct of banking business and excluding Saturdays and Sundays.

"**Contracts**" means all contracts, leases, subleases, deeds, mortgages, licenses, instruments, notes, commitments, purchase orders, customer orders, undertakings, indentures, joint ventures, and all other agreements, commitments, and legally binding arrangements, whether written or oral, and with respect to any of the foregoing, all amendments, supplements, extensions, addenda, or restatements relating thereto.

"**Damages**" means any and all actions, suits, proceedings (including any investigation or inquiries), losses, damages, costs, expenses, liabilities, obligations, and claims of any kind or nature whatsoever, including, without limitation, reasonable attorneys' fees and other legal costs and expenses.

"**Final Order**" means a judgment or Order of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the clerk of the Bankruptcy Court (or such other court) on the docket in the Bankruptcy Case (or the docket of such other court), which has not been modified, amended, reversed, vacated or stayed (other than such modifications or amendments that are consented in writing to by Buyer) and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, stay, reargument or rehearing shall then be pending or (b) if an appeal, writ of certiorari, new trial, stay, reargument or rehearing thereof has been sought, such judgment or Order of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such judgment or Order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument or rehearing shall have expired, as a result of which such judgment or Order shall have become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure; provided that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedures, or any analogous rule under the Federal Rules of Bankruptcy Procedure, may be filed relating to such judgment or Order, shall not cause such judgment or Order not to be a Final Order.

"**Franchise Agreements**" mean the certain Franchise Agreements by and between Franchisor and Seller for each of the locations listed in Exhibit F.

"**Franchisor**" means Restaurant Brands International, Inc. and/or Burger King Corporation and/or Burger King Company LLC, as applicable.

"**Governmental Entity**" means any foreign, federal, state or local government or any court, administrative or regulatory agency or commission or other governmental or quasi-governmental authority or agency having jurisdiction.

"**Knowledge of Seller**" or "**Seller's Knowledge**" means the current actual knowledge of Joginder Sidhu, on the date hereof and on the Closing Date, and does not include constructive knowledge or inquiry knowledge.

"**Liability**" or "**Liabilities**" means each and every demand, claim, action, loss (including any diminution in value), liability, judgment, damage, cost and expense of any kind or nature

29

whatsoever, including, without limitation, reasonable attorneys' fees and other legal costs and expenses.

"**Liens**" means all liens, claims, encumbrances, charges, mortgages, pledges and other similar security interests or restriction.

"**Material Adverse Effect**" means a material and adverse effect on the Assets, or financial condition, properties, business or results of operations of the Business, taken as a whole, or on the ability of Seller to perform its obligations under this Agreement or to consummate the Transaction contemplated herein; provided, however, that effects relating to (a) any adverse change, effect, event, occurrence, state of facts or development attributable to conditions affecting the industry in which Seller participates, the U.S. economy as a whole or the capital markets in general or the markets in which Seller and its parent company operate which does not materially and disproportionately affect Seller and its parent company, taken as a whole; (b) any adverse change, effect, event, occurrence, state of facts or development attributable to the reaction of employees, customers or suppliers of Seller to the public announcement of the Transaction contemplated by this Agreement, (c) any adverse change, effect, event, occurrence, state of facts or development arising from or relating to any change required by generally accepted accounting principles, in accounting requirements or principles or any change in applicable laws, rules or regulations or the interpretation thereof which does not materially and disproportionately affect Seller and its parent company, taken as a whole; or (d) the failure of Seller and its parent company to meet any projected financial or other results, in each case, shall not be deemed to constitute a "Material Adverse Effect" and shall not be considered in determining whether a "Material Adverse Effect" has occurred.

"**Person**" means an individual, a partnership, a limited liability company, a joint venture, a corporation, a trust, an unincorporated organization, a division or operating group of any of the foregoing, a government or any department or agency thereof, or any other entity.

"**Transaction**" means transactions contemplated by this Agreement and any of the Transaction Documents.

"**Transaction Documents**" means this Agreement and any and all of the agreements, contracts, certificates, orders, consents, approval, agreements and commitments executed and/or delivered in connection with transactions contemplated by this Agreement.

Section 14.2 **Entire Agreement**. This Agreement, including the agreements referred to in this Agreement, the Schedules and Exhibits attached to this Agreement and other documents referred to in this Agreement which form a part of this Agreement, contains the entire understanding of the parties to this Agreement in respect of the subject matter contained in this Agreement. There are no restrictions, promises, representations, warranties, covenants or undertakings, other than those expressly set forth or referred to in this Agreement. This Agreement supersedes all prior agreements and understandings between the parties with respect to such subject matter.

[Signatures on Following Pages]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed in multiple original counterparts as of the date first above written.

**SELLER:**

**PREMIER KINGS OF GEORGIA, INC.**

By: _David Baker_____

Name: David M. Baker

Title: Chief Restructuring Officer

**BUYER**:

**RRG OF JACKSONVILLE, LLC**

By: _Randy Pianin_____

Name: Randy Pianin

Title:   Manager

## List of Exhibits and Schedules

| | |
|---|---|
| Exhibit A | List of Stores |
| Exhibit B | Existing Leases |
| Exhibit C | Form of Bill of Sale |
| Exhibit D | Form of Assignment and Assumption Agreement |
| Exhibit E | Form of Escrow Agreement |
| Exhibit F | Franchise Agreements |
| Schedule 1.2(a) -1 | Assignable Contracts |
| Schedule 1.2(a) - 2 | Designated Contracts |
| Schedule 1.3(a) -1 | Assignable Leases |
| Schedule 1.3(a) - 2 | Designated Leases |
| Schedule 1.5 | Excluded Assets |
| Schedule 6.4 | Compliance with Law |
| Schedule 6.6 | Lease Defaults |
| Schedule 6.7 | Contract Defaults |
| Schedule 6.9 | Legal Proceedings |
| Schedule 6.11 | Employees |
| Schedule 6.13 | Commissions |
| Schedule 8.1 | Pre-Closing Conduct of Business Covenant Exceptions |

**Exhibit A**

**List of Store Locations**

| Store# | Operating Entity | Address | City | State | Zip Code |
|---|---|---|---|---|---|
| 1197 | Premier Kings of Georgia, Inc. | 250 Monument Road | Jacksonville | FL | 32225 |
| 1724 | Premier Kings of Georgia, Inc. | 5922 Merrill Road | Jacksonville | FL | 32277 |
| 2873 | Premier Kings of Georgia, Inc. | 1940 S. 8th Street | Fernandina Beach | FL | 32034 |
| 6986 | Premier Kings of Georgia, Inc. | 11031 Old St. Augustine Rd | Jacksonville | FL | 32257 |
| 7068 | Premier Kings of Georgia, Inc. | 13180 Atlantic Blvd | Jacksonville | FL | 32225 |
| 7121 | Premier Kings of Georgia, Inc. | 10142 Phillip's Hwy | Jacksonville | FL | 32256 |
| 8907 | Premier Kings of Georgia, Inc. | 1162 Boone St Ext E | Kingsland | GA | 31548 |
| 9942 | Premier Kings of Georgia, Inc. | 9090 Merrill Road | Jacksonville | FL | 32225 |
| 10422 | Premier Kings of Georgia, Inc. | 542370 US Highway 1 | Callahan | FL | 32011 |
| 11309 | Premier Kings of Georgia, Inc. | 462581 SR 200 | Yulee | FL | 32097 |
| 13106 | Premier Kings of Georgia, Inc. | 13404 Sutton Park Dr. | Jacksonville | FL | 32224 |
| 15499 | Premier Kings of Georgia, Inc. | 13049 North Main St | Jacksonville | FL | 32218 |
| 16751 | Premier Kings of Georgia, Inc. | 184 S. Hwy 17 | East Palatka | FL | 32131 |
| 17831 | Premier Kings of Georgia, Inc. | 11761 Beach Blvd Ste 15 | Jacksonville | FL | 32246 |
| 19411 | Premier Kings of Georgia, Inc. | 2455 SR 207 | St Augustine | FL | 32084 |
| 23806 | Premier Kings of Georgia, Inc. | 2430 Osborne Rd | St Mary's | GA | 31558 |
| 1691 | Premier Kings of Georgia, Inc. | 5015 New Jesup Hwy | Brunswick | GA | 31520 |
| 322 | Premier Kings of Georgia, Inc. | 601 Martin Luther King Blvd | Savannah | GA | 31401 |
| 521 | Premier Kings of Georgia, Inc. | 7923 White Bluff Rd | Savannah | GA | 31406 |
| 1226 | Premier Kings of Georgia, Inc. | 14 W. DeRenne Ave | Savannah | GA | 31405 |
| 1404 | Premier Kings of Georgia, Inc. | 11711 Abercorn Street | Savannah | GA | 31419 |
| 1471 | Premier Kings of Georgia, Inc. | 1295 Ribaut Rd | Beaufort | SC | 29902 |
| 1551 | Premier Kings of Georgia, Inc. | 4241 Augusta Road | Garden City | GA | 31408 |
| 2124 | Premier Kings of Georgia, Inc. | 1710 Memorial Drive | Waycross | GA | 31501 |
| 2397 | Premier Kings of Georgia, Inc. | 998 Sunset Blvd | Jesup | GA | 31545 |
| 3048 | Premier Kings of Georgia, Inc. | 18770 Whyte Hardee Blvd | Hardeeville | SC | 29927 |
| 5571 | Premier Kings of Georgia, Inc. | 415 US Highway 80 E | Pooler | GA | 31322 |
| 10241 | Premier Kings of Georgia, Inc. | Highway 251 Magnolia Bluff Way | Darien | GA | 31305 |
| 10893 | Premier Kings of Georgia, Inc. | 815 Elma G. Miles Parkway | Hinesville | GA | 31313 |
| 12107 | Premier Kings of Georgia, Inc. | 115 Golden Isles Plaza | Brunswick | GA | 31520 |
| 12792 | Premier Kings of Georgia, Inc. | 3527 Highway 84 West | Blackshear | GA | 31516 |
| 12906 | Premier Kings of Georgia, Inc. | 8257 E Main St | Ridgeland | SC | 29936 |
| 13243 | Premier Kings of Georgia, Inc. | 154 S. Main St. | Baxley | GA | 31513 |
| 14209 | Premier Kings of Georgia, Inc. | 201 Museum St | Hilton Head Island | SC | 29926 |
| 14614 | Premier Kings of Georgia, Inc. | 602 Fair Road | Statesboro | GA | 30458 |
| 15760 | Premier Kings of Georgia, Inc. | 4268 Ogeechee Road | Savannah | GA | 31405 |
| 23049 | Premier Kings of Georgia, Inc. | 496 Jimmy DeLoach Parkway | Savannah | GA | 31407 |
| 23155 | Premier Kings of Georgia, Inc. | 3 Baylor Brook Dr | Okatie | SC | 29909 |
| 24560 | Premier Kings of Georgia, Inc. | 5918 Ogeehee Road | Savannah | GA | 31419 |
| 25882 | Premier Kings of Georgia, Inc. | 106 N Duval St | Claxton | GA | 30417 |
| 25937 | Premier Kings of Georgia, Inc. | 4660 Hwy 17 | Richmond Hill | GA | 31324 |
| 26749 | Premier Kings of Georgia, Inc. | 13708 East Oglethorpe Hwy | Midway | GA | 31320 |
| 26868 | Premier Kings of Georgia, Inc. | 7306 Hwy 21 | Port Wentworth | GA | 31407 |
| 27690 | Premier Kings of Georgia, Inc. | 13200 W Cleveland Street | Nahunta | GA | 31553 |

# Exhibit B

# Leased Properties

| Store Number | Store Address | City | State | Zip Code | Lessor/Sublessor | Lessor Address | Lessee/ Op Entity | Date of Lease or Sublease | As Amended or Assigned | Expiry of Primary Term or Current Option Period |
|---|---|---|---|---|---|---|---|---|---|---|
| 322 | 601 Martin Luther King Blvd | Savannah | GA | 31401 | Crown Premier Properties, LLC | 10 Mall Court, Suite A, Savannah, GA 31411 ATTN: Fonda Salgueiro | PKGA | 1/26/97 | 1/18/16 1/20/16 6/18/19 | 6/17/39 |
| 521 | 7923 White Bluff Road | Savannah | GA | 31406 | Burger King Corporation | 5707 Blue Lagoon Drive Miami FL  33126 ATTN: Robin Shafer | PKGA | 1/19/21 | | 10/31/41 |
| 1197 | 250 Monument Road | Jacksonville | FL | 32225 | Burger King Corporation | 5707 Blue Lagoon Drive Miami FL  33126 ATTN: Robin Shafer | PKGA | 10/13/16 | 1/31/18 | 12/31/36 |
| 1226 | 14 W. DeRenne Ave | Savannah | GA | 31405 | Crown Premier Properties, LLC | 10 Mall Court, Suite A Savannah, GA 31411 ATTN: Fonda Salgueiro | PKGA | 6/18/19 | | 6/29/39 |
| 1404 | 11711 Abercorn Street | Savannah | GA | 31419 | Burger King Corporation | 5707 Blue Lagoon Drive Miami FL  33126 ATTN: Robin Shafer | PKGA | 10/24/20 | | 10/31/41 |
| 1471 | 1295 RIBAUT RD | Beaufort | SC | 29902 | YSB Capital | 350 Riverdale Drive Fort Lee, NJ 07024 | PKGA | 12/5/14 | 1/31/18 | 1/31/38 |
| 1551 | 4241 Augusta Road | Garden City | GA | 31408 | Burger King Corporation | 5707 Blue Lagoon Drive Miami FL  33126 ATTN: Robin Shafer | PKGA | 10/31/21 Approximate | | 10/31/41 |
| 1691 | 5015 New Jesup | Brunswick | GA | 31520 | BQK 5015, LLLC | c/o Provident Mgmt Corp    1430 Broadway Suite 903    New York, NY 10018 ATTN: Mark Nagel | PKGA | 6/30/92 | 4/16/13 8/1/13 6/15/16 | 8/1/33 |
| 1724 | 5922 Merrill Road | Jacksonville | FL | 32277 | Burger King Corporation | 5707 Blue Lagoon Drive Miami FL  33126 ATTN: Robin Shafer | PKGA | 9/1/21 | | 12/31/40 |
| 2124 | 1710 Memorial Drive | Waycross | GA | 31501 | SRJ Ventures | 4141 Southpoint Dr. E, Suite B, Jacksonville, AL 32216 ATTN: John McCue | PKGA | 1/28/05 | 6/15/16 | 1/31/27 |
| 2397 | 998 Sunset Blvd Loc 129 | Jesup | GA | 31545 | Burger King Corporation | 5707 Blue Lagoon Drive Miami FL  33126 ATTN: Robin Shafer | PKGA | 9/25/18 | | 9/24/38 |

| Store Number | Store Address | City | State | Zip Code | Lessor/Sublessor | Lessor Address | Lessee/ Op Entity | Date of Lease or Sublease | As Amended or Assigned | Expiry of Primary Term or Current Option Period |
|---|---|---|---|---|---|---|---|---|---|---|
| 2873 | 1940 S. 8th Street | Fernandina Beach | FL | 32034 | Power House Marina | 18205 Biscayne Blvd #2201, Aventura, FL 33160 | PKGA | 1/31/18 | | 1/31/38 |
| 3048 | 18770 WHYTE HARDEE BLVD | Hardeeville | SC | 29927 | Dutchtown Villas Apartments, LLC | 7370 Hodgson Memorial Drive, Suite D-10 Savannah, GA 31406 | PKGA | 12/5/14 | 1/31/18 | 1/31/38 |
| 5571 | 415 US HIGHWAY 80 E | Pooler | GA | 31322 | College Street Station, LLC | 7370 Hodgson Memorial Drive, Suite D-10 Savannah, GA 31406 ATTN: Jeanne Whitney | PKGA | 1/31/18 | | 1/31/38 |
| 6986 | 11031 Old St. Augustine Rd | Jacksonville | FL | 32257 | South Coast Enterprises, LLC | 14125 Robert Paris Ct, Chantilly, VA 20151 ATTN: Ashok Mehta | PKGA | 1/31/18 | | 1/31/38 |
| 7068 | 13180 Atlantic Blvd | Jacksonville | FL | 32225 | Burger King Corporation | 5707 Blue Lagoon Drive Miami FL 33126 ATTN: Robin Shafer | PKGA | 2/24/22 | | 12/31/41 |
| 7121 | 10142 Phillip's Hwy | Jacksonville | FL | 32256 | Burger King Corporation | 5707 Blue Lagoon Drive Miami FL 33126 ATTN: Robin Shafer | PKGA | 1/31/18 | | 12/31/32 |
| 8907 | 1162 Boone Ave Ext E | Kingsland | GA | 31548 | Premier Kings Holdings of Georgia, LLC | Estate of Manraj S Sidhu c/o Robert Ritchey P.O. Drawer 4540 Montgomery, AL 36103-4540 | PKGA | 6/15/16 | 10/30/18 | 10/31/38 |
| 9942 | 9090 Merrill Road | Jacksonville | FL | 32225 | Isram Merrill | 506 South Dixie Hwy Hallandale, FL 33009 | PKGA | 2/1/18 | | 9/26/36 |
| 10241 | 13060 Highway 251 | Darien | GA | 31305 | Premier Kings Holdings of Georgia, LLC | Estate of Manraj S Sidhu c/o Robert Ritchey P.O. Drawer 4540 Montgomery, AL 36103-4540 | PKGA | 6/15/16 | 10/30/18 | 10/31/38 |
| 10422 | 542370 US Highway 1 | Callahan | FL | 32011 | DEW1014 Invesments LLC. | 1920 E. Hallandale Beach Blvd Suite 900 Hallandale Beach, FL 33009 | PKGA | 2/1/18/ | | 1/31/38 |
| 10893 | 815 Elma G. Miles Parkway | Hinesville | GA | 31313 | Crown Premier Properties, LLC | 10 Mall Court, Suite A Savannah, GA 31411 ATTN: Fonda Salgueiro | PKGA | 6/18/19 | | 6/30/39 |

| Store Number | Store Address | City | State | Zip Code | Lessor/Sublessor | Lessor Address | Lessee/ Op Entity | Date of Lease or Sublease | As Amended or Assigned | Expiry of Primary Term or Current Option Period |
|---|---|---|---|---|---|---|---|---|---|---|
| 11309 | 462581 SR 200 | Yulee | FL | 32097 | South Coast Enterprises, LLC | 14125 Robert Paris Ct, Chantilly, VA 20151 ATTN: Ashok Mehta | PKGA | 1/31/18 | | 1/31/38 |
| 12107 | 115 Golden Isles Plaza | Brunswick | GA | 31520 | Premier Kings Holdings of Georgia, LLC | Estate of Manraj S Sidhu c/o Robert Ritchey P.O. Drawer 4540 Montgomery, AL 36103-4540 | PKGA | 6/15/16 | 10/30/18 | 10/31/38 |
| 12792 | 3527 Highway 84 West | Blackshear | GA | 31516 | Premier Kings Holdings of Georgia, LLC | Estate of Manraj S Sidhu c/o Robert Ritchey P.O. Drawer 4540 Montgomery, AL 36103-4540 | PKGA | 6/15/16 | 10/30/18 | 10/31/38 |
| 12906 | 8257 E MAIN ST | Ridgeland | SC | 29936 | J Gisel LLC | 488 NE 18th Street, Unit 415, Miami, FL 33132 | PKGA | 1/31/18 | 8/4/22 8/9/22 | 1/31/38 |
| 13106 | 13404 Sutton Park Dr. | Jacksonville | FL | 32224 | Tyler BK Associates LLC | 12037 Glacier Bay Drive Boynton Beach, FL 33473 ATTN: Neil Tepper | PKGA | 1/31/18 | 4/27/23 | 1/31/38 |
| 13243 | 154 S. Main St. | Baxley | GA | 31513 | Premier Kings Holdings of Georgia, LLC | Estate of Manraj S Sidhu c/o Robert Ritchey P.O. Drawer 4540 Montgomery, AL 36103-4540 | PKGA | 7/6/16 | 10/30/18 | 10/31/38 |
| 14209 | 201 MUSEUM ST | Hilton Head Isla | SC | 29926 | GRD Family Properties | 501 East Sunny Hills Road Fullerton, CA 92835 ATTN: Ryan Daiily | PKGA | 1/31/18 | | 1/31/38 |
| 14614 | 602 Fair Road | Statesboro | GA | 30458 | Crown Premier Properties, LLC | 10 Mall Court, Suite A Savannah, GA 31411 ATTN: Fonda Salgueiro | PKGA | 6/18/19 | | 6/30/39 |
| 15499 | 13049 North Main St | Jacksonville | FL | 32218 | Premier Kings Holdings of Georgia, LLC | Estate of Manraj S Sidhu c/o Robert Ritchey P.O. Drawer 4540 Montgomery, AL 36103-4540 | PKGA | 3/1/17 | 10/30/18 | 10/31/38 |
| 15760 | 4268 Ogeechee Road | Savannah | GA | 31405 | 375 W. Arenas Avi-Ross, LLC | 222 Karen Ave #702 Las Vegas, NV 89109 ATTN: Marina Rossi | PKGA | 6/18/19 | | 6/30/39 |

| Store Number | Store Address | City | State | Zip Code | Lessor/Sublessor | Lessor Address | Lessee/ Op Entity | Date of Lease or Sublease | As Amended or Assigned | Expiry of Primary Term or Current Option Period |
|---|---|---|---|---|---|---|---|---|---|---|
| 16751 | 184 S. Hwy 17 | East Palatka | FL | 32131 | South Coast Enterprises, LLC | 14125 Robert Paris Ct, Chantilly, VA 20151 ATTN: Ashok Mehta | PKGA | 1/31/18 | | 1/31/38 |
| 17831 | 11761 Beach Blvd    Ste | Jacksonville | FL | 32246 | South Coast Enterprises, LLC/Hakimian Holdings | 14125 Robert Paris Ct, Chantilly, VA 20151 ATTN: Ashok Mehta | PKGA | 2/1/18 | | 8/31/30 |
| 19411 | 2455 SR 207 | St Augustine | FL | 32084 | South Coast Enterprises, LLC | 14125 Robert Paris Ct, Chantilly, VA 20151 ATTN: Ashok Mehta | PKGA | 43131 | | 50436 |
| 23049 | 496 Jimmy DeLoach Parkw | Savannah | GA | 31407 | Crown Premier Properties, LLC | 10 Mall Court, Suite A, Savannah, GA 31411 ATTN: Fonda Salgueiro | PKGA | 6/18/19 | | 6/30/39 |
| 23155 | 3 BAYLOR BROOK DR | Okatie | SC | 29909 | Rave RE, LLC | 14125 Robert Paris Ct, Chantilly, VA 20151 ATTN: Ashok Mehta | PKGA | 1/31/18 | | 1/31/38 |
| 23806 | 2430 Osborne Rd | St Mary's | GA | 31558 | Premier Kings Holdings of Georgia, LLC | Estate of Manraj S Sidhu c/o Robert Ritchey P.O. Drawer 4540 Montgomery, AL 36103-4540 | PKGA | 3/28/17 | 10/30/18 | 10/31/38 |
| 24560 | 5910 Ogeechee Road | Savannah | GA | 31419 | Grant Realty Corp | 1982 Ashley Hall Road Charleston, SC 29407 ATTN: Barry Newton | PKGA | 4/27/17 | 1/22/18 | 12/31/37 |
| 25882 | 106 N Duval St | Claxton | GA | 30417 | Premier Holdings of Georgia, LLC | Estate of Manraj S Sidhu c/o Robert Ritchey P.O. Drawer 4540 | PKGA | 12/13/18 | | 12/29/38 |
| 25937 | 4660 Hwy 17 | Richmond Hill | GA | 31324 | Premier Holdings of Georgia, LLC | Estate of Manraj S Sidhu c/o Robert Ritchey P.O. Drawer 4540 | PKGA | 6/5/19 | | 11/4/39 |
| 26749 | 13708 East Oglethorpe Hw | Midway | GA | 31320 | Premier Holdings of Georgia, LLC | Estate of Manraj S Sidhu c/o Robert Ritchey P.O. Drawer 4540 | PKGA | 5/24/19 | | 8/19/39 |
| 26868 | 7304 Hwy 21 | Port Wentworth | GA | 31407 | Port Wentworth, (GL to PKGA)PHGA (Del Agrmnt w/PK-GA) | c/o Cape Asset Management 3735 Beam Road, Suite B Charlotte, NC 28217 | PKGA | 5/8/18 (GL) 5/17/19 Dev Agr | 8/3/18 (GL) | 3/31/39 |
| 27690 | 13200 W Cleveland Street | Nahunta | GA | 31553 | Premier Holdings of Georgia, LLC | Estate of Manraj S Sidhu c/o Robert Ritchey P.O. Drawer 4540 Montgomery, AL 36103-4540 | PKGA | 3/1/19 | | 12/19/39 |

*PKGA = Premier Kings of Georgia, Inc.

