# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | |
| PREMIER KINGS, INC.[1] | ) | Case No. 23-02871-TOM-7 |
| | ) | |
| Debtors. | ) | |

| | | |
|---|---|---|
| PREMIER HOLDINGS OF GEORGIA, LLC, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | A.P. No. 24-00016-TOM |
| vs. | ) | |
| | ) | |
| RRG OF JACKSONVILLE, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This adversary proceeding came before the Court on August 19, 2025, for a trial on the Complaint (AP Doc. 1) filed by Premier Holdings of Georgia, LLC.[2] Appearing before the Court were Heather A. Jamison, Chloe Champion, and Mike Hall, attorneys for Premier Holdings of Georgia, LLC; Peter J. Hailey, attorney for RRG of Jacksonville, LLC; Jaipal Gill, witness for Premier Holdings of Georgia; and Randy Pianin, witness for RRG of Jacksonville, LLC. Closing arguments were held on December 16, 2025.[3] Appearing before the Court on that date were Ms.

---

[1] The Court entered an order for joint administration of certain bankruptcy cases (BK Doc. 84) on October 30, 2023. The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification numbers, are: Premier Kings, Inc. (3932); Premier Kings of Georgia, Inc. (9797); and Premier Kings of North Alabama, LLC (9282). The Debtors' address is 7078 Peachtree Industrial Blvd., Suite #800, Peachtree Corners, GA 30071.

[2] Based on no objections having been filed and no verbal objections voiced at any hearings thus far, all parties and their counsel have implied their consent and they will be deemed to have entered a consent to entry of any and all final orders or judgment in this adversary proceeding by the Bankruptcy Court.

[3] Also before the Court on December 16, 2025, was the Motion for Leave to Submit Corrected Copy of Proposed Findings (AP Doc. 91) filed by RRG of Jacksonville, LLC. This unopposed motion was granted (AP Doc. 94) the same day.

Jamison, Ms. Champion, and Mr. Haley. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b), 151, and 157(a), and the District Court's General Order of Reference dated July 16, 1984, as amended July 17, 1984.[4] This is a core proceeding arising under Title 11 of the United States Code as defined in 28 U.S.C. § 157(b)(2)(O).[5] The Court has considered the pleadings, the arguments, the testimony, and the law, and finds and concludes as follows.[6]

### **INTRODUCTION**[7]

This lawsuit arises from the sale of about 165 Burger King restaurants within the southeast by three related debtors in Chapter 11 bankruptcy cases before this Court. The three debtors owned and/or operated these restaurants, often on property leased from others, and often other corporate entities with ownership similar to that of the debtors were involved with the debtors in various ways.

One particular Burger King location, located in Port Wentworth, Georgia, was operated by one of the three related debtors on property leased from an apparently unrelated entity. Testimony at trial established that an entity sharing some common ownership with the owner/operator of this particular location obtained a loan for the construction of the restaurant on the leased property; in order for the borrowing entity (the entity sharing some common ownership with the

---

[4] The General Order of Reference Dated July 16, 1984, As Amended July 17, 1984 issued by the United States District Court for the Northern District of Alabama provides:
> The general order of reference entered July 16, 1984 is hereby amended to add that there be hereby referred to the Bankruptcy Judges for this district all cases, and matters and proceedings in cases, under the Bankruptcy Act.

[5] 28 U.S.C. §157(b)(2)(O) provides as follows:
> (b)(2) Core proceedings include, but are not limited to–
> . . . .
> (O) other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship . . . [.]

[6] This Memorandum Opinion and Order constitutes findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, applicable to adversary proceedings in bankruptcy pursuant to Federal Rule of Bankruptcy Procedure 7052.

[7] This section is intended to provide a very brief introduction to the dispute before this Court and the parties involved. The parties and relevant documents are defined in more detail in the Findings of Fact.

owner/operator) to be repaid by the owner/operator, and then pay the construction loan lender, the two reached a side deal wherein the owner/operator would make monthly payments to borrowing entity based on the debt service payments. It is this side deal, labeled a Development Agreement, between the one owner/operator and the borrowing entity, that is the focus of this adversary proceeding.

The three related debtors filed cases under Chapter 11 of the Bankruptcy Code in 2023 seeking to sell the restaurant locations. The debtors reached agreements with four apparently unrelated purchasers for the sale of the assets relating to approximately 165 Burger King locations, and this Court approved the sale of the Burger King locations. One of those purchasers bought approximately 40 Burger King stores, including the Port Wentworth location. Now that the asset sales have taken place, the borrowing entity that obtained the construction loan in 2019 has asserted that the purchaser of the Port Wentworth, Georgia location has assumed and is responsible for the payments on the side deal that the borrowing entity had reached with the owner/operator, even though the borrowing entity was not a party to the actual sale involving that location. Only the Port Wentworth Store location is at issue, and only the borrowing entity and the purchaser of the Port Wentworth Store location are involved in this dispute; the original owner/operator (one of this Court's debtors), is not a party to this lawsuit. This dispute at its heart is a basic contract dispute regarding the side deal.

**FINDINGS OF FACTS**[8]

**Background of the bankruptcy cases**[9]

---

[8] Pursuant to Rule 201 of the Federal Rules of Evidence, the Court may take judicial notice of the contents of its own files. *See ITT Rayonier, Inc. v. U.S.*, 651 F.2d 343 (5th Cir. 1981); *Florida v. Charley Toppino & Sons, Inc.,* 514 F.2d 700, 704 (5th Cir. 1975).

[9] At trial, the parties introduced several exhibits into evidence. Many, if not most, of the exhibits had already been filed into the Court's ECF system as part of various motions and other filings. The exhibits themselves are quite lengthy and in fact fill four large three-ring binders. The pages of the exhibits are not Bates stamped in a consistent manner and in some cases not numbered at all. Where possible, the Court will cite to the exhibits that have been

3

Premier Kings of Georgia, Inc. (hereinafter, "Seller"), along with two other related entities (the three entities, collectively, the "Debtors"),[10] filed Chapter 11 bankruptcy cases on October 25, 2023.[11] The three bankruptcy cases were consolidated by this Court for joint administration for procedural purposes. BK Doc. 84. Prior to their bankruptcy filing the Debtors had begun negotiations with prospective purchasers regarding their assets.[12] BK Doc. 43 at 6-8. On December 13, 2023, this Court entered its Order (I) Approving Asset Sale Purchase Agreements and Authorizing the Sale of Substantially All of the Debtors' Assets under 11 U.S.C. § 363(b) and 363(m); Authorizing the Sale of Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests Pursuant to 11 U.S.C. §363(f); (III) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Pursuant to 11 U.S.C. § 365; and (IV) Granting Related Relief (BK Doc. 355, the "Sale Order") allowing the Debtors to complete sales of their assets to four unrelated purchasers. One of those purchasers, RRG of Jacksonville, LLC (hereafter, "Purchaser"),[13] purchased assets and assumed leases pertaining to approximately 40 Burger King restaurants operated by the Seller (this Court's Debtor Premier Kings of Georgia, Inc.). BK Doc. 355 at 215. Out of all of the locations involved in the transaction between Seller and Purchaser,

---

filed into the ECF system by using the ECF docket and page numbers so that the relevant pages may be found quickly. Filings in the underlying consolidated bankruptcy case are designated as "BK Doc. ___" and filings in the adversary proceeding are designated as "AP Doc. ___."

[10] The three related debtors sold approximately 165 stores altogether. In order to keep a clear distinction between the three debtors collectively, and the one particular debtor, Premier Kings of Georgia, LLC, that operated the Port Wentworth Store location, Premier Kings of Georgia, LLC will be referred to only as "Seller," except for the instances where the entity name is part of a quote, and only in relation to the sale of the Port Wentworth Store location. A reference to "Debtors" will refer only to the three debtors collectively.

[11] The factual and procedural history of the Debtors and their consolidated bankruptcy cases is quite lengthy and will be detailed only to the extent pertinent to the issue currently before this Court.

[12] At the time of filing the Debtors had approximately 172 Burger King restaurants in the Southeast. BK Doc. 42 at 4. The Debtors eventually sold approximately 160 restaurants through the asset sales in their bankruptcy cases.

[13] While RRG of Jacksonville, LLC purchased approximately 40 Burger King restaurant locations, the dispute before this Court involves only the Port Wentworth Store location. For clarity, RRG of Jacksonville, Inc. will be referred to only as "Purchaser," except for the instances where the entity name is part of a quote, and only in relation to the purchase of the Port Wentworth Store location.

4

only one location, store number 26868, located at 7304 Highway 21, Port Wentworth, Georgia (the "Port Wentworth Store"), is at issue in this adversary proceeding.

**The original transaction**

In order to address the issue before this Court, it is necessary to review Seller's original acquisition of the Port Wentworth Store. In 2009, Manraj "Patrick" Sidhu ("Mr. Sidhu") formed Seller for the purpose of owning and operating Burger King restaurants. BK Doc. 43 at 4. Jaipal Gill ("Mr. Gill") served as Vice President of Seller until December 1, 2023. AP Doc. 47-1 at 6-7. As evidenced by a ground lease (AP Doc. 36-2 at 2, the "Ground Lease") dated May 8, 2018, Seller leased property from Port Wentworth Fee Owner, LLC that contemplated the construction of a Burger King restaurant.[14] AP Doc. 36-2 at 2, 7-8. According to the trial testimony of Mr. Gill, certain covenants prevented Seller from obtaining a loan to build the restaurant, so Premier Holdings of Georgia, LLC (hereafter, "Plaintiff"),[15] whose members Mr. Sidhu and Mr. Gill each owned a 50% membership interest, obtained a loan on May 17, 2019 for the construction from IberiaBank, now known as First Horizon Bank.[16] AP Doc. 86 at 100, AP Doc. 47-1 at 8, 141. Seller, Mr. Sidhu, and Mr. Gill executed a Guaranty Agreement (AP Doc. 47-1 at 184) guaranteeing payment of the construction loan made to Plaintiff.

In conjunction with the loan, Seller, as "Owner/Operator," and Plaintiff, as "Developer," entered into a Development Agreement on May 17, 2019, providing that Plaintiff would construct

---

[14] The Ground Lease was later amended on August 3, 2018 (Doc. 47-1 at 139) but it appears that nothing in the amended ground lease affects the issue before this Court.

[15] Plaintiff Premier Holdings of Georgia, LLC was involved, for various reasons, with various Burger King restaurant locations owned or operated by the Debtors. For clarity, since this Court's current concern with Premier Holdings of Georgia, LLC is only in regards to the lawsuit (adversary proceeding) regarding the Port Wentworth Store location, it will be referred to as the "Plaintiff."