**Exhibit C**

**Bill of Sale**

THIS BILL OF SALE (this "**Bill of Sale**") is made and entered into as of [_____], 2023, by Premier Kings of Georgia, Inc., a Georgia corporation ("**Seller**") in favor of _____, a _____ ("**Buyer**"). Seller and Buyer are referred to collectively as "**Parties**" herein, and each individually, a "**Party**".

**RECITALS**

WHEREAS, Buyer and Seller are parties to that certain Asset Purchase Agreement dated as of [_____], 2023 (the "**Purchase Agreement**"), pursuant to which Seller agreed to sell, convey, assign, transfer and deliver to Buyer, all of its respective right, title and interest in and to the Assets (as defined therein), and Buyer agreed to acquire the same; and

WHEREAS, all capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Purchase Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, and incorporating the recitals above, the Parties agree as follows:

**AGREEMENT**

1.  <u>Assignment</u>.  Subject to the terms and conditions set forth in the Purchase Agreement, for valuable consideration received from Buyer, Seller does hereby irrevocably and unconditionally sell, assign, transfer, convey and deliver to Buyer, its successors and assigns forever, all of Seller's rights, title and interest in and to the Assets, including good and marketable title thereto, free and clear of any and all Liens, to have and to hold the same and each and all thereof unto Buyer, its successors and assigns forever, to its and their own use and benefit forever.

2.  <u>Further Assurances</u>.  In case at any time after the date hereof any further actions are necessary or desirable to carry out the purposes of this Bill of Sale, Seller shall execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required or requested by Buyer to carry out the provisions hereof.

3.  <u>Instrument of Conveyance Only</u>.  This Bill of Sale is being made by Seller pursuant to the requirements of the Purchase Agreement, the terms and conditions of which are incorporated herein by this reference, and this Bill of Sale shall be subject to such terms and conditions.  Except for the actual conveyance of the Assets as set forth in <u>Section 1</u> of this Bill of Sale, nothing set forth in this Bill of Sale is intended to or shall expand, enlarge, modify, restrict, limit, or abridge any of the terms, representations, warranties, covenants, conditions, agreements, provisions, rights, benefits, obligations or liabilities of the Parties beyond that set

forth in the Purchase Agreement. In the event of any conflict, ambiguity or discrepancy between the terms or conditions of the Purchase Agreement and this Bill of Sale, the terms and conditions of the Purchase Agreement shall be controlling in all respects.

4.    <u>No Third Party Beneficiaries</u>.  This Bill of Sale is for the sole and exclusive benefit of the Parties and their respective successor and permitted assigns, and nothing herein is intended or shall be construed to confer upon any person other than the Parties and their respective successors and permitted assigns any rights, remedies or claims under, or by any reason of, this Bill of Sale of any term, covenant or condition hereof.

5.    <u>Governing Law; Disputes</u>.  The Parties agree that this Bill of Sale shall be governed by and construed in accordance with the laws of the State of Alabama without regard to such state's conflicts of laws rules.  Any dispute arising from this Bill of Sale shall be subject to the terms and conditions of the Purchase Agreement.

6.    <u>Counterparts</u>.  This Bill of Sale may be executed in multiple counterparts, each of which will constitute an original and all of which, when taken together, will constitute one and the same agreement.  Seller may deliver executed signature pages to this Bill of Sale by facsimile or email transmission.  No Party may raise as a defense to the formation or enforceability of this Bill of Sale, and each Party forever waives any such defense, either (a) the use of a facsimile or email transmission to deliver a signature or (b) the fact that any signature was signed and subsequently transmitted by facsimile or email transmission.

[Remainder of Page Left Blank]

DocuSign Envelope ID: D0E1D790-6803-4214-AD02-8F7AF4AB84B0

IN WITNESS WHEREOF, the undersigned have executed this Bill of Sale effective as of the date first set forth above.

**SELLER:**

PREMIER KINGS OF GEORGIA, INC.

By: _____

Name: _____

Title: _____

## Exhibit D

## Assignment and Assumption Agreement

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (this "<u>Assignment</u>") is made and entered into as of _____, 2023, by and among Premier Kings of Georgia, Inc., a Georgia corporation ("**Assignor**") and _____, a _____ ("**Assignee**").  Assignor and Assignee are referred to collectively as "**Parties**" herein, and each individually, a "**Party**".

## RECITALS

WHEREAS, Assignor and Assignee are parties to that certain Asset Purchase Agreement dated as of [_____], 2023 (the "**Purchase Agreement**"), pursuant to which to which Assignor agreed to assign, and Assignee agreed to assume, all of Assignor's right, title and interest in and to the Assumed Contracts;

WHEREAS, in connection with the consummation of the transactions contemplated by the Purchase Agreement, Assignor agreed to assign, and Assignee agreed to assume, pay, perform, discharge or otherwise satisfy the Assumed Liabilities; and

WHEREAS, all capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Purchase Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, and incorporating the recitals above, the Parties agree as follows:

## AGREEMENT

1. <u>Assignment of Assumed Contracts</u>.  Subject to the terms and conditions set forth in the Purchase Agreement, for valuable consideration received from Assignee, Assignor hereby assigns, transfers and conveys to Assignee all of Assignor's right, title and interest in, to and under the Assumed Contracts and Assignee accepts such assignment.

2. <u>Assumption of Assumed Liabilities</u>.  Subject to the terms and conditions set forth in the Purchase Agreement, Assignor hereby assigns to Assignee the Assumed Liabilities and Assignee hereby accepts such assignment and agrees to pay, perform, discharge or otherwise satisfy the Assumed Liabilities.  Other than as specifically set forth herein, Assignee assumes no debt, liability, or obligation of Assignor all of which shall remain the responsibility of Assignor and shall be Excluded Liabilities.

3. <u>Further Assurances</u>.  In case at any time after the date hereof any further actions are necessary or desirable to carry out the purposes of this Assignment, the Parties shall execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof.

DocuSign Envelope ID: D0E1D790-6803-4214-AD02-8F7AF4AB84B0

4.     <u>Instrument of Conveyance Only</u>.  This Assignment is being made by the Parties pursuant to the requirements of the Purchase Agreement, the terms and conditions of which are incorporated herein by this reference, and this Assignment shall be subject to such terms and conditions.  Except for the actual conveyance of the Assumed Contracts as set forth in <u>Section 1</u> of this Assignment and the assumption of the Assumed Liabilities as set forth in <u>Section 2</u> of this Assignment, nothing set forth in this Assignment is intended to or shall expand, enlarge, modify, restrict, limit, or abridge any of the terms, representations, warranties, covenants, conditions, agreements, provisions, rights, benefits, obligations or liabilities of Assignors or Assignee beyond that set forth in the Purchase Agreement.  In the event of any conflict, ambiguity or discrepancy between the terms or conditions of the Purchase Agreement and this Assignment, the terms and conditions of the Purchase Agreement shall be controlling in all respects.

5.     <u>No Third Party Beneficiaries</u>.  This Assignment is for the sole and exclusive benefit of the Parties and their respective successor and permitted assigns, and nothing herein is intended or shall be construed to confer upon any person other than the Parties and their respective successors and permitted assigns any rights, remedies or claims under, or by any reason of, this Assignment of any term, covenant or condition hereof.

6.     <u>Governing Law; Disputes</u>.  The Parties agree that this Assignment shall be governed by and construed in accordance with the laws of the State of Alabama without regard to such state's conflicts of laws rules.  Any dispute arising from this Assignment shall be subject to the terms and conditions of the Purchase Agreement.

7.     <u>Counterparts</u>.  This Assignment may be executed in multiple counterparts, each of which will constitute an original and all of which, when taken together, will constitute one and the same agreement.  The Parties may deliver executed signature pages to this Assignment by facsimile or email transmission.  No Party may raise as a defense to the formation or enforceability of this Assignment, and each Party forever waives any such defense, either (a) the use of a facsimile or email transmission to deliver a signature or (b) the fact that any signature was signed and subsequently transmitted by facsimile or email transmission.

[Signature Page Follows]

IN WITNESS WHEREOF, Assignor and Assignee have executed this Assignment effective as of the date first set forth above.

**ASSIGNOR:**

PREMIER KINGS OF GEORGIA, INC.

By:_____

Name:_____

Title:_____

**ASSIGNEE:**

By:_____

Name:_____

Title:_____

# Exhibit E

# Franchise Agreements

| Store# | Operating Entity | Original Signer | Agreement Date | Date Assigned to PK | Agreement Addendum | Address | City | State | Zip Code |
|---|---|---|---|---|---|---|---|---|---|
| 1197 | PKGA | Vance Rossell (South Coast Enterprises, LLC) | 12/2/2016 | 1/31/2018 | Franchise Agreement Addendum BKoT signed on 12/2/16 | 250 Monument Road | Jacksonville | FL | 32225 |
| 1724 | PKGA | Manraj S. Sidhu | 5/12/2022 | | Successor Addendum signed on 5/12/22 Franchise Agreement Addendum BKoT signed on 5/12/22 | 5922 Merrill Road | Jacksonville | FL | 32277 |
| 2873 | PKGA | Vance Rossell (South Coast Enterprises, LLC) | 10/5/2010 | 1/31/2018 | | 1940 S. 8th Street | Fernandina Beach | FL | 32034 |
| 6986 | PKGA | Vance Rossell (South Coast Enterprises, LLC) | Per BKC 12/7/10 | | | 11031 Old St. Augustine Rd | Jacksonville | FL | 32257 |
| 7068 | PKGA | Manraj S. Sidhu | Per BKC 2/24/22 | | | 13180 Atlantic Blvd | Jacksonville | FL | 32225 |
| 7121 | PKGA | Vance Rossell (South Coast Enterprises, LLC) | 4/10/2015 | 1/31/2018 | | 10142 Phillip's Hwy | Jacksonville | FL | 32256 |
| 8907 | PKGA | Manraj S. Sidhu | 8/21/2017 | | Successor Addendum signed on 8/21/17 | 1162 Boone St Ext E | Kingsland | GA | 31548 |
| 9942 | PKGA | Vance Rossell (South Coast Enterprises, LLC) | 12/31/2016 | 1/31/2018 | | 9090 Merrill Road | Jacksonville | FL | 32225 |
| 10422 | PKGA | Vance Rossell (South Coast Enterprises, LLC) | 12/1/2014 | 1/31/2018 | | 542370 US Highway 1 | Callahan | FL | 32011 |
| 11309 | PKGA | Vance Rossell (South Coast Enterprises, LLC) | 8/31/2015 | 1/31/2018 | | 462581 SR 200 | Yulee | FL | 32097 |
| 13106 | PKGA | Vance Rossell (South Coast Enterprises, LLC) | 12/16/2016 | 1/31/2018 | | 13404 Sutton Park Dr. | Jacksonville | FL | 32224 |
| 15499 | PKGA | Manraj S. Sidhu | 3/31/2017 | | Replacement Franchise Addendum signed on 3/31/17 | 13049 North Main St | Jacksonville | FL | 32218 |
| 16751 | PKGA | Vance Rossell (South Coast Enterprises, LLC) | 10/1/2008 | 1/31/2018 | | 184 S. Hwy 17 | East Palatka | FL | 32131 |
| 17831 | PKGA | Vance Rossell (South Coast Enterprises, LLC) | 12/10/2010 | 1/31/2018 | | 11761 Beach Blvd Ste 15 | Jacksonville | FL | 32246 |
| 19411 | PKGA | Vance Rossell (South Coast Enterprises, LLC) | 11/22/2013 | 1/31/2018 | | 2455 SR 207 | St Augustine | FL | 32084 |
| 23806 | PKGA | Manraj S. Sidhu | 3/28/2017 | | Franchise Agreement Addendum signed on 3/28/17 | 2430 Osborne Rd | St Mary's | GA | 31558 |
| 1691 | PKGA | Carol Slade (Parks Restaurant Management, Inc.) | 2/13/2014 | 6/15/2016 | | 5015 New Jesup Hwy | Brunswick | GA | 31520 |
| 322 | PKGA | Alex Salgueiro (Savannah Restaurants Corporation) | 11/28/2017 | 6/17/2019 | | 601 Martin Luther King Blvd | Savannah | GA | 31401 |

| Store# | Operating Entity | Original Signer | Agreement Date | Date Assigned to PK | Agreement Addendum | Address | City | State | Zip Code |
|---|---|---|---|---|---|---|---|---|---|
| 521 | PKGA | Manraj S. Sidhu | 10/1/2021 | | Successor Addendum signed on 10/1/21 Franchise Agreement Addendum BKoT signed on 10/1/21 | 7923 White Bluff Road | Savannah | GA | 31406 |
| 1226 | PKGA | Alex Salgueiro (Savannah Restaurants Corporation) | 9/10/2015 | 6/17/2019 | | 14 W. DeRenne Ave | Savannah | GA | 31405 |
| 1404 | PKGA | Manraj S. Sidhu | Per BKC 10/1/21 | | | 11711 Abercorn Street | Savannah | GA | 31419 |
| 1471 | PKGA | Ashok Mehta (Rave Enterprises, LLC) | 12/7/2014 | 1/31/2018 | | 1295 Ribaut Rd | Beaufort | SC | 29902 |
| 1551 | PKGA | Manraj S. Sidhu | 10/1/2021 | | Successor Addendum signed on 10/1/21 Franchise Agreement Addendum BKoT signed on 10/1/21 | 4241 Augusta Road | Garden City | GA | 31408 |
| 2124 | PKGA | Carol Slade (Parks Restaurant Management, Inc.) | 3/30/2011 | 6/15/2016 | | 1710 Memorial Drive | Waycross | GA | 31501 |
| 2397 | PKGA | Manraj S. Sidhu | Per BKC 4/17/19 | | | 998 Sunset Blvd | Jesup | GA | 31545 |
| 3048 | PKGA | Ashok Mehta (Rave Enterprises, LLC) | 8/31/2017 | 1/31/2018 | | 18770 Whyte Hardee Blvd | Hardeeville | SC | 29927 |
| 5571 | PKGA | Ashok Mehta (Rave Enterprises, LLC) | 12/7/2014 | 1/31/2018 | | 415 US Highway 80 E | Pooler | GA | 31322 |
| 10241 | PKGA | Manraj S. Sidhu | Per BKC 11/30/18 | | | Highway 251 Magnolia Bluff Way | Darien | GA | 31305 |
| 10893 | PKGA | Alex Salgueiro (Savannah Restaurants Corporation) | 12/31/2012 | 6/17/2019 | | 815 Elma G. Miles Parkway | Hinesville | GA | 31313 |
| 12107 | PKGA | Manraj S. Sidhu | Per BKC 12/20/2019 | | | 115 Golden Isles Plaza | Brunswick | GA | 31520 |
| 12792 | PKGA | Manraj S. Sidhu | 11/30/2018 | | Successor Addendum signed on 11/30/18 | 3527 Highway 84 West | Blackshear | GA | 31516 |
| 12906 | PKGA | Ashok Mehta (Rave Enterprises, LLC) | 11/18/2016 | 1/31/2018 | | 8257 E Main St | Ridgeland | SC | 29936 |
| 13243 | PKGA | Manraj S. Sidhu | 11/30/2018 | | Successor Addendum signed on 11/27/18 | 154 S. Main St. | Baxley | GA | 31513 |
| 14209 | PKGA | Ashok Mehta (Rave Enterprises, LLC) | 9/28/2017 | 1/31/2018 | | 201 Museum St | Hilton Head Island | SC | 29926 |
| 14614 | PKGA | Alex Salgueiro (Savannah Restaurants Corporation) | 6/4/2003 | 6/17/2019 | | 602 Fair Road | Statesboro | GA | 30458 |
| 15760 | PKGA | Alex Salgueiro (Savannah Restaurants Corporation) | 11/20/2006 | 6/17/2019 | | 4268 Ogeechee Road | Savannah | GA | 31405 |
| 23049 | PKGA | Alex Salgueiro (Savannah Restaurants Corporation) | 12/30/2016 | 6/17/2019 | | 496 Jimmy DeLoach Parkway | Savannah | GA | 31407 |
| 23155 | PKGA | Ashok Mehta (Rave Enterprises, LLC) | 12/27/2016 | 1/31/2018 | | 3 Baylor Brook Dr | Okatie | SC | 29909 |
| 24560 | PKGA | Manraj S. Sidhu | 12/31/2017 | | Franchise Agreement Addendum signed on 12/31/17 | 5918 Ogeehee Road | Savannah | GA | 31419 |
| 25882 | PKGA | Manraj S. Sidhu | Per BKC 12/30/2018 | | | 106 N Duval St | Claxton | GA | 30417 |
| 25937 | PKGA | Manraj S. Sidhu | 11/5/2019 | | Franchise Agreement Addendum signed on 11/5/19 | 4660 Hwy 17 | Richmond Hill | GA | 31324 |

| Store# | Operating Entity | Original Signer | Agreement Date | Date Assigned to PK | Agreement Addendum | Address | City | State | Zip Code |
|---|---|---|---|---|---|---|---|---|---|
| 26749 | PKGA | Manraj S. Sidhu | 8/20/2019 | | Franchise Agreement Addendum signed on 8/20/19 | 13708 East Oglethorpe Hwy | Midway | GA | 31320 |
| 26868 | PKGA | Manraj S. Sidhu | 8/1/2019 | | Franchise Agreement Addendum signed on 8/1/19 | 7306 Hwy 21 | Port Wentworth | GA | 31407 |
| 27690 | PKGA | Manraj S. Sidhu | 12/20/2019 | | Franchise Agreement Addendum signed on 12/20/19 | 13200 W Cleveland Street | Nahunta | GA | 31553 |

*PKGA - Premier Kings of Georgia, Inc.

**Schedule 1.2(a) -1**
**Assignable Contracts**

None.

**Schedule 1.2(a) – 2**
**Designated Contracts**

None

# Schedule 1.3(a) -1
# Assignable Leases

| Store Number | Store Address | City | State | Zip Code | Lessor/Sublessor | Lessor Address | Lessee/ Op Entity | Date of Lease or Sublease | As Amended or Assigned | Expiry of Primary Term or Current Option Period |
|---|---|---|---|---|---|---|---|---|---|---|
| 322 | 601 Martin Luther King Blvd | Savannah | GA | 31401 | Crown Premier Properties, LLC | 10 Mall Court, Suite A, Savannah, GA 31411 ATTN: Fonda Salgueiro | PKGA | 1/26/97 | 1/18/16 1/20/16 6/18/19 | 6/17/39 |
| 521 | 7923 White Bluff Road | Savannah | GA | 31406 | Burger King Corporation | 5707 Blue Lagoon Drive Miami FL 33126 ATTN: Robin Shafer | PKGA | 1/19/21 | | 10/31/41 |
| 1197 | 250 Monument Road | Jacksonville | FL | 32225 | Burger King Corporation | 5707 Blue Lagoon Drive Miami FL 33126 ATTN: Robin Shafer | PKGA | 10/13/16 | 1/31/18 | 12/31/36 |
| 1226 | 14 W. DeRenne Ave | Savannah | GA | 31405 | Crown Premier Properties, LLC | 10 Mall Court, Suite A Savannah, GA 31411 ATTN: Fonda Salgueiro | PKGA | 6/18/19 | | 6/29/39 |
| 1404 | 11711 Abercorn Street | Savannah | GA | 31419 | Burger King Corporation | 5707 Blue Lagoon Drive Miami FL 33126 ATTN: Robin Shafer | PKGA | 10/24/20 | | 10/31/41 |
| 1471 | 1295 RIBAUT RD | Beaufort | SC | 29902 | YSB Capital | 350 Riverdale Drive Fort Lee, NJ 07024 | PKGA | 12/5/14 | 1/31/18 | 1/31/38 |
| 1551 | 4241 Augusta Road | Garden City | GA | 31408 | Burger King Corporation | 5707 Blue Lagoon Drive Miami FL 33126 ATTN: Robin Shafer | PKGA | 10/31/21 Approximate | | 10/31/41 |
| 1691 | 5015 New Jesup | Brunswick | GA | 31520 | BQK 5015, LLLC | c/o Provident Mgmt Corp 1430 Broadway Suite 903 New York, NY 10018 ATTN: Mark Nagel | PKGA | 6/30/92 | 4/16/13 8/1/13 6/15/16 | 8/1/33 |
| 1724 | 5922 Merrill Road | Jacksonville | FL | 32277 | Burger King Corporation | 5707 Blue Lagoon Drive Miami FL 33126 ATTN: Robin Shafer | PKGA | 9/1/21 | | 12/31/40 |
| 2124 | 1710 Memorial Drive | Waycross | GA | 31501 | SRJ Ventures | 4141 Southpoint Dr. E, Suite B, Jacksonville, AL 32216 ATTN: John McCue | PKGA | 1/28/05 | 6/15/16 | 1/31/27 |
| 2397 | 998 Sunset Blvd Loc 129 | Jesup | GA | 31545 | Burger King Corporation | 5707 Blue Lagoon Drive Miami FL 33126 ATTN: Robin Shafer | PKGA | 9/25/18 | | 9/24/38 |