[16] On October 25, 2024, Plaintiff filed an Evidentiary Submission in Support of Plaintiff Premier Holdings of Georgia, LLC's Motion for Summary Judgment (the "Evidentiary Submission"). AP Doc. 47. Among the documents filed as part of the evidentiary submission are loan documents from the loan Plaintiff obtained from IberiaBank, now known as First Horizon Bank. For the sake of simplicity, the Court will refer to the entity as First Horizon Bank.

5

the Burger King restaurant to be operated by Seller. AP Doc. 47-1 at 86. According to the Development Agreement:

> 1. Development of the Premises. Developer . . . does hereby agree to construct a Burger King restaurant on the Premises . . . for the use and benefit of the Owner/Operator . . . .

AP Doc. 47-1 at 86. For its part, Seller would pay a monthly sum to Plaintiff:

> 3. Development Fee. Owner/Operator agrees to pay to Developer . . . a monthly development fee . . . equal to (a) the Developer's debt service payment associated with the development of the Project . . . plus (b) an administrative/overhead/profit fee of $100.00.

AP Doc. 47-1 at 86. The Development Agreement also provided:

> 5. Assignment. This Agreement is not assignable, except that the Developer shall have the right at any time to assign all its rights and obligations in and to the Project and to transfer this Agreement or any part thereof to any affiliate of the Developer that agrees to assume assigned obligations of the Developer in and to the Project; and if so assigned, the Developer shall continue to be responsible for the performance of the obligations of the Developer under this Agreement.

AP Doc. 47-1 at 86-87. Also on May 17, 2019, Plaintiff granted to First Horizon Bank "a security interest in and to, all of [Plaintiff's] right, tile and interest" in the Development Agreement. AP Doc. 47-1 at 214. However, First Horizon did not have the right to enforce the Development Agreement unless Plaintiff defaulted on its obligations to the bank. AP Doc. 47-1 at 215 ¶ 4.

**The bankruptcy filing and lead-up to the asset sale**

Mr. Sidhu passed away unexpectedly in 2022 and thereafter the restaurants operated by Seller and the two other related entities experienced operational and financial difficulties.[17] BK Doc. 20 at 6-7. The management of the Debtors was taken over by Aurora Management Partners Inc. ("Aurora") in June of 2022. BK Doc. 20 at 1. Despite the takeover, it appears that Mr. Gill

---

[17] According to the Declaration of David M. Baker, Managing Partner of Aurora Management Partners Inc., other factors such as "the national impact of the COVID-19 pandemic . . ., high inflation, increased borrowing rates, and an increasingly limited qualified labor force" affected the Debtors as well. BK Doc. 20 at 6.

continued to serve as Vice President of Seller until December 1, 2023. *See* AP Doc. 47-1 at 6-7. As discussed previously, the three related entities, including Seller, filed their Chapter 11 bankruptcy petitions on October 25, 2023 with an eye toward selling their assets. The day after filing their bankruptcy cases, the Debtors filed the motion (BK Doc. 43, the "Sale Motion") seeking an order (i) approving asset purchase agreements the Debtors had previously entered into and approving the sale of substantially all of their assets, (ii) authorizing the Debtors to sell the assets free and clear of liens, and (iii) approving the assumption and assignment of certain executory contracts and unexpired leases.[18]

On October 27, 2023, the Debtors filed a Notice of Filing of Stalking Horse Agreements (BK Doc. 47, the "Notice of Stalking Horse Agreements") regarding agreements the Debtors had already negotiated with prospective purchasers, including Purchaser RRG of Jacksonville, LLC, the defendant in this adversary proceeding.[19] Attachments to the Notice included an Asset Purchase Agreement (the "APA") between Seller and Purchaser executed on October 25, 2023, the bankruptcy filing date. BK Doc. 47 at 66. The APA provided that Seller would sell or assign certain assets to Purchaser, and Purchaser would purchase and assume those assets, including Seller's right, title, and interest in certain leases and contracts.[20] BK Doc. 47 at 67. A list of store locations operated by Seller was provided on Exhibit A to the APA. Included in this list was the Port Wentworth Store:

| Store# | Operating Entity | Address | City | State | Zip Code |
|---|---|---|---|---|---|
| 26868 | Premier Kings of Georgia, Inc. | 7306 Hwy 21 | Port Wentworth | GA | 31407 |

---

[18] The Sale Motion contains a more detailed history of the Debtors' business and the events leading up to their bankruptcy filings. BK Doc. 43.

[19] The group of documents relating to the Purchaser's transaction are labeled <u>Exhibit "B"</u> and begin on page 64. Note that the Asset Purchase Agreement between Seller and Purchaser has exhibits and schedules attached to it as well.

[20] An Asset Purchase Agreement for purchasers Newell-Berg Alliance AL, LLC and Newell-Berg Alliance TN II, LLC, and an Asset Purchase Agreement for purchaser Bulldog Restaurants, LLC, were also attached to the Notice.

BK Doc. 47 at 98. Similarly, a list of approximately 40 properties leased by Seller was identified in Exhibit B, spanning multiple pages, and again including the Port Wentworth Store:

| Store Number | Store Address | City | State | Zip Code | Lessor/Sublessor | Lessor Address | Lessee/ Op Entity | Date of Lease or Sublease | As Amended or Assigned | Expiry of Primary Term or Current Option Period |
|---|---|---|---|---|---|---|---|---|---|---|
| 26868 | 7304 Hwy 21 | Port Wentworth | GA | 31407 | Port Wentworth, (GL to PKGA)PHGA (Del Agrmnt w/PK-GA) | c/o Cape Asset Management 3735 Beam Road, Suite B Charlotte, NC 28217 | PKGA | 5/8/18 (GL) 5/17/19 Dev Agr | 8/3/18 (GL) | 3/31/39 |

BK Doc. 47 at 101.[21] The terms "Del Agrmnt" and "Dev Agr" as referenced in the entry above are not defined in the APA. It is not clear that these two sets of two-word phrases refer to the same thing. The terms, while on the same line of an exhibit to the APA, are different and inconsistent. Furthermore, since there are no periods behind any of the terms, it is not even clear whether or not the terms are abbreviations.

In addition to the various exhibits, schedules were also attached to the APA. Schedule 1.2(a)-1 contained a list of contracts that Purchaser could choose to assume, known as the "Assignable Contracts." At the time of filing, Schedule 1.2(a)-1 showed "None." BK Doc. 47 at 68, 110. However, Schedule 1.3(a)-1, another list of about 40 stores spread over multiple pages, contained a list of "Assignable Leases," including the Port Wentworth Store:

| Store Number | Store Address | City | State | Zip Code | Lessor/Sublessor | Lessor Address | Lessee/ Op Entity | Date of Lease or Sublease | As Amended or Assigned | Expiry of Primary Term or Current Option Period |
|---|---|---|---|---|---|---|---|---|---|---|
| 26868 | 7304 Hwy 21 | Port Wentworth | GA | 31407 | Port Wentworth, (GL to PKGA)PHGA (Del Agrmnt w/PK-GA) | c/o Cape Asset Management 3735 Beam Road, Suite B Charlotte, NC 28217 | PKGA | 5/8/18 (GL) 5/17/19 Dev Agr | 8/3/18 (GL) | 3/31/39 |

BK Doc. 47 at 68-69, 114.[22] The entry for the Port Wentworth Store included on Exhibit B and on Schedule 1.3(a)-1 were the same, each containing a reference to "(GL to PKGA)PHGA (Del

---

[21] This entry has been copied and pasted directly from the Notice of Stalking Horse Agreements without modification; therefore, the text boxes and size of the font therein are the same here as in the original document. *See* BK Doc. 47 at 101.

[22] This entry has been copied and pasted directly from the Notice of Stalking Horse Agreements without modification; therefore, the text boxes and size of the font therein are the same here as in the original document. *See* BK Doc. 47 at 114.

8

Agrmnt w/PK-GA)." Schedules 1.2(a)-2 and 1.3(a)-2 were to contain the contracts and leases, respectively, to be assumed by the Purchaser. At the time of filing, Schedule 1.2(a)-2 indicated "None" while Schedule 1.3(a)-2 noted that the leases to be assumed were "[t]o be provided by Buyer in accordance with the terms of this Agreement." BK Doc. 47 at 111, 115. Schedule 1.3(a)-1, like Exhibit B, provided no explanation for the terms "Del Agrmnt" or "Dev Agr" contained in the Port Wentworth Store entry.

Other schedules and exhibits that were attached to the APA did not specifically mention the Port Wentworth Store but were more generic in nature and presumably applied to all of the locations being considered by Purchaser. One of these exhibits, Exhibit D, is a form assignment and assumption agreement containing a section entitled "recitals"; the first three "whereas" paragraphs under "recitals" provide as follows:

> WHEREAS, Assignor and Assignee are parties to that certain Asset Purchase Agreement dated as of [_____], 2023 (the "**Purchase Agreement**"), pursuant to which to which [sic] Assignor agreed to assign, and Assignee agreed to assume, all of Assignor's right, title and interest in and to the Assumed Contracts;
>
> WHEREAS, in connection with the consummation of the transactions contemplated by the Purchase Agreement, Assignor agreed to assign, and Assignee agreed to assume, pay, perform, discharge or otherwise satisfy the Assumed Liabilities; and
>
> WHEREAS, all capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Purchase Agreement.

BK Doc. 47 at 105; *see also* BK Doc. 355 at 177.

Besides setting out what assets that Seller proposed to sell to Purchaser, the APA also set out the liabilities that Purchaser would assume from Seller:

Section 2.1 **Assumed Liabilities**.

(a) In consideration for the transfer of the Assets by Seller, Buyer shall assume only those executory liabilities, obligations or commitments of Seller for payment and performance pursuant to the Designated Leases and Designated

9

Contracts, in each case solely to the extent arising or to be performed after the Effective Time (collectively, the "***Assumed Liabilities***").

(b)     ANYTHING   CONTAINED   HEREIN   TO   THE   CONTRARY NOTWITHSTANDING,   EXCEPT   FOR   THE   ASSUMED   LIABILITIES SPECIFICALLY DESCRIBED IN <u>SECTION 2.1(a)</u>, BUYER SHALL NOT AND BUYER DOES NOT ASSUME ANY LIABILITIES, TAXES, OR OBLIGATIONS (FIXED OR CONTINGENT, KNOWN OR UNKNOWN, MATURED   OR   UNMATURED,   OR   OTHERWISE)   OF   SELLER, WHETHER OR NOT ARISING OUT OF OR RELATING TO ANY OF THE ASSETS, THE BUSINESS, OR ANY OTHER BUSINESS OF SELLER, ALL OF WHICH LIABILITIES, TAXES, AND OBLIGATIONS SHALL, AT AND AFTER THE CLOSING, REMAIN THE EXCLUSIVE RESPONSIBILITY OF SELLER.

BK Doc. 47 at 70.