| Store Number | Store Address | City | State | Zip Code | Lessor/Sublessor | Lessor Address | Lessee/ Op Entity | Date of Lease or Sublease | As Amended or Assigned | Expiry of Primary Term or Current Option Period |
|---|---|---|---|---|---|---|---|---|---|---|
| 2873 | 1940 S. 8th Street | Fernandina Beach | FL | 32034 | Power House Marina | 18205 Biscayne Blvd #2201, Aventura, FL 33160 | PKGA | 1/31/18 | | 1/31/38 |
| 3048 | 18770 WHYTE HARDEE BLVD | Hardeeville | SC | 29927 | Dutchtown Villas Apartments, LLC | 7370 Hodgson Memorial Drive, Suite D-10 Savannah, GA 31406 | PKGA | 12/5/14 | 1/31/18 | 1/31/38 |
| 5571 | 415 US HIGHWAY 80 E | Pooler | GA | 31322 | College Street Station, LLC | 7370 Hodgson Memorial Drive, Suite D-10 Savannah, GA 31406 ATTN: Jeanne Whitney | PKGA | 1/31/18 | | 1/31/38 |
| 6986 | 11031 Old St. Augustine Rd | Jacksonville | FL | 32257 | South Coast Enterprises, LLC | 14125 Robert Paris Ct, Chantilly, VA 20151 ATTN: Ashok Mehta | PKGA | 1/31/18 | | 1/31/38 |
| 7068 | 13180 Atlantic Blvd | Jacksonville | FL | 32225 | Burger King Corporation | 5707 Blue Lagoon Drive Miami FL 33126 ATTN: Robin Shafer | PKGA | 2/24/22 | | 12/31/41 |
| 7121 | 10142 Phillip's Hwy | Jacksonville | FL | 32256 | Burger King Corporation | 5707 Blue Lagoon Drive Miami FL 33126 ATTN: Robin Shafer | PKGA | 1/31/18 | | 12/31/32 |
| 8907 | 1162 Boone Ave Ext E | Kingsland | GA | 31548 | Premier Kings Holdings of Georgia, LLC | Estate of Manraj S Sidhu c/o Robert Ritchey P.O. Drawer 4540 Montgomery, AL 36103-4540 | PKGA | 6/15/16 | 10/30/18 | 10/31/38 |
| 9942 | 9090 Merrill Road | Jacksonville | FL | 32225 | Isram Merrill | 506 South Dixie Hwy Hallandale, FL 33009 | PKGA | 2/1/18 | | 9/26/36 |
| 10241 | 13060 Highway 251 | Darien | GA | 31305 | Premier Kings Holdings of Georgia, LLC | Estate of Manraj S Sidhu c/o Robert Ritchey P.O. Drawer 4540 Montgomery, AL 36103-4540 | PKGA | 6/15/16 | 10/30/18 | 10/31/38 |
| 10422 | 542370 US Highway 1 | Callahan | FL | 32011 | DEW1014 Invesments LLC. | 1920 E. Hallandale Beach Blvd Suite 900 Hallandale Beach, FL 33009 | PKGA | 2/1/18/ | | 1/31/38 |
| 10893 | 815 Elma G. Miles Parkway | Hinesville | GA | 31313 | Crown Premier Properties, LLC | 10 Mall Court, Suite A Savannah, GA 31411 ATTN: Fonda Salgueiro | PKGA | 6/18/19 | | 6/30/39 |

| Store Number | Store Address | City | State | Zip Code | Lessor/Sublessor | Lessor Address | Lessee/ Op Entity | Date of Lease or Sublease | As Amended or Assigned | Expiry of Primary Term or Current Option Period |
|---|---|---|---|---|---|---|---|---|---|---|
| 11309 | 462581 SR 200 | Yulee | FL | 32097 | South Coast Enterprises, LLC | 14125 Robert Paris Ct, Chantilly, VA 20151 ATTN: Ashok Mehta | PKGA | 1/31/18 | | 1/31/38 |
| 12107 | 115 Golden Isles Plaza | Brunswick | GA | 31520 | Premier Kings Holdings of Georgia, LLC | Estate of Manraj S Sidhu c/o Robert Ritchey P.O. Drawer 4540 Montgomery, AL 36103-4540 | PKGA | 6/15/16 | 10/30/18 | 10/31/38 |
| 12792 | 3527 Highway 84 West | Blackshear | GA | 31516 | Premier Kings Holdings of Georgia, LLC | Estate of Manraj S Sidhu c/o Robert Ritchey P.O. Drawer 4540 Montgomery, AL 36103-4540 | PKGA | 6/15/16 | 10/30/18 | 10/31/38 |
| 12906 | 8257 E MAIN ST | Ridgeland | SC | 29936 | J Gisel LLC | 488 NE 18th Street, Unit 415, Miami, FL 33132 | PKGA | 1/31/18 | 8/4/22 8/9/22 | 1/31/38 |
| 13106 | 13404 Sutton Park Dr. | Jacksonville | FL | 32224 | Tyler BK Associates LLC | 12037 Glacier Bay Drive Boynton Beach, FL 33473 ATTN: Neil Tepper | PKGA | 1/31/18 | 4/27/23 | 1/31/38 |
| 13243 | 154 S. Main St. | Baxley | GA | 31513 | Premier Kings Holdings of Georgia, LLC | Estate of Manraj S Sidhu c/o Robert Ritchey P.O. Drawer 4540 Montgomery, AL 36103-4540 | PKGA | 7/6/16 | 10/30/18 | 10/31/38 |
| 14209 | 201 MUSEUM ST | Hilton Head Isla | SC | 29926 | GRD Family Properties | 501 East Sunny Hills Road Fullerton, CA 92835 ATTN: Ryan Daily | PKGA | 1/31/18 | | 1/31/38 |
| 14614 | 602 Fair Road | Statesboro | GA | 30458 | Crown Premier Properties, LLC | 10 Mall Court, Suite A Savannah, GA 31411 ATTN: Fonda Salgueiro | PKGA | 6/18/19 | | 6/30/39 |
| 15499 | 13049 North Main St | Jacksonville | FL | 32218 | Premier Kings Holdings of Georgia, LLC | Estate of Manraj S Sidhu c/o Robert Ritchey P.O. Drawer 4540 Montgomery, AL 36103-4540 | PKGA | 3/1/17 | 10/30/18 | 10/31/38 |
| 15760 | 4268 Ogeechee Road | Savannah | GA | 31405 | 375 W. Arenas Avi-Ross, LLC | 222 Karen Ave #702 Las Vegas, NV 89109 ATTN: Marina Rossi | PKGA | 6/18/19 | | 6/30/39 |

| Store Number | Store Address | City | State | Zip Code | Lessor/Sublessor | Lessor Address | Lessee/ Op Entity | Date of Lease or Sublease | As Amended or Assigned | Expiry of Primary Term or Current Option Period |
|---|---|---|---|---|---|---|---|---|---|---|
| 16751 | 184 S. Hwy 17 | East Palatka | FL | 32131 | South Coast Enterprises, LLC | 14125 Robert Paris Ct, Chantilly, VA 20151 ATTN: Ashok Mehta | PKGA | 1/31/18 | | 1/31/38 |
| 17831 | 11761 Beach Blvd    Ste | Jacksonville | FL | 32246 | South Coast Enterprises, LLC/Hakimian Holdings | 14125 Robert Paris Ct, Chantilly, VA 20151 ATTN: Ashok Mehta | PKGA | 2/1/18 | | 8/31/30 |
| 19411 | 2455 SR 207 | St Augustine | FL | 32084 | South Coast Enterprises, LLC | 14125 Robert Paris Ct, Chantilly, VA 20151 ATTN: Ashok Mehta | PKGA | 43131 | | 50436 |
| 23049 | 496 Jimmy DeLoach Parkw | Savannah | GA | 31407 | Crown Premier Properties, LLC | 10 Mall Court, Suite A, Savannah, GA 31411 ATTN: Fonda Salgueiro | PKGA | 6/18/19 | | 6/30/39 |
| 23155 | 3 BAYLOR BROOK DR | Okatie | SC | 29909 | Rave RE, LLC | 14125 Robert Paris Ct, Chantilly, VA 20151 ATTN: Ashok Mehta | PKGA | 1/31/18 | | 1/31/38 |
| 23806 | 2430 Osborne Rd | St Mary's | GA | 31558 | Premier Kings Holdings of Georgia, LLC | Estate of Manraj S Sidhu c/o Robert Ritchey P.O. Drawer 4540 Montgomery, AL 36103-4540 | PKGA | 3/28/17 | 10/30/18 | 10/31/38 |
| 24560 | 5910 Ogeechee Road | Savannah | GA | 31419 | Grant Realty Corp | 1982 Ashley Hall Road Charleston, SC 29407 ATTN: Barry Newton | PKGA | 4/27/17 | 1/22/18 | 12/31/37 |
| 25882 | 106 N Duval St | Claxton | GA | 30417 | Premier Holdings of Georgia, LLC | Estate of Manraj S Sidhu c/o Robert Ritchey P.O. Drawer 4540 | PKGA | 12/13/18 | | 12/29/38 |
| 25937 | 4660 Hwy 17 | Richmond Hill | GA | 31324 | Premier Holdings of Georgia, LLC | Estate of Manraj S Sidhu c/o Robert Ritchey P.O. Drawer 4540 | PKGA | 6/5/19 | | 11/4/39 |
| 26749 | 13708 East Oglethorpe Hw | Midway | GA | 31320 | Premier Holdings of Georgia, LLC | Estate of Manraj S Sidhu c/o Robert Ritchey P.O. Drawer 4540 | PKGA | 5/24/19 | | 8/19/39 |
| 26868 | 7304 Hwy 21 | Port Wentworth | GA | 31407 | Port Wentworth, (GL to PKGA)PHGA (Del Agrmnt w/PK-GA) | c/o Cape Asset Management 3735 Beam Road, Suite B Charlotte, NC 28217 | PKGA | 5/8/18 (GL) 5/17/19 Dev Agr | 8/3/18 (GL) | 3/31/39 |
| 27690 | 13200 W Cleveland Street | Nahunta | GA | 31553 | Premier Holdings of Georgia, LLC | Estate of Manraj S Sidhu c/o Robert Ritchey P.O. Drawer 4540 Montgomery, AL 36103-4540 | PKGA | 3/1/19 | | 12/19/39 |

*PKGA = Premier Kings of Georgia, Inc.

**Schedule 1.3(a) - 2**
**Designated Leases**

To be provided by Buyer in accordance with the terms of the Agreement.

DocuSign Envelope ID: D0E1D790-6803-4214-AD02-8F7AF4AB84B0

**Schedule 1.5**
**Excluded Assets**

1. Coca-Cola Rebate for the portion of the rebate earned by Premier King through closing date.

2. Dr. Pepper Rebate for the portion of the rebate earned by Premier King through closing date.

3. RSI Rebate for the portion of the rebate earned by Premier King through closing.

4. Any and all claims and causes of action of Seller arising under bankruptcy and applicable non-bankruptcy law, including, but not limited to, all claims to collect accounts receivable and other debts, and all other causes of action for events and occurrences arising both before and after the Petition Date.

5. Any and all cash, cash equivalents, bank accounts, deposit accounts, credits, prepaid expenses, deposits, deferred charges, insurance claims, litigation proceeds, advance payments, security deposits, prepaid items, funds, securities, investment accounts, accounts receivable, notes, notes receivable, mortgages, security interests, income, revenues derived from Seller before the Closing Date.

6. Any and all avoidance actions Seller may have under Sections 544-551 of the Bankruptcy Code.

7. Any real or tangible personal property not located in the Stores to be sold to Buyer.

8. All of Seller's rights, claims and interests under insurance policies.

9. To the extent Buyer does not assume liability for and agree to take assignment of Seller's contracts with Brinks and Coca-Cola that have equipment within the Stores, all such equipment owned by such vendors, who also have the right to retrieve their equipment within the purchased restaurants.

DocuSign Envelope ID: D0E1D790-6803-4214-AD02-8F7AF4AB84B0

**Schedule 3.2**
**Escrow Agreement**

**Schedule 6.4**
**Compliance with Law**

Florida Dept of Environmental Protection v. Premier Kings of Georgia. S.A. NO: 23SA050388AN in the Circuit Court of the Fourth Judicial Circuit in and for Nassau County, Florida.

**Schedule 6.6**
**Lease Defaults**

| Store Number | Buyer | Landlord | Store Address | City | State | Zip Code | Nature of Default |
|---|---|---|---|---|---|---|---|
| 521 | RRG | Burger King Corporation | 7923 White Bluff Road | Savannah | GA | 31406 | Failure to Pay Rent |
| 1197 | RRG | Burger King Corporation | 250 Monument Road | Jacksonville | FL | 32225 | Failure to Pay Rent |
| 1404 | RRG | Burger King Corporation | 11711 Abercorn St. | Savannah | GA | 31419 | Failure to Pay Rent |
| 1551 | RRG | Burger King Corporation | 4241 Augusta Rd | Garden City | GA | 31408 | Failure to Pay Rent |
| 1724 | RRG | Burger King Corporation | 5922 Merrill Road | Jacksonville | FL | 32277 | Failure to Pay Rent |
| 2397 | RRG | Burger King Corporation | 998 Sunset Blvd. | Jesup | GA | 31545 | Failure to Pay Rent |
| 7068 | RRG | Burger King Corporation | 13180 Atlantic Boulevard | Jacksonville | FL | 32225 | Failure to Pay Rent |
| 7121 | RRG | Burger King Corporation | 10142 Phillip's Hwy | Jacksonville | FL | 32256 | Failure to Pay Rent |
| 17831 | RRG | Gates of the Beachwood, LLC | 11761-15 Beach Boulevard | Jacksonville | FL | 32246 | Failure to Pay Rent |

DocuSign Envelope ID: D0E1D790-6803-4214-AD02-8F7AF4AB84B0

**Schedule 6.7**
**Contracts**

None.

DocuSign Envelope ID: D0E1D790-6803-4214-AD02-8F7AF4AB84B0

**Schedule 6.9**
**Legal Proceedings**

| Case Title | Case number | Court Information |
|---|---|---|
| Florida Dept of Environmental Protection v. Premier Kings of Georgia, Inc. | S.A. NO; 23SA050388AN | Circuit Court of the 4th Judical Circuit in and for Nassau County, FL |

**Schedule 6.11**
**Employees**

None.

**Schedule 6.13**
**Brokers**

1.      An investment banking fee is owed by Seller to Raymond James Financial.

**Schedule 8.1**

**Pre-Closing Conduct of Business Covenant Exceptions**

None

**EXHIBIT "C"**

**ASSET PURCHASE AGREEMENT**


**by and between**


**PREMIER KINGS, INC. AND CERTAIN OF ITS AFFILIATES, as Sellers**


**and**


**BULLDOG RESTAURANTS, LLC, as Buyer**


**October 26, 2023**

1

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "**Agreement**") dated as of October 26, 2023 (the "**Effective Date**") is by and between Premier Kings, Inc., an Alabama corporation ("**PK**"), and its affiliate Premier Kings of North Alabama, LLC, an Alabama limited liability company ("**PKNA**", and collectively with PK, "**Sellers**"), and Bulldog Restaurants, LLC, a Delaware limited liability company ("**Buyer**"). Buyer and Sellers are each referred to herein individually as a "**Party**" and collectively as the "**Parties**". Capitalized terms used herein but not otherwise defined have the meanings ascribed to them in Article 14.

## RECITALS

**WHEREAS**, Sellers currently operate a number of retail fast food restaurants at various locations. Sellers' restaurants include those listed in Exhibit A (each individual restaurant listed thereon being a "**Store**" and collectively, the "**Stores**"), under the name "Burger King" pursuant to the Franchise Agreements (defined below) held by each of the Sellers, and the businesses operated at the Stores pursuant to the Franchise Agreements are collectively referred to herein as the "**Business**;"

**WHEREAS**, Sellers lease certain real property and improvements listed on Exhibit B attached hereto with respect to the Stores (the "**Leased Properties**") pursuant to lease agreements governing the Leased Properties listed on Exhibit C (the "**Assumed Leases**");

**WHEREAS**, Sellers are parties to certain contracts, service agreements, disposal agreements, equipment leases, license agreements, commitments, purchase orders, business arrangements, governmental contracts, and all amendments, modifications and assignments thereof, which directly and exclusively relate to the operation of the Leased Properties or the Business, which include those listed on Exhibit D (the "**Assumed Contracts**").

**WHEREAS**, pursuant to and subject to the terms and conditions of this Agreement, Sellers desire to (i) assign to Buyer and Buyer desires to assume from Sellers, the Assumed Leases and the Assumed Contracts, in each case subject to the terms and conditions thereof unless otherwise provided herein or as agreed to by Buyer and the third-parties to the Assumed Leases and Assumed Contracts, and (ii) sell and transfer to Buyer, and Buyer desires to purchase and assume from Sellers, all of Sellers' right, title, and interest in the Assets (as defined below); and

**WHEREAS**, Sellers have advised the Buyer that Sellers intend to file a voluntary petition (the "**Petition**") for relief under Title 11 of the United States Code, 11 U.S.C. §101 et seq. (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Northern District of Alabama (the "**Bankruptcy Court**") in order to preserve and maximize the value of their Business through a Bankruptcy Court sale process as set forth below;

## AGREEMENT

**NOW, THEREFORE**, for and in consideration of the recitals and of the promises and mutual covenants, agreements, representations and warranties contained in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Buyer and Sellers agree as follows:

1

DocuSign Envelope ID: D8A6F8DD-ED09-44C4-AFDB-4EC79CD21600

# ARTICLE 1
## PURCHASE AND SALE OF ASSETS; EXCLUDED ASSETS

Section 1.1 <u>Assets to be Sold</u>. At the Effective Time (as defined in <u>Section 5.6</u> below), on the terms and subject to the conditions set forth in this Agreement, Sellers will sell, assign, transfer, convey and deliver to Buyer, and Buyer agrees to purchase, accept, acquire, assume, and take assignment and delivery from Sellers of, the following assets (collectively, the "**Assets**"), free and clear of all Liens:

(a) <u>Assumed Leases and Assumed Contracts</u>. The Assumed Leases and Assumed Contracts except (i) to the extent Buyer and the counter-party agree to the termination of existing contract or lease and execution of new or replacement agreements by Buyer in connection with the transactions contemplated herein, or (ii) Buyer elects, by written notice to Sellers prior to the Closing Date to remove one or more Stores, Leased Properties, leases or contracts from <u>Exhibit A</u>, <u>Exhibit B</u>, <u>Exhibit C</u> and <u>Exhibit D</u> to this Agreement, in which case each Exhibit shall be deemed amended to remove each such Store, Leased Property, contract and/or lease from the lists set forth therein. The parties acknowledge and agree that there will be no adjustment or reduction to the amount of the Initial Purchase Price or the amount due for the Inventory Audit Value under Paragraph 3.4(c) due to the exclusion of any one or more Stores, Leased Properties, contracts or leases pursuant to this Section 1.1(a).

(b) <u>Leased Properties</u>. All of Sellers' right, title and interest in and to the Leased Properties pursuant to the Assumed Leases, along with all of Sellers' right, title and interest, if any, in and to all buildings, improvements, easements, appurtenances, rights and privileges belonging or appertaining to the Leased Properties;

(c) <u>Equipment</u>. All of Sellers' rights, title, and interest in and to the Equipment located at the Stores on the Closing Date. For purposes of this Agreement, "**Equipment**" means all furniture, furnishings, fixtures, signage, security systems, point-of-sale systems, computer equipment, alarm systems, cameras, kitchen equipment, equipment, and machinery within the four walls of each Store, including such Equipment leased by Seller.

(d) <u>Inventory</u>. All inventory (including without limitation, food, supplies, paper, cleaning and marketing supplies) of Sellers held for use or sale by Sellers in connection with the operation of the Business at the Stores at the Effective Time (the "**Inventory**"). Following the close of business on the day which is five (5) days prior to the Closing Date, Buyer and Sellers together shall audit the Inventory at the Stores as set forth in <u>Section 3.4(c)</u> below;

(e) <u>Permits</u>. To the extent assignable, all of the permits, approvals, authorizations, registrations, licenses, certificates of occupancy, variances, orders, rulings, and decrees or permissions from any Governmental Entity or any entity or Person which directly and exclusively relate to the operation of the Leased Properties or the Business or the ownership of the Assets (the "**Permits**"); and

2

(f)     Other Assets.  To the extent assignable without the consent of any third party, all telephone and fax numbers for the Stores, keys and codes for security systems, rights under equipment warranties and other warranties and guarantees pertaining to the Stores, the Assets or the Business, and any other assets of Seller located within the four walls of each Store immediately prior to the Effective Time or necessary for the ongoing operation of the Business, to the extent owned by Sellers, other than Excluded Assets as described in Section 1.2.

Section 1.2     Excluded Assets.  Notwithstanding anything in this Agreement to the contrary, Buyer will not acquire from Sellers any of Sellers' assets listed on Schedule 1.2 (the "**Excluded Assets**").  The Parties, upon mutual agreement, may amend the Schedules and Exhibits included herewith at any time on or before the Closing Date in order to include or exclude any additional Assets or Excluded Assets.

Section 1.3     Franchise Agreements.  Sellers and the Business operate the Stores pursuant to Franchise Agreements with Franchisor  listed on Exhibit E (the "**Franchise Agreements**").  Buyer shall use commercially reasonable efforts to cause Franchisor and Buyer to enter into new Franchise Agreements with Buyer ("**New Franchise Agreements**") on terms satisfactory to Buyer in its sole discretion, and Sellers shall cooperate with Buyer in obtaining the approval of the Franchisor, without any obligation on the part of Sellers to incur any costs in connection with such approval.  If Buyer does not obtain the New Franchise Agreements prior to the Sale Hearing, Buyer may, by written notice to Sellers, terminate this Agreement.

## ARTICLE 2
## ASSUMPTION OF LIABILITIES

Section 2.1     Liabilities Assumed.  Except as expressly provided herein, Buyer shall not assume any liabilities of Sellers, including any liabilities stemming from a bank, bank holding company, debt fund, private creditor, or any other lending institution.  Buyer shall not assume any liabilities of Sellers under any contract (including, without limitation, any Assumed Lease or Assumed Contract) which first accrued and was to be performed prior to the Closing Date (including, without limitation, the cure amounts referenced in Section 4.1(c)) or which otherwise relate to any period prior to the Closing Date or any liability of Sellers arising out of or resulting from its compliance or noncompliance with any law, rules, or regulations of any Governmental Entity, except as Buyer may expressly agree in writing as a condition for assignment of any such contract to Buyer. Upon the terms and subject to the conditions set forth in this Agreement, at the Effective Time, Buyer shall assume and thereafter shall perform and discharge, (i) Sellers' obligations arising on and after the Effective Time under the Assumed Leases and the Assumed Contracts that are assigned as contemplated by this Agreement; and (ii) those obligations and liabilities arising out Buyer's ownership or operation of the Assets and Business from and after the Effective Time (the "**Assumed Liabilities**").  For avoidance of doubt, the Assumed Liabilities shall not include any liabilities arising as a result of a Sellers' breach of an Assumed Contract or Assumed Lease prior to the Closing Date.

3

## ARTICLE 3
## PURCHASE PRICE AND ADJUSTMENT

Section 3.1    Purchase Price.  The consideration to be paid by Buyer to Sellers on the Closing Date for the Assets shall be paid via wire transfer of good and collected funds, to an account designated in writing by Sellers at least two (2) days prior to the Closing Date, in the amount of $8,000,000.00 (the "**Initial Purchase Price**"), plus or minus, as applicable, the adjustments as set forth in Section 3.4 (all such amounts collectively, the "**Purchase Price**"), *minus* the amount of the Good Faith Deposit (as defined below).