Plaintiff has been involved in the bankruptcy cases from the outset.[23] Emails referenced at trial indicate that Plaintiff participated in sale negotiations, at least with respect to the Purchaser's transaction. Counsel for Plaintiff attended the hearing on first-day motions and most, if not all, other hearings held, including the December 11, 2023 hearing at which the Sale Order was approved. In fact, at the hearing on the Sale Motion, the Court also addressed the Limited Objection to Debtor's Proposed Cure Amount (BK Doc. 311, the "Cure Objection") that was filed on December 6, 2023 by Plaintiff and three other related entities in response to a notice that was required by this Court's Order (BK Doc. 232) entered November 20, 2023.[24]  According to the Cure Objection:

---

[23] The Plaintiff in this adversary proceeding, was involved with various issues that arose during the course of the bankruptcy proceedings and sometimes aligned itself with other related entities including Premier Holdings, LLC, Premier Kings Holdings, LLC, and Premier Kings Holdings of Alabama, LLC (the "Holdings Entities"). The first mention of any of the Holdings Entities on the bankruptcy case docket sheet was on October 29, 2023, four days after the bankruptcy cases were filed, when original counsel for all four Holdings Entities filed a notice of appearance. *See* BK Doc. 69.

[24] The Cure Objection, filed by all four Holdings entities, was filed in response to a Notice of Possible Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with Sale that they received from the Debtors pursuant to this Court's Order (BK Doc. 232) requiring the Debtors to notify certain parties of the amounts the Debtors believed necessary to cure defaults in executory contracts or unexpired leases that would potentially be assumed and assigned. The form Notice of Possible Assumption and Assignment was attached to the Order referenced herein as Exhibit 3.

10

> 3. Holdings and Debtors are parties to over fifty (50) commercial real property leases for the operation of Burger King restaurants. As is relevant to this Objection, Holdings and Debtors are parties to the following leases (collectively, the "Leases"):
>
> . . . .
>
> > c. <u>Store No. 26868</u>, involving a ground lease between Port Wentworth Fee Owner, LLC and Premier Holdings of Georgia, LLC, with a corresponding sublease by Premier Holdings of Georgia, LLC to Premier Kings of Georgia, Inc., for premises located in Port Wentworth, Georgia.
>
> . . . .
>
> 7. Holdings objects to the Cure Notice as to the relevant Leases as follows:
>
> . . . .
>
> > c. <u>Store No. 26868</u>: In addition to any amounts proposed to be made to the Port Wentworth Fee Owner, LLC as ground lessor, $23,638.16 is due to Holdings as the sublandlord to Debtors as subtenant.

BK Doc. 311 at 2-3. It appears likely that the Cure Notice is the first place in any document filed into the ECF system where Plaintiff has been clearly referred to as a "sublandlord" or where it is alleged that a purported "sublease" exists.[25] Prior to this time, the Development Agreement had not been mentioned except in the attachments to the APA only as "(GL to PKGA)PHGA (Del Agrmnt w/PK-GA)." *See* BK Doc. 47 at 101, 114. At the time the APA was filed with the Notice of Stalking Horse Agreement in October 2023, Aurora was running the Seller's business; nonetheless, Mr. Gill was still involved with Seller as a Vice President. At the time the Cure Objection was filed, Mr. Gill was a fifty-percent member of Plaintiff. It is unclear to this Court why the Development Agreement, referenced in the APA only by the ambiguous terms in the attachments, was now apparently referred to as a "sublease" in the Cure Objection.

---

[25] As will be discussed *infra*, the Development Agreement was not initially included with other documents regarding the Port Wentworth Store that were made available to Purchaser by way of a "data room," and further, the Development Agreement was not sent to Purchaser prior to an email dated January 5, 2024. It appears that as of the time the Cure Objection was filed that the Development Agreement had only been referenced by the ambiguous terms "Del Agrmnt" and "Dev Agr" on documents attached to the APA.

11

On December 8, 2023, the Debtors filed a reply that, among other things, addressed Plaintiff's Cure Objection:

| Objecting Party:<br><br>Doc. No. 311 | Premier Holdings (Cure Amount objection) |
|---|---|
| Basis for Objection: | Disputes the Cure Amounts for 4 of the stores they lease to the Debtors. |
| Debtors' Response: | The Debtors will try to resolve this dispute, which involves small amounts, prior to the hearing, failing which the disputed portions will be escrowed subject to further Order of Court determining the correct amounts. |

BK Doc. 332 at 13. Counsel for Plaintiff noted at trial that Aurora, the advisor running the Debtors' businesses during the bankruptcy cases, was required to pay cure amounts "only on stores that RRG or others would assume," and that Aurora did pay cure amounts as to the Ground Lease and the Development Agreement. AP Doc. 86 at 10. Mr. Gill confirmed during his trial testimony that Plaintiff received from Aurora the Development Agreement cure amount that had been negotiated between Aurora and Plaintiff, and that receipt of the cure amount led Mr. Gill to conclude that the Development Agreement had been assigned and assumed. AP Doc. 86 at 47. While it is clear that the Development Agreement cure amount was agreed on by Aurora (running the Seller's business) and Plaintiff (an entity connected to Seller at least through Mr. Gill), leading Mr. Gill to believe the Development Agreement was assigned and assumed, it is not clear that Purchaser knew a cure amount had been paid or the importance that Plaintiff placed on that payment. Plaintiff has argued that Aurora only had to pay cure amounts for leases or agreements that were being assumed, and this should have been notice to Purchaser that the Development Agreement existed and was expected to be assumed. However, this holds true only to the extent that Purchaser understood that the ambiguous terms on Exhibit B and Schedule 1.3(a)-1 to the APA meant "Development

Case 23-02871-TOM11    Doc 1106    Filed 05/05/26    Entered 05/05/26 15:31:55    Desc
Main Document    Page 12 of 43

Agreement," and that the Development Agreement was the same as the "sublease" Plaintiff mentioned in the APA.

**The Sale Order**

The Debtors requested in the Sale Motion that they be allowed to sell their assets free and clear of liens and interests pursuant to Bankruptcy Code § 363(f). In large Chapter 11 bankruptcy cases such as these it is not unusual for all or most of a debtor's assets to be sold free and clear of liabilities, liens, and encumbrances except for specific obligations that are clearly being assumed by a purchaser. Businesses are typically in Chapter 11 cases because their debts and obligations have become significantly difficult, or perhaps impossible, for them to pay. Sales of estate assets free and clear of liens can often result in the restaurants, stores, or other businesses remaining open under new purchasers, allowing employees to keep their jobs (such as the roughly 3,000 employees who remained employed at the Burger King locations formerly owned by the Debtors), taxing authorities to continue collecting substantial revenue, and customers to continue eating, shopping, or transacting business at locations convenient and familiar to them. Surrounding businesses may benefit as well when a customer who comes to eat decides to shop next door. For these reasons, allowing the Debtors to sell their assets free and clear of liens so that the Burger King restaurants could remain open positively impacted the communities in which the restaurants are located.

Specifically, in these Chapter 11 cases, the financial problems arose primarily because the individual that formed and ran the business, Mr. Sidhu, passed away. Thus, the bankruptcy was filed primarily to keep the restaurants open and operating so they could be sold as a going concern. This purpose for filing Chapter 11 and a resulting sale of all assets, as was done here, is not atypical or unusual; this Court has had many cases with similar outcomes.

13

With that benefit in mind, after having thoroughly reviewed filings related to the sale including the asset purchase agreements, and after having heard and ruled on multiple objections and other issues regarding the Sale Motion, this Court determined that the Sale Motion should be granted. The Debtors submitted to the Court a proposed order authorizing the sale that had been circulated for review and comment to the attorneys for the purchasers, the Bankruptcy Administrator, Wells Fargo Bank (the primary lender), Plaintiff, the Unsecured Creditors Committee, and miscellaneous other creditors and interested parties. The proposed order (the "Sale Order")[26] was entered on December 13, 2023 after the hearing on the Sale Motion.

Certain provisions of the Sale Order are particularly relevant in this adversary proceeding, including:

> **Effect of Closing**
> N.      As of the Closing, pursuant and subject to the terms of the Purchase Agreements, the transfer of the Assets pursuant to the Sale . . . will vest the Buyers with all of the Debtors' rights, title and interest in and to the Assets, including operatorship thereof, free and clear of all liens, claims, interests, and encumbrances other than as set forth in the Purchase Agreements.
> . . . .
> **Free and Clear**
> P.      The Buyers would not have entered into the Purchase Agreements and would not consummate the Sale, thus adversely affecting the Debtors, the Debtors' estates and their creditors if (a) the Assets and (b) the assumption and assignment of the Assumed Contracts were not free and clear of all liens, claims, encumbrances, and interests other than as set forth in the Purchase Agreements, to the greatest extent permitted by the Bankruptcy Code and applicable, non-bankruptcy law. . . .
> Q.      Accordingly, the transfer of the Assets to Buyers pursuant to the Sale under the Agreements will . . . vest in Buyers all rights, title, and interest of the Debtors in the Assets, free and clear of any and all liens, claims, interests and encumbrances. The Assets shall be sold free and clear of all of the following (collectively, the "Encumbrances"): mortgages, security interests, conditional sale or other retention agreement, pledges, liens (as that term is defined in section 101(37) of the Bankruptcy Code), claims (as that term is defined in section 101(5) of the Bankruptcy Code), obligations, guaranties, debts, rights, contractual commitments, interests, judgments, demands, easements, charges, encumbrances, defects,

---

[26] While the Court made some edits, the Sale Order entered by the Court was substantially the same as the proposed order the Debtors submitted.

options, rights of first refusal, other encumbrances, liens, and restrictions of any kind or nature whether imposed by agreement, understanding, law, equity, or otherwise . . . .

**<u>Successor Liability</u>**

R.      . . . [N]either the Buyers nor any of their affiliates shall assume or in any way be responsible for any liability or obligation of the Debtors and/or their estates, except to the extent set forth in the Purchase Agreements.

BK Doc. 355 at 10-12.

Documents relating to the transactions with various purchasers were attached to the Sale Order, including those specifically pertaining to the sale to Purchaser. The set of Purchaser documents included the APA executed on October 25, 2023, that had been attached to the Notice of Stalking Horse Agreements. BK Doc. 355 at 138. In addition, the set of Purchaser documents now included the First Amendment to Asset Purchase Agreement (Doc. 355 at 208, the "Amended APA") dated December 11, 2023, that amended only certain provisions of the original APA. Schedule 1.3(a)-2 now listed the Designated Leases being assumed by Purchaser, including the Port Wentworth Store:

| Store Number | Store Address |
| --- | --- |
| 26868 | 7304 Hwy. 21, Port Wentworth, GA |

BK Doc. 355 at 215. Notably, the Amended APA did not have an updated lease assignment and assumption agreement attached and thus presumably the form lease assignment and assumption agreement attached as Exhibit D to the original APA would be used in the Purchaser transaction. The lease assignment and assumption agreement was to ensure that the Purchaser could continue operations at the existing location. To the Court's knowledge, the side agreement between Seller and Plaintiff labeled "Development Agreement"[27] that is at issue in this adversary proceeding was

---

[27] This side agreement which is at the center of this lawsuit was essentially to provide for repayment of a construction loan used to build the restaurant at the Port Wentworth Store location.