Section 3.2    Good Faith Deposit.  Upon the execution and delivery of this Agreement, Buyer shall deposit a cash payment equal to ten percent (10%) of the Initial Purchase Price (the "**Good Faith Deposit**") which shall be placed in an account with Flagstar Bank (the "**Escrow Agent**").  Each of the Buyer, on the one hand, and the Sellers, on the other hand, shall pay fifty percent (50%) of all fees and expenses of the Escrow Agent.  If Buyer fails to make the Good Faith Deposit in a timely manner, then Sellers shall have the right to terminate this Agreement and the Parties shall have no further rights or obligations hereunder.  The Good Faith Deposit and Escrow Agent's duties hereunder shall be further subject to the provisions of that certain Escrow Agreement in substantially the form set forth on Schedule 3.2 attached hereto, (the "**Escrow Agreement**") to be executed and delivered by PK, Buyer, and the Escrow Agent on the Effective Date.  Upon Closing of the sale of the Assets under this Agreement, the Good Faith Deposit shall be released to Sellers and applied to the Purchase Price at Closing.

Section 3.3    Tax Allocations.  Sellers and Buyer agree that (i) the Purchase Price will be allocated for state and federal income tax purposes as determined by Buyer and in accordance with applicable law, and (ii) after the Closing, neither party will take any position or action in connection with complying with the Internal Revenue Code (the "**Code**") and the regulations promulgated thereunder, inconsistent with such allocations. If required by the Code, both Buyer and Sellers agree to execute the appropriate tax forms to acknowledge such allocations.

Section 3.4    Adjustment of the Purchase Price.  The Purchase Price will be adjusted at the Closing as follows:

(a)    Tax Prorations between Buyer and Sellers.  All ad valorem property and personal taxes payable upon the Assets will be prorated between Sellers and Buyer for the tax year in which the Closing is held on the basis of the tax statements for such year; provided, however, that if tax statements for the current year are not available as of the Closing Date, the tax proration between Sellers and Buyer will be made on the basis of the taxes for the immediately prior tax year.  Notwithstanding anything to the contrary, the tax proration made at Closing will be a final proration between Buyer and Sellers.

(b)    Store Bank Accounts and Deposits in Transit.  In addition to the Purchase Price and payment for Inventory provided below, Buyer shall pay to Sellers, as provided below, the amount of aggregate cash amounts held as "store banks" as daily operating cash for amounts generated prior to the Effective Time but held in the cash registers or other repositories at the Stores or on behalf of the Stores at the Effective Time (the "**Closing Cash Amount**").  Buyer shall be entitled to retain the Closing Cash Amount, and Sellers

4

shall be entitled to retain all other cash generated prior to the Effective Time but held in transit for deposit, whether at the Stores or otherwise. Following the close of business the day prior to the Closing Date, Buyer and Sellers together shall audit the cash registers and other repositories at the Stores or on behalf of the Stores to determine a good faith estimate of the amount of cash held as "store banks" at the Effective Time (the "**Estimated Closing Cash Amount**"). At Closing, Buyer shall pay to Sellers the Estimated Closing Cash Amount. Within thirty (30) days following the Closing, Buyer shall deliver a written statement to Sellers setting forth Buyer's calculation of the actual Closing Cash Amount (the "**Closing Cash Statement**"). Buyer shall pay to Sellers, or Sellers shall pay to Buyer, as applicable, without offset for any reason, the difference between the actual Closing Cash Amount in the store banks and the Estimated Closing Store Cash Amount within ten (10) days following Buyer's delivery of the Closing Cash Statement to Sellers.

(c)     <u>Inventory Audit and Payment</u>. In addition to the Purchase Price and the payment for "store banks" as provided above, at Closing, the Purchase Price shall be adjusted for Inventory in accordance with this <u>Section 3.4(c)</u>. Following the close of business on the day which is five (5) days prior to the Closing Date, Buyer and Sellers together shall audit the Inventory and from said audit determine the amount and value (based on Sellers' actual cost without mark-up) of all Inventory on hand, excluding any expired or non-usable or non-salable items of Inventory (the "**Inventory Audit Value**"). At the Closing, the Purchase Price shall be increased or decreased, as applicable, by an amount equal to the difference between (i) the Inventory Audit Value *plus* any additional deliveries of Inventory to the Stores between the time of the Inventory audit and the Effective Time and (ii) the estimated value of Inventory to be consumed at the Stores between the time of the Inventory audit and the Effective Time (as determined using Sellers' historical operational data for the Stores); provided, however, that in no event shall the Purchase Price be increased due to the adjustment under this <u>Section 3.4(c)</u> by an amount greater than the product of (i) the number of Stores multiplied by (ii) $12,000 (the "**Inventory Value Cap**").

(d)     <u>Expenses</u>. Operational expenses directly related to the Assets and the Business, including, without limitation, Assumed Contract expenses, utilities and rent (including sales tax on rent), will be prorated with Sellers being responsible for those expenses accruing prior to the Effective Time and Buyer being responsible for those expenses accruing at or after the Effective Time, provided that nothing in this Section 3.4(d) is intended to or shall cause Buyer to be liable for any cure amounts contemplated by Section 4.1(c) or any other liabilities of Sellers other than Assumed Liabilities. Utilities shall be paid by Sellers to the Closing Date and the accounts closed or assigned to Buyer effective as of Closing. If the closing or assigning of Sellers' operating accounts with utility and other providers, and opening of Buyer's operating accounts with same, is impractical or would cause an interruption in service, the Parties shall work in good faith to ensure a smooth transition and avoid any interruption in service. Utilities, deposits and similar expenses prorated pursuant to this Section 3.4(d) shall be estimated and adjusted as of Closing and determined and settled within thirty (30) days after Closing by mutual agreement of the Parties.

DocuSign Envelope ID: D8A6F8DD-ED09-44C4-AFDB-4EC79CD21600

(e)     Security Deposits.  At the option of Sellers, Sellers shall ether (i) retain all rights to any security deposits paid by Sellers and held by landlords, Franchisor, or utilities under any Existing Leases, the Franchise Agreements, or other agreements, or (ii) at Closing Sellers shall assign such security deposits to Buyer and the Buyer shall pay to Sellers an amount equal to the amount of such security deposits; provided, however, that Buyer shall have no obligation to pay any amount (and Sellers shall be obligated to reimburse Buyer for any amount Buyer pays or has paid) with respect to, and to the extent of, security deposits that are returned to Sellers or for which Buyer otherwise does not receive the benefit, based on the actions of the third party holding such security deposit or otherwise.

(f)     Seller Payments.  Sellers shall be jointly and severally responsible for any amounts due from Sellers, or any of them, pursuant to this Section 3.4 or any other provision of this Agreement.

## ARTICLE 4
## BANKRUPTCY COURT MATTERS

Section 4.1     Competing Bids and Break-Up Fee

(a)     This Agreement is subject to approval by the Bankruptcy Court and the consideration by Sellers of higher or better competing bids (each a "**Competing Bid**"). Buyer shall have the right to bid against any Competing Bids.

(b)     In the event that Buyer is not the winning bidder with respect to all the Assets at any Auction held in the bankruptcy case, as set forth below, and the Sellers close sale(s) of some or all the Assets with one or more other bidder(s), Sellers shall pay Buyer, as consideration for Buyer's entry into this Agreement, (i) a "break-up fee" equal to Two Hundred Thousand Dollars  ($200,000) (the "**Break-Up Fee**") and (ii) amount sufficient to reimburse Buyer for its documented out of pocket expenses actually incurred in connection with this Agreement, including, but not limited to, attorney fees, accountant fees, architect fees, third party vendor fees for site visits, and set up fees for new accounts not to exceed One Hundred Fifty Thousand Dollars ($150,000) (the "**Expense Reimbursement**").  The Break-Up Fee and the Expense Reimbursement shall be paid by Sellers to Buyer at the closing on the sale of any of the Assets approved by the Bankruptcy Court.  This provision shall survive termination of this Agreement.

(c)     The Sale Motion and Procedures

(i)     Sale Motion and Bid Procedures Order.  Within five (5) Business Days following the complete execution of this Agreement, Sellers shall file with the Bankruptcy Court the Petition and also will file a motion for approval of this Agreement ("**Sale Motion**"), subject to higher and better bids, as well as entry of an Order of the Bankruptcy Court approving the procedures for submission and consideration of Competing Bids ("**Bid Procedures Order**").  The Sale Motion shall include procedures for the assumption of and assignment to Buyer of the Assumed Contracts. The Bid Procedures Order will include provisions for approval

65533/0001-46347368v6

of the Break-Up Fee and Expense Reimbursement pursuant to Section 4.1(b) as well as provisions governing the submission of Competing Bids. The form of the notice to lease and contract counterparties shall be subject to review and comment (but not approval) by Buyer.

(ii)     <u>Assumption</u>.    Sellers shall serve all counterparties to Assumed Leases and Assumed Contracts a notice of proposed assumption and assignment of unexpired leases and executory contract and cure which shall include a deadline for counterparty objections and a procedure for resolution of objections. All cure amounts ("**Cure Amounts**"), whether agreed to by counterparties or set by the Court shall be paid from the Purchase Price.  Bankruptcy Court approval of the Sellers' assumption and assignment of the Assumed Leases and Assumed Contracts to Buyer shall be incorporated in the Sale Order.  The form of the notice to Assumed Lease and Assumed Contract counterparties shall be subject to review and comment (but not approval) by Buyer.

(iii)     <u>Auction</u>.    In the event that Sellers receive one or more Competing Bids that Sellers determine, in their sole discretion, is a qualified bid higher or better than the Purchase Price provided under this Agreement, then Sellers shall schedule and conduct an auction to be conducted in the manner set forth in the Bid Procedures Order, during which Buyer and any qualified bidder will be permitted to submit higher and better bids (the "**Auction**").    At minimum, to become a qualified bidder a competing bidder must make a good faith deposit equal to or greater than the Good Faith Deposit of the Buyer, provide evidence that, in the Sellers' judgment and sole discretion, the competing bidder should be qualified as a franchisee by the Franchisor, and offer an overbid price with an Asset Purchase Agreement in a form similar to this Agreement with a mark-up showing the changes made to this Agreement. At the conclusion of the Auction, Sellers shall select the winning bid based on the Sellers' determination, in their sole discretion, of which bid is the highest or best bid.

(iv)     <u>Back-up Bidder</u>.    The Sellers also may select, in the Sellers' sole discretion, the second best bid, which shall be designated as the "Back-up Bidder", with the understanding that if for any reason the winning bidder fails to close as required by the applicable purchase agreement approved by the Bankruptcy Court, the Back-up Bidder shall be authorized and obligated to close on its bid for the purchase of the Assets approved by the Bankruptcy Court.  If the Buyer is the Back-Up Bidder, Buyer shall keep its bid open to consummate the purchase of the Assets on the terms and conditions set forth in this Agreement, as the same may be improved upon by the Buyer in the Auction, open and irrevocable until the sooner of fifteen (15) days from the Outside Date or until this Agreement is otherwise terminated pursuant to Article 11. Following the Auction, if the winning bidder fails to close as a result of a breach or failure to perform on the part of such winning bidder, then the Buyer, if the Buyer is the Back-Up Bidder, will be deemed to have the new prevailing bid, and the Sellers may seek authority to consummate the purchase on the terms and conditions set forth in this Agreement (as the same may be improved upon by the Buyer in the Auction) with the Back-Up Bidder. In the

event the winning bidder consummates the purchase, Buyer, in addition to return of its Good Faith Deposit and interest earned thereon, shall be paid the Break-up Fee and Expense Reimbursement by Sellers.

(d)　　Sale Order.  Subject to Buyer being designated as the Successful Bidder, Sellers shall use commercially reasonable efforts to obtain entry of an Order approving the sale of all the Assets to Buyer under this Agreement (the "**Sale Order**"), shall not be subject to the stay in Bankr. R. Civ. P. 6004(h) and 6006(d) and is enforceable and effective immediately.  The Sale Order shall also include findings and conclusions that (i) notice of the Sale Motion and Sale Procedures Order have been provided to all entities who claim any interest or lien in the Assets, all governmental entities who may have claims against the Sellers, all utilities serving the Seller and the Assets, all persons entitled to notice under Bankr. R. Civ. P. 9010 and 2002 and all entities that expressed an interest in purchasing the Assets, (ii)  the Buyer is not assuming any debts, liabilities or obligations of the Seller accrued as of the Closing Date except as otherwise set forth in this Agreement, (iii) the Buyer is not a mere continuation of the Sellers or the Sellers' bankruptcy estate and there is no continuity of enterprise between the Seller and Buyer and Buyer is not a successor of the Sellers, (iv) the transactions effecting the sale of the Assets  by the Seller to the Buyer do not constitute a consolidation,  merger or de facto merger of the Buyer and the Sellers or the Sellers' bankruptcy estate, (v) the Sale Order shall be binding upon the Sellers and their respective successors and assigns, including any successor Chapter 7 or 11 Trustee, (vi)  the Assets  are being sold and transferred to the Buyer free and clear of all liens, claims, encumbrances, lis pendens, rights of possession, contracts, covenants, options or other rights to acquire and interest in the Assets, (vii) that Buyer is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code, and (viii) the Assumed Leases and Assumed Contracts are assigned to Buyer on a free and clear basis pursuant to Section 365 of the Bankruptcy Code with Sellers to pay all Cure Amounts.

## ARTICLE 5
## CLOSING

Section 5.1　　Closing; Risk of Loss.

(a)　　Consummation of the transactions contemplated by this Agreement (the "**Closing**" will be held at a location, time, manner, and date (the "**Closing Date**") to be agreed upon by the Parties, provided that in all events Closing shall be completed by no later than January 8, 2024 (the "Outside Date").

(b)　　The risk of loss for the Assets will be borne by Sellers until the Closing and by Buyer after the Closing.

Section 5.2　　Buyer's Closing Expenses.  Except as otherwise provided in this Agreement, Buyer will pay the following Closing expenses:

(a)　　Fees for any type of inspection or audit that may be required by Buyer to determine whether the Assets are suitable for the purposes for which Buyer, or its assigns may intend;

(b)      Fees of Buyer's attorneys, accountants, consultants and other advisors;

(c)      All commissions which arise from the inaccuracy of Buyer's representations in <u>Section 7.5</u> below;

(d)      All costs, fees and expenses attributable to Buyer's financing;

(e)      All transfer fees, extension fees, and other fees, charges or requirements of Franchisor, including but not limited to all scopes of work (or similar property improvements required by the Franchisor) and all franchise related fees and charges arising out of the transactions contemplated in this Agreement, <u>excluding</u> any such fees outstanding or otherwise in arrears and any associated penalties, late fees, or reinstatement fees of the Franchisor as provided under the Franchise Agreements as of the Effective Date;

(f)      Any and all sales, use, transfer, mortgage, documentary and like taxes and/or stamps required to be paid in connection with the transactions contemplated hereby; and

(g)      Costs for all other items for which Buyer is responsible under this Agreement.

For the avoidance of doubt, Buyer shall not be responsible for any investment banking or broker fees, commissions, or payments of any kind claimed by any professional engaged by Sellers, whether before or after the Effective Date.

Section 5.3   <u>Sellers' Closing Expenses</u>.   Except as otherwise provided in this Agreement, Sellers will pay the following Closing expenses:

(a)      Fees of Sellers' attorneys, investment bankers, accountants, consultants and other professionals and advisors; and

(b)      Costs for all other items for which Sellers are expressly responsible under this Agreement.

Section 5.4   <u>Deferred Closing</u>.   Notwithstanding anything in this Agreement to the contrary, Buyer may, at any time prior to the Closing Date, by written notice to Sellers, elect to defer agreeing to accepting the assumption and assignment of one or more Store Leases (each a "**Deferred Store Lease**" and collectively, the "**Deferred Store Leases**"), for up to one hundred twenty (120) days from the Closing Date (the "**Deferred Closing Date**").  Prior to the Deferred Closing Date, Buyer may, by written notice to Seller, direct the Sellers to assume and assign one or more of the Deferred Store Leases to Buyer or its designee (whether an affiliate or third party) or to reject one or more Deferred Store Leases from the purchase.  In the event that one or more Deferred Store Leases is excluded from the purchase pursuant to this Section 5.4, <u>Exhibit C</u> and <u>Exhibit D</u> to this Agreement shall be deemed amended to remove each such Deferred Store Lease from the Assumed Leases listed on <u>Exhibit C</u> and to remove any associated Assumed Contracts from the lists set forth therein, provided, however, that such rejection shall not affect Buyer's rights to any other Assets related to the Stores covered by the Deferred Store Leases (including, without limitation, Equipment, Closing Cash Amounts, and Inventory), and provided further that Buyer

shall cease, upon Sellers receipt of the written rejection notice, to have any obligation for expenses pursuant to Section 3.4(d) or further ad valorem property taxes pursuant to Section 3.4(a) with respect to the Leased Properties covered by such rejected Deferred Store Leases, except as expressly provided below in this Section 5.4. The parties acknowledge and agree that regardless of whether Buyer gives notice to assume and assign Deferred Store Leases, Buyer shall remain fully liable to pay Sellers at Closing, on the Closing Date, all amounts due under this Agreement at Closing, and Buyer's election to exercise rights under this Section 5.4 shall cause no delay or reduction in payments or adjustment in the amount of the Initial Purchase Price or the amount due for the Inventory Audit Value, due to the exclusion of any one or more Deferred Store Leases pursuant to this Section 5.4.  Buyer shall pay the rent and other obligations under the Deferred Stores Leases that accrue under each Deferred Store Lease during the period from the Closing to the Deferred Closing Date.

Section 5.5    Waiver of all other Warranties.  Except as expressly provided in Article 6 and any express warranties of title contained in the closing documents contemplated in Section 5.7, the Assets will be conveyed "as is, where is", with all faults, and without any warranties, express or implied, including but not limited to warranties of title, condition, fitness for a particular purpose or habitability.  Buyer acknowledges that other than as specifically provided in this Agreement, Sellers have made no representation, warranty or guaranty, express or implied, oral or written, past, present or future, of, as to, or including:  (a) the condition or state of repair of the Assets, including, without limitation, any condition arising in substances (which includes all substances listed as such by applicable law, all pollutants or asbestos and naturally-occurring but harmful substances such as methane or radon) on, in, under, above, upon or in the vicinity of the Assets; (b) the quality, nature, adequacy, and physical condition of the Assets, including but not limited to, the structural elements, environmental issues, appurtenances, and access; (c) the quality, nature, adequacy and physical condition of soils and geology and the existence of ground water; (d) the existence, quality, nature, adequacy and physical conditions of utilities serving the Property or Assets; (e) the development potential of the Property, its habitability, merchantability, or the fitness, suitability or adequacy of the Assets for any particular purpose; (f) the zoning or other legal status of the Property; (g) the Property or its operations' (including the Business) compliance with any applicable codes, laws, regulations, statutes, ordinances, covenants, conditions, and restrictions of any governmental or quasi-governmental entity or of any other person or entity. Sellers and Buyer agree that this provision shall survive the execution of this Agreement and the Closing of the sale of the Assets.  Other than the express representations and warranties specifically provided in Article 6 of this Agreement and any express warranties of title contained in the closing documents contemplated in Section 5.7, Buyer hereby acknowledges and declares reliance solely on its own examination, inspection and evaluation of the Assets, and not on any warranties or representation, whether express or implied or written or oral, from Sellers. Except for any claims arising out of a breach of the express representations and warranties set forth in Article 6 (subject to the limitations set forth in Article 12) or the express warranties of title contained in the closing documents contemplated in Section 5.7, Buyer shall have absolutely no right or cause of action against Sellers, whether in tort, contract, quasi contract or otherwise, to assert in any controversy or litigation any claim or demand arising from the sale or purchase of, or in an way related to or in connection with, the Assets. All implied warranties with respect to the Assets, including those related to title and fitness for a particular purpose, will be, and are hereby disclaimed by Sellers in any controversy, claim, demand, or litigation arising from or in connection with the Assets, except with respect to a default under this Agreement, or breach of any warranty or representation made

by Sellers herein or in the closing documents contemplated in Section 5.7. Sellers hereby reserve the right to include, in Sellers' sole discretion, language to the effect of the foregoing waiver of warranties in any documents conveying the Assets to Buyer as contemplated in this Agreement.

Section 5.6    Effective Time.  Notwithstanding the actual time of the Closing, the transfer of the Assets will be effective as of 12:01 a.m. Eastern Time on the Closing Date (the "**Effective Time**").  Prorations and similar adjustments, however, shall be made as of 11:59 p.m. on the date preceding the Closing Date.

Section 5.7    Execution and Delivery of Documents.  At or prior to the Closing and subject to the conditions to Closing set forth in Article 10, Sellers and Buyer will execute and deliver to the other all documents, instruments, certificates and schedules required under this Agreement, including, but not limited to, the following:

(a)    Sellers will deliver to Buyer in a form reasonably acceptable to Buyer:

(i)    An Assignment and Assumption of the Assumed Leases in the form attached hereto as Exhibit G;

(ii)    An Assignment and Assumption of the Assumed Contracts in the form attached hereto as Exhibit H;

(iii)    A Bill of Sale in the form attached hereto as Exhibit I;

(iv)    A certificate of active status or good standing of Sellers issued by the Secretary of State of the State of Alabama and the State of Georgia, as applicable;

(v)    A certificate dated as of the Effective Date of Sellers' non-foreign status as set forth in Treasury Regulation Section 1.1445-2(b); and

(vi)    All lease files for the Assumed Leases, together with keys for the Stores, the combinations of any safes located in the Stores, and the access codes for any electronic security systems located at the Stores.

(b)    Buyer will deliver to Sellers:

(i)    Signed counterparts, as applicable, of the documents required in Section 5.7(a)(i)-(iii);

(ii)    The Purchase Price, as adjusted pursuant to Article 3 or other provisions of this Agreement and less the amount of the Good Faith Deposit (which shall be released to or for the benefit of Sellers upon Closing pursuant to Section 3.2 and the Escrow Agreement), by cash or wire transfer, with the portion of the Purchase Price sufficient to pay in full the amount owed to Seller's lenders as of Closing (not to exceed the amount of the Purchase Price less the amount of the Good Faith Deposit) to be delivered by wire transfer to the Administrative Agent

11

and the balance, if any, to be delivered by wire transfer to an account designated in writing by Sellers;

(iii)     A certified copy of resolutions of Buyer's directors, members, managers and/or shareholders authorizing this Agreement and the transactions contemplated by this Agreement; and

(iv)     A certificate of active status or good standing of Buyer issued by the Secretary of State of Delaware.

(c)     Buyer and Sellers will execute and deliver to one another:

(i)     A closing statement setting forth the calculation of the adjustments to the Purchase Price described in Article 3;

(ii)     Internal Revenue Service Form 8594, Asset Acquisition Statement, or similar required form attesting to the Asset allocations; and

(iii)     Any documents reasonably requested by Sellers or Buyer to effectuate the transactions and waivers contemplated by this Agreement.

Section 5.8     Simultaneous Delivery.  All payments, documents and instruments to be delivered on the Closing Date will be regarded as having been delivered simultaneously, and no document or instrument will be regarded as having been delivered until all documents and instruments being delivered on the Closing Date have been delivered.