15

not filed into the Court's ECF system and not otherwise provided to this Court prior to the adversary proceeding being filed.

**The adversary proceeding**

According to the deposition testimony of Mr. Gill,[28] on the same day that Plaintiff filed the adversary proceeding, his company JG Coastal Properties, Inc. ("JG Coastal") paid off the building loan from First Horizon, purchased the improvements on the Port Wentworth leased property from Plaintiff, and received a bill of sale and deed. AP Doc. 47-1 at 14-16. On June 3, 2024, almost two months after the adversary proceeding was filed and JG Coastal allegedly became involved, Plaintiff filed a Motion to Substitute requesting that JG Coastal be substituted as the plaintiff in this adversary proceeding. AP Doc. 17. Attached to the Motion to Substitute was an assignment and assumption agreement that was, according to the face of the document, "effective April 5, 2024" between Plaintiff and JG Coastal wherein Plaintiff assigned to JG Coastal all of its rights and interests in the Development Agreement.[29] AP Doc. 17 at 5. Purchaser objected to the Motion to Substitute partly on the grounds that Plaintiff had allegedly assigned its interests in the Development Agreement on the same day that the adversary was filed, and further, that Plaintiff did not inform the Court at hearings on May 11 and May 22, 2024 that the assignment had taken place. AP Doc. 20. Because it was not entirely clear that Plaintiff had no interest in the Development Agreement, after a hearing on July 10, 2024, this Court denied the Motion to Substitute. AP Doc. 29.

---

[28] The transcript of Mr. Gill's deposition was made a part of the evidentiary submission filed by Plaintiff in support of its Motion for Summary Judgment. *See* AP Doc. 47-1 and *supra* note 16.

[29] According to its first page, the document was "effective as of April 5, 2024." AP Doc. 17 at 5. The signature page of the document states that the "Assignor and Assignee have duly executed this Assignment as of the date first set forth above, to be effective as of the Effective Date." *Id.* at 7. The document not provide the date the document was actually signed.

When this adversary proceeding was filed, the Assignment and Assumption of Lease Agreement (the "Assignment and Assumption Agreement") dated January 16, 2024 executed by Seller and Purchaser relating to the Port Wentworth Store was attached to the Complaint filed by Plaintiff. AP Doc. 1-2 at 1. Prior to this time, the Court had only seen the form assignment and assumption agreement that had been attached to the Notice of Stalking Horse Agreement and the Sale Order. The executed Assignment and Assumption Agreement, which is at the center of the dispute between the parties, contains a significant change from the form assignment and assumption agreement. In the "recitals" portion of the Assignment and Assumption Agreement, an additional "whereas" clause had been inserted before the other "whereas" clauses:

> WHEREAS, Assignor, as tenant, and Port Wentworth Fee Owner, LLC, as landlord, are **parties to that certain Ground Lease**, dated as of May 8, 2018, as amended by that certain Amendment to Ground Lease, dated August 3, 2018, **and as subject to that certain Development Agreement between Premier Holdings of Georgia, LLC and Assignor,** dated May 17, 2019 (**collectively, the** "**Lease**");

AP Doc. 1-2 at 1 (emphasis added). The "agreement" portion of the Assignment and Assumption Agreement sets forth what Plaintiff was actually assigning and Purchaser was actually assuming:

> 1. <u>Assignment of Lease</u>.  Subject to the terms and conditions set forth in the Purchase Agreement, for valuable consideration received from Assignee, Assignor hereby assigns, transfers and conveys to Assignee all of Assignor's right, title and interest in, to and under the Lease and Assignee accepts such assignment.
>
> 2. <u>Assumption of Assumed Liabilities</u>.  Subject to the terms and conditions set forth in the Purchase Agreement, Assignor hereby assigns to Assignee the Assumed Liabilities and Assignee hereby accepts such assignment and agrees to pay, perform, discharge or otherwise satisfy the Assumed Liabilities. Other than as specifically set forth herein, Assignee assumes no debt, liability, or obligation of Assignor, all of which shall remain the responsibility of Assignor and shall be Excluded Liabilities.

AP Doc. 1-2 at 1.[30]

---

[30] Numbered paragraphs 1 and 2 in the executed Assignment and Assumption Agreement are substantially the same as those found in the form asset and assumption agreement attached to the Stalking Horse Agreement and the Sale

17

Randy Pianin, the CEO and part owner of Purchaser, explained at trial that Purchaser had been formed in late 2022 for the purpose of purchasing 23 Burger King restaurants in Jacksonville, Florida, which Purchaser did in early 2023. AP Doc. 86[31] at 113, 115. According to Mr. Pianin, the "Burger King corporate folks" informed him of the possibility that other Burger King locations might be sold at some point, and in 2023 Purchaser saw an "offering memorandum from Raymond James"[32] referencing a potential sale by Seller. AP Doc. 86 at 115. Mr. Pianin, a certified public accountant, testified that Raymond James had given Purchaser access to a data room containing information about sales, rent, costs, profitability, agreements, and other information pertinent to the Debtors' Burger King locations. AP Doc. 86 at 115-16. According to Mr. Pianin, Purchaser had a short window to review documents evidencing rents, revenue, and other information related to multiple Burger King franchise locations in order to determine which locations that Purchaser wanted to acquire. AP Doc. 86 at 115-18. He explained that Purchaser was particularly interested in locations with rents between seven and nine percent of sales. [33] AP Doc. 86 at 116. According to Mr. Pianin, information gathered from the data room indicated that for the previous twelve-month period apparently ending September 2023, sales and rent at the Point Wentworth Store (store number 26868) totaled $1,208,184 and $120,015 respectively, or rent of 9.9 percent when

Order. The formatting is different, and instead of "Assignment of Lease" as the heading for paragraph 1, the form version used "Assignment of Assumed Contracts" as the heading for paragraph 1. *See* BK Doc. 47 at 105; BK Doc. 355 at 177.

[31] Docket number 86 in this Adversary Proceeding is the transcript from the trial on the Complaint held on August 19, 2025. Generally, this Court will cite "AP Doc. 86 at ___" when referencing testimony given at trial.

[32] Raymond James and Associates, Inc. served as investment bankers for the Debtors. Joint Ex. 53, Affidavit of Laura Kendall.

[33] Both Mr. Gill and Mr. Pianin gave testimony indicating that the amount of rent that Purchaser would pay for the Port Wentworth Store would be based, at least in part, on a percentage of sales at that location. *See* AP Doc. 86 at 85-88, 122. *See also* Joint Ex. 36. Joint Exhibit 36 is a series of several emails between counsel for Plaintiff, consultants for Purchaser, Mr. Gill, and others regarding negotiations as to several Burger Kings locations. It does not appear that the Port Wentworth Store location, designated store number 26868, is a subject of these emails; however, counsel for Purchaser referenced the emails in his cross-examination of Mr. Gill regarding rent based on percentage of sales, or "rent to sale," designated as "RTS." *See* AP Doc. 86 at 83-88.

calculated as a percentage of sales. AP Doc. 86 at 121-22; Joint Ex. 10 at 1.[34] Further, beginning

in the month of March 2023 forward, data room information collected on Joint Exhibit 10 indicated

monthly rent of $6,165 for the Port Wentworth Store (store number 26868). AP Doc. 86 at 129,

Joint Ex. 10 at 3.

Mr. Gill's testimony reflects that Plaintiff considers the payments made pursuant to the

Ground Lease and pursuant to the Development Agreement, collectively, as the rent for the Port

Wentworth Store. AP Doc. 86 at 58-59, 66. Counsel for Purchaser questioned Mr. Gill about a

spreadsheet in Joint Exhibit 10, referred to by Mr. Pianin in his testimony, that reflected the Port

Wentworth Store rent as $6,165 per month for the six-month period prior to the bankruptcy filing.

AP Doc. 86 at 68, Joint Ex. 10 at 3. Mr. Gill explained that prior to March of 2023 Aurora paid

both the payments due under the Ground Lease and under the Development Agreement, totaling

$14,000 per month or more, to Plaintiff. AP Doc. 86 at 66-71; *see* Joint Ex. 10 at 3. Mr. Gill further

explained that the same page of Joint Exhibit 10 reflecting rent of $6,165 as of March 2023 forward

also reflected higher rent for the months prior to March 2023 because the total Ground Lease and

Development Agreement payments were included in the entries for those months. AP Doc. 86 at

70-71, Joint Ex. 10 at 3. According to Mr. Gill, as of March 2023, Aurora began paying the Ground

Lease rent payment of $6,165 per month directly to the landlord and the $11,000 remainder to

---

[34] It is unclear who prepared Joint Exhibit 10:

> The Court:   Where did all these - these are the various rents, as I understand it, for various stores. Where did this information come from? Did I miss that in the beginning? It's probably in my notes.
> Mr. Hailey:   It's from the data room.
> . . . .
> The Court:   Who compiled this chart? Was it in the data room like this?
> Mr. Haley:   It was in the data room like that.

AP Doc. 86 at 143-44.

Plaintiff, for a total of approximately $17,000 per month; at that point, Aurora characterized only the Ground Lease payments as "rent." AP Doc. 86 at 70-71; Joint Ex. 10 at 3.

When asked what Purchaser would have done regarding the Port Wentworth Store if assuming the Ground Lease also meant responsibility for the Development Agreement obligation, Mr. Pianin testified:

> Q.     And Mr. Gill has testified that the actual amounts being paid were some 17,000 dollars a month or 204,000 a year, on a twelve-month basis. Would you have assumed this lease if you understood the property obligation to be 17,000 per month?
> A.     No. That would have put the rent as a percent of sales, if you deem the development agreement as rent, over seventeen percent, which would have been the highest out of any location. The highest right now was at 13.7 or 8.
> Q.     And would you have been able to operate the store profitably at seventeen percent of rent to sales?
> A.     We'd maybe make five grand. It wouldn't have been enough to put any effort into. And it would be clear -- we -- at the sales volume and at that rent, it would have absolutely been rejected.
> . . . .
> Q.     And were you ever told by Mr. Gill, or anyone at Premier Holdings, or Aurora, or at Raymond James that the real payment was 17,000 dollars per month?
> A.     Absolutely not.
> Q.     And other than the extraordinary cost burden of the development agreement, were there other reasons that you would not have assumed the development agreement?
> A.     Well, once - I saw the agreement, there isn't a fixed amount, so we would not have known what it is we would have been paying. So . . . we typically do not enter into agreements where we don't know how much we're . . . required to pay.
>        Two, it - it's not a lease. It's a - it's an agreement and we did not assume any agreements. Based on what - again what we're seeing it looks like it's a debt service, which we didn't assume anybody's debt. Never have.