Section 5.9     Further Acts.     Sellers and Buyer agree to (a) furnish such further information, (b) execute and deliver to the other such other documents and instruments, and (c) do such other acts and things, all as the other party reasonably requests, for the purpose of carrying out the intent of this Agreement and transfer and assignment of the Assets.

Section 5.9     Sellers' Payment of Cure Costs.  Upon Closing, promptly after Sellers' receipt of the Purchase Price, Sellers shall pay all Cure Amounts in accordance with Section 4.1(c) and the Sale Order.

## ARTICLE 6
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Sellers, jointly and severally, hereby represent and warrant to Buyer as of the Effective Date of this Agreement and as of immediately prior to the Closing as follows:

Section 6.1     Organization and Qualification.  Each Seller (a) is an Alabama corporation and limited liability company respectively, duly formed, validly existing and in good standing under the laws of the State of Alabama; (b) has all corporate and limited liability company powers, as applicable, to own its properties and to carry on the Business as owned and operated as of the date of this Agreement; and (c) is duly qualified and is in good standing in all jurisdictions in which the nature of the Business makes such qualification necessary, in each case, except where the failure to have such power or authority would not have a Material Adverse Effect on the Assets,

12

Leased Properties, results or operations or conditions (financial or otherwise) of the Business, taken as a whole.

Section 6.2    Due Authorization; Enforceability.

(a)    The execution, delivery and performance of this Agreement by Sellers and the consummation of the transactions contemplated by this Agreement have been duly and effectively authorized by the governing authority of Sellers, as well as by all other requisite corporate or limited liability company action, as applicable.

(b)    This Agreement and the agreements contemplated by this Agreement have been, and when executed will be, duly executed, delivered and performed by Sellers; and, assuming the due authorization, execution and delivery of this Agreement and the agreements contemplated by this Agreement by Buyer, this Agreement constitutes, and when executed will constitute, a valid and binding obligation of Sellers, enforceable against Sellers in accordance with its terms.

Section 6.3    No Violation.  The execution and performance of this Agreement and the agreements contemplated by this Agreement by Sellers will not: (a) cause Sellers to violate any (i) law, (ii) rule or regulation of any Governmental Entity or (iii) order, writ, judgment, injunction, decree, determination or award; (b) violate or be in conflict with, or result in a breach of or constitute (with or without notice or lapse of time or both) a default under, Sellers' organizational documents or any Assumed Lease or Assumed Contract, Permit, or other agreement to which any Seller is a party or to which any Seller or any of the Assets are bound; or (c) result in the creation or imposition of any Lien upon any of the Assets, except, in the case of clauses (a) and (b) only, for violations, breaches, accelerations or defaults which would not, individually or in the aggregate, have a Material Adverse Effect.

Section 6.4    Compliance with Laws; Governmental Consents.  Except as disclosed on Schedule 6.4, to Sellers' Knowledge, Sellers are not in violation or default, and in carrying out the transactions described in this Agreement will not come into material violation or default, under any present laws, ordinances, regulations, orders or decrees applicable to the Business, Sellers or the Assets that could reasonably be expected to have a Material Adverse Effect.  Other than as required by, or pursuant to, the Bankruptcy Code, the Bidding Procedures Order, or the Sale Order, no Seller is required to give any notice to, make any filing with, or obtain any authorization, consent or approval of any Governmental Entity in order for the Parties to consummate the transactions contemplated by this Agreement, except where the failure to give notice, file or obtain such authorization, consent or approval would not, individually or in the aggregate, have a Material Adverse Effect or prevent or materially impair or delay any Seller's ability to consummate the transaction or timely perform its obligations hereunder.

Section 6.5    Foreign Person. No Seller is a foreign person under Sections 1445 and 7703 of the Internal Revenue Code of 1986, as amended and regulations promulgated thereunder.

Section 6.6    No Owned Real Property; Assumed Leases.  Sellers do not own any of the real property on which the Stores are located.  Sellers have made available to Buyer true and correct copies of all Assumed Leases.  Each of the Assumed Leases is in full force and effect. Except as

13

disclosed on Schedule 6.6 attached hereto, Seller has not received written notice of any default or breach on the part of Seller of any of the Assumed Leases. Except as set forth on Schedule 6.6, no portion of the Leased Properties is subject to any pending or, to Seller's Knowledge, threatened condemnation proceeding. Except as set forth on Schedule 6.6, there are no material leases, subleases, licenses, concessions or other agreements under which any Seller or, to Sellers' Knowledge, any other party has granted any party or parties the right of use or occupancy of any portion of the Leased Properties.

Section 6.7    Contracts. Sellers have made available to Buyer true and correct copies of all material contracts and agreements relating to the Assets, the Leased Properties, and the Business, including, without limitation, the Assumed Contracts and the Franchise Agreements. Each of the Assumed Contracts is in full force and effect. Except as disclosed on Schedule 6.7 attached hereto, Sellers have not received written notice of any default or breach on the part of Sellers under any Assumed Contract.

Section 6.8    Permits. Sellers have made available to Buyer true and correct copies of all Permits in their possession. To the Knowledge of Sellers, the Permits are in full force and effect except where Sellers are in the process of renewing or reinstating periodic or lapsed Permits, and there is no outstanding material violation of any Permit that could reasonably be expected to have a Material Adverse Effect.

Section 6.9    Legal Proceedings. Except as listed in Schedule 6.9, there is not pending or, to the Knowledge of Sellers, threatened, any legal, administrative, arbitration or other proceeding or investigation related to the Business or the Assets, and Sellers have no Knowledge of any circumstances that could be expected to give rise to any action, suit or proceeding against Sellers or Buyer that could reasonably be expected to have a Material Adverse Effect.

Section 6.10    Equipment. As of the Effective Time, the Equipment included in the Assets will be present at each Store and no Equipment shall have been removed from a Store since the Effective Date. Sellers shall own the Equipment at the Stores as of the Closing Date, and none of the Equipment is subject to any lease.

Section 6.11    Exclusivity of Representations and Warranties; As-Is Sale. EXCEPT AS EXPRESSLY SET FORTH IN ARTICLE 6 OF THIS AGREEMENT OR ANY EXPRESS WARRANTIES OF TITLE IN THE CLOSING DOCUMENTS CONTEMPLATED BY SECTION 5.7, THE REPRESENTATIONS AND WARRANTIES MADE BY SELLERS IN THIS AGREEMENT ARE IN LIEU OF AND ARE EXCLUSIVE OF ALL OTHER REPRESENTATIONS AND WARRANTIES, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. EXCEPT AS EXPRESSLY SET FORTH IN ARTICLE 6 OF THIS AGREEMENT OR ANY WARRANTIES OF TITLE IN THE CLOSING DOCUMENTS CONTEMPLATED BY SECTION 5.7, SELLERS HEREBY DISCLAIM ANY SUCH OTHER OR IMPLIED REPRESENTATIONS OR WARRANTIES, NOTWITHSTANDING THE DELIVERY OR DISCLOSURE TO BUYER OR ITS OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIVES OF ANY DOCUMENTATION OR OTHER INFORMATION (INCLUDING ANY FINANCIAL PROJECTIONS OR OTHER SUPPLEMENTAL DATA). BUYER ACKNOWLEDGES AND AGREES THAT, EXCEPT AS EXPRESSLY SET FORTH

IN THIS AGREEMENT, SELLERS HAVE NOT MADE, AND HEREBY SPECIFICALLY NEGATE AND DISCLAIM, ANY REPRESENTATIONS, WARRANTIES, COVENANTS OR AGREEMENTS OF ANY KIND OR CHARACTER REGARDING ANY ASPECT OF THE ASSETS.  BUYER FURTHER ACKNOWLEDGES AND AGREES THAT, EXCEPT AS OTHERWISE SET FORTH IN THIS AGREEMENT OR ANY EXPRESS WARRANTIES IN THE CLOSING DOCUMENTS CONTEMPLATED BY SECTION 5.7, TO THE MAXIMUM EXTENT PERMITTED BY LAW THE SALE PROVIDED FOR HEREIN IS MADE ON AN "AS-IS, WHERE-IS" BASIS AS TO CONDITION WITH ALL FAULTS.

## ARTICLE 7
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Sellers that as of the Effective Date of this Agreement and as of immediately prior to the Closing as follows:

Section 7.1    Organization and Qualification.  Buyer (a) is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Delaware; (b) has all necessary limited liability company powers to own its properties and to carry on its business as owned and operated as of the date of this Agreement; and (c) is duly qualified and is in good standing in all jurisdictions in which the nature of its business makes such qualification necessary, in each case, except where the failure to have such power or authority would not have a Material Adverse Effect.

Section 7.2    Due Authorization.

(a)    The execution, delivery and performance of this Agreement by Buyer and the consummation of the transactions contemplated by this Agreement have been duly and effectively authorized by the managers and members of Buyer, as well as by all other requisite company action.

(b)    This Agreement and the agreements contemplated by this Agreement have been, and when executed will be, duly executed and delivered by Buyer; and, assuming the due authorization, execution and delivery of this Agreement and the agreements contemplated by this Agreement by Sellers, this Agreement constitutes, and when executed will constitute, a valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, except (a) to the extent enforceability may be limited by applicable bankruptcy, insolvency, reorganization or other laws affecting the enforceability of creditor's rights generally and (b) that the availability of equitable remedies, including specific performance, is subject to the discretion of the court before which any proceeding thereof may be brought.

Section 7.3    No Violation.  Buyer's execution, delivery and performance of this Agreement and the agreements contemplated by this Agreement will not: (a) cause Buyer to violate any (i) law, (ii) rule or regulation of any Governmental Entity, or (iii) order, writ, judgment, injunction, decree, determination or award; or (b) violate or be in conflict with, or result in a breach of or constitute (with or without notice or lapse of time or both) a default under, Buyer's

organizational documents, in each case, except for violations, breaches, accelerations or defaults which would not individually or in the aggregate, have a Material Adverse Effect.

Section 7.4    <u>Governmental Bodies Approvals</u>.  No consent, approval or authorization of, or declaration, filing or registration with, any Governmental Entity or any other Person applicable to Buyer  is required by the Buyer in connection with the Buyer's execution and delivery of this Agreement and consummation of the transactions contemplated by this Agreement, except (a) the Sale Order having been entered by the Bankruptcy Court and (b) any consent, approval or authorization of or designation, declaration or filing with any Governmental Entity the failure of which to be made or obtained would not, individually or in the aggregate, have a Material Adverse Effect.

Section 7.5    <u>Commissions</u>.  Buyer has not incurred or become liable for any broker's commission or finder's fees related to the transactions contemplated by this Agreement.

## ARTICLE 8
## COVENANTS AND ACTIONS PENDING CLOSING

Section 8.1    <u>Conduct of Business</u>.  Between the date of this Agreement and the Closing Date, Sellers will:

(a)     maintain the operation of the Business and conduct the Business in the ordinary course and in accordance with past business practices;

(b)     maintain and repair all the tangible Assets in accordance with past business practices;

(c)     comply with all applicable laws, rules and regulations in all material respects applicable to the Business or the Assets;

(d)     maintain insurance in the ordinary course of business with respect to the Assets until the Effective Time on the Closing Date;

(e)     advertise and market the Stores and Business consistent with historical business practices;

(f)     not sell or dispose of any of the Assets other than in the ordinary course of the operation of the Business

(g)     not enter into, modify, amend, terminate, waive any material rights or obligations under, or otherwise seek to reject any Assumed Leases or Assumed Contracts without the prior written consent of Buyer; and

(h)     not incur, assume, guarantee, create or otherwise become liable with respect to any indebtedness, borrowed money, or similar obligation, except in the ordinary course of business consistent with past practices, with respect to the Leased Properties, Equipment (regardless of who owns such equipment and how that equipment is owned), Stores, Business, or the Assets, subject to the further exceptions set forth on Schedule 8.1 hereto.

DocuSign Envelope ID: D8A6F8DD-ED09-44C4-AFDB-4EC79CD21600

Section 8.2    <u>Consents; Additional Agreements</u>.    Buyer and Sellers agree to use commercially reasonable efforts to cooperate and promptly take, or cause to be taken, all commercially reasonable action, and to cooperate and promptly do, or cause to be done, all commercially reasonable things reasonably necessary, proper or advisable to consummate and make effective as promptly as practicable the transactions contemplated by this Agreement, including: (i) the removal of any legal impediment to the consummation or effectiveness of such transactions; and (ii) the obtaining of all necessary waivers, releases, consents, assignments, and approvals of all third parties and Governmental Bodies, and the making of all necessary filings.

Section 8.3    <u>Confidentiality</u>.  Until the Petition is filed with the Bankruptcy Court, Buyer will hold, and will cause its respective officers, agents and employees to hold, in confidence, and not disclose to others, the terms of this Agreement, the transactions contemplated by this Agreement, and all plans, documents, contracts, records, data analysis, compilations, forecasts, and studies and other informational material received or prepared by them with respect to the Assets and the Business (collectively the "**Information**") except: (a) to the extent that such Information (i) is otherwise available from third persons without restrictions on its further use or disclosure or (ii) is required by order of any Governmental Entity, any law, regulation or any reporting obligation of Buyer or Sellers; (b) to the extent such information is or becomes publicly known other than through a violation of this paragraph by the party in question; or (c) to the extent such information is provided to Sellers' lenders and professionals assisting Sellers in connection with the sale process and other persons who are assisting Sellers or Buyer in the consummation (including financing) of the transactions contemplated hereby, or is required to be given to such third party in order to obtain any consents, approval, authorizations or disclosures contemplated by this Agreement (including, without limitation, the disclosure to representatives or employees of the Franchisor, any landlord, Sellers' lenders and professionals, Buyer's lenders, investors and professionals, or any Governmental Entity).

Section 8.4    <u>Right of First Refusal</u>.  Sellers, with Buyer's cooperation, will provide all required information and notice to Franchisor in order that Franchisor may timely elect or waive its right of first refusal.

Section 8.5    <u>Contact with Employees, Customers and Suppliers</u>.  Prior to the Closing, except as otherwise mutually agreed, Buyer and its representatives shall not contact or communicate with any of the employees, customers, landlords, developers and suppliers of Sellers in connection with the transaction contemplated by this Agreement, except with the prior consent of Sellers, which consent shall not be unreasonably withheld; provided, however, (i) Buyer may contact or communicate with the Franchisor in connection with this transaction, (ii) after the Petition has been filed, Buyer may contact or communicate with the landlords with respect to the Assumed Leases, including, without limitation, to attempt to negotiate modified lease terms, and may contact or communicate with critical vendors with respect to the Stores, and (iii) Sellers shall allow Buyer reasonable access to the key employees of Sellers (as mutually agreed upon by the Parties), provided that, in the case of clause (iii), Sellers shall be allowed to have its representative(s) present at any such meeting.  Nothing herein shall be deemed to prevent Buyer's representatives currently involved in the business operations of Sellers from continuing their business activities consistent with past practices.

65533/0001-46347368v6

Section 8.6    Access to Seller Information. Prior to Closing, Sellers shall provide Buyer and its representatives access to the Stores, Leased Properties, Assets, and Business, subject to reasonable prior notice during normal business hours, and any and all reasonably requested books and records and any other such information reasonably requested by Buyer that is in Sellers' possession and shall cooperate reasonably with Buyer in its investigation of the Business.

## ARTICLE 9
## PROVISIONS RESPECTING EMPLOYEES

Section 9.1    Sellers' Employees.  Immediately after the Closing, Sellers will notify all of its employees who are engaged in connection with the operation of the Stores (the "**Employees**") that the Assets have been sold to Buyer.  Buyer and Sellers agree that Buyer may, but is not obligated to, offer to the Employees employment with Buyer.  This Section 9.1 does not establish, as to any Employee, a contract of employment for a definite term or any term or any contractual right that his or her employment can only be terminated for just cause, and no Employee has any rights under this Agreement as a third -party beneficiary or otherwise.

Section 9.2    Employee Matters.  Sellers shall be responsible for all employees' wages, accrued bonuses, pension benefits, vacation time, F.I.C.A. unemployment and other taxes and benefits due as the employer of the employees at the Stores which have accrued and have been earned prior to the Closing Date, and, in the case of any employees who are not hired by Buyer at or after Closing, which accrue and are earned on or after the Closing Date.  Buyer shall have no responsibility or obligation for any severance payments or severance benefits for Sellers' employees (including, without limitation, any continuation coverage obligations for employees and their beneficiaries under ERISA or COBRA) that may arise in connection with the termination of any such employee's employment with any Seller, whether or not such employee is hired by Buyer. Buyer shall be responsible for such compensation and benefits for those employees (in accordance with Buyer's policies and plans) Buyer rehires or retains to the extent accrued or earned from and after the date on which such employee is hired by Buyer.  Subject to Buyer's review and reasonable satisfaction of the employee information to be provided to Buyer by Sellers and subject to Buyer's standard employment practices and policies, Buyer presently intends to hire substantially all of Sellers' employee at the Stores; however, the foregoing does not establish as to any person an offer or right of employment.

## ARTICLE 10
## CONDITIONS TO CLOSING

Section 10.1   Conditions Applicable to Buyer and Sellers.  The respective obligations of each Party to consummate the transactions contemplated by this Agreement are subject to the satisfaction or waiver on or prior to the Closing Date of the following conditions:

(a)    The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall not be subject to any stay.

(b)    Buyer shall have obtained the New Franchise Agreements.

(c)     Conditions to Sellers' Obligations.  Each and every obligation of Sellers under this Agreement to be performed at or before the Closing will be subject to the satisfaction, at or prior to the Closing, of the following conditions, unless waived in writing by Sellers:

(i)     The representations and warranties of Buyer contained in this Agreement that are qualified as to Material Adverse Effect shall be true and correct as of the date of this Agreement and as of immediately prior to the Closing (other than representations and warranties which address matters only as of a particular date, in which case such representations and warranties shall be true and correct, on and as of such particular date), with the same force and effect as if then made; and (ii) the representations and warranties of Buyer contained in this Agreement that are not qualified as to Material Adverse Effect shall be true and correct as of the date of this Agreement and as of immediately prior to the Closing (other than representations and warranties which address matters only as of a particular date, in which case such representations and warranties shall be true and correct, on and as of such particular date), with the same force and effect as if then made, except where the failure of such representations and warranties to be true and correct would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Buyer and Sellers shall have received a certificate to that effect from Buyer.

(ii)     Buyer shall have performed or complied in all material respects with all material agreements and covenants required by this Agreement to be performed or complied with by it on or prior to the Closing Date.

(iii)     All third parties on all Assumed Contracts shall have consented in writing to an assignment of such contracts to Buyer with Buyer's assumption thereof, if any such consent is required under applicable law.

(d)     Conditions to Buyer's Obligations.  Each and every obligation of Buyer under this Agreement to be performed at or before the Closing will be subject to the satisfaction, at or before the Closing, of the following conditions, unless waived in writing by Buyer:

(i)     the representations and warranties of Sellers contained in this Agreement that are qualified as to Material Adverse Effect shall be true and correct as of the date of this Agreement and as of immediately prior to the Closing (other than representations and warranties which address matters only as of a particular date, in which case such representations and warranties shall be true and correct, on and as of such particular date), with the same force and effect as if then made; and (ii) the representations and warranties of Sellers contained in this Agreement that are not qualified as to Material Adverse Effect shall be true and correct as of the date of this Agreement and as of immediately prior to the Closing (other than representations and warranties which address matters only as of a particular date, in which case such representations and warranties shall be true and correct, on and as of such particular date), with the same force and effect as if then made, except

19

where the failure of such representations and warranties to be true and correct would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, and Buyer shall have received a certificate to such effect from Sellers.

(ii)     Sellers shall have performed or complied in all material respects with all agreements and covenants required by this Agreement to be performed or complied with by it on or prior to the Closing Date.

(iii)     Unless waived by Buyer, the Sale Order shall have become final and non-appealable.

(iv)     No action or proceeding shall have commenced against any Seller, Buyer, or any Affiliate of the foregoing, which prevents the Closing or materially affects the consummation of the transactions contemplated hereby, as reasonably determined by Buyer.

## ARTICLE 11
## TERMINATION

Section 11.1   <u>Termination</u>.  This Agreement may be terminated at any time as follows:

(a)     By mutual written consent of Sellers and Buyer;

(b)     By Buyer if (i) Sellers have breached any of their respective representations, warranties, covenants or agreements and, if curable, have not cured such breach prior to the earlier of (A) 10 days following written notice of the breach and (B) the Closing Date; (ii) any order, decree, ruling or other order has been issued by a court or other competent Governmental Entity permanently restraining, enjoining, or otherwise prohibiting the transactions contemplated by this Agreement and each such decree, ruling or other order has become final and non-appealable; (iii) so long as Buyer is not in default of its obligations hereunder, if any of the conditions to closing set forth in <u>Article 10</u> benefiting Buyer are not satisfied on or prior to the Closing Date; (iv) if the Closing has not occurred, for any reason whatsoever, on or before the date that is fifteen (15) days after the Outside Date; (v) there shall be any law that makes consummation of the transactions contemplated by this Agreement illegal or otherwise prohibited; (vi) in accordance with Section 1.3 above, or (vii) Buyer is neither the Successful Bidder nor the Back-Up Bidder; in which case (i.e., any of clauses (i) – (vii)) Buyer shall receive a return of the Good Faith Deposit;

(c)     by Sellers if (i) Buyer has breached any of its representations, warranties, covenants or agreements and has not cured such breach prior to the earlier of (A) 10 days following written notice of the breach and (B) the Closing Date; or (ii) any order, decree, ruling or other order has been issued by a court or other competent Governmental Entity permanently restraining, enjoining, or otherwise prohibiting the transactions contemplated by this Agreement and each such decree, ruling or other order has become final and non-appealable; (iii)  so long as Sellers are not in default of their obligations hereunder, if any of the conditions to closing set forth in <u>Article 10</u> benefiting Sellers are not satisfied on or

prior to the Closing Date; or (iv) if the Closing has not occurred, for any reason whatsoever, on or before the date set forth in Section 5.1(a).

(d)     In the event of the termination of this Agreement pursuant to the provisions of this Article 11, no Party will have any liability of any nature whatsoever to the other under this Agreement, including liability for damages, unless such Party is in default of its obligations under this Agreement prior to such termination, in which event the Party in default will be liable to the other Party for such default as set forth below.  Notwithstanding the foregoing, (i) each party shall be obligated to indemnify the other for those items for which it has agreed to indemnify the other under this Agreement, subject to the limitations of such indemnity, (ii) Sellers shall be obligated to make the payments and reimbursements contemplated by Section 4.1(b) to the extent required by the terms thereof, (iii) if termination occurs pursuant to Section 11.1(a) or (b), or pursuant to any clause of Section 11.1(c) other than clause (i) thereof, Sellers shall return to Buyer the Good Faith Deposit within ten (10) Business Days following such termination, and (iv) the provisions of Section 4.1(b) (Break-Up Fee and Expense Reimbursement), Section 8.3 (Confidentiality), Article 11 (Termination), and Article 13 (Miscellaneous) shall survive the termination of this Agreement in accordance with their terms.