AP Doc. 86 at 123-24.

Mr. Pianin testified that he had not seen a copy of the Development Agreement until the beginning of Plaintiff's lawsuit. AP Doc. 86 at 120. However, Plaintiff asserts that Purchaser had information about the Development Agreement prior to closing. First, Plaintiff argues that, although done in small type as conceded by counsel for Plaintiff in opening arguments, the

Development Agreement was referenced on Exhibit B and Schedule 1.3(a)-1 of the APA filed in October 2023 as "(GL to PKGA)PHGA (Del Agrmnt w/PK-GA)." AP Doc. 86 at 10. According to counsel for Plaintiff, this reference in the APA at least gave Purchaser inquiry notice of the Development Agreement. AP Doc. 86 at 10. In addition, at trial counsel for Plaintiff asked Mr. Pianin about that reference:

> Q.  And if you look at the lessor/sublessor column for Port Wentworth, it shows some abbreviations of different type [sic] of leases, correct?
> A.  It shows abbreviations. I'm not answering because a – a development agreement is not a lease. So it does show abbreviations. But to answer your question, it shows abbreviations.
> Q.  If you look on the column entitled, date of lease or sublease, do you see two different dates?
> A.  I do.
> Q.  One of those dates, 5/8/18, has in parenthesis, GL. What does that mean to you?
> A.  Ground lease.
> Q.  And then you also see 5/17/19, dev agr. What does that mean to you?
> A.  Well, now it means development agreement. But at the time of this, I would not have known what that was because we had never - we  - I hadn't seen it done personally.
> Q.  But you reviewed this document?
> A.  Well, I reviewed the document, absolutely.
> Q.  And didn't notice that there were two different dates
> A.  No.

AP Doc. 86 at 135-36. Looking at the entry referenced by counsel for Plaintiff, reproduced above, the ambiguous terms are found under the column for "Lessor/Sublessor," and there are two dates under the column "Date of Lease or Sublease." However, only one lessor is clearly named, and under the "Lessor Address" column only one address, presumably that of Port Wentworth Fee Owner, LLC, is provided. It is not clear from this entry that there are two separate "leases," or a "lease" and a "sublease," that could be, or were intended to be, assumed by Purchaser.

Second, counsel for Purchaser drafted, or at least had a hand in drafting, the APA and Amended APA as evidenced by the testimony of Mr. Pianin. *See* AP Doc. 86 at 135. In opening

arguments, counsel for Plaintiff remarked that "[i]n schedule 1.3(a)-1 of the APA, entitled Assignable Leases, Purchaser again includes the ground lease and the development agreement using the same abbreviations and dates for the two documents as the stores that will be acquired." AP Doc. 86 at 8. However, there is no testimony or other evidence as to who actually prepared either Exhibit B containing the list of properties leased by Seller or Schedule 1.3(a)-1, the list of leases that Seller could assign.

Third, the Development Agreement was attached to an email sent to Mr. Pianin prior to closing. At trial counsel for Plaintiff questioned Mr. Pianin about an email on which he was copied dated January 5, 2024 with the Development Agreement attached, and he admitted that he had not reviewed that particular email. AP Doc. 86 at 121; *see also* Joint Ex. 41 at RRG_010594-95, RRG_010762-66. Besides the Development Agreement, the email contained multiple attachments regarding various stores. *See* Joint Ex. 41. The email was not addressed to Mr. Pianin; he was copied, along with Mr. Gill and multiple others.

While Purchaser had access to Exhibit B and Schedule 1.3(a)-1 of the APA containing an ambiguous reference to what is now recognized as the Development Agreement, and to the Development Agreement itself attached to a group email on which Mr. Pianin was copied, it is undisputed that the Development Agreement was missing from the Raymond James data room, one key source of information available to Purchaser and its counsel for evaluating Seller's assets. Laura Kendall, Senior Managing Director for Aurora, explains in her Affidavit that prior to the sale of the Debtors' assets Aurora created a data room[35] containing documents relating to the Debtors and their assets. Joint Ex. 53, Affidavit of Laura Kendall at 2. According to Ms. Kendall,

---

[35] Ms. Kendall refers in her Affidavit to a "Drop Box" created by Aurora. Joint Ex. 53, Affidavit of Laura Kendall at 2-3. It appears that the Drop Box referenced by Ms. Kendall is the same thing as the "data room" referred to by the parties at the trial. *See* Joint Ex. 53, Parties Stipulation of Fact.

Raymond James was provided access to the Aurora data room, which included a copy of the Development Agreement, but none of the purchasers were given access. Joint Ex. 53, Kendall Affidavit at 2-3. Raymond James created its own data room, apparently accessible by the purchasers, but without a copy of the Development Agreement. Joint Ex. 53, Parties Stipulation of Fact at 1. As a result, neither Purchaser nor its counsel would have seen the Development Agreement when they reviewed documents in the Raymond James data room.

In sum, Plaintiff's case relies in part on the contention that the Development Agreement was noticeably defined and treated as a lease, and therefore Seller assigned, and Purchaser assumed, the Development Agreement either as a stand-alone lease or as part of the Ground Lease for the Port Wentworth Store. Plaintiff has noted that the Development Agreement was defined, collectively with the Ground Lease, as a "lease" in the executed Assignment and Assumption Agreement; due to the agreement, "the actual nature of the Development Agreement is irrelevant. Instead, it is the APA which determines whether the Development Agreement constituted a lease which Purchaser could choose to assume." AP Doc. 87 at 36.[36] In addition, the Plaintiff argues that the list of assignable leases on Schedule 1.3(a)-1 of the APA and the list of leased properties on Exhibit B of the APA effectively disclosed that the Development Agreement, by the reference to "Del Agrmnt" and "Dev Agr," was an additional lease to be assigned and assumed with the Port Wentworth Store location. Furthermore, the Plaintiff argues that Purchaser assumed the side agreement, or Development Agreement, since, on its Schedule 1.3(a)-2 list of designated leases that it would assume, it referenced the Port Wentworth Store only by store number and address, and thus by doing so, then Purchaser "indicate[d] that if the Ground Lease was assumed, then so

_____

[36] Plaintiff Premier Holdings of Georgia, LLC's Proposed Findings of Fact and Conclusions of Law.

23

was the Development Agreement." AP Doc. 48 at 14.[37] In other words, according to Plaintiff, both the Ground Lease and Development Agreement were listed as assignable leases, and Purchaser did not specify which lease it was assuming; therefore, the Plaintiff argues that Purchaser intended to assume them both. *See id.*

**CONCLUSIONS OF LAW**

Plaintiff filed this adversary proceeding against Purchaser on April 5, 2024, asserting two causes of action in its Complaint. In Count One, Plaintiff seeks a declaratory judgment that "pursuant to the APA, RRG assumed the Development Agreement, RRG is liable to [Plaintiff] under the Development Agreement, and RRG is required to perform its obligations due under the Development Agreement." AP Doc. 1 at 6. In Count Two, Plaintiff claims breach of contract on the grounds that "[t]he Development Agreement was validly assigned . . . [and] RRG assumed the Development Agreement pursuant to the APA, the Assumption Agreement, and the Sale Order." *Id.*

In summary, the Seller's and Plaintiff's side agreement, labeled Development Agreement, was executed for Seller to pay Plaintiff, then in turn for Plaintiff to pay First Horizon Bank, the payments owing on the construction loan Plaintiff obtained to build the Port Wentworth Store building. Unknown to the Purchaser, prior to the bankruptcy, the Seller had been paying to the Plaintiff, according to the express terms of the side agreement, an amount equal to the debt service payments plus a small fee every month. The side agreement, labeled Development Agreement, was therefore basically an agreement for the payment of money.

---

[37] Plaintiff Premier Holdings of Georgia, LLC's Brief in Support of Opposition to Defendant's Motion for Judgment on the Pleadings, Defendant's Presumed Motion for Summary Judgment, Defendant's Motion for Relief from Order Assuming and Assigning Contract, and Brief in Support of Plaintiff's Motion for Summary Judgment.

The complaint and this adversary proceeding were filed because Plaintiff seeks payment of past due and accruing fees owed under the Development Agreement, in addition to attorney fees, expenses, and any other amounts owing under the Development Agreement. *Id.* For Plaintiff to succeed with its Complaint, this Court must determine that the side agreement, labeled the Development Agreement, either is or should be deemed a lease that Purchaser assumed along with the Ground Lease as part of the purchase of the Port Wentworth Store and pursuant to the Sale Order, the documents executed pursuant to the sale, applicable law, and Bankruptcy Code policy. In short, this Court must decide if the Purchaser is liable for payments due by Seller pursuant to the side agreement.

In support of its argument that Purchaser assumed both the Ground Lease and the Development Agreement, Plaintiff calls attention to language in the first "whereas" clause of the Assignment and Assumption Agreement which provides the "Ground Lease . . . [is] subject to that certain Development Agreement . . . (collectively, the "Lease")[.]" AP Doc. 1-2 at 1. Plaintiff also claims in effect that since the Development Agreement is referenced in Exhibit B and Schedule 1.3(a)-1 of the APA by the notations "Port Wentworth, (GL to PKGA)PHGA (Del Agrmnt w/PK-GA)" under the column for "Lessor/Sublessor" and "5/8/18 (GL)" and "5/17/19 Dev Agr" under the column for "Date of Lease or Sublease" then Purchaser was under inquiry notice that the Development Agreement was being treated as a lease that could be, and was, assumed by Purchaser. In addition, Plaintiff notes that the deficiency on its "sublease," as raised in its Cure Objection, was in fact cured and that Aurora cured deficiencies "only on stores that RRG or others would assume." AP Doc. 86 at 10. For Plaintiff to prevail under this set of arguments depends on a conclusion that the Development Agreement is to be considered a lease.

25

Under Alabama law, lease agreements are contracts.[38] *Hardin v. Kirkland Enters., Inc.*, 939 So. 2d 40, 44 (Ala. Civ. App. 2006). Not all contracts are leases though. As the Alabama Supreme Court has explained:

> A lease is a contract by which the "possessor of real property conveys the right to use and occupy the property in exchange for consideration." *Black's Law Dictionary* 1024 (10th ed. 2014). Although a sublease is a species of lease, it has a distinct, refined legal meaning. A "sublease" is defined as "[a] lease by a lessee to a third party, conveying some or all of the leased property for a term shorter than that of the lessee, who retains a right of reversion." *Black's, supra*, at 1652.