Section 11.2   Default.  In the event the sale contracted for herein is not consummated due to breach or default on the part of Buyer of its obligations under this Agreement, and without fault on the part of Sellers, then Sellers' remedies hereunder shall be limited to the right to terminate this Agreement pursuant to Section 10.1(c) upon written notice to the Buyer and retain the Good Faith Deposit, which amount shall constitute liquidated damages and, notwithstanding anything in this Agreement to the contrary, shall be in lieu of any and all other rights and remedies that might otherwise have been available to Sellers under applicable law, including, without limitation, the right to seek recovery of damages or specific performance.

## ARTICLE 12
## SURVIVAL OF AGREEMENTS; POST-CLOSING OBLIGATIONS

Section 12.1   Survival of Representations, Warranties and Covenants.    The representations and warranties contained in this Agreement, and any indemnity obligations related thereto, shall not survive the Closing.

Section 12.2   Indemnification by Buyer.  Subject to the provisions of this Article 12, Buyer hereby agrees to indemnify and hold harmless Sellers and each officer, director, manager, employee, agent or Affiliate of Seller (each, a "**Seller Indemnified Party**") from and against, and agrees promptly to defend each Seller Indemnified Party for any and all Damages arising directly from (a) the material inaccuracy or breach by Buyer of any of Buyer's representations or warranties set forth in this Agreement or in any document or agreement delivered hereunder; (b) the Assumed Liabilities; and (c) any failure by Buyer to carry out, perform, satisfy or discharge any covenants, agreements, undertakings, liabilities or obligations to be performed by Buyer pursuant to the terms of this Agreement or any of the documents or agreements delivered by Buyer pursuant to this Agreement, each only upon Sellers having suffered or incurred actual damages. Sellers shall take and cause its Affiliates to take all commercially reasonable steps to mitigate any Damages upon becoming aware of any event which would reasonably be expected to, or does, give rise thereto,

including incurring costs only to the minimum extent necessary to remedy the breach which gives rise to the Damages.

Section 12.3    Certain Rebates, Excluded Assets.  For rebates included in the Excluded Assets on Schedule 1.2, which are not received until after the Closing, Buyer shall remit to Seller, within thirty (30) days following Borrower's receipt thereof, the amount of such rebates received by Buyer for periods prior to Closing. Any rebate pre-payments or mutually agreed rebates received by Sellers prior to or after the Closing for any period following the Closing Date shall be remitted to Buyer or the Purchase Price shall be adjusted accordingly.

## ARTICLE 13
## MISCELLANEOUS PROVISIONS

Section 13.1    Further Assurance and Assistance.  Each Party agrees that after the Closing Date it will, from time to time, upon the reasonable request of the other, execute, acknowledge and deliver in proper form any instrument of conveyance or further assurance reasonably necessary or desirable to transfer to Buyer the interest in the Assets being transferred to Buyer in accordance with the terms of this Agreement, or otherwise carry out the terms of this Agreement.

Section 13.2    Amendment and Modification.  This Agreement may be amended, modified or supplemented only by mutual written consent of the Parties to this Agreement.

Section 13.3    Waiver of Compliance.  The failure by any Party at any time to require performance of any provision of this Agreement will not affect its right later to require such performance.  No waiver in any one or more instances will (except as stated therein) be deemed to be a further or continuing waiver of any such condition or breach in other instances or a waiver of any condition or breach of any other term, covenant, representation or warranty.

Section 13.4    Expenses.    All costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby will be paid by the Party incurring such expenses, except as provided elsewhere in this Agreement.

Section 13.5    Notices.  All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed given if delivered personally, facsimile (with confirmation), mailed by certified mail (postage prepaid, return receipt requested), or delivered by national courier service to the Parties at the following addresses (or at such other address for a party as shall be specified by like notice) and shall be effective upon receipt (or upon the next succeeding Business Day if received after 5:00 p.m. local time on a Business Day or if received on a Saturday, Sunday or United States holiday). All notices and other communications required may be made by email, where there is reasonable certainty that such email may be relied upon as valid (and if receipt is confirmed) and as follows:

If to Buyer:          Bulldog Restaurants, LLC
                      c/o Gomel Holdings, LLC
                      Attention: Chris Gomel
                      7 Hillwood Rd
                      Mobile, AL 36608
                      Email: cgomel@me.com

and:

Bulldog Restaurants, LLC
Attention: Brandon Stewart
225 Oxmoor Cir., Unit 809
Birmingham, AL 35209
Email: Brandon@starboardinvestments.com

If to Sellers:  Premier Kings, Inc., et al.
c/o Aurora Management Partners
112 South Tryon Street, Suite 1770
Charlotte, NC 28284
Attention: David M. Baker
Email: dbaker@auroramp.com

With a copy to:  Cole Schotz P.C.
1201 Wills Street, Suite 320
Baltimore, MD 21231
Attention: Gary Leibowitz, Esquire
                 Irving E. Walker, Esquire
Email: gleibowitz@coleschotz.com
          iwalker@coleschotz.com

or to such other addresses as may be specified pursuant to notice given by either Party in accordance with the provisions of this Section 13.5.

Section 13.6  Time.  Time is of the essence of this Agreement, provided that if any date upon which some action, notice or response is required of any party hereunder occurs on a weekend or national holiday or other day that is not a Business Day, such action, notice or response shall not be required until the next succeeding Business Day.

Section 13.7  Assignability of Agreement.  This Agreement and the rights and obligations of the parties hereunder may not be transferred, assigned, pledged or hypothecated by any party without the prior written consent of the other party hereto.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. Notwithstanding the foregoing, it is understood and agreed by the Parties that Buyer may establish affiliated controlled entities for structuring, tax, and liability purposes, and may designate one or more third parties to assume and take assignment of certain Assume Leases or other Assets, each of which affiliated controlled entities or third party designees may enter into the various agreements as contemplated in this Agreement, provided that Buyer shall remain liable to Seller under this Agreement in any event.

Section 13.8  Governing Law; Jurisdiction and Venue; Waiver of Jury Trial.

DocuSign Envelope ID: D8A6F8DD-ED09-44C4-AFDB-4EC79CD21600

(a)     This Agreement shall be governed by, and construed in accordance with, the laws of the State of Alabama, regardless of the laws that might otherwise govern under applicable principles of conflicts of law.  The Parties each hereby irrevocably submit to the exclusive jurisdiction of the state courts of Alabama, or, to the extent they have jurisdiction, the federal courts in the Northern District of Alabama, for any claims or matters arising under or relating to this Agreement; provided, however, that following the filing of the Petition by Sellers, the Parties each hereby irrevocably submit to the exclusive jurisdiction of, and venue in, the Bankruptcy Court, with respect to any disputes, claims or matters arising under or relating to this Agreement.  Each Party also agrees not to bring any action or proceeding arising out of or relating to this Agreement in any court other than a state court of Alabama or, to the extent it has jurisdiction, a federal court in the Northern District of Alabama.   Any Party may make service on any other Party by sending or delivering a copy of the process to the Party to be served at the address and in the manner provided for the giving of notices in Section 13.5 above other than by facsimile or e-mail.  Nothing in this Section, however, shall affect the right of any Party to serve legal process in any other manner permitted by law or at equity.

(b)     TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, BUYER AND SELLER HEREBY IRREVOCABLY AND EXPRESSLY WAIVE ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER DOCUMENTS AND AGREEMENTS DELIVERED IN CONNECTION HEREWITH, THE TRANSACTION OR THE ACTIONS OF BUYER OR SELLERS IN THE NEGOTIATION, ADMINISTRATION, OR ENFORCEMENT HEREOF OR THEREOF.

Section 13.9     Attorneys' Fees.  In the event of any dispute, litigation or other proceeding between the Parties to enforce any of the provisions of this Agreement or any right of either Party hereunder, the unsuccessful party to such dispute, litigation or other proceeding shall pay to the successful party all costs and expenses, including reasonable attorneys' fees, incurred at trial, on appeal, and in any arbitration, administrative or other proceedings, all of which may be included in and as a part of the judgment rendered in such litigation.  Any indemnity provisions herein shall include indemnification for such costs and fees.  This section shall survive the Closing or a prior termination hereof.

Section 13.10 Counterparts, Electronic Signatures.  This Agreement may be executed simultaneously in two or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.  This Agreement and any other documents to be delivered in connection herewith may be electronically signed, and any electronic signatures or such other documents are the same as handwritten signatures for the purposes of validity, enforceability, and admissibility. All Schedules and Exhibits attached hereto and referred to herein are hereby incorporated herein by reference and made a part of this Agreement for all purposes as if fully set forth herein.

65533/0001-46347368v6

Section 13.11  <u>Headings</u>.  The headings of the Sections and Articles of this Agreement are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Agreement.

Section 13.12  <u>No Reliance</u>.  No third party is entitled to rely on any of the representations, warranties and agreements contained in this Agreement.  Buyer and Sellers assume no liability to any third party because of any reliance on the representations, warranties and agreements of Buyer or Seller contained in this Agreement.

Section 13.13  <u>Severability</u>.  If any term or other provision of this Agreement is held by a court of competent jurisdiction to be invalid, illegal or incapable of being enforced by any rule of law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect.  Upon such a determination, the parties hereto shall negotiate in good faith to modify this Agreement so as to affect the original intent of the parties as closely as possible in a reasonably acceptable manner in order that the transactions contemplated hereby may be consummated as originally contemplated to the fullest extent possible.

Section 13.14  <u>Interpretation</u>.  Unless the context requires otherwise, all words used in this Agreement in the singular number shall extend to and include the plural, all words in the plural number shall extend to and include the singular, and all words in either gender shall extend to and include both genders.

Section 13.15  <u>Force Majeure</u>.  In no event shall Buyer be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation, strikes, work stoppages, failure of suppliers of materials, accidents, war, invasion, epidemic, pandemic, acts or war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software or hardware) services. Reasonable diligence shall be used to remove the condition that prevents performance and shall not be entitled to suspend performance of its obligations in any greater scope or for any longer duration than is required by the event.

## ARTICLE 14
## DEFINITIONS

Section 14.1  <u>Definitions</u>.  For purposes of this Agreement, the following terms have the meanings specified below:

"**Administrative Agent**" means Wells Fargo Bank, National Association, as Administrative Agent for itself as a lender and for each of the lenders now or hereafter party to the Credit Agreement with Sellers.

"**Affiliate**" of a Person (as defined herein) means any Person that directly or indirectly controls, is controlled by or is under common control with such Person and each of such Person's executive officers, directors and partners.  For the purpose of this definition, "control" of a Person means the power to direct, or to cause the direction of, the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise, and the terms and

DocuSign Envelope ID: D8A6F8DD-ED09-44C4-AFDB-4EC79CD21600

phrases "controlling," "controlled by" and "under common control with" have correlative meanings.

"**Business Day**" means any day on which banking institutions located in the State of Alabama, are not required to open for the conduct of banking business and excluding Saturdays and Sundays.

"**Damages**" means any and all actions, suits, proceedings (including any investigation or inquiries), losses, damages, costs, expenses, liabilities, obligations, and claims of any kind or nature whatsoever, including, without limitation, reasonable attorneys' fees and other legal costs and expenses.

"**Franchise Agreements**" mean the certain Franchise Agreements by and between Franchisor and Sellers for each of the locations listed in <u>Exhibit A</u>.

"**Franchisor**" means Burger King Corporation, a Florida corporation or Restaurant Brands International, Inc., as applicable

"**Governmental Entity**" means any federal, state or local government or any court, administrative or regulatory agency or commission or other governmental authority or agency having jurisdiction.

"**Knowledge of Sellers**" or "**Sellers' Knowledge**" means the current actual knowledge of Joginder Sidhu, on the date hereof and on the Closing Date, and does not include constructive knowledge or inquiry knowledge.

"**Liens**" means liens, pledges, charges, security interests, deeds of trust, mortgages, conditional sales agreements, interests, encumbrances, rights of first refusal, or other similar rights of third parties.

"**Material Adverse Effect**" means a material and adverse effect on the Assets, taken as a whole, or on the financial condition, properties, business or results of operations of Sellers with respect to the Stores, taken as a whole, or on the ability of Sellers to perform their obligations under this Agreement or to consummate the transactions contemplated herein; provided, however, that effects relating to (a) any adverse change, effect, event, occurrence, state of facts or development attributable to conditions affecting the industry in which Sellers participate, the U.S. economy as a whole or the capital markets in general or the markets in which Sellers and its parent company operate which does not materially and disproportionately affect Sellers and their parent company, taken as a whole; (b) any adverse change, effect, event, occurrence, state of facts or development attributable to the reaction of employees, customers or suppliers of Sellers to the public announcement of the transactions contemplated by this Agreement; (c) any adverse change, effect, event, occurrence, state of facts or development arising from or relating to any change required by generally accepted accounting principles, in accounting requirements or principles or any change in applicable laws, rules or regulations or the interpretation thereof which does not materially and disproportionately affect Sellers, taken as a whole, or (d) the failure of Sellers to meet any projected financial or other results, in each case, shall not be deemed to constitute a "Material Adverse Effect" and shall not be considered in determining whether a "Material Adverse Effect" has occurred.

65533/0001-46347368v6

DocuSign Envelope ID: D8A6F8DD-ED09-44C4-AFDB-4EC79CD21600

"**Person**" means an individual, a partnership, a limited liability company, a joint venture, a corporation, a trust, an unincorporated organization, a division or operating group of any of the foregoing, a government or any department or agency thereof, or any other entity.

Section 14.2 <u>Entire Agreement</u>. This Agreement, including the agreements referred to in this Agreement, the Schedules and Exhibits attached to this Agreement and other documents referred to in this Agreement which form a part of this Agreement, contains the entire understanding of the parties to this Agreement in respect of the subject matter contained in this Agreement. There are no restrictions, promises, representations, warranties, covenants or undertakings, other than those expressly set forth or referred to in this Agreement. This Agreement supersedes all prior agreements and understandings between the parties with respect to such subject matter.

[Signatures on Following Pages]

65533/0001-46347368v6

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed in multiple original counterparts as of the date first above written.

SELLERS:

**PREMIER KINGS, INC.**

By: David Baker
Name:   David M. Banker
Title:   Chief Restructuring Officer

**PREMIER KINGS OF NORTH ALABAMA, LLC**

By: David Baker
Name:   David M. Banker
Title:   Chief Restructuring Officer

**BUYER**:

**BULLDOG RESTAURANTS, LLC**

By:
Name:   Brandon Stewart
Title:   Chief Executive Officer

## List of Exhibits and Schedules

| | |
|---|---|
| Exhibit A | List of Store Locations |
| Exhibit B | Leased Property |
| Exhibit C | Assumed Leases |
| Exhibit D | Assumed Contracts |
| Exhibit E | Franchise Agreements |
| Exhibit F | [Reserved] |
| Exhibit G | Form of Assignment and Assumption Agreement |
| Exhibit H | Form of Assignment and Assumption Agreement |
| Exhibit I | Form of Bill of Sale |
| | |
| Schedule 1.2 | Excluded Assets |
| Schedule 3.2 | Escrow Provisions |
| Schedule 6.4 | Compliance with Laws |
| Schedule 6.6 | Leases |
| Schedule 6.7 | Contracts |
| Schedule 6.9 | Litigation |
| Schedule 8.1 | Pre-Closing Conduct of Business Covenant Exceptions |

# Exhibit A

## List of Store Locations

Store Locations

| Store# | Operating Entity | Address | City | State | Zip Code |
|--------|------------------|---------|------|-------|----------|
| 461 | Premier Kings, Inc. | 290 Oxmoor Road | Birmingham | AL | 35209 |
| 469 | Premier Kings of North Alabama, LLC | 414 East Meighan Blvd | Gadsden | AL | 35903 |
| 1069 | Premier Kings, Inc. | 1524 6th Ave South | Birmingham | AL | 35233 |
| 1577 | Premier Kings, Inc. | 312 Highland Avenue | Selma | AL | 36701 |
| 2616 | Premier Kings, Inc. | 504 North Main Street | Tuskegee | AL | 36083 |
| 2872 | Premier Kings, Inc. | 708 Hwy 78 East | Jasper | AL | 35501 |
| 3345 | Premier Kings, Inc. | 3092 Ross Clark Cr SW | Dothan | AL | 36301 |
| 3610 | Premier Kings, Inc. | 2203 Ross Clark Cr SW | Dothan | AL | 36301 |
| 4058 | Premier Kings, Inc. | 832 Us 231 S Troy Hwy | Troy | AL | 36081 |
| 4431 | Premier Kings, Inc. | 1555 Montgomery Highway | Hoover | AL | 35216 |
| 4848 | Premier Kings, Inc. | 701 Boll Weevil Cr | Enterprise | AL | 36330 |
| 5238 | Premier Kings, Inc. | 601 Madison Avenue | Montgomery | AL | 36104 |
| 6065 | Premier Kings, Inc. | 5525 Carmichael Road | Montgomery | AL | 36117 |
| 6642 | Premier Kings, Inc. | 100 Interstate Dr | Greenville | AL | 36037 |
| 7390 | Premier Kings, Inc. | 1780 East Main Street | Pratville | AL | 36067 |
| 7564 | Premier Kings, Inc. | 1701 Douglas Ave | Brewton | AL | 36426 |
| 9834 | Premier Kings, Inc. | 740 Academy Drive | Bessemer | AL | 35022 |
| 10327 | Premier Kings, Inc. | 681 1st Street SW | Alabaster | AL | 35007 |
| 10881 | Premier Kings of North Alabama, LLC | 3322-B Rainbow Drive | Rainbow City | AL | 35906 |
| 11481 | Premier Kings, Inc. | 1137 M L King Jr Expy | Andalusia | AL | 36420 |
| 12003 | Premier Kings, Inc. | 2229 Bessemer Road | Birmingham | AL | 35208 |
| 12427 | Premier Kings, Inc. | 801 3rd Ave West | Birmingham | AL | 35204 |
| 12520 | Premier Kings, Inc. | 220 S Main St | Atmore | AL | 36502 |
| 16437 | Premier Kings, Inc. | 7757 Crestwood Blvd | Birmingham | AL | 35210 |
| 17003 | Premier Kings, Inc. | 5001 Bond Blvd | Bessemer | AL | 35022 |
| 17389 | Premier Kings, Inc. | 2700 University Blvd | Birmingham | AL | 35233 |
| 18108 | Premier Kings, Inc. | 7581 Mobile Highway | Hope Hull | AL | 36043 |
| 18307 | Premier Kings, Inc. | 2232 East South Blvd | Montgomery | AL | 36116 |
| 19242 | Premier Kings, Inc. | 819 Ann Street | Montgomery | AL | 36107 |
| 19875 | Premier Kings, Inc. | 1003 Highway 80 East | Demopolis | AL | 36732 |
| 19958 | Premier Kings, Inc. | 3016 Allison Bonnett Memorial Drive | Hueytown | AL | 35023 |
| 21471 | Premier Kings, Inc. | 3190 Taylor Rd | Montgomery | AL | 36116 |
| 21654 | Premier Kings, Inc. | 4010 Atlanta Highway | Montgomery | AL | 36108 |
| 21983 | Premier Kings, Inc. | 5076 Hwy 31 | Calera | AL | 35040 |
| 22803 | Premier Kings, Inc. | 1630 Federal Drive | Montgomery | AL | 36117 |
| 22834 | Premier Kings, Inc. | 1484 Forestdale Blvd | Forestdale | AL | 35214 |
| 23135 | Premier Kings, Inc. | 850 Northeastern Blvd | Montgomery | AL | 36117 |
| 23203 | Premier Kings, Inc. | 12560 County Rd 42 | Jemison | AL | 35085 |
| 23805 | Premier Kings, Inc. | 4520 Pinson Blvd | Pinson | AL | 35126 |
| 24123 | Premier Kings, Inc. | 20 Springville Station Blvd | Springville | AL | 35146 |
| 24563 | Premier Kings, Inc. | 123 Premier Drive | Geneva | AL | 36340 |
| 24565 | Premier Kings, Inc. | 16752 US Hwy 431 South | Headland | AL | 36345 |
| 25426 | Premier Kings of North Alabama, LLC | 1980 Highway 77 | Southside | AL | 35907 |
| 25565 | Premier Kings, Inc. | 30024 State Hwy 79 | Locust Fork | AL | 35097 |
| 25743 | Premier Kings, Inc. | 122 Carl Cannon Blvd | Jasper | AL | 35501 |
| 26579 | Premier Kings, Inc. | 22182 AL 216 | McCalla | AL | 35111 |
| 26914 | Premier Kings, Inc. | 395 Main St | Shorter | AL | 36075 |

| 27281 | Premier Kings, Inc. | 5482 Hwy 280 | Harpersville | AL | 35078 |
| 28954 | Premier Kings of North Alabama, LLC | 204 US 278 | Piedmont | AL | 36272 |