*Rochester-Mobile, LLC v. C&S Wholesale Grocers, Inc.*, 239 So. 3d 1139, 1144 (Ala. 2017). A case from the Delaware bankruptcy court, while not entirely on point with the facts of the case before this Court, is illustrative for determining whether the Development Agreement is a lease that could have been assumed by Purchaser. In *In re Montgomery Ward L.L.C.*, the Delaware bankruptcy court was confronted with the question of "whether [a] Ground Lease and Sublease Agreement are truly leases or instead constitute a financing arrangement" for purposes of claims allowance. *In re Montgomery Ward, L.L.C.*, 469 B.R. 522, 527 (Bankr. D. Del. 2012). In *Montgomery Ward*, the document in question was governed by Illinois law common law. *Id.* at 529. As explained by the court:

> The Bankruptcy Code does not provide which features of a transaction define its nature. Such determination depends on state law. . . . [U]tilizing Illinois common law, courts look to the economics of the transaction, rather than its label to determine the nature of the agreement. . . . Courts must analyze the "economic reality" of the agreement at issue to determine its true nature. *Dena Corp.*, 312 B.R. at 169; *see also Pillowtex*, 349 F.3d at 723; *Liona Corp., N.V. v. PCH Assocs. (In re PCH Assocs.)*, 804 F.2d 193 (2d Cir. 1986) ("the bankruptcy court is to look to the circumstances of the case and consider the economic substance of the transaction rather than 'the locus of the title, the form of the transaction or the fact that the transaction is denominated as a "lease,"' to determine whether the transaction embodies a 'true lease' or a financing transaction.").

---

[38] According to their terms, both the APA and the Assignment and Assumption Agreement are governed by Alabama law. BK Doc. 355 at 167, AP Doc. 1-2 at 2.

*Montgomery Ward*, 469 B.R. at 529 (some internal citations omitted). Examining other cases, the court noted that "an agreement is not a true lease where the obligations under the lease significantly differ from those under ordinary landlord/tenant agreements." *Id.* Further, "rent . . . measured by the amount borrowed, not the value of the land," is indicative of a financing arrangement instead of a lease. *Id.*

In the matter before this Court, Plaintiff did not convey to Seller a "right to use and occupy" the building in exchange for consideration, and Plaintiff was not a "lessee" of the Ground Lease who could convey "some or all of the leased property" to Seller. Instead, the economic reality, established by Mr. Gill's testimony, is that Plaintiff borrowed the funds to construct the Port Wentworth Store on leased property because Seller could not obtain the financing. Further, the Development Agreement itself provides that Seller would pay to Plaintiff "a monthly development fee . . . equal to (a) the Developer's debt service payment associated with the development of the [restaurant], including without limitation under the Bank Loan, plus (b) an administrative/overhead/profit fee of $100.00." AP Doc. 1-1 at 1. What Mr. Gill is referring to as "rent" is the "monthly development fee" to be paid by Seller based solely on the debt service plus a small administrative fee. The Development Agreement, which was signed to ensure repayment of Plaintiff's construction loan, was not, and is not, a lease or sublease, despite how it was characterized in certain documents.

The arguments advanced by Plaintiff, reduced to their most basic point, is that because the Development Agreement was defined as a lease in the recitals, or a "whereas" clause, in the Assignment and Assumption Agreement then the Development Agreement is a lease regardless of its nature. AP Doc. 87 at 36. Even if there was any merit to the Plaintiff's reliance on the recitals provision, a label given by the parties does not control the nature of the document. *See In re Byers*,

27

621 B.R. 943, 946 (Bankr. S.D. Ala. 2020) (noting that where there is a question of whether a transaction is a lease or security interest, "[t]he title of a document purporting to be a lease is not dispositive."). The Alabama Supreme Court has determined that "it is settled that the nature of a contract is to be determined by the terms and conditions of the contract itself and not by the name given to it. It is not a question of what the parties call a contract, but what they put in the contract, because the law regards substance and not form." *McGiure v. Andre*, 65 So. 2d 185, 190 (Ala. 1953). The same principle applies to the argument that the Development Agreement is a lease simply because one party argues that it is defined as such in a recital in the agreement. As discussed, the purpose, terms and conditions of the Development Agreement itself are not consistent with those of a lease or a sublease, and this Court cannot hold Purchaser responsible for a debt based solely on a label that is contrary to the content, terms and conditions of the contract from which the debt arises.

Even though the Development Agreement is not a lease, Plaintiff has emphasized that the Development Agreement appears on Exhibit B and Schedule 1.3(a)-1 in the same entry as the Ground Lease. Effectively, Plaintiff argues that Purchaser should have known about the Development Agreement from this entry and realized that the Development Agreement was a lease (at least in the eyes of Plaintiff) to be assumed. The Plaintiff suggests and argues that the inclusion of the Development Agreement in the entry would have been inquiry notice for Purchaser. The entry for the Port Wentworth Store appears on Schedule 1.3(a)-1, the list of assignable leases, and on Exhibit B, the list of leased properties, as follows:

| Store Number | Store Address | City | State | Zip Code | Lessor/Sublessor | Lessor Address | Lessee/ Op Entity | Date of Lease or Sublease | As Amended or Assigned | Expiry of Primary Term or Current Option Period |
|---|---|---|---|---|---|---|---|---|---|---|
| 26868 | 7304 Hwy 21 | Port Wentworth | GA | 31407 | Port Wentworth, (GL to PKGA)PHGA (Del Agrmnt w/PK-GA) | c/o Cape Asset Management 3735 Beam Road, Suite B Charlotte, NC 28217 | PKGA | 5/8/18 (GL) 5/17/19 Dev Agr | 8/3/18 (GL) | 3/31/39 |

28

BK Doc. 47 at 101, 114. Counsel for Plaintiff conceded that the font in this entry is small, with a lot of information squeezed in it. The Court agrees that the font size is very small, and while much has been included in the entry, what has been included is not very informative. "Del Agrmnt" and "Dev Agr" are not commonly used abbreviations, and the lack of any periods in any of these terms makes it ambiguous as to whether they are in fact abbreviations at all. Further, the two terms on the same line are inconsistent so it is not even clear if the two terms, "Del Agrmnt" and "Dev Agr," relate to the same thing. Mr. Pianin testified that he now knows that "Dev Agr" means "Development Agreement," but he did not know when reviewing the documents. *See* AP Doc. 86 at 136. Prior to entering the Sale Order, this Court thoroughly reviewed not only the body of the order but also all exhibits and schedules attached, not to mention having thoroughly reviewed the Stalking Horse Agreement when it was filed. As familiar as this Court was with the filings in the bankruptcy cases, it was not apparent to the Court that two supposed leases were included in the entry. Regardless, it would be contrary to the policy of the Bankruptcy Code for this Court to find that an asset purchaser assumed an obligation when it had not been made clear that the obligation existed. Furthermore, instead of attempting to transform the Development Agreement into a lease, Seller and Plaintiff could have included the Development Agreement on the appropriate APA schedules and exhibits addressing assumable contracts. Had the Development Agreement been designated as an assumable contract, there would have been no question that the Development Agreement was available for Purchaser to assume or reject.

However, the Development Agreement was not designated as an assumable contract. The question then is whether it was clear from the APA, and its attached exhibits and schedules referencing "Del Agrmnt" and "Dev Agr," that a document labeled as "Development Agreement" existed and that at least the Plaintiff expected the Development Agreement to be assumed. It is

29

undisputed that counsel for Purchaser had at least some participation in drafting the APA; however, from the evidence before the Court it does not appear likely that counsel or other representative of Purchaser would have prepared Exhibit B or Schedule 1.3(a)-1. These two attachments to the APA were included with the Stalking Horse Agreement filed on October 27, 2023. The parties have stipulated that the Development Agreement was not included in the Raymond James data room, and testimony at trial established that the Development Agreement was attached to an email sent to Mr. Pianin on January 5, 2024. Thus, according to the evidence before the Court, Purchaser did not add the "Del Agrmnt" and "Dev Agr" language to either Exhibit B or Schedule 1.3(a)-1. Further, although Purchaser would have presumably seen Exhibit B and Schedule 1.3(a)-1, it does not follow that Purchaser would have necessarily known the significance of the ambiguous terms or that there were two separate documents intended to be assumed together.

In hindsight, both of the parties agree that "Del Agrmnt" and "Dev Agr" refers to the Development Agreement; however, Mr. Pianin, when asked what the term "Dev Agr" meant to him, he testified "now it means development agreement. But at the time of this, I would not have known what that was because . . . I hadn't seen it done personally." Doc. 86 at 136. Mr. Pianin, a CPA, is a well-educated, sophisticated businessman who has been involved with various well-known, large businesses over the course of his career. AP Doc. 86 at 114. According to Mr. Pianin's testimony, he had been involved through Purchaser in the purchase of other Burger King restaurants prior to the transaction with Seller. This Court finds that Mr. Pianin is a credible witness. Ideally, Mr. Pianin or someone representing Purchaser would have seen and inquired as to the meaning of "Del Agrmnt" and "Dev Agr." On the other hand, Seller or Plaintiff, with Mr. Gill being involved with both businesses, would ideally have made certain that Purchaser knew of the Development Agreement and the expectation that the Development Agreement obligation

would be assumed with the Port Wentworth Ground Lease, especially considering the importance to Plaintiff that the obligation be paid. In fact, Plaintiff was involved in the Debtors' Chapter 11 cases literally from the beginning of the case with the First Day Motions and regularly appeared at every hearing. Plaintiff was involved in the bidding process and certainly familiar with the APA being negotiated between Seller and Purchaser.

Turning to a discussion of the Assignment and Assumption Agreement, it appears that Purchaser's counsel was involved in or assisted with drafting the APA. Even so, the Assignment and Assumption Agreement for the Port Wentworth Store changed significantly from the form included with the Stalking Horse Agreement and the Sale Order to the one actually executed by Seller and Purchaser, and there is no evidence or testimony before this Court to indicate how, why, when, or by whom the change was made. However, the Court knows from the testimony of Mr. Pianin and the Court's own experience in presiding over the underlying bankruptcy cases that there were many assets to evaluate and a very short time in which to do it.