# Exhibit B

# Leased Properties

Store Locations

| Store# | Operating Entity | Address | City | State | Zip Code |
|---|---|---|---|---|---|
| 461 | Premier Kings, Inc. | 290 Oxmoor Road | Birmingham | AL | 35209 |
| 469 | Premier Kings of North Alabama, LLC | 414 East Meighan Blvd | Gadsden | AL | 35903 |
| 1069 | Premier Kings, Inc. | 1524 6th Ave South | Birmingham | AL | 35233 |
| 1577 | Premier Kings, Inc. | 312 Highland Avenue | Selma | AL | 36701 |
| 2616 | Premier Kings, Inc. | 504 North Main Street | Tuskegee | AL | 36083 |
| 2872 | Premier Kings, Inc. | 708 Hwy 78 East | Jasper | AL | 35501 |
| 3345 | Premier Kings, Inc. | 3092 Ross Clark Cr SW | Dothan | AL | 36301 |
| 3610 | Premier Kings, Inc. | 2203 Ross Clark Cr SW | Dothan | AL | 36301 |
| 4058 | Premier Kings, Inc. | 832 Us 231 S Troy Hwy | Troy | AL | 36081 |
| 4431 | Premier Kings, Inc. | 1555 Montgomery Highway | Hoover | AL | 35216 |
| 4848 | Premier Kings, Inc. | 701 Boll Weevil Cr | Enterprise | AL | 36330 |
| 5238 | Premier Kings, Inc. | 601 Madison Avenue | Montgomery | AL | 36104 |
| 6065 | Premier Kings, Inc. | 5525 Carmichael Road | Montgomery | AL | 36117 |
| 6642 | Premier Kings, Inc. | 100 Interstate Dr | Greenville | AL | 36037 |
| 7390 | Premier Kings, Inc. | 1780 East Main Street | Pratville | AL | 36067 |
| 7564 | Premier Kings, Inc. | 1701 Douglas Ave | Brewton | AL | 36426 |
| 9834 | Premier Kings, Inc. | 740 Academy Drive | Bessemer | AL | 35022 |
| 10327 | Premier Kings, Inc. | 681 1st Street SW | Alabaster | AL | 35007 |
| 10881 | Premier Kings of North Alabama, LLC | 3322-B Rainbow Drive | Rainbow City | AL | 35906 |
| 11481 | Premier Kings, Inc. | 1137 M L King Jr Expy | Andalusia | AL | 36420 |
| 12003 | Premier Kings, Inc. | 2229 Bessemer Road | Birmingham | AL | 35208 |
| 12427 | Premier Kings, Inc. | 801 3rd Ave West | Birmingham | AL | 35204 |
| 12520 | Premier Kings, Inc. | 220 S Main St | Atmore | AL | 36502 |
| 16437 | Premier Kings, Inc. | 7757 Crestwood Blvd | Birmingham | AL | 35210 |
| 17003 | Premier Kings, Inc. | 5001 Bond Blvd | Bessemer | AL | 35022 |
| 17389 | Premier Kings, Inc. | 2700 University Blvd | Birmingham | AL | 35233 |
| 18108 | Premier Kings, Inc. | 7581 Mobile Highway | Hope Hull | AL | 36043 |
| 18307 | Premier Kings, Inc. | 2232 East South Blvd | Montgomery | AL | 36116 |
| 19242 | Premier Kings, Inc. | 819 Ann Street | Montgomery | AL | 36107 |
| 19875 | Premier Kings, Inc. | 1003 Highway 80 East | Demopolis | AL | 36732 |
| 19958 | Premier Kings, Inc. | 3016 Allison Bonnett Memorial Drive | Hueytown | AL | 35023 |
| 21471 | Premier Kings, Inc. | 3190 Taylor Rd | Montgomery | AL | 36116 |
| 21654 | Premier Kings, Inc. | 4010 Atlanta Highway | Montgomery | AL | 36108 |
| 21983 | Premier Kings, Inc. | 5076 Hwy 31 | Calera | AL | 35040 |
| 22803 | Premier Kings, Inc. | 1630 Federal Drive | Montgomery | AL | 36117 |
| 22834 | Premier Kings, Inc. | 1484 Forestdale Blvd | Forestdale | AL | 35214 |
| 23135 | Premier Kings, Inc. | 850 Northeastern Blvd | Montgomery | AL | 36117 |
| 23203 | Premier Kings, Inc. | 12560 County Rd 42 | Jemison | AL | 35085 |
| 23805 | Premier Kings, Inc. | 4520 Pinson Blvd | Pinson | AL | 35126 |
| 24123 | Premier Kings, Inc. | 20 Springville Station Blvd | Springville | AL | 35146 |
| 24563 | Premier Kings, Inc. | 123 Premier Drive | Geneva | AL | 36340 |
| 24565 | Premier Kings, Inc. | 16752 US Hwy 431 South | Headland | AL | 36345 |
| 25426 | Premier Kings of North Alabama, LLC | 1980 Highway 77 | Southside | AL | 35907 |
| 25565 | Premier Kings, Inc. | 30024 State Hwy 79 | Locust Fork | AL | 35097 |
| 25743 | Premier Kings, Inc. | 122 Carl Cannon Blvd | Jasper | AL | 35501 |
| 26579 | Premier Kings, Inc. | 22182 AL 216 | McCalla | AL | 35111 |
| 26914 | Premier Kings, Inc. | 395 Main St | Shorter | AL | 36075 |

| 27281 | Premier Kings, Inc. | 5482 Hwy 280 | Harpersville | AL | 35078 |
| 28954 | Premier Kings of North Alabama, LLC | 204 US 278 | Piedmont | AL | 36272 |

# Exhibit C

## Assumed Leases

| Store Number | Store Address | State | Zip Code | City | Lessor/Sublessor | Lessor Address | Lessee/ Op Entity | Date of Lease or Sublease | As Amended or Assigned | Expiry of Primary Term or Current Option Period |
|---|---|---|---|---|---|---|---|---|---|---|
| 461 | 290 Oxmoor Road | AL | 35209 | Birmingham | Burger King Corporation | 5707 Blue Lagoon Drive Miami FL 33126 ATTN: Robin Shafer | PKI | 6/30/05 | 5/20/19 1/10/13 | 6/30/30 |
| 469 | 414 East Meighan Blvd | AL | 35903 | Gadsden | Burger King Corporation | 5707 Blue Lagoon Drive Miami FL 33126 ATTN: Robin Shafer | PKNA | 3/17/15 | | 6/29/35 |
| 1069 | 1524 6th Ave South | AL | 35233 | Birmingham | Burger King Corporation | 5707 Blue Lagoon Drive Miami FL 33126 ATTN: Robin Shafer | PKI | 8/16/99 | 1/10/13 7/20/20 | 5/31/41 |
| 1577 | 312 Highland Avenue | AL | 36701 | Selma | Burger King Corporation | 5707 Blue Lagoon Drive Miami FL 33126 ATTN: Robin Shafer | PKI | 6/30/21 Approximate | | 6/30/41 |
| 2616 | 504 North Main Street | AL | 36083 | Tuskegee | Premier Kings Holdings, LLC | Estate of Manraj S Sidhu c/o Robert Ritchey P.O. Drawer 4540 Montgomery, AL 36103-4540 | PKI | 5/3/12 | 10/30/18 | 10/31/38 |
| 2872 | 708 Hwy 78 East | AL | 35501 | Jasper | Burger King Corporation | 5707 Blue Lagoon Drive Miami FL 33126 ATTN: Robin Shafer | PKI | 10/29/79 | 1/28/10 1/10/13 5/20/19 | 12/31/29 |
| 3345 | 3092 Ross Clark Cr SW L | AL | 36301 | Dothan | ARC CAFEUSA001, LLC c/o Vereit, Inc. | 11995 El Camino Real San Diego, CA 92130 ATTN: Marisss Hodsdon Prop ID: 8841 | PKI | 8/18/06 | 5/31/07, 7/31/13, 11/14/13, 6/30/14, 10/26/16 | 8/31/28 |
| 3610 | 2203 Ross Clark Cr SW | AL | 36301 | Dothan | A.R.T. Investments, LLC | 9705 Collins Avenue, Suite 1602N, Ball Harbor, FL 33154 ATTN: Mark Fedotovskly | PKI | 8/18/06 | 6/30/14 10/26/16 | 8/31/26 |
| 4058 | 832 US 231 S   Loc 114 | AL | 36081 | Troy | ARC CAFEUSA001, LLC c/o Vereit Inc. | 11995 El Camino Real San Diego, CA 92130 ATTN: Marissa Hodson Prop ID: 8847 | PKI | 8/18/06 | 5/31/07, 7/31/13, 11/14/13, 6/30/14, 10/26/16 | 8/31/28 |
| 4431 | 1555 Montgomery Highw | AL | 35216 | Hoover | Burger King Corporation | 5707 Blue Lagoon Drive Miami FL 33126 ATTN: Robin Shafer | PKI | 3/29/21 Approximate | | 3/29/41 |
| 4848 | 701 Boll Weevil Cr   Loc 1 | AL | 36330 | Enterprise | ARC CAFEUSA001, LLC c/o Vereit, Inc. | 11995 El Camino Real San Diego, CA 92130 ATTN: Marissa Hodson Prop ID: 8843 | PKI | 10/26/16 | | 12/31/28 |

| Store Number | Store Address | State | Zip Code | City | Lessor/Sublessor | Lessor Address | Lessee/ Op Entity | Date of Lease or Sublease | As Amended or Assigned | Expiry of Primary Term or Current Option Period |
|---|---|---|---|---|---|---|---|---|---|---|
| 5238 | 601 Madison Avenue | AL | 36104 | Montgomery | The High Revocable Trust | 1300 Countryview Drive, Modesto, CA 95356 ATTN: Randolph and Kathy High | PKI | 1/29/10 | 10/17/12 6/3/22 | 7/31/39 |
| 6065 | 5525 Carmichael Road | AL | 36117 | Montgomery | George C. Salmon | 48 Golf Road Pleasanton, CA 94566 ATTN: George Salmon | PKI | 6/1/17 | | 5/30/37 |
| 6642 | 100 Interstate Dr  Loc 12 | AL | 36037 | Greenville | Burger King Corporation | 5707 Blue Lagoon Drive Miami FL 33126 ATTN: Robin Shafer | PKI | 10/31/16 | 5/8/21 | 5/7/40 |
| 7390 | 1780 East Main Street | AL | 36067 | Pratville | Pramila Khatri | 19710 Michaels Ct. Castro Valley, CA 94546 ATTN: Pramilr Katri | PKI | 1/29/10 | | 12/16/26 |
| 7564 | 1701 Douglas Ave  Loc 13 | AL | 36426 | Brewton | ARC CAFEUSA001, LLC c/o Vereit, Inc. | 11995 El Camino Real San Diego, CA 92130 ATTN: Mariss Hodson Prop ID: 8840 | PKI | 10/26/16 | | 12/31/28 |
| 9834 | 740 Academy Drive | AL | 35022 | Bessemer | Burger King Corporation | 5707 Blue Lagoon Drive Miami FL 33126 | PKI | 6/21/12 | | 6/30/32 |
| 10327 | 681 1st Street South W | AL | 35007 | Alabaster | Burger King Corporation | 5707 Blue Lagoon Drive Miami FL 33126 ATTN: Robin Shafer | PKI | 6/21/12 | | 10/31/31 |
| 10881 | 3322-B Rainbow Drive | AL | 35906 | Rainbow City | Traymore Properties, LLC | 4012A Dunsmore Street, Huntsville, AL 35802 ATTN: James Wessell | PKNA | 4/29/14 | 8/14/14 | 4/29/34 |
| 11481 | 1137 N Bypass  Loc 117 | AL | 36420 | Andalusia | ARC CAFEUSA001, LLC c/o Vereit, Inc. | 11995 El Camino Real San Diego, CA 92130 ATTN: Mariss Hodson Prop ID: 8838 | PKI | 10/26/16 | | 12/31/28 |
| 12003 | 2229 Bessemer Road | AL | 35208 | Birmingham | Burger King Corporation | 5707 Blue Lagoon Drive  Miami FL 33126    ATTN: Robin Shafer | PKI | 5/20/19 | | 11/17/28 |
| 12427 | 801 3rd Ave West | AL | 35204 | Birmingham | Burger King Corporation | 5707 Blue Lagoon Drive Miami FL 33126 ATTN: Robin Shafer | PKI | 9/27/21 Approximate | | 9/26/41 |

| Store Number | Store Address | State | Zip Code | City | Lessor/Sublessor | Lessor Address | Lessee/ Op Entity | Date of Lease or Sublease | As Amended or Assigned | Expiry of Primary Term or Current Option Period |
|---|---|---|---|---|---|---|---|---|---|---|
| 12520 | 220 S Main St  Loc 118 | AL | 36502 | Atmore | ARC CAFEUSA001, LLC c/o Vereit, Inc. | 11995 El Camino Real San Diego, CA 92130 ATTN: Mariss Hodson Prop ID: 8839 | PKI | 10/26/16 | | 12/31/28 |
| 16437 | 7757 Crestwood Blvd | AL | 35210 | Birmingham | Burger King Corporation | 5707 Blue Lagoon Drive Miami FL 33126 ATTN: Robin Shafer | PKI | 5/20/19 | | 4/17/28 |
| 17003 | 5001 Bond Blvd | AL | 35022 | Bessemer | Burger King Corporation | 5707 Blue Lagoon Drive Miami FL 33126 ATTN: Robin Shafer | PKI | 6/20/12 | | 2/27/34 |
| 17389 | 2700 University Blvd | AL | 35233 | Birmingham | Burger King Corporation | 5707 Blue Lagoon Drive Miami FL 33126 ATTN: Robin Shafer | PKI | 5/20/19 | | 2/4/30 |
| 18108 | 7581 Mobile Highway | AL | 36043 | Hope Hull | Premier Kings Holdings, LLC | Estate of Manraj S Sidhu c/o Robert Ritchey P.O. Drawer 4540 Montgomery, AL 36103-4540 | PKI | 5/18/11 | 10/30/18 | 10/31/38 |
| 18307 | 2232 East South Blvd #18 | AL | 36116 | Montgomery | Premier Kings Holdings, LLC | Estate of Manraj S Sidhu c/o Robert Ritchey P.O. Drawer 4540 Montgomery, AL 36103-4540 | PKI | 9/2/11 | 10/30/18 | 10/31/38 |
| 19242 | 819 Ann Street #19242 | AL | 36107 | Montgomery | Premier Kings Holdings, LLC | Estate of Manraj S Sidhu c/o Robert Ritchey P.O. Drawer 4540 Montgomery, AL 36103-4540 | PKI | 1/11/13 | 10/30/18 | 10/31/38 |
| 19875 | 1003 Highway 80 East | AL | 36732 | Demopolis | Premier Kings Holdings, LLC | Estate of Manraj S Sidhu c/o Robert Ritchey P.O. Drawer 4540 Montgomery, AL 36103-4540 | PKI | 9/19/13 | 10/30/18 | 10/31/38 |
| 19958 | 3016 Allison Bonnett Me | AL | 35023 | Hueytown | Premier Kings Holdings, LLC | Estate of Manraj S Sidhu c/o Robert Ritchey P.O. Drawer 4540 Montgomery, AL 36103-4540 | PKI | 1/24/14 | 10/30/18 | 10/31/38 |
| 21471 | 3190 Taylor Rd | AL | 36116 | Montgomery | Premier Kings Holdings, LLC | Estate of Manraj S Sidhu c/o Robert Ritchey P.O. Drawer 4540 Montgomery, AL 36103-4540 | PKI | 4/1/15 | 10/30/18 | 10/31/38 |

| Store Number | Store Address | State | Zip Code | City | Lessor/Sublessor | Lessor Address | Lessee/ Op Entity | Date of Lease or Sublease | As Amended or Assigned | Expiry of Primary Term or Current Option Period |
|---|---|---|---|---|---|---|---|---|---|---|
| 21654 | 4010 Atlanta Highway | AL | 36108 | Montgomery | Premier Kings Holdings, LLC | Estate of Manraj S Sidhu c/o Robert Ritchey P.O. Drawer 4540 Montgomery, AL 36103-4540 | PKI | 12/17/14 | 3/27/15 4/30/15 1015/15 | 12/2/35 |
| 21983 | 5076 Hwy 31 | AL | 35040 | Calera | Premier Holdings, LLC | Estate of Manraj S Sidhu c/o Robert Ritchey P.O. Drawer 4540 Montgomery, AL 36103-4540 | PKI | 7/21/15 7/21/15 | | 12/29/35 |
| 22803 | 1630 Federal Drive | AL | 36117 | Montgomery | Premier Kings Holdings of Alabama, LLC | Estate of Manraj S Sidhu c/o Robert Ritchey P.O. Drawer 4540 Montgomery, AL 36103-4540 | PKI | 5/26/16 | 10/30/18 | 10/31/38 |
| 22834 | 1484 Forestdale Blvd | AL | 35214 | Forestdale | Premier Kings Holdings of Alabama, LLC | Estate of Manraj S Sidhu c/o Robert Ritchey P.O. Drawer 4540 Montgomery, AL 36103-4540 | PKI | 5/4/16 | 10/30/18 | 10/31/38 |
| 23135 | 850 Northeastern Blvd | AL | 36117 | Montgomery | Premier Kings Holdings, LLC | Estate of Manraj S Sidhu c/o Robert Ritchey P.O. Drawer 4540 Montgomery, AL 36103-4540 | PKI | 5/26/16 | 10/30/18 | 10/31/38 |
| 23203 | 12560 County Rd 42  Loc | AL | 35085 | Jemison | Sweet Melinda Smitherman | 430 County Road 909 Clanton, AL 35046 ATTN: Sweet M. Smitherman | PKI | 3/9/16 | 10/1/16 4/1/23 | 9/30/36 |
| 23805 | 4520 Pinson Blvd | AL | 35126 | Pinson | Jimmy Hale Mission | P. O. Box 968 Birmingham, AL 35201 ATTN: J.H. Berry & Gilbert, Inc. | PKI | 6/14/16 | 9/12/16 12/11/16 | 3/31/32 |
| 24123 | 20 Springville Station Blv | AL | 35146 | Springville | GEWSI 2 LLC | 16 Palmer Court Drums, PA 18222 ATTN: Jim Gallagher | PKI | 5/21/20 | | 4/31/2040 |
| 24563 | 123 Premier Drive | AL | 36340 | Geneva | Premier Kings Holdings, LLC | Estate of Manraj S Sidhu c/o Robert Ritchey P.O. Drawer 4540 Montgomery, AL 36103-4540 | PKI | 12/31/17 | 10/30/18 | 10/31/38 |
| 24565 | 16752 US Hwy 431 South | AL | 36345 | Headland | Premier Kings Holdings, LLC | Estate of Manraj S Sidhu c/o Robert Ritchey P.O. Drawer 4540 Montgomery, AL 36103-4540 | PKI | 12/30/17 | 10/30/18 | 10/31/38 |

| Store Number | Store Address | State | Zip Code | City | Lessor/Sublessor | Lessor Address | Lessee/ Op Entity | Date of Lease or Sublease | As Amended or Assigned | Expiry of Primary Term or Current Option Period |
|---|---|---|---|---|---|---|---|---|---|---|
| 25426 | 1980 Highway 77 | AL | 35907 | Southside | Formerly Premier Holdings, LLC | PeoplesSouth Bank P.O. Box 8038 Dothan, Alabama 36304 ATTN: D. Keith Carmichael. | PKNA | 6/18/17 | | 9/4/38 |
| 24565 | 30024 State Hwy 79 | AL | 35097 | Locust Fork | Premier Holdings, LLC | Estate of Manraj S Sidhu c/o Robert Ritchey P.O. Drawer 4540 Montgomery, AL 36103-4540 | PKI | 11/30/17 | | 11/28/38 |
| 25743 | 122 Carl Cannon Blvd | AL | 35501 | Jasper | Premier Holdings, LLC | Estate of Manraj S Sidhu c/o Robert Ritchey P.O. Drawer 4540 Montgomery, AL 36103-4540 | PKI | 11/30/17 | | 3/13/39 |
| 26579 | 22182 AL 216 | AL | 35111 | McCalla | Premier Holdings, LLC | Estate of Manraj S Sidhu c/o Robert Ritchey P.O. Drawer 4540 Montgomery, AL 36103-4540 | PKI | 12/7/18 | | 3/31/39 |
| 26914 | 395 Main St | AL | 36075 | Shorter | Premier Holdings, LLC | Estate of Manraj S Sidhu c/o Robert Ritchey P.O. Drawer 4540 Montgomery, AL 36103-4540 | PKI | 8/30/18 | | 7/16/39 |
| 27281 | 5482 Hwy 280 | AL | 35078 | Harpersville | Premier Holdings, LLC | Estate of Manraj S Sidhu c/o Robert Ritchey P.O. Drawer 4540 Montgomery, AL 36103-4540 | PKI | 11/27/18 | | 11/28/39 |
| 28954 | 204 US 278 Piedmont | AL | 36272 | Piedmont | Premier Holdings, LLC | Estate of Manraj S Sidhu c/o Robert Ritchey P.O. Drawer 4540 Montgomery, AL 36103-4540 | PKNA | 4/29/21 | | 4/28/41 |

DocuSign Envelope ID: D8A6F8DD-ED09-44C4-AFDB-4EC79CD21600

## Exhibit D

## Assumed Contracts

None

# Exhibit E

# Franchise Agreements

| Store# | Operating Entity | Original Signer | Agreement Date | Date Assigned to PK | Agreement Addendum | Address | City | State | Zip Code |
|---|---|---|---|---|---|---|---|---|---|
| 461 | PKI | Charles James III (PRG Ventures, LLC) | 1/10/2013 | 5/20/2019 | | 290 Oxmoor Road | Birmingham | AL | 35209 |
| 469 | PKNA | Manraj S. Sidhu | 3/17/2015 | | ITP2 Successor Franchise Addendum signed on 3/17/15 | 414 East Meighan Blvd | Gadsden | AL | 35903 |
| 1069 | PKI | Manraj S. Sidhu | 2/9/2021 | | Successor Addendum signed on 2/9/21 Franchise Agreement Addendum BKoT signed on 2/9/21 | 1524 6th Ave South | Birmingham | AL | 35233 |
| 2872 | PKI | Charles James III (PRG Ventures, LLC) | 1/10/2013 | 5/20/2019 | | 708 Hwy 78 East | Jasper | AL | 35501 |
| 4431 | PKI | Manraj S. Sidhu | 2/16/2022 | | Successor Addendum signed on 2/16/22 Franchise Agreement Addendum BKoT signed on 2/16/22 | 1555 Montgomery Highway | Hoover | AL | 35216 |
| 9834 | PKI | Manraj S. Sidhu | 6/20/2012 | 6/20/2012 | | 740 Academy Drive | Bessemer | AL | 35022 |
| 10327 | PKI | Manraj S. Sidhu | 6/20/2012 | 6/20/2012 | | 681 1st Street SW | Alabaster | AL | 35007 |
| 10881 | PKNA | Manraj S. Sidhu | 12/16/2016 | | Successor Addendum signed on 12/16/16 Image Transformation Program Successor Franchise Addendum signed on 12/16/16 | 3322-B Rainbow Drive | Rainbow City | AL | 35906 |
| 12003 | PKI | Charles James III (PRG Ventures, LLC) | 1/10/2013 | 5/20/2019 | | 2229 Bessemer Road | Birmingham | AL | 35208 |
| 12427 | PKI | Manraj S. Sidhu | Per BKC 12/3/21 | | | 801 3rd Ave West | Birmingham | AL | 35204 |
| 16437 | PKI | Charles James III (PRG Ventures, LLC) | 1/10/2013 | 5/20/2019 | | 7757 Crestwood Blvd | Birmingham | AL | 35210 |
| 17003 | PKI | Manraj S. Sidhu | 6/20/2012 | 6/20/2012 | | 5001 Bond Blvd | Bessemer | AL | 35022 |
| 17389 | PKI | Charles James III (PRG Ventures, LLC) | 1/10/2013 | 5/20/2019 | | 2700 University Blvd | Birmingham | AL | 35233 |
| 19958 | PKI | Manraj S. Sidhu | 12/31/2013 | 12/31/2013 | Franchise Agreement Addendum signed on 12/31/13 | 3016 Allison Bonnett Memorial Drive | Hueytown | AL | 35023 |
| 21983 | PKI | Manraj S. Sidhu | 12/29/2015 | 12/29/2015 | Franchise Agreement Addendum signed on 12/29/15 | 5076 Hwy 31 | Calera | AL | 35040 |
| 22834 | PKI | Manraj S. Sidhu | 1/18/2017 | | Franchise Agreement Addendum signed on 1/18/17 | 1484 Forestdale Blvd | Forestdale | AL | 35214 |
| 23805 | PKI | Manraj S. Sidhu | 6/29/2017 | 6/29/2017 | Franchise Agreement Addendum signed on 6/29/17 | 4520 Pinson Blvd | Pinson | AL | 35126 |
| 24123 | PKI | Manraj S. Sidhu | 11/10/2017 | 11/10/2017 | Franchise Agreement Addendum signed on 11/10/17 | 20 Springville Station Blvd | Springville | AL | 35146 |