This adversary proceeding brought by Plaintiff against Purchaser is the only one so far, out of all of the asset sales to all of the purchasers, that has been filed involving a development agreement. In addition, the form assignment and assumption agreements attached to the Stalking Horse Agreement and the Sales Order were all substantially the same, if not identical. Ideally, all of the sellers and all of the purchasers would have been on the same page as to exactly what was being purchased, assumed, and assigned. Realistically, there was much information being exchanged while the sales were being negotiated, with many representatives, attorneys, and others involved in the negotiations besides just the Debtors and the prospective purchasers, and at some point, some crucial bit of information was bound to be lost in the shuffle. It appears that the Development Agreement was, in fact, lost in the shuffle as it was not included in the Raymond

31

James data room. Further, that the only hint in the documents filed with the Stalking Horse Agreement and presented in the proposed Sale Order that a second contract was attached or related to the Port Wentworth Store came in the small, somewhat cryptic and unexplained inclusion of "Del Agrmnt" and "Dev Agr" in Exhibit B and Schedule 1.3(a)-1. The Court finds that the Assignment and Assumption Agreement could have easily been interpreted in more than one way. It is possible that the interpretation proposed by Plaintiff, that the definition of "lease" including both a lease and contract meant that two separate documents, neither of which mentioned the other, were being assumed. It is also possible to interpret the mention of the Development Agreement[39] as merely a piece of information with no major significance, especially considering that the Development Agreement was not available to Purchaser until January 5, 2024, according to the evidence before this Court. The Court further finds that including the Development Agreement in the definition of lease did not clearly and sufficiently indicate that Purchaser was assuming an additional obligation exceeding $1,000,000. It might have been clear to Seller, Plaintiff, and Mr. Gill, but according to Mr. Pianin's credible testimony, Purchaser did not have the same understanding. Seller, Plaintiff, and Mr. Gill could have easily ensured that everyone involved knew of the Development Agreement and understood the significance of the definition of "lease," especially since they unquestionably had all of the facts, all of the documents, and were in the best position to have prevented the current dispute. Thus, the small printed terms in the attachments to the APA were not sufficient to make or transform this side agreement, labeled Development Agreement, into a lease.

Similarly, Plaintiff's attempt to define the Development Agreement as part of the Ground Lease by stating that the Ground Lease was "subject to" the Development Agreement likewise did

---

[39] The Development Agreement was mentioned in the "recitals" portion of the Assignment and Assumption Agreement, the importance of which will be discussed *infra*.

not impose liability for the Development Agreement on Purchaser. The phrase "subject to" is open to more than one interpretation under Alabama law. In its proposed findings and conclusions of law Plaintiff cites the Alabama Supreme Court decision *Verner v. White*, 108 So. 369 (Ala. 1926), to support its position that the phrase "subject to" in the Assignment and Assumption Agreement effectively linked the Ground Lease with the Development Agreement. AP Doc. 87 at 28. As noted by Plaintiff, the *Verner* decision involved a promissory note and a separate contract. The Supreme Court explained:

> The promissory note sued upon was given for services to be rendered under an executory contract. At the time of execution the maker wrote upon the face of the paper, and across the marginal end thereof, "subject to terms of contract." The single question presented is whether this entry on the note destroyed its negotiability and let in the defense of failure of consideration as against an indorser for value before maturity.

*Verner v. White*, 108 So. 369, 369 (Ala. 1926). After examining several cases wherein the phrase "subject to" was used, the Supreme Court determined:

> The parties here chose the same words used in the cases as most expressive of the intent that the obligation to pay shall be subject to the conditions of the contract. The effect is to write into the note the contract itself so far as it fixes the obligation to pay. All holders must take the note subject to the conditions thus incorporated therein.

*Id.* Thus Plaintiff contends that under the *Verner* decision, Purchaser took the Port Wentworth Store lease "subject to" the Development Agreement and therefore the terms of the Development Agreement were effectively written into the Assignment and Assumption Agreement.

However, in *Trauner v. Lowrey*, the Alabama Supreme Court again addressed the phrase "subject to," this time to "determine the nature of the estate conveyed by a deed expressly made 'subject to' a mortgage . . . ." *Trauner v. Lowrey*, 369 So. 2d 531, 533 (Ala. 1979). According to the court:

Case 23-02871-TOM11   Doc 1106   Filed 05/05/26   Entered 05/05/26 15:31:55   Desc
Main Document    Page 33 of 43

> Clearly, the conveyance . . . was made subject to the . . . mortgage. As a result of this conveyance [grantee] received an equity of redemption which was all that [grantor] had to convey. As grantee, [he] incurred no personal obligation to pay the mortgage, but he had the privilege to do so to protect his interest in the property.

*Id.* at 534. The Court finds that the facts in this adversary proceeding, where a lease taken "subject to" a contract in which the original obligor agreed to pay the debt service payments of a construction loan, are more akin to the facts in *Trauner* than in *Verner*. Under the *Trauner* case, it could be said that Seller assigned its interest in the Port Wentworth Store lease, which is what it had to convey, and Purchaser took the lease "subject to" the Development Agreement. Seller assigned its rights under the Port Wentworth Store lease, and Purchaser assumed the lease, but did not assume the liability for paying any sums due under the Development Agreement.

The language stating that the Ground Lease is "subject to" the Development Agreement is found only in the Assignment and Assumption Agreement, and then only in the first "whereas" clause under the heading "recitals." A recital, according to *Black's Law Dictionary*, is:

1. An account or description of some fact or thing
2. A preliminary statement in a contract or deed explaining the reasons for entering into it or the background of the transaction, or showing the existence of particular facts

*Black's Law Dictionary* (12th ed. 2024). The Eleventh Circuit Court of Appeals has recently explained that "of course, introductory clauses to contracts, like the Recitals section in the Agreement, generally aren't binding and serve only to express desires of the parties." *Affordable Housing Group, Inc. v. Florida Housing Affordability, Inc.*, 159 F.4th 860, 865 (11th Cir. 2025) (citing *Barseback Kraft AB v. United States*, 121 F.3d 1475, 1481 (Fed. Cir. 1997) (explaining that under federal law, introductory clauses to a contract "express only desires, not binding commitments")). The "whereas" clauses in the Assignment and Assumption Agreement fall squarely within the second definition of "recital" found in *Black's Law Dictionary*. In particular,

the first "whereas" paragraph simply states that the Ground Lease is "subject to" the Development Agreement and defines the term "lease"; it does not impose any obligations under the Development Agreement upon Purchaser. Therefore, based on the foregoing, the Court finds that Purchaser did not assume the Development Agreement merely because of the "subject to" language, or the definition of "lease," found in the recitals of the Assignment and Assumption Agreement.

The sales transaction between Seller (this Court's Debtor), and Purchaser was authorized by this Court's Sales Order entered pursuant to Bankruptcy Code § 363, and in determining whether Purchaser is responsible for the Development Agreement obligation it is necessary to consider both the Sale Order and overall Bankruptcy Code policy. This Court's Sale Order provided that assets would be sold "free and clear of all liens, claims, interests, and encumbrances, other than as set forth in the Purchase Agreements." BK Doc. 355 at 18. Bankruptcy Code § 363(f) provides that property may be sold "free and clear of any interest in such property of an entity other than the estate" if certain conditions are met. 11 U.S.C. § 363(f).

In the case of *United Mine Workers of America Combined Benefit Fund v. Walter Energy, Inc.*, Judge Proctor in the District Court for the Northern District of Alabama was confronted with the question of whether future liabilities under 26 U.S.C. §§ 9701-9722, the Coal Industry Retiree Health Benefit Act (the "Coal Act"), could be considered "'interests in . . . property' that may be extinguished under 11 U.S.C. § 363(f)." *United Mine Workers of America Combined Benefit Fund v. Walter Energy, Inc.*, 551 B.R. 631, 633 (N.D. Ala. 2016) (alteration in original). In short, the Coal Act requires coal operators such as the debtors in Walter Energy to pay "premiums" to fund health benefits for certain retired miners and their dependents. *Id.* at 634. The District Court determined that the debtors' sale of assets free and clear of interests and liens, including future liabilities under the Coal Act, was permissible; to get there, the District Court had to first determine

35

whether those liabilities were interests in property of the debtors. *Id.* at 641. Ultimately, Judge

Proctor concluded that the future liabilities fit within a broad definition of interests in property in

accordance with the language and policy of the Bankruptcy Code. *Id.* at 642. As explained by

Judge Proctor:

> To be sure, a minority of courts have narrowly interpreted the term "interests in property" as used in Section 363(f) to mean *in rem* interests in property, such as liens. *See, e.g., In re White Motor Credit Corp.*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) ("General unsecured claimants including tort claimants, have no specific interest in a debtor's property. Therefore, Section 363 is inapplicable for sales free and clear of such claims."); *In re New England Fish Co.*, 19 B.R. 323, 326 (Bankr. W.D.Wash.1982) (same). But while a minority of courts initially interpreted the phrase "interest in such property" in this narrow way, Section 363(f) has more often (and more correctly) been given a broad reading to effectuate the purposes of the Bankruptcy Code. Indeed, "the 'modern trend' of bankruptcy courts [is] to ascribe a broad meaning to the term 'any interest' as used in § 363." *In re PBBPC, Inc.*, 484 B.R. 860, 867 (1st Cir. BAP 2013). This more expansive reading of "interests in property" also "encompasses other obligations that may flow from ownership of the property." *In re Trans World Airlines, Inc.*, 322 F.3d at 291 (3d Cir.2003) (citing 3 Collier on Bankruptcy ¶ 363.06[1]). . . .
>
> [T]his broad interpretation is more consistent with the language of the Bankruptcy Code, and is consistent with the general policy of the Bankruptcy Code to maximize the value of the bankruptcy estate. An expansive interpretation of the term "interest in property" that can be cut off by a "free and clear" order under Section 363(f) promotes that policy by, *inter alia*, maximizing the value of the assets that are being sold. *See Douglas v. Stamco*, 363 Fed. Appx. 100, 102–03 (2d Cir. 2010) (the potential chilling effect of not allowing sales of assets free and clear of interests subsequent to the sale would run counter to a core aim of the Bankruptcy Code, which is to maximize the value of the assets and thereby maximize potential recovery to the creditors). This is a critical component of a bankruptcy sale because the Code's drafters understood the importance of maximizing a debtor's property value. They also understood that it was necessary to permit the bankruptcy trustee to have the flexibility to arrange a quick sale. And, to achieve a quick sale, it is necessary that the disposition of competing interests in the property not usurp the sale. These same interests apply not just to real property but to all other property interests sold in bankruptcy. . . .
>
> This broader and truer interpretation of the term "interest" applies to Coal Act premiums.

*Walter Energy*, 551 B.R. at 641-42 (some internal citations omitted).

The future Development Agreement payments that Plaintiff asserts Purchaser is responsible for are similar to the Coal Act premiums addressed by Judge Proctor in *Walter Energy*. It does not appear from the evidence before this Court that Plaintiff had any type of secured claim against Seller relating to the Development Agreement; however, under an expansive definition of "interests in property" as recognized by Judge Proctor, Seller owed an obligation to Plaintiff that "flow[ed] from ownership" of the property," namely, the Port Wentworth Store Ground Lease. *See Walter Energy*, 551 B.R. at 641-42. In this case, the Court has already determined that Debtors, including Seller, could sell their assets free and clear of interests in property and the sales have long since taken place. However, the reasoning employed by Judge Proctor in *Walter Energy* that the future premiums were interests in the property that could be cut off under § 363(f) is equally applicable in determining whether the Development Agreement obligation survived the sale to Purchaser.