| Store# | Operating Entity | Original Signer | Agreement Date | Date Assigned to PK | Agreement Addendum | Address | City | State | Zip Code |
|---|---|---|---|---|---|---|---|---|---|
| 25426 | PKNA | Requested from BKC | Per BKC 7/31/18 | | | 1980 Highway 77 | Southside | AL | 35907 |
| 25565 | PKI | Requested from BKC | Per BKC 11/29/18 | | | 30024 State Hwy 79 | Locust Fork | AL | 35097 |
| 25743 | PKI | Requested from BKC | Per BKC 3/15/19 | | | 122 Carl Cannon Blvd | Jasper | AL | 35501 |
| 26579 | PKI | Manraj S. Sidhu | 6/6/2019 | | Franchise Agreement Addendum signed on 6/6/19 | 22182 AL 216 | McCalla | AL | 35111 |
| 27281 | PKI | Manraj S. Sidhu | 11/29/2019 | | Franchise Agreement Addendum signed on 11/29/19 | 5482 Hwy 280 | Harpersville | AL | 35078 |
| 28954 | PKNA | Manraj S. Sidhu | 4/29/2021 | | Franchise Agreement Addendum signed on 4/29/21 | 204 US 278 | Piedmont | AL | 36272 |
| 1577 | PKI | Manraj S. Sidhu | Per BKC 12/6/21 | | | 312 Highland Avenue | Selma | AL | 36701 |
| 2616 | PKI | Manraj S. Sidhu | 6/15/2017 | | Successor Addendum signed on 6/15/17 Image Transformation Program Successor Franchise Addendum signed on 6/15/17 | 504 North Main Street | Tuskegee | AL | 36083 |
| 3345 | PKI | Anand Patel (Burger Gulf Coast, LLC) | 3/27/2015 | 10/31/2016 | | 3092 Ross Clark Cr SW | Dothan | AL | 36301 |
| 3610 | PKI | Manraj S. Sidhu | 3/27/2015 | | Successor Addendum signed on 3/27/15 | 2203 Ross Clark Cr SW | Dothan | AL | 36301 |
| 4058 | PKI | Anand Patel (Burger Gulf Coast, LLC) | 10/19/2016 | 10/19/2016 | | 832 Us 231 S Troy Hwy | Troy | AL | 36081 |
| 4848 | PKI | Anand Patel (Burger Gulf Coast, LLC) | 10/19/2016 | 10/19/2016 | | 701 Boll Weevil Cr | Enterprise | AL | 36330 |
| 5238 | PKI | Manraj S. Sidhu | 11/22/2013 | | Image Transformation Program Successor Franchise Addendum signed on 11/22/23 | 601 Madison Avenue | Montgomery | AL | 36104 |
| 6065 | PKI | Manraj S. Sidhu | 12/31/2012 | | Image Transformation Program Successor Franchise Addendum signed on 12/31/12 | 5525 Carmichael Road | Montgomery | AL | 36117 |
| 6642 | PKI | Manraj S. Sidhu | 12/29/2021 | | Successor Addendum signed on 12/29/21 Image Transformation Program Successor Franchise Addendum signed on 12/29/21 | 100 Interstate Dr | Greenville | AL | 36037 |
| 7390 | PKI | Manraj S. Sidhu | 11/22/2013 | | Image Transformation Program Successor Franchise Addendum signed on 11/22/13 | 1780 East Main Street | Pratville | AL | 36067 |
| 7564 | PKI | Anand Patel (Burger Gulf Coast, LLC) | 10/19/2016 | 10/31/2016 | | 1701 Douglas Ave | Brewton | AL | 36426 |
| 11481 | PKI | Manraj S. Sidhu | 10/19/2016 | | Successor Addendum signed on10/31/16 | 1137 M L King Jr Expy | Andalusia | AL | 36420 |

| Store# | Operating Entity | Original Signer | Agreement Date | Date Assigned to PK | Agreement Addendum | Address | City | State | Zip Code |
|---|---|---|---|---|---|---|---|---|---|
| 12520 | PKI | Anand Patel (Burger Gulf Coast, LLC) | 10/19/2016 | 10/31/2016 | | 220 S Main St | Atmore | AL | 36502 |
| 18108 | PKI | Manraj S. Sidhu | 6/30/2011 | | | 7581 Mobile Highway | Hope Hull | AL | 36043 |
| 18307 | PKI | Requested from BKC | Per BKC 12/20/19 | | | 2232 East South Blvd | Montgomery | AL | 36116 |
| 19242 | PKI | Manraj S. Sidhu | 4/17/2013 | 4/17/2013 | | 819 Ann Street | Montgomery | AL | 36107 |
| 19875 | PKI | Manraj S. Sidhu | 12/19/2013 | 12/19/2013 | Franchise Addendum signed on 12/19/13 | 1003 Highway 80 East | Demopolis | AL | 36732 |
| 21471 | PKI | Manraj S. Sidhu | 11/3/2015 | 11/3/2015 | | 3190 Taylor Rd | Montgomery | AL | 36116 |
| 21654 | PKI | Manraj S. Sidhu | 11/30/2015 | 11/30/2015 | Franchise Agreement Addendum signed on 11/30/15 | 4010 Atlanta Highway | Montgomery | AL | 36108 |
| 22803 | PKI | Manraj S. Sidhu | 9/29/2016 | | Franchise Agreement Addendum signed on 9/29/16 | 1630 Federal Drive | Montgomery | AL | 36117 |
| 23135 | PKI | Manraj S. Sidhu | 12/23/2016 | | Franchise Agreement Addendum signed on 12/23/16 | 850 Northeastern Blvd | Montgomery | AL | 36117 |
| 23203 | PKI | Manraj S. Sidhu | 2/3/2017 | 2/3/2017 | Franchise Agreement Addendum signed on 2/3/17 | 12560 County Rd 42 | Jemison | AL | 35085 |
| 24563 | PKI | Manraj S. Sidhu | 12/30/2017 | | Franchise Agreement Addendum signed on 12/30/17 | 123 Premier Drive | Geneva | AL | 36340 |
| 24565 | PKI | Manraj S. Sidhu | 12/31/2017 | | Franchise Agreement Addendum signed on 12/31/17 | 16752 US Hwy 431 South | Headland | AL | 36345 |
| 26914 | PKI | Manraj S. Sidhu | 7/17/2019 | | Franchise Agreement Addendum signed on 7/17/19 | 395 Main St | Shorter | AL | 36075 |

*PKI - Premier Kings, Inc.
*PKNA - Premier Kings of North Alabama, LLC

DocuSign Envelope ID: D8A6F8DD-ED09-44C4-AFDB-4EC79CD21600

**Exhibit F**

**[Reserved]**

**Exhibit G**

**Assignment and Assumption of the Assumed Leases**

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Assignment") is made and entered into as of _____, 2023, by and among Premier Kings, Inc., an Alabama limited liability company and Premier Kings of North Alabama, LLC, an Alabama limited liability company (jointly, "**Assignor**"), and _____, a _____ ("**Assignee**"). Assignor and Assignee are referred to collectively as "**Parties**" herein, and each individually, a "**Party**".

## RECITALS

WHEREAS, Assignor and Assignee are parties to that certain Asset Purchase Agreement dated as of [_____], 2023 (the "**Purchase Agreement**"), pursuant to which Assignor agreed to assign, and Assignee agreed to assume, all of Assignor's right, title and interest in and to the Assumed Leases;

WHEREAS, in connection with the consummation of the transactions contemplated by the Purchase Agreement, Assignor agreed to assign, and Assignee agreed to assume, pay, perform, discharge or otherwise satisfy the Assumed Liabilities; and

WHEREAS, all capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Purchase Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, and incorporating the recitals above, the Parties agree as follows:

## AGREEMENT

1.  Assignment of Assumed Leases. Subject to the terms and conditions set forth in the Purchase Agreement, for valuable consideration received from Assignee, Assignor hereby assigns, transfers and conveys to Assignee all of Assignor's right, title and interest in, to and under the Assumed Leases and Assignee accepts such assignment.

2.  Assumption of Assumed Liabilities. Subject to the terms and conditions set forth in the Purchase Agreement, Assignor hereby assigns to Assignee the Assumed Liabilities and Assignee hereby accepts such assignment and agrees to pay, perform, discharge or otherwise satisfy the Assumed Liabilities. Other than as specifically set forth herein, Assignee assumes no debt, liability, or obligation of Assignor all of which shall remain the responsibility of Assignor and shall be Excluded Liabilities.

3.  Further Assurances. In case at any time after the date hereof any further actions are necessary or desirable to carry out the purposes of this Assignment, the Parties

DocuSign Envelope ID: D8A6F8DD-ED09-44C4-AFDB-4EC79CD21600

shall execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof.

4. <u>Instrument of Conveyance Only</u>.  This Assignment is being made by the Parties pursuant to the requirements of the Purchase Agreement, the terms and conditions of which are incorporated herein by this reference, and this Assignment shall be subject to such terms and conditions.  Except for the actual conveyance of the Assumed Leases as set forth in <u>Section 1</u> of this Assignment and the assumption of the Assumed Liabilities as set forth in <u>Section 2</u> of this Assignment, nothing set forth in this Assignment is intended to or shall expand, enlarge, modify, restrict, limit, or abridge any of the terms, representations, warranties, covenants, conditions, agreements, provisions, rights, benefits, obligations or liabilities of Assignors or Assignee beyond that set forth in the Purchase Agreement.  In the event of any conflict, ambiguity or discrepancy between the terms or conditions of the Purchase Agreement and this Assignment, the terms and conditions of the Purchase Agreement shall be controlling in all respects.

5. <u>No Third Party Beneficiaries</u>.  This Assignment is for the sole and exclusive benefit of the Parties and their respective successors and permitted assigns, and nothing herein is intended or shall be construed to confer upon any person other than the Parties and their respective successors and permitted assigns any rights, remedies or claims under, or by any reason of, this Assignment of any term, covenant or condition hereof.

6. <u>Governing Law; Disputes</u>.  The Parties agree that this Assignment shall be governed by and construed in accordance with the laws of the State of Alabama without regard to such state's conflicts of laws rules.  Any dispute arising from this Assignment shall be subject to the terms and conditions of the Purchase Agreement.

7. <u>Counterparts</u>.  This Assignment may be executed in multiple counterparts, each of which will constitute an original and all of which, when taken together, will constitute one and the same agreement.  The Parties may deliver executed signature pages to this Assignment by facsimile or email transmission.  No Party may raise as a defense to the formation or enforceability of this Assignment, and each Party forever waives any such defense, either (a) the use of a facsimile or email transmission to deliver a signature or (b) the fact that any signature was signed and subsequently transmitted by facsimile or email transmission.

[Signature Page Follows]

IN WITNESS WHEREOF, Assignor and Assignee have executed this Assignment effective as of the date first set forth above.

**ASSIGNOR:**

PREMIER KINGS, INC.

By:_____
Name:_____
Title:_____

PREMIER KINGS OF NORTH ALABAMA, INC.

By:_____
Name:_____
Title:_____

**ASSIGNEE:**

By:_____
Name:_____
Title:_____

**Exhibit H**

**Assignment and Assumption of the Assumed Contracts**

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Assignment") is made and entered into as of _____, 2023, by and among Premier Kings, Inc., an Alabama limited liability company and Premier Kings of North Alabama, LLC, an Alabama limited liability company (jointly, "**Assignor**"), and _____, a _____ ("**Assignee**"). Assignor and Assignee are referred to collectively as "**Parties**" herein, and each individually, a "**Party**".

**RECITALS**

WHEREAS, Assignor and Assignee are parties to that certain Asset Purchase Agreement dated as of [_____], 2023 (the "**Purchase Agreement**"), pursuant to which Assignor agreed to assign, and Assignee agreed to assume, all of Assignor's right, title and interest in and to the Assumed Contracts;

WHEREAS, in connection with the consummation of the transactions contemplated by the Purchase Agreement, Assignor agreed to assign, and Assignee agreed to assume, pay, perform, discharge or otherwise satisfy the Assumed Liabilities; and

WHEREAS, all capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Purchase Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, and incorporating the recitals above, the Parties agree as follows:

**AGREEMENT**

1.  Assignment of Assumed Contracts. Subject to the terms and conditions set forth in the Purchase Agreement, for valuable consideration received from Assignee, Assignor hereby assigns, transfers and conveys to Assignee all of Assignor's right, title and interest in, to and under the Assumed Contracts and Assignee accepts such assignment.

2.  Assumption of Assumed Liabilities. Subject to the terms and conditions set forth in the Purchase Agreement, Assignor hereby assigns to Assignee the Assumed Liabilities and Assignee hereby accepts such assignment and agrees to pay, perform, discharge or otherwise satisfy the Assumed Liabilities. Other than as specifically set forth herein, Assignee assumes no debt, liability, or obligation of Assignor all of which shall remain the responsibility of Assignor and shall be Excluded Liabilities.

3.  Further Assurances. In case at any time after the date hereof any further actions are necessary or desirable to carry out the purposes of this Assignment, the Parties

shall execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof.

4.  Instrument of Conveyance Only.  This Assignment is being made by the Parties pursuant to the requirements of the Purchase Agreement, the terms and conditions of which are incorporated herein by this reference, and this Assignment shall be subject to such terms and conditions.  Except for the actual conveyance of the Assumed Contracts as set forth in Section 1 of this Assignment and the assumption of the Assumed Liabilities as set forth in Section 2 of this Assignment, nothing set forth in this Assignment is intended to or shall expand, enlarge, modify, restrict, limit, or abridge any of the terms, representations, warranties, covenants, conditions, agreements, provisions, rights, benefits, obligations or liabilities of Assignors or Assignee beyond that set forth in the Purchase Agreement.  In the event of any conflict, ambiguity or discrepancy between the terms or conditions of the Purchase Agreement and this Assignment, the terms and conditions of the Purchase Agreement shall be controlling in all respects.

5.  No Third Party Beneficiaries.  This Assignment is for the sole and exclusive benefit of the Parties and their respective successors and permitted assigns, and nothing herein is intended or shall be construed to confer upon any person other than the Parties and their respective successors and permitted assigns any rights, remedies or claims under, or by any reason of, this Assignment of any term, covenant or condition hereof.

6.  Governing Law; Disputes.  The Parties agree that this Assignment shall be governed by and construed in accordance with the laws of the State of Alabama without regard to such state's conflicts of laws rules.  Any dispute arising from this Assignment shall be subject to the terms and conditions of the Purchase Agreement.

7.  Counterparts.  This Assignment may be executed in multiple counterparts, each of which will constitute an original and all of which, when taken together, will constitute one and the same agreement.  The Parties may deliver executed signature pages to this Assignment by facsimile or email transmission.  No Party may raise as a defense to the formation or enforceability of this Assignment, and each Party forever waives any such defense, either (a) the use of a facsimile or email transmission to deliver a signature or (b) the fact that any signature was signed and subsequently transmitted by facsimile or email transmission.

[Signature Page Follows]

IN WITNESS WHEREOF, Assignor and Assignee have executed this Assignment effective as of the date first set forth above.

**ASSIGNOR:**

PREMIER KINGS, INC.

By:_____
Name:_____
Title:_____

PREMIER KINGS OF NORTH ALABAMA, INC.

By:_____
Name:_____
Title:_____

**ASSIGNEE:**

By:_____
Name:_____
Title:_____

**Exhibit I**
**BILL OF SALE**

THIS BILL OF SALE (this "**Bill of Sale**") is made and entered into as of _____[●], 2023, by Premier Kings, Inc., an Alabama corporation and Premier Kings of North Alabama, Inc., an Alabama corporation (jointly, "**Sellers**") in favor of _____, a limited liability company, ("**Buyer**"). Sellers and Buyer are referred to collectively as "**Parties**" herein, and each individually, a "**Party**".

## RECITALS

WHEREAS, Buyer and Sellers are parties to that certain Asset Purchase Agreement dated as of [●], 2023 (the "**Purchase Agreement**"), pursuant to which Sellers agreed to sell, convey, assign, transfer and deliver to Buyer, all of its respective right, title and interest in and to the Assets (as defined therein), and Buyer agreed to acquire the same; and

WHEREAS, all capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Purchase Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, and incorporating the recitals above, the Parties agree as follows:

## AGREEMENT

1. <u>Assignment</u>. Subject to the terms and conditions set forth in the Purchase Agreement, for valuable consideration received from Buyer, Sellers do hereby irrevocably and unconditionally sell, assign, transfer, convey and deliver to Buyer, its successors and assigns forever, all of Sellers' rights, title and interest in and to the Assets, including good and marketable title thereto, free and clear of any and all Liens, to have and to hold the same and each and all thereof unto Buyer, its successors and assigns forever, to its and their own use and benefit forever.

2. <u>Further Assurances</u>. In case at any time after the date hereof any further actions are necessary or desirable to carry out the purposes of this Bill of Sale, Sellers shall execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required or requested by Buyer to carry out the provisions hereof.

3. <u>Instrument of Conveyance Only</u>. This Bill of Sale is being made by Sellers pursuant to the requirements of the Purchase Agreement, the terms and conditions of which are incorporated herein by this reference, and this Bill of Sale shall be subject to such terms and conditions. Except for the actual conveyance of the Assets as set forth in <u>Section 1</u> of this Bill of Sale, nothing set forth in this Bill of Sale is intended to or shall expand, enlarge, modify, restrict, limit, or abridge any of the terms, representations, warranties, covenants, conditions, agreements,

provisions, rights, benefits, obligations or liabilities of the Parties beyond that set forth in the Purchase Agreement.  In the event of any conflict, ambiguity or discrepancy between the terms or conditions of the Purchase Agreement and this Bill of Sale, the terms and conditions of the Purchase Agreement shall be controlling in all respects.

4. <u>No Third Party Beneficiaries</u>.  This Bill of Sale is for the sole and exclusive benefit of the Parties and their respective successors and permitted assigns, and nothing herein is intended or shall be construed to confer upon any person other than the Parties and their respective successors and permitted assigns any rights, remedies or claims under, or by any reason of, this Bill of Sale or any term, covenant or condition hereof.

5. <u>Governing Law; Disputes</u>.  The Parties agree that this Bill of Sale shall be governed by and construed in accordance with the laws of the State of Alabama without regard to such state's conflicts of laws rules.  Any dispute arising from this Bill of Sale shall be subject to the terms and conditions of Section 13.8 of the Purchase Agreement.

6. <u>Counterparts</u>.  This Bill of Sale may be executed in multiple counterparts, each of which will constitute an original and all of which, when taken together, will constitute one and the same agreement.  Sellers may deliver executed signature pages to this Bill of Sale by facsimile or email transmission.  No Party may raise as a defense to the formation or enforceability of this Bill of Sale, and each Party forever waives any such defense, either (a) the use of a facsimile or email transmission to deliver a signature or (b) the fact that any signature was signed and subsequently transmitted by facsimile or email transmission.

*[Remainder of Page Left Blank]*

DocuSign Envelope ID: D8A6F8DD-ED09-44C4-AFDB-4EC79CD21600

IN WITNESS WHEREOF, the undersigned have executed this Bill of Sale effective as of the date first set forth above.

SELLERS

PREMIER KINGS, INC.

By:_____
Name:_____
Title:_____

PREMIER KINGS OF NORTH ALABAMA, INC.

By:_____
Name:_____
Title:_____

**Schedule 1.2**
**Excluded Assets**

1. Coca-Cola Rebate for the portion of the rebate earned by Premier King through closing date.
2. Dr. Pepper Rebate for the portion of the rebate earned by Premier King through closing date.
3. RSI Rebate for the portion of the rebate earned by Premier King through closing.
4. Any and all claims and causes of action of Sellers arising under bankruptcy and applicable non-bankruptcy law, including, but not limited to, all claims to collect accounts receivable and other debts, and all other causes of action for events and occurrences arising both before and after the Petition Date.
5. Any and all cash, cash equivalents, bank accounts, deposit accounts, credits, prepaid expenses, deposits, deferred charges, insurance claims, litigation proceeds, advance payments, security deposits, prepaid items, funds, securities, investment accounts, accounts receivable, notes, notes receivable, mortgages, security interests, income, revenues derived from Seller before the Closing Date, other than the Closing Cash Amount pursuant to Section 3.4(b) of the Asset Purchase Agreement and, to the extent applicable, any security deposits assigned by Sellers to Buyer pursuant to Section 3.4(e) of the Asset Purchase Agreement.
6. Any and all avoidance actions Seller may have under Sections 544-551 of the Bankruptcy Code.
7. Any real or tangible personal property not located in the Stores to be sold to Buyer.
8. All of Sellers' rights, claims and interests under insurance policies.
9. To the extent Buyer does not assume liability for and agree to take assignment of Sellers' contracts with Brinks and Coca Cola that have equipment within the Stores, all such equipment owned by such vendors, who also have the right to retrieve their equipment within the purchased restaurants.

DocuSign Envelope ID: D8A6F8DD-ED09-44C4-AFDB-4EC79CD21600

**Schedule 3.2**

**Escrow Agreement**

**Schedule 6.4**

**Compliance with Laws**

None.

# Schedule 6.6

# Owned Real Property; Assumed Leases

| Store Number | Buyer | Landlord | Store Address | City | State | Zip Code | Nature of Default |
|---|---|---|---|---|---|---|---|
| 461 | Starboard | Burger King Corporation | 290 Oxmoor Road | Birmingham | AL | 35209 | Failure to Pay Rent |
| 469 | Starboard | Burger King Corporation | 414 East Meighan | Gadsden | AL | 35903 | Failure to Pay Rent |
| 1069 | Starboard | Burger King Corporation | 1524 - 6th Avenue, South | Birmingham | AL | 35233 | Failure to Pay Rent |
| 1577 | Starboard | Burger King Corporation | 312 Highland Avenue | Selma | AL | 36701 | Failure to Pay Rent |
| 2872 | Starboard | Burger King Corporation | 708 Highway 78, East | Jasper | AL | 35501 | Failure to Pay Rent |
| 4431 | Starboard | Burger King Corporation | 1555 Montgomery Highway | Hoover | AL | 35216 | Failure to Pay Rent |
| 6642 | Starboard | Burger King Corporation | 100 Interstate Drive | Greenville | AL | 36037 | Failure to Pay Rent |
| 9834 | Starboard | Burger King Corporation | 740 Academy Drive | Bessemer | AL | 35022 | Failure to Pay Rent |
| 10327 | Starboard | Burger King Corporation | 681 1st Street South West | Alabaster | AL | 35007 | Failure to Pay Rent |
| 12003 | Starboard | Burger King Corporation | 2229 Bessemer Road | Birmingham | AL | 35208 | Failure to Pay Rent |
| 12427 | Starboard | Burger King Corporation | 801 3rd Avenue West | Birmingham | AL | 35204 | Failure to Pay Rent |
| 16437 | Starboard | Burger King Corporation | 7757 Crestwood Blvd | Irondale | AL | 35210 | Failure to Pay Rent |
| 17003 | Starboard | Burger King Corporation | 5001 Bond Blvd | Bessemer | AL | 35022 | Failure to Pay Rent |
| 17389 | Starboard | Burger King Corporation | 2700 University Blvd | Birmingham | AL | 35233 | Failure to Pay Rent |

**NONE**   **Starboard**          **There are no Starboard Locations with ongoing condemnation proceedings**

DocuSign Envelope ID: D8A6F8DD-ED09-44C4-AFDB-4EC79CD21600

**Schedule 6.7**

**Contracts**

None

**Schedule 6.9**

**Legal Proceedings**

| Case Title | Case number | Court Information |
|---|---|---|
| Willie J.Butler v.  Premier Kings, Inc | 01-CV-2023-902265 | Jefferson County Circuit Court Clerk |

**Schedule 8.1**
**Pre-Closing Conduct of Business Covenant Exceptions**

None.