Judge Proctor recognized in *Walter Energy* that selling assets free and clear of interests in property, where "interests in property" is broadly interpreted, would maximize the value of the estate's assets and thereby maximize the value of the estate and potential recovery by creditors, all in furtherance of Bankruptcy Code policy. Otherwise, a lack of ability to sell free and clear under § 363(f) could have a "chilling effect" on bids by potential purchasers reluctant or unwilling to take on additional debt encumbering estate assets, as evidenced by Mr. Pianin's testimony. Mr. Pianin testified that had he understood the Development Agreement obligation would be assumed along with the Ground Lease then Purchaser would have excluded the Port Wentworth Store from the APA and not bought the Port Wentworth Store location. According to Mr. Pianin, the additional obligation would have pushed the rent as a percent of sales to over 17 percent, and the profit "wouldn't have been enough to put any effort into." AP Doc. 86 at 123-24. It is important

37

to note that the Purchaser did not change its mind regarding wanting this location, but clearly the Purchaser was not fully informed about the financial obligations that existed in the side agreement. It is safe to conclude that had Purchaser passed on the Port Wentworth Store, unless Seller could have quickly lined up another purchaser willing to take on the Ground Lease and the Development Agreement obligation, then Seller's estate – and Seller's creditors – would have lost out on the proceeds resulting from the sale of that location.

Here, the asset sale has already taken place and Purchaser has now assumed the Ground Lease. If the Court determines, as Plaintiff advocates, that Purchaser assumed the Development Agreement as well, Seller's estate will not be affected. However, the consequences of such a determination could cause enormous harm for other debtors and their creditors in future asset sales. Such a finding would result in a substantial chilling effect on future Chapter 11 asset sales. This Court held in its Sale Order that assets were being sold free and clear of all liens, claims, interests and encumbrances.[40] *See* BK Doc. 355 at 11-12. Purchasers could therefore acquire the Debtors' assets with the assurance that no creditor could later claim an interest in or assert an encumbrance on the assets. For this Court to conclude now that Purchaser has an unanticipated obligation tied to a side deal to Plaintiff on account of assuming the Port Wentworth Store Ground Lease would certainly have a chilling effect on future asset sales, an effect that the Bankruptcy Code's drafters

---

[40] There is a special provision in the Sale Order regarding Plaintiff:

> All objections to the relief sought in the Sale Motion that have not been withdrawn, waived, or settled are hereby overruled on the merits. Notwithstanding the foregoing, this Order shall be without prejudice to the claims and interests of Premier Holdings, LLC and its affiliates [including Premier Holdings of Georgia, LLC] and its lenders that assert a lien or interest in Assets located within Stores leased by Holdings to the Debtors . . . with respect to payment from the "Disputed Claims Reserve", as defined herein, based on their respective claims of ownership or liens on the Assets being sold free and clear of all liens, claims, encumbrances and interests under this Order.

BK Doc. 355 at 14-15. Plaintiff therefore knew that the Debtors' assets were being sold free and clear of interests and encumbrances.

wanted to avoid. It is likely that no potential purchasers would pay the maximum value for an asset when an unexpected liability could pop up at any time; thus, the intended effect of § 363(f) – to maximize the value of estate assets – would be significantly diminished, if not erased.

Further, it is worth repeating that the Debtors' asset sales had a much broader impact than just maximized recovery for the Debtors' creditors. The communities in which the Burger King stores are located benefited when employees kept their jobs and governments kept the tax revenue generated by the stores. While these benefits may not have been intended by the drafters of the Bankruptcy Code, the positive impact on the communities is nonetheless important.

Considering the foregoing, the Court finds that that the Development Agreement was an interest in estate property as recognized in *Walter Energy*, and further, that Purchaser acquired the Port Wentworth Store Ground Lease free and clear of Plaintiff's interests in the Ground Lease or in any of the other assets that Purchaser acquired from Seller. As a result, the Court further finds that Purchaser did not assume the Development Agreement and is not obligated to Plaintiff, or to any successors or assigns of Plaintiff, for any sums under the Development Agreement or on account of any asset that Purchaser obtained from Seller.

The Sale Order eventually entered in the underlying bankruptcy cases was primarily drafted by the Debtors with input from the various parties who had an interest in the sale. When the proposed order prepared by and circulated among the parties was submitted to this Court for entry, the Court followed its usual procedure of reviewing the order along with all schedules, exhibits, and other attachments to ensure that the proposed order complied with the Court's prior decisions and the Bankruptcy Code. The Sale Order presented to the Court included for each purchaser a set of documents pertaining to the particular sale. Each set of documents contained a substantially similar, if not exactly the same, form assignment and assumption agreement that

39

would presumably be used in all of the sales. It was not until the adversary proceeding was filed that this Court saw the actual executed Assignment and Assumption Agreement regarding the Port Wentworth Store that was not substantially the same as the one submitted with the proposed order and was not approved by this Court. The insertion of language purporting to define "lease" as the Ground Lease and Development Agreement together, as well as stating that the Ground Lease is subject to the Development Agreement, effectively changes what this Court understood to be the agreement between Seller and Purchaser. The Port Wentworth Store is the only store, out of all of the locations covered by the Sale Order, where an additional obligation has been raised or litigated.

The hearing on the Debtors' Sale Motion was held on December 11, 2023, two days before the Sale Order was entered. Seller and Plaintiff knew of the Development Agreement at this time. It is unclear why neither mentioned the Development Agreement at the hearing or included the actual assignment and assumption agreement to be used for the Port Wentworth Store along with the other Purchaser documents submitted with the proposed order. It is undisputed that the Development Agreement was not included in the Raymond James data room, and the email with the attached Development Agreement and on which Mr. Pianin was copied was not sent until January 5, 2024. Seller and Plaintiff could have ensured that Purchaser and this Court knew about the Development Agreement, and that Plaintiff expected it to be paid, by making it clear in the Cure Objection, making it clear at the hearing on the Sale Motion or by attaching it to the proposed order, yet Seller and Plaintiff did neither. Regardless, if Seller and Plaintiff planned on using a different form for the Port Wentworth Store sale then it should have been submitted for this Court's approval. Even assuming that Seller and Plaintiff did not realize until after the hearing and after the Sale Order was entered that a different form would be needed, some party could have filed an emergency motion or a motion requesting an expedited hearing, and such motion would have been

40

quickly set for hearing. Given the importance to Plaintiff that the Development Agreement obligation be paid, it is unclear why Seller or Plaintiff did not make certain that Purchaser and this Court were aware of it. There is no doubt that the whole sales process including negotiations occurred fairly quickly (which is common in a large Chapter 11 case) but given that there was apparently only one location for which a development agreement was an issue then Plaintiff could have made certain its interests were protected.

It is unfortunate that none of the parties concerned with this transaction brought to the Court's attention that the Port Wentworth Store location was different than the Debtors' other restaurants due to the Development Agreement. Emails indicate that Plaintiff was involved in the negotiations between Seller and Purchaser, and was present for most, if not all, hearings. Either Plaintiff or Seller, who share a common bond by way of Mr. Gill, could have taken steps to make clear that Plaintiff intended for the Port Wentworth Store Ground Lease and the Development Agreement to be assigned and assumed together. The mere inclusion in schedules and exhibits of the notation "Port Wentworth (GL to PKGA)PHGA (Del Agrmnt w/PK-GA)" in small font, along with many other restaurant locations, does not adequately convey that a lease is coupled with an additional, substantial obligation, especially given that the Ground Lease itself makes no mention of the Development Agreement.

Mr. Pianin stated, and Plaintiff did not dispute, that the entire sale process took place in a short amount of time. Due to this Court's own involvement presiding over the Debtors' bankruptcy estates, the Court is well-aware of and understands the time constraints, the numerous and complex issues raised, the multiple parties and interests, and the hundreds of pages of information involved with the asset sales. It is undisputed that either Purchaser or its counsel at least had a hand in drafting the documents pertaining to the transaction with Seller, but this alone does not mean

41

Purchaser was or should have been fully aware of the Development Agreement's relevance or financial impact given the time restraints and number of Burger King locations involved.

The sales process required Seller to produce hundreds of records involving the locations, and Purchaser to examine the hundreds of records, in order for Purchaser to make informed decisions as to which locations it wanted to acquire. At the same time, Seller and the other related Debtors were working on asset sales to other potential purchasers, all to be completed in a short time frame. It appears from this Court's view that for whatever reason the Development Agreement "slipped through the cracks" as those involved with the Port Wentworth Store asset sale could have each done more to disclose or to discover the importance of the Development Agreement; however, given the circumstances, such oversight is understandable. Despite that, the Court has to determine what is required under the agreement between Seller and Purchaser, under the Bankruptcy Code, and based on applicable law.

This Court's duty is to enforce its orders as entered. To allow an order to be effectively modified after the fact and without this Court's approval would set a dangerous precedent. Therefore, this Court finds that to the extent the Assignment and Assumption Agreement executed by Seller and Purchaser imposes on Purchaser an obligation to pay any sums owed under the Development Agreement and is thus in contravention to this Court's Sale Order, such obligation is void and of no effect. All other provisions of the Assignment and Assumption Agreement executed by Seller and Purchaser, including Seller's assignment, and Purchaser's assumption, of the Port Wentworth Store Ground Lease, remain in full force and effect.

From the evidence before it, this Court cannot conclude that Plaintiff (or JG Coastal) established any liability of the Purchaser nor did Plaintiff establish any entitlement to enforce the Development Agreement against the Purchaser. For the reasons set forth herein, the Court holds

42

that Purchaser did not assume the Development Agreement, no matter how it is characterized, and therefore has no liability for making payments thereunder to Plaintiff, JG Coastal, or any successors or assigns of either. It is therefore

**ORDERED, ADJUDGED, and DECREED** that the relief requested by Plaintiff, Premier Holdings of Georgia, LLC, in its Complaint is **DENIED**. Purchaser, RRG of Jacksonville, LLC, did not assume the Development Agreement in its transaction with Seller, Premier Kings of Georgia, Inc.; therefore, Purchaser RRG of Jacksonville, LLC is not liable for any obligations that have arisen or may arise under the Development Agreement and, having no liability under the Development Agreement, Purchaser RRG of Jacksonville, LLC cannot have breached any contractual obligation under the same.

To the extent the Court has not addressed any of the parties' arguments, it has considered the arguments and determined that they would not alter the result of this Memorandum Opinion and Order.

A separate judgment will be entered.

Dated: May 5, 2026

/s/ Tamara O. Mitchell
TAMARA O. MITCHELL
United States Bankruptcy Judge

TOM/dgm

